# EXHIBIT A

**EXHIBIT A**
**EXCERPTS FROM DOJ'S DECEMBER 10, 2019 *BRADY* LETTER**

Defendants Parker H. "Pete" Petit and William Taylor respectfully request that the Court order DOJ to supplement and/or amplify its earlier *Brady* disclosures set out below:

1. The following statement appears within notes of a meeting that took place on or about October 12, 2018, which indicate that Mark Andersen, an individual previously employed by MiMedx, provided the following information to criminal authorities, in substance and in part:

   - Rest of the day, no one talks to MA – not until next day the 19th, discussion with MS, AE, and JC. Walked through the points – GAAP references the 605 on rev rec, SEC guidance, talked about why he had concerns with rev rec. Response GAAP is gray area and MA does not have all the facts and circumstances. Nothing they shared back that was technical GAAP literature saying MA was wrong. There were facts and circumstances eventually shared, not sure if this meeting[.]

   *Brady* Letter at 2 (alterations in original).

2. The following statement appears within notes of a meeting that took place on or about December 9, 2018, which indicate that Andrew Brock, an individual previously employed by Ernst and Young, provided the following information to criminal authorities, in substance and in part:

   - JC at some point said to AB that he didn't understand some of the acting principles until they engaged w ST, in terms of SEC's views of these matters. JC said he was not well versed in some of this issues [sic]. JC explained his rule of thumb was very contractual based [sic]. Their contract gen structured w no ROR stated in agreement and title transfer was upon shipment. In john's mind in trying to managing [sic] this was, is there the proper documentation in place to recognize the revenue, there was a PO, that it was shipped at a certain point in time.

   *Brady* Letter at 2–3.

3.  The following statement appears within notes of a meeting that took place on or about May 30, 2019, which indicate that Marc Brooks, a former MiMedx distributor, provided the following information to criminal authorities, in substance and in part:

- Addtl free product, bought mil 5, if raise to mil 8—give u 5-10% free product or extra 5% off invoice.
  Discounts—tier levels
  MB would so no, dont [sic] do that, theyd [sic] say how about if u [sic] move slow moving product addtl product and discount? Diff every time and wasn't every time it happened.

  […]

- Sending product back right after june over, wanted to swap AI5050 bc pending orders coming up.

  *Brady* Letter at 3.

4.  The following statement appears within notes of an interview that took place on or about March 12, 2019, which indicate that Michael Carlton, a former MiMedx employee, provided the following information to criminal authorities, in substance and in part:

- MC thought that if mdx didn't have the sizes they wanted at the time, they could swap it out later. It wasn't atypical to do swaps. It was more of a negotiation on the revenue #. MC's issue was not having enough product.

  *Brady* Letter at 5.

5.  The following statement appears within notes of an interview that took place on or about November 12, 2018, which indicate that Paul Chancey, an employee of Cherry Bekaert, provided the following information to criminal authorities, in substance and in part:

- 4202.00 A/R Substantive testing
  CB-LAPTOP-2014-0000122-125
  (C,32)
  CPM did not return their confirm – no understanding why.

>   CPM not responding – CB would send another confirmation. Normally sends two confirms. CB at mercy of customer taking time to fill out confirm and responding back to CB. Instead of getting a confirm, rely on subsequent receipts.
>   Disputes btwn MDX and CPM – not aware at this time. Didn't personally ask anyone including @ MDX why CPM did not respond.
>
>   *Brady* Letter at 7–8.

6. The following statement appears within notes of an interview that took place on or about April 9, 2019, which indicate that Rick Creese, an employee of Cherry Bekaert, provided the following information to criminal authorities, in substance and in part:

>   - MA concerns about distributors –
>     Knows MA had concerns, but RC's understanding from his team was that MA had convos w MS, but after that convo RC understood that MA didn't have any further concerns. PC told RC this. PC describe MA's concerns – PC indicated that MA thought that some of the revenue may have been recognized too early. Believes the WPs and K in '15 would show tht [sic] the lvl [sic] of rtns [sic] were insignificant.
>
>   *Brady* Letter at 11.

7. The following statement appears within notes of an interview that took place on or about May 21, 2019, which indicate that Alexandra ("Lexi") Haden, a former MiMedx employee, provided the following information to criminal authorities, in substance and in part:

>   - There was a cover email where BT questioned MB getting stock and $200K and PP was referencing to MB's complaint that he lost money when mdx signed a GPO contract. LH understood PP was saying that they're giving him $200K to make up for the GPO contract and re-instate stock for the stock mdx took from him. LH understood the $200K was to make up for the GPO issue. GPOs signs [sic] hospitals and hospitals decide whether they want to participate in contract. It doesn't mean the hospital can't purchase from others bc they are a member of a GPO, but you typically get better pricing when purchasing off of a GPO contract. MB didn't have GPO contract and had contracts w individual with hospitals who happen to be members of the GPO. When MDX entered into an agreement w the GPO, mdx's pricing/incentives thru the GPO contracts made the member

3

      hospitals realize it would be more beneficial to buy directly from mdx rather than a distrib for mdx. So it cut MB out.

      *Brady* Letter at 14.

8.      The following statement appears within notes of an interview that took place on or about November 12, 2019, which indicate that David Nix, a MiMedx distributor, provided the following information to criminal authorities, in substance and in part:

- August over 2-3 week – this at least included Q2 exchange and could have included epifix. TAYLOR wanted to do it this way – he didn't know why. He doesn't recall discussions on this issue.

      *Brady* Letter at 17.

4