# Freshfields Bruckhaus Deringer

**ERIC B. BRUCE**

700 13th Street, NW
10th Floor
Washington, DC  20005-3960
Tel +1 202 777 4545
Fax +1 202 777 4555
Eric.Bruce@freshfields.com

<u>**Via Email**</u>

The Honorable Jed S. Rakoff
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
Room 1340
New York, NY 10007-1312

November 10, 2020

**Re:**   *United States v. Parker H. Petit and William Taylor*, No. 19 Cr. 850 (JSR)

Dear Judge Rakoff,

In an effort to make the best use of the jury's time in this matter, Defendant Parker H. Petit submits this letter to respectfully request that Your Honor consider and admit several exhibits that Mr. Petit proposes to offer into evidence through an unsworn reader in order to provide context and understanding for testimony provided during trial proceedings.

Specifically, these exhibits fall into four categories. ***First***, the Defense requests that Your Honor reconsider four exhibits, including two exhibits, DX-125 and DX-135, that Your Honor previously offered to admit pending further "foundation" during proceedings. Tr. 1021:12-20. ***Second***, the Defense requests that Your Honor admit 14 documentary exhibits that are admissible based on several hearsay exceptions under the Federal Rules of Evidence and, as set out below, impeachment of Mr. Carlton's and Mr. Schultz's direct testimony. ***Third***, the Defense requests that Your Honor admit 16 audio exhibits that are admissible on the same grounds. And, ***fourth***, to the extent helpful, the Defense previews the summary exhibits that it intends to offer when it calls its first witness in this matter.

## I.      Request for Reconsideration

### 1.  Defense Exhibit 125

This exhibit contains a June 25, 2015 email exchange involving Mr. Petit, Mr. Taylor, Mike Carlton, and Lexi Haden about whether to rescind cancellation of Mr. Brooks' consulting agreement from earlier that day. Among other statements, Mr. Petit proposes (at p. 1):

The Freshfields Bruckhaus Deringer US LLP partners include members of the Bars of the State of New York and the District of Columbia, Solicitors of the Supreme Court of England and Wales and Rechtsanwälte of Germany

Abu Dhabi  Amsterdam  Bahrain Beijing  Berlin  Brussels  Cologne  Dubai  Düsseldorf  Frankfurt am Main  Hamburg Hanoi  Ho Chi Minh City  Hong Kong  London  Madrid  Milan  Moscow  Munich  New York  Paris  Rome  Shanghai Singapore  Tokyo  Vienna  Washington

The Honorable Jed S. Rakoff
November 10, 2020
Page 2

I agree with this approach. We can continue to cope with this manic-depressive behavior. Like we did previously, I believe tomorrow we need to serve our legal remedies.

In a letter motion to Your Honor on November 1, 2020, the Defense explained that DX-125 reveals the states of mind for each of the individuals involved in the chain—Mr. Petit, Mr. Taylor, Mr. Carlton, and Ms. Haden. Mr. Taylor suggests that he "thinks" there are several breaches of the existing distributor agreement between MiMedx and CPM Medical. Mr. Carlton speculates that he "thinks" another individual *may* be able to "fix the deal," even though it is a "[l]ong shot." Based on the states of mind of his fellow officers and employees, Mr. Petit proposes a forward-looking plan to "serve legal remedies" as soon as "tomorrow." It is therefore apparent that Mr. Petit was considering whether to terminate the same distributor that the Government alleges that he bribed just one day later. This fact is highly probative of Mr. Petit's good faith and central to the defense theory in this case.

During trial proceedings on November 2, 2020, Tr. 1021:12-20, Your Honor suggested this exhibit was admissible, provided that the Defense laid a proper foundation. At this time, the Defense cannot seek to admit this exhibit through testimony of Mr. Brooks or Ms. Haden, because the Government has declined to call these witnesses. However, the Defense respectfully submits that it has laid a proper foundation for the jury to consider the most recent email within this chain—which captures Mr. Petit's intention to find a way to continue the CPM relationship. During testimony, Mr. Schultz spoke about his role as a "liaison" to CPM after the June 26, 2015, including efforts to disclose GPO contracts during subsequent months. Tr. 1125:5-10, 1176:12-1176:7. He also spoke at length about "tension" between the two businesses. Tr. 1037:17-21.

Based on this record, there is no risk that the jury will misunderstand or misinterpret the purpose or significance of this exhibit. To the contrary, this exhibit will help the jury to understand a critical fact in this case—Mr. Petit's motivation to rescind the cancellation and negotiate a revised consulting agreement with Mr. Brooks that contained important compensation terms.

## 2. Defense Exhibit 135

This exhibit contains a June 26, 2015 email from Mr. Petit to Mr. Brooks, with Lexi Haden and Mr. Carlton in copy, that rescinds cancellation of Mr. Brooks' consulting agreement:

What I was told yesterday was not factual. Therefore, the decision I made to cancel our Consulting Agreement was based on misinformation. With this email, I am rescinding the cancellation of your consulting agreement. Also, our management issues relative to your business will be resolved immediately. [...] [T]here is no excuse for the lack of communication and information flow that has occurred. This is not the way that I wish to conduct business. I certainly apologize[.]

In the same letter motion to Your Honor on November 1, 2020, the Defense explained that DX-135 constitutes a verbal act with legal consequences. After cancelling Mr. Brooks' consulting agreement on June 25, 2015, Mr. Petit "rescind[ed] the cancellation." In addition, the email contains numerous statements that reveal Mr. Petit's state of mind, including the statement that

The Honorable Jed S. Rakoff
November 10, 2020
Page 3

he "believes" that he is "now fully informed as to the circumstances that have developed around our mutual business activities" and he plans to "resolve[] immediately" the "management issues relative to your businesses." At the conclusion of the email, Mr. Petit also "apologize[s]", which is also a verbal act, rather than a statement offered for its truth in this case.

During the November 2, 2020 trial proceedings, Your Honor suggested this exhibit was admissible, provided that the Defense laid a proper foundation. For the same reasons described with reference to DX-125 above, the Defense submits that subsequent trial testimony has provided the jury with the necessary foundation by eliciting testimony and providing exhibits that show that Mr. Schultz was in Dallas and offered to serve as Mr. Brooks' advocate during consulting agreement negotiations. Tr. 1133:2-13, 1134:13-20, 1347:19-1348:3. This exhibit explains the conspicuous gap between the cancellation on June 25, 2015 and the reinstatement the next day.

Based on this record, there is no risk that the jury will misunderstand or misinterpret the purpose or significance of this exhibit. Instead, this exhibit fills a key factual gap in the record and explains the precise events that resulted in the June 26, 2015 phone conversation with Mr. Brooks and the subsequent June 26, 2015 amendments to the consulting agreement.

### 3. Defense Exhibit 137

This exhibit contains a June 26, 2015 email from Ms. Haden to Mr. Petit, Mr. Taylor, Mr. Carlton, and Chris Cashman, that relates to internal discussions about the terms within Mr. Brooks' Second Amended Consulting Agreement. Ms. Haden explains:

> Here is a draft of the Brooks agreement. Let me know if you have comments, revisions, etc. Based on what I heard on the phone, I don't think Brooks was completely understanding the benefit of some of the things that had been put into the last draft of the agreement.

The Defense previously addressed this exhibit in its November 1, 2020 letter motion. During the November 2, 2020 trial proceedings, Your Honor excluded this exhibit on rule of completeness grounds. Tr. 1021:5-11. However, the Defense respectfully submits that this exhibit is alternatively admissible under Rule 803(3) because it shows Ms. Haden's state of mind at the time of the drafting process. Ms. Haden explains that she does not "think Brooks was completely understanding the benefit of some of the things that had been put into the last draft," and she offers comments in the draft agreement that address these perceived concerns.

### 4. Defense Exhibit 140A

This exhibit contains a June 26, 2015 email from Mr. Carlton to Mr. Taylor, with Mr. Petit, Ms. Haden, and Mr. Cashman in copy, that relates to internal discussions about the terms within Mr. Brooks' amended consulting agreement. In the latest email in this chain, Mr. Carlton writes, "In Pete's office." This statement apparently refers to Mr. Carlton's location at the time.

The Honorable Jed S. Rakoff
November 10, 2020
Page 4

The Defense also addressed this exhibit in its November 1, 2020 letter motion. During the November 2, 2020 trial proceedings, Your Honor excluded this exhibit on rule of completeness grounds. Tr. 1021:5-11. However, the Defense respectfully submits that this exhibit is admissible for two alternative reasons. *First*, Mr. Taylor asks a question: "I thought we needed him to forgo the stock from June 11 of this year for the $200K?" As Your Honor has noted during trial proceedings, a question is never hearsay. Tr. 242:25. *Second*, Mr. Carlton appears to reveal his then-current location, "[i]n Pete's office." This statement qualifies as a present sense impression under Rule 803(1) because Mr. Carlton describes "an event or condition [...] while or immediately after [he] perceived it." That Mr. Carlton was likely in Mr. Petit's office while the terms of the agreement were being negotiated is relevant because it refutes Mr. Carlton's testimony that he was uninvolved in this process. It also completes an essential storyline that is conspicuously absent from the Government's curated narrative—Mr. Petit considered the $200,000 payment term openly alongside top MiMedx executives because he believed the payment served a legitimate business purpose to resolve an outstanding business dispute.

## II.    Request for Admission of Document Exhibits

### 1.    Defense Exhibit 51

This exhibit contains an October 1, 2014 email from Bill McLaughlin to Mr. Taylor, with Mr. Brooks in copy, that attaches a projected forecast for future CPM purchase orders, including a projected $1.3 million during the second quarter of 2015 (at p. 5).

As Mr. Schultz acknowledged during cross examination, Tr. 1117:5-11, the CPM Distributor Agreement required CPM to provide quarterly purchase forecasts. The attached forecast constitutes a business record under Rule 803(6) because it was a regularly-created record of CPM future product demands that CPM provided as part of a contractual obligation. Further, the email and attachment reflect Mr. McLaughlin's state of mind under Rule 803(3) because the projection reflects a future intention to purchase $1.3 million of MiMedx product during the second quarter of 2015. This fact is highly relevant because it directly contradicts testimony that CPM "didn't want" any product during this quarter, Tr. 618:1-3, even though CPM itself projected a minimum $1.3 million purchase order ***nine months earlier***.

### 2.    Defense Exhibit 111

This exhibit contains text messages between Mr. Brooks and Charlie Hopper, who is the principal for another distributor company. In a June 23, 2015 text message, Mr. Brooks expresses anger toward MiMedx based on direct sales to Texas hospitals:

> It looks like I'm not going to order Anything from Mimedx this quarter. I caught them selling direct into 4 more hospitals. [...] I give up.  My non-compete is up in November!!

This exhibit is admissible as evidence of Mr. Brooks' state of mind under Rule 803(3). Mr. Brooks expresses his anger based on his belief that MiMedx has made additional direct sales

The Honorable Jed S. Rakoff
November 10, 2020
Page 5

to hospitals in Texas. He expresses his future intention to not order any MiMedx product. This exhibit is not offered for its truth, but instead to establish that Mr. Brooks believed that he had a legitimate business grievance against MiMedx just prior to the subsequent negotiation of the amended consulting agreement and the $200,000 payment term on June 26, 2015.

### 3.   Defense Exhibit 116

This exhibit contains a June 23, 2015 text message from Mr. Brooks to Mr. McLaughlin, the CPM head of finance. Mr. Brooks states that he believes MiMedx owes him substantial amounts of compensation based on recent business tensions:

> Tell Taylor we put up with to[o] much crap from them. 50K shares now & 50 k in a year!!! 0.00 $ value & no restrictions. They can take from petite personal stash. 1.2 mm in stock is a lot less then the 30+% drop in Mimedx stock value. We also want to see ALL there Texas contracts they have hidden from us. Try that out sunshine[.]

As with DX-111 above, this exhibit is admissible as evidence of Mr. Brooks' state of mind under Rule 803(3). Mr. Brooks expresses his frustration that CPM puts up with too much "crap" from MiMedx, which is an apparent reference to the direct sales frustrations that Mr. Brooks shared with Mr. Hopper on June 23, 2015. *See* DX-111. In this case, Mr. Brooks also assigns a monetary value to these frustrations—suggesting that CPM business losses amount to $1.2 million and proposing that MiMedx compensate him with equivalent stock options. As above, this exhibit is not offered for its truth, but instead to establish that Mr. Brooks believed that he had a legitimate business grievance against MiMedx just prior to the negotiation of the amended consulting agreement and the $200,000 payment term on June 26, 2015.

### 4.   Defense Exhibit 118

This exhibit contains a June 24, 2015 email from Mr. Taylor to Mr. Carlton and others, with Mr. Schultz in copy, that attaches a CPM proposed mix of products for purchase. Mr. Taylor asks the following question about the proposed mix:

> Take a look and let me know if this mix will work.  If not, please let me [know] what portion you can do, and then what a proposed updated mix would look like that we can deliver.

This exhibit is admissible on multiple grounds. ***First***, Mr. Taylor's statement amounts to a question. He is uncertain about whether the CPM proposed mix is viable, and he reaches out to several sales and inventory employees to obtain the answer. Again, as Your Honor has noted during proceedings, a question is never hearsay. Tr. 242:25. ***Second***, this exhibit reveals Mr. Taylor's state of mind under Rule 803(3). Although Mr. Taylor is uncertain about whether the mix will be viable, he copies six separate sales and inventory employees on the email. It suggests that Mr. Taylor did not have a concern about openly raising this issue within the company.

The Honorable Jed S. Rakoff
November 10, 2020
Page 6

### 5.  Defense Exhibit 136A

This exhibit contains a June 26, 2015 email from Mr. Petit to Mr. Brooks that attaches a term-sheet with proposed agreements on eight business issues. For example, it includes the following: "In replacement of the June 2015 RSAs (15,000), MiMedx will convert it to a $200,000 consulting fee." It also addresses overrides, GPO contracts, and future product discounts.

This exhibit is admissible as evidence of Mr. Petit's state of mind under Rule 803(3). The term-sheet reflects several actions that Mr. Petit proposes to take in the future, such as providing CPM with visibility into GPO contracts. The second bullet also reflects Mr. Petit's belief that the $200,000 did not initially arise as an inducement for the purchase order but as a "replacement" for previous stock options. This fact is central to the good faith defense in this case—and directly contradicts the Government's theory that the $200,000 payment was nothing more than a bribe.

### 6.  Defense Exhibit 138

This exhibit contains a June 26, 2015 text message from Bill Cochrane to Mr. Brooks about a telephone call that took place on the evening of June 25, 2015 involving Mr. Cochrane, Mr. Carlton, Mr. Schultz, and Mr. Petit. Mr. Cochrane explains:

> Jeff [Schultz] just said Pete [Petit] listened to the call that I [Cochrane] had with Mike [Carlton] and Jeff after we left you. Mike had either recorded it or took good notes on about [sic] all the ways I said Mimedx had fuck[ed] you and other distributors. Supposedly that's when he said well guys. Regardless of how this turns out we owe the man an apology.

This exhibit is admissible as evidence of Mr. Cochrane's state of mind under Rule 803(3). Mr. Carlton recounts a phone call involving Mr. Schultz and Mr. Carlton on the previous evening. He shares his belief that MiMedx has harmed CPM in various ways. Mr. Cochrane's message also contains a contemporaneous statement from Mr. Schultz that Mr. Petit listened to the phone conversation. The exhibit is highly relevant to Mr. Schultz's state of mind, including Mr. Schultz's testimony that disputes with CPM over direct sales in the Texas market "might have come up" with MiMedx colleagues at this time. Tr. 1122:1-7.

### 7.  Defense Exhibit 142A

This exhibit contains a June 26, 2015 email from Mr. McLaughlin to Ms. Haden and Mr. Carlton. Mr. McLaughlin provides "proposed changes to Mark's amended consultant agreement" and attaches an updated version of that agreement. Mr. McLaughlin's agreement additions include several terms that relate (at p. 4) to a 25 percent override to a sub-distributor and future details about MiMedx's GPO contracts in Texas.

This exhibit is admissible on two grounds. ***First***, this exhibit is admissible as a verbal act under Rule 801(c). During negotiations with Ms. Haden, who was MiMedx's General Counsel, Mr. McLaughlin submits "proposed changes" to the consulting agreement. Mr. McLaughlin's

The Honorable Jed S. Rakoff
November 10, 2020
Page 7

proposal—especially when made to MiMedx's lead attorney—constitutes an offer that MiMedx could have accepted at that time. Indeed, just hours later, the parties reached a final agreement. ***Second***, this exhibit is admissible as evidence of Mr. McLaughlin's state of mind under Rule 803(3). The nature of Mr. McLaughlin's counter-proposals unveil a critical fact in this case: the CPM representative involved in finalizing the agreement details believed the agreement should include terms that resolved the direct sales dispute.

### 8.   Defense Exhibit 165

This exhibit contains a July 2, 2015 email from Ms. Haden to Mr. Petit, Mr. Taylor, and Mr. Cashman, with John Cranston and Mike Senken from the Accounting Department in copy, that attaches a copy of Mr. Brooks' final consulting agreement. Ms. Haden writes:

> Hi, we need to pay Mark Brooks the $200,000 consulting fee per the attached final agreement. Whoever is authorized to approve this request, will you please let accounting know so they can process?

This exhibit is admissible on two grounds. ***First***, Ms. Haden asks a question: "Whoever is authorized to approve this request, will you please let accounting know so they can process?" As Your Honor has noted, a question is never hearsay. Tr. 242:25. ***Second***, this email is admissible under Rule 803(3) for its effect on the state of mind on the recipients, who were, in this case, the leaders of MiMedx's Accounting Department. ***Ms. Haden's choice of words is absolutely critical to the factual merits of this case***: in the primary communication to the Accounting Department about the consulting agreement, the company's top attorney tells the Accounting Department that the $200,000 payment is a "consulting fee". If Ms. Haden explained that the larger purpose of the payment was to resolve various business disputes, including business losses related to GPO contracts, the Accounting Department may have treated the $200,000 differently in terms of the subsequent revenue recognition analysis.

### 9.   Defense Exhibit 171

This exhibit contains a July 2, 2015 email exchange that involves the same subject and same participants as DX-165 above. In this extended version of that communication, Ms. Haden provides an update on her intentions with regard to making the $200,000 payment:

> By the way, I don't think we could issue check today because there is no one here with check signing authority.  So, I will just let Bill M. know the check with go out Monday.  I think they will be fine with that.

This exhibit is admissible for the reasons described with reference to DX-165 above. In addition, this extended version of the email chain is probative of Ms. Haden's state of mind under Rule 803(3) because it shows Ms. Haden's future plan to make the payment to Mr. Brooks on "Monday." It also demonstrates Ms. Haden's belief that it was necessary to obtain the check from someone with "signing authority." This is yet another crucial fact in this case. Contrary to trial

The Honorable Jed S. Rakoff
November 10, 2020
Page 8

testimony from Mr. Schultz that MiMedx management wanted to avoid putting the payment "on the books to our audit committee," Tr. 1144:17-22, this email clearly indicates Ms. Haden's intention to make sure that the payment went through proper "authority" channels.

### 10. Defense Exhibit 249

This exhibit contains an October 5, 2015 email from Claudia Bell, a MiMedx executive legal assistant, to Mr. Brooks that attaches a formal letter that threatens to terminate the CPM Distributor Agreement unless CPM takes certain actions to address outstanding disputes. The letter makes clear that CPM can exchange but not return product. It also explains:

> Following the signing of the Fourth Amendment [to the Distributor Agreement] […] the average days in accounts receivable for the third quarter rose to 139 days. […] [E]ven under the more permissive payment terms described in the Fourth Amendment, CPM is in default.  Pursuant to Section 16.2(iii) of the Agreement, CPM has 15 days to cure this default, or MiMedx will proceed with its right to terminate the Agreement.

This exhibit is admissible as a verbal act under Rule 801(c) because it contains a statement with legal consequences. Mr. Petit states that, unless certain events take place, he will "terminate" the agreement within 15 days. *See, e.g., Arasimowicz v. Bestfoods, Inc*., 81 F. Supp. 2d 526, 528 (S.D.N.Y. 2000) ("[G]iven the fact that the Confirmation Letter was a legally operative document […] the copy of the letter would be admissible as non-hearsay under Rule 801(c).") In addition, this exhibit is admissible as a business record under Rule 803(6) because it is a formal letter to a distributor that was created in the ordinary course of business to convey legal information.

### 11. Defense Exhibit 270

This exhibit contains an October 21, 2015 email from Ms. Haden to Thorton Kuntz and Theresa Tardell that attaches a formal letter that terminates the CPM Distributor Agreement. The letter contains the following language:

> I have not received a response to my October 5, 2015 letter to you regarding your default under the Distributor Agreement.  As the default has not been cured within the 15 day period specified in the Distributor Agreement, this will serve as notice that MiMedx is exercising its right to terminate the Distributor Agreement pursuant to Section 16.2(iii), and the Consulting Agreement pursuant to Section 3(c).

As above, this exhibit is admissible as a verbal act under Rule 801(c) because it contains a statement with legal consequences. Mr. Petit states that he is terminating CPM's Distributor Agreement and Mr. Brooks' Consulting Agreement. In addition, this exhibit is admissible as a business record because it is a formal communication to a distributor that was created in the ordinary course of business in order to convey legal information.

The Honorable Jed S. Rakoff
November 10, 2020
Page 9

### 12. Defense Exhibit 658

This exhibit contains a September 25, 2015 email from Mr. Petit to Mr. Brooks that describes the current state of business relations between CPM and MiMedx. Among other topics, Mr. Petit expresses his opinion on the status of GPO contracts (at p. 1):

> MiMedx has completed everything we committed to regarding GPOs and helping CPM access our contracts. […] The open items for CPM are for you to advise which contracts you want to join, details on how you will report the sales, and then how you will pay the GPO fee associated with your sales.

This exhibit is admissible under Rule 803(3) because it captures Mr. Petit's state of mind that MiMedx has "completed everything we committed to regarding GPOs and helping CPM access our contracts." This statement is not offered for its truth. Rather, it reveals a critical detail about Mr. Petit's good faith belief that, after negotiating a GPO-related settlement during June 2015, MiMedx had continued to work with CPM to join these contracts.

### 13. Defense Exhibit 1005

This exhibit contains a weighted average of commercial interest rates for the fourth quarter of 2015 based on data maintained by the Federal Reserve Bank of St. Louis. It demonstrates that that the average commercial loan rate was just over two percent during this timeframe. The Defense and Government agree that it is admissible as a business record under Rule 803(6).

This exhibit is directly relevant to testimony from Government witnesses that SLR Medical was not an economically viable entity because, allegedly, it could not qualify for a commercial loan. During direct examination, Mr. Booher testified that it would be a "challenge" for Mr. Morrison to qualify for a $250,000 loan. Tr. 1370:19-1371:7. Mr. Urbizo later testified that it "would have mattered" if Mr. Morrison was unsuccessful in obtaining a commercial loan. Tr. 1868:16-23. This exhibit demonstrates two points that the Government has failed to present to the jury. *First*, the market for commercial loans was highly competitive, as indicated by the historically low two percent prevailing interest rate. *Second*, the market rate was actually lower than the actual rate that Mr. Morrison subsequently obtained and successfully paid to Torpin LLC, based on the 5 percent interest rate in the loan. *See* GX-1084 (in evidence).

### 14. Government Exhibit 202-T

This exhibit contains the transcript of a July 30, 2015 MiMedx earnings conference call that contains statements from Mr. Senken, the Chief Financial Officer, among other participants. Specifically, Mr. Senken states (at p. 20):

> As Bill mentioned, and I don't like to bring this out, in case any customer is listening, we target around 75 days. […] Part of what happens as you're growing and you're adding, let's say, new commercial accounts and new reimbursements, typically there is a slower process upfront in terms

The Honorable Jed S. Rakoff
November 10, 2020
Page 10

of getting the claims paid to the hospital or the clinic or the doctor's office. And then over time, it becomes more normalized. […] Practically speaking, the payments are a reflection of how quickly they get reimbursed. And that's a big part of what's happening.

This exhibit is admissible under Rule 803(3) as evidence of Mr. Senken's state of mind. Defendants do not offer this exhibit for its truth about MiMedx's average days sales outstanding at this time, but as evidence that Mr. Senken believed that it was not a problem to publicly disclose that MiMedx frequently offered flexible payment terms.

## III.    Request for Admission of Audio Transcript Exhibits

These potential exhibits, which are identified as PP_000001_T through PP_000030_T, contain transcripts of recorded voicemails from Mr. Schultz to Mr. Petit during the time period from July 19, 2018 to March 12, 2019. These exhibits impeach Mr. Schultz's repeated testimony that Mr. Petit's business practices made him feel "uncomfortable." *See, e.g.,* Tr. 1238:2-7.

To illustrate, the following is an excerpt from an August 22, 2018 voicemail, identified as PP_000009_T, that followed Mr. Petit's resignation from his CEO position:

> I know you're probably busy with stuff, but just, ah, concerned about ya and, ah, just want you to know, I love you buddy, and I'm thinking about you, praying for ya, and, uh, hope everything's going as, as good as it can be.

In addition, the following is an excerpt from a September 20, 2018 voicemail, identified as PP_000019_T, that followed MiMedx's decision to terminate Mr. Petit "for cause":

> I just saw the news, buddy. I'm thinking about you, praying for ya, and uh, you know I love you and I'm always in your corner, so, uh, these guys don't know what the hell they're doing. They have no fuckin' idea about a healthcare company. There's no leadership in this organization and it's absolutely disheartening.

> And […] I'm so sorry for what they are doing to you, and Bill. I, I am deeply, deeply saddened by it, buddy.  But I just want you to know I'm thinking about you and praying for ya.

> Alright, I love you buddy.

These exhibits are admissible as evidence of Mr. Schultz's state of mind under Rule 803(6). Mr. Schultz expresses "love" for Mr. Petit, who he describes as a "buddy," and emphasizes he is in Mr. Petit's "corner." Mr. Schultz also expresses his sorrow at "what they [the MiMedx Board of Directors] are doing to you." These exhibits provide valid impeachment evidence related to Mr. Schultz's repeated testimony that he was "uncomfortable" with Mr. Petit's business practices, including testimony that Mr. Petit orchestrated a "bribe" and pressured Mr. Schultz to "lie" about it. Tr. 1020:2-5, 1144:17-22, 1238:2-7. Mr. Schultz even testified that he could not make use of the MiMedx "compliance hotline" because "Pete controlled everything."

The Honorable Jed S. Rakoff
November 10, 2020
Page 11

Tr. 1323:9-13. These voicemails paint a starkly different picture of Mr. Schultz's actual sentiments toward Mr. Petit and the MiMedx company as a whole.[1]

## IV.    Summary Exhibits

Mr. Petit's first witness in this matter will be a summary witness, through whom we will offer a series of summary exhibits, as follows.

### 1.   SLR-Related Exhibits (DX-608 and DX-672)

Beginning with its Opening Statement and throughout its case-in-chief, the Government has continually tried to paint SLR as a tiny operation, with minimal sales and cash flow, that could not support a $4.6 million order in Q3 2015—*and did not pay for it*. Mr. Petit should be permitted to rebut this contention.

Indeed, the Government opened the door to this type of evidence by stating (incorrectly) in its Opening Statement that "one distributor, he agreed to take millions of dollars of product to help them meet their number at the end of the quarter. But the problem was the distributor was having trouble paying. *Months went by and they were barely paying*." Tr. 35:10-13.

Further, throughout testimony, Mr. Schultz continually described SLR as "very minimal the business he [Jerry Morrison] was doing," Tr. 982:12, and that he only had sales of "10 grand, maybe 15 grand a month at the max. Nothing. Very minimal." Tr. 982:15-16. Mr. Schultz went on to describe in great detail a conversation he had with Jerry Morrison, in which Jerry Morrison showed him the product he had just purchased and Mr. Morrison purportedly said: "*It will probably take me two years to sell this product*. He goes, I don't know how I am going to get rid of it." Tr. 983:20-22.

This testimony and argument undoubtedly left a false impression in the minds of the jurors that Jerry Morrison did not pay MiMedx for the product for up to "two years." However, the true facts are far different and the jury should now be permitted to hear them.

As depicted in DX-608, SLR had a respectable cash balance in its bank accounts in late December-early January ranging between $400,299 to $721,995. Further, as depicted in DX-672, SLR made substantial payments against the $4.6 million order starting in December 2015 and carrying through the remainder of 2016. Ultimately, in far less than the "two years" referenced by Mr. Schultz, SLR paid off $3,434,362 towards the $4.6 million sale.

During this time period, Mr. Morrison received a loan from Todd Campbell, Mr. Petit's son-in-law, as the Government has already demonstrated. However, the Government seeks to

---

[1]   Defense counsel only recently became aware of these voicemail recordings as a result of their efforts to comply with the "if, as, and when" subpoena issued to Mr. Petit by the Government.

The Honorable Jed S. Rakoff
November 10, 2020
Page 12

have it both ways. They have incorrectly led the jury to believe that Mr. Morrison was not making payments towards the $4.6 million order, while simultaneously putting in proof that he took a loan for $1.5 million.  This has created a lopsided and factually incorrect presentation for the jury.

Indeed, the entire picture painted by the Government is inaccurate, and Mr. Petit seeks only to put evidence before the jury that show the true facts.

### 2.  Timing of Payment on Invoices (DX-604)

Further, throughout the Government's case, they have sought to cast a sinister gloss where payments from the four distributors at issue were made outside of the 30-day contractual terms in the distributor agreements as somehow evidence of fraud or the defendants' fraudulent intent. However, nothing could be further from the truth.

As DX-604 demonstrates, it was very common for MiMedx to receive payments outside of the 30-day window to the point that over 50,000 payments were received outside of 30 days. Undoubtedly, this evidence helps negate the inference of fraudulent intent suggested by the Government and Mr. Petit seeks to offer it.

### 3.  MiMedx Reserves (DX-605)

Prior to Opening Statements, counsel for Mr. Petit sought permission to "mention in my opening, subject to this conversation and request, […] The existence of reserves at MiMedx and that Mr. Petit made certain business decisions in the context of knowing that those reserves existed." Tr. 14:3-7.  The Government did not object because "there's independent evidence about the existence of reserves," so the Court allowed counsel to open on this issue. Tr. 14:10-13.

Mr. Petit now seeks to prove in his case-in-chief what he promised the jury during his Opening Statement, especially after seeking approval from the Court to do so.

### 4.  MiMedx Stock's Reaction to Revenue Announcements (DX-607)

Throughout the trial, the Government has also repeatedly offered evidence and testimony that both defendants were very concerned with meeting their quarterly revenue targets, often because they were concerned about the company's stock price. Mr. Petit should be allowed to rebut this evidence as well.

DX-607 shows the true facts concerning the correlation between what happened when the company met its quarterly revenue guidance and when it missed that guidance. Specifically, in each quarter of 2015, MiMedx met its quarterly revenue guidance, but its stock price nonetheless dropped an average of 7.95 percent. In Q1 2016, MiMedx missed its quarterly revenue guidance and the company stock dropped a similar 8.8 percent. This evidence should be permitted to rebut the misleading picture painted by the government regarding the correlation between meeting the company's quarterly revenue and its effect on the company's stock price.

The Honorable Jed S. Rakoff
November 10, 2020
Page 13

**V.    Conclusion**

For the foregoing reasons, the Defense respectfully requests that Your Honor consider and admit these exhibits based on the applicable hearsay exceptions under the Rules of Evidence and for impeachment purposes, where indicated.

Thank you for Your Honor's consideration in this matter.

Respectfully submitted,

/s/ Eric B. Bruce
Eric B. Bruce
Jennifer B. Loeb
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4577
Email: Eric.Bruce@freshfields.com
Email: Jennifer.Loeb@freshfields.com


Matthew I. Menchel
Amanda N. Tuminelli
Kobre & Kim LLP
800 Third Avenue
6th Floor
New York, NY 10022
Telephone: (212) 488-1200
Email: matthew.menchel@kobrekim.com
Email: amanda.tuminelli@kobrekim.com

*Attorneys for Parker H. Petit*

(Enclosure)

The Honorable Jed S. Rakoff
November 10, 2020
Page 14

cc by electronic means:

Edward Imperatore
Scott Hartman
Daniel Tracer
Assistant United States Attorneys
The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, NY 10007
Telephone: (212) 637-2327
Email: Edward.Imperatore@usdoj.gov
Email: Scott.Hartman@usdoj.gov
Email: Daniel.Tracer@usdoj.gov

*Attorneys for the United States*

William D. Weinreb
Michael T. Packard
Quinn Emanuel Urquhart & Sullivan, LLP
111 Huntington Ave., Suite 520
Boston, MA 02199
Telephone: (617) 712-7100
Email: billweinreb@quinnemanuel.com
Email: michaelpackard@quinnemanuel.com

William A. Burck
Quinn Emanuel Urquhart & Sullivan, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Email: williamburck@quinnemanuel.com

*Attorneys for William Taylor*

| Message | |
|---|---|
| **From:** | Pete Petit [/O=MIMEDX/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4B58BBA5458449718A9EBFBB9A7A228F-PETE PETIT] |
| **Sent:** | 6/25/2015 9:42:48 PM |
| **To:** | Mike Carlton [mcarlton@mimedx.com] |
| **CC:** | Bill Taylor [btaylor@mimedx.com]; Lexi Haden [lhaden@mimedx.com] |
| **BCC:** | Pete Petit [ppetit@mimedx.com] |
| **Subject:** | Re: 062515 Letter to Mark Brooks |

I agree with this approach. We can continue to cope with this manic-depressive behavior. Like we did previously, I believe tomorrow we need to serve our legal remedies. Also, we need to deal with Chris Reig.

Parker H. "Pete" Petit
Chairman and CEO
MiMedx
1775 West Oak Commons Court
Marietta, GA 30062
Office (770) 651-9101
www.mimedx.com

On Jun 25, 2015, at 9:35 PM, "Mike Carlton" <MCarlton@mimedx.com> wrote:

> Cochrane thinks he can fix this deal and Mark will order $2M.  Long shot but Penny (Mark's wife) doesn't want a stressful law suit.
>
> Sent from my iPhone
>
> On Jun 25, 2015, at 8:55 PM, Bill Taylor <BTaylor@mimedx.com> wrote:
>
>> First thing we need to look at distribution agreement. I think there are several breaches and rather than terminate for no cause, we should declare breach and insist on them fixing.
>>
>> Sent from my iPhone
>>
>> On Jun 25, 2015, at 8:09 PM, "Lexi Haden" <LHaden@mimedx.com> wrote:
>>
>>> Yes, I think Reeg did, but it would have only been for what he had vested already.  He still has some unvested.
>>>
>>> Alexandra O. Haden
>>> *General Counsel & Secretary*
>>> Office 770-651-9217 | Fax 770-590-3567 | Mobile 678-595-8823
>>>
>>> MiMedx Group, Inc.
>>> 1775 West Oak Commons Ct.
>>> Marietta, GA  30062
>>> lhaden@mimedx.com
>>> www.mimedx.com
>>>
>>> **From:** Mike Carlton
>>> **Sent:** Thursday, June 25, 2015 8:06 PM
>>> **To:** Bill Taylor

DEFENDANTS'
EXHIBIT

**125**

19 Cr. 850 (JSR)

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_DSCL_0000305
USAO_SDNY_R_002014866

**DX 125-001**

**Cc:** Pete Petit; Lexi Haden
**Subject:** Re: 062515 Letter to Mark Brooks

I think he just exercised

Sent from my iPhone

On Jun 25, 2015, at 7:07 PM, Bill Taylor <BTaylor@mimedx.com> wrote:

> Need to cancel Chris Reeg's as well.
>
> Sent from my iPhone
>
> On Jun 25, 2015, at 6:42 PM, "Pete Petit"
> <PPetit@mimedx.com> wrote:
>
>
>> Parker H. "Pete" Petit
>> Chairman and CEO
>> MiMedx
>> 1775 West Oak Commons Court
>> Marietta, GA 30062
>> Office (770) 651-9101
>> www.mimedx.com
>>
>>
>> <Mark Brooks Letter 062515.pdf>

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_DSCL_0000306
USAO_SDNY_R_002014867

DX 125-002

| | |
|---|---|
| **From:** | Mark Brooks <incaremed@aol.com> |
| **Sent:** | Friday, June 26, 2015 9:20 AM |
| **To:** | Bill McLaughlin |
| **Subject:** | Fwd: Agreements |

Sent from my iPhone

Begin forwarded message:

> **From:** Pete Petit <PPetit@mimedx.com>
> **Date:** June 26, 2015 at 9:07:34 AM CDT
> **To:** Mark Brooks <incaremed@aol.com>
> **Cc:** Lexi Haden <LHaden@mimedx.com>, Mike Carlton <MCarlton@mimedx.com>
> **Subject: Agreements**
>
> Mark,
> I believe I am now fully informed as to the circumstances that have developed around our mutual
> business activities. What I was told yesterday was not factual. Therefore, the decision I made to
> cancel our Consulting Agreement was based on misinformation.
> With this email, I am rescinding the cancellation of your consulting agreement.
> Also, our management issues relative to your businesses will be resolved immediately. I am
> having discussions on those issues at this moment.
> I can classify some of this as MiMedx growing pains, but there is no excuse for the lack of
> communication and information flow that has occurred. This is not the way that I wish to
> conduct business. I certainly apologize, and I would like to schedule a brief call with you.
> Thanks for your patience.
>
> Parker H. "Pete" Petit
> Chairman and CEO
> MiMedx
> 1775 West Oak Commons Court
> Marietta, GA 30062
> Office (770) 651-9101
> www.mimedx.com

This email message and any attachments are for the sole use of the above-named intended recipient(s). This email and any attachments are confidential and proprietary to MiMedx Group, Inc. and may also contain certain privileged attorney-client information. This information is intended only for the use of the individual entity or intended recipient addressed above. You are not to use, disclose, distribute or disseminate this email by any means without the expressed permission of MiMedx Group, Inc. If you are not the intended recipient, or the employee or agent responsible for delivering this email to the intended recipient, you are hereby notified that any use, disclosure, printing, copying, distribution or dissemination by any means of this email or any attachments is strictly prohibited. If you have received this email in error, please immediately notify the sender by telephone at (678) 384-6720 or by reply email and delete this email and any attachments and destroy all hard copies. Thank you.

1

DEFENDANTS'
EXHIBIT

**135**

19 Cr. 850 (JSR)

Confidential

MB00001242

USAO_SDNY_R_000700449

**DX 135-001**

| Message | |
|---|---|
| **From:** | Lexi Haden [/O=MIMEDX/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EB1498A0723241F297337826F11C6B75-LEXI HADEN] |
| **Sent:** | 6/26/2015 3:08:28 PM |
| **To:** | Pete Petit [ppetit@mimedx.com]; Bill Taylor [btaylor@mimedx.com]; Mike Carlton [mcarlton@mimedx.com]; Chris |
| | Cashman [ccashman@mimedx.com] |
| **Subject:** | Brooks draft agreement |
| **Attachments:** | Brooks, Mark Second Amendment to Consulting Agreement 6.26.15.docx |

Here is a draft of the Brooks agreement. Let me know if you have comments, revisions, etc. Based on what I heard on the phone, I don't think Brooks was completely understanding the benefit of some of the things that had been put into the last draft of the agreement. I do not want to send him this version with my comments in it, as that would be inappropriate for me to do as an attorney. However, I inserted these explanations for your benefit, in case you need to be prepared to explain how certain terms of the agreement help him.

Alexandra O. Haden
*General Counsel & Secretary*
Office 770-651-9217 | Fax 770-590-3567 | Mobile 678-595-8823

MiMedx Group, Inc.
1775 West Oak Commons Ct.
Marietta, GA  30062
lhaden@mimedx.com
www.mimedx.com

**DEFENDANTS'
EXHIBIT**

**137**

19 Cr. 850 (JSR)

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_DSCL_0000097
USAO_SDNY_R_002014658

**SECOND AMENDMENT TO CONSULTING AGREEMENT**

This SECOND AMENDMENT TO CONSULTING AGREEMENT amends that certain Consulting Agreement that was effective January 23, 2012 and amended effective January 23, 2013 (together, the "Agreement") between MiMedx Group, Inc., a Florida corporation (the "Company") and Mark Brooks, an individual whose business address is 1565 North Central Expressway, Suite 200, Dallas, TX 75080 (the "Consultant"), and is effective as of the ___ day of _____, 2015.

WHEREAS the Consultant has an ownership interest in CPM Medical Consultants, LLC ("CPM"); and

WHEREAS the Company and CPM are parties to a Distributor Agreement that was effective November 27, 2012, and amended on November 27, 2012, January 20, 2014, and March 25, 2014 (together, the "Distributor Agreement");

WHEREAS the Company and Consultant desire to amend the Agreement;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Consultant agree that the Agreement shall be, and hereby is, amended as follows:

1. Section 2 of the Agreement shall be deleted and replaced with the following:

   "Duties. In conjunction with designated Company staff and under the direction and control of the Company's President & COO or his designee, Consultant shall provide market intelligence, sales consulting and distribution services as requested by the Company from time to time, and other services on a project basis as agreed to by both parties. "

2. Section 3 of the Agreement shall be deleted and replaced with the following:

   "Term. The engagement of Consultant hereunder shall commence on the date hereof and shall continue through July 11, 2018 unless sooner terminated by the happening of any of the following events:

   (a) The death of Consultant;
   (b) Fifteen (15) days following written notice to the Consultant from Company that Consultant has committed a material breach of the Agreement or the Distributor Agreement and such breach has not been cured;
   (c) Fifteen (15) days following written notice to Company from Consultant indicating Consultant's decision to terminate the Agreement."

3. Section 4 of the Agreement shall be deleted and replaced with the following:

   "Compensation. In consideration of the performance by Consultant of the services set forth herein, Company shall pay to Consultant a one-time consulting fee in the amount of two hundred thousand dollars ($200,000.00). Company shall also pay to Consultant $5,000 for each of the months of July, August, September, October, and November 2015 for monthly meetings relative

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_DSCL_0000098
USAO_SDNY_R_002014659

to the duties described in Section 2. Such meetings shall ordinarily be conducted as conference calls or held in person in Consultant's metro area. If such meetings are mutually agreed to outside of Consultant's metro area, Consultant will be entitled to a $5,000 travel allowance. Additional expenses, if applicable, must be contained in a statement of work that is agreed upon by the parties in advance of the expenses being incurred. Invoices for consulting services shall be submitted to the attention of Accounts Payable, MiMedx Group, Inc., 1775 West Oak Commons Ct., Marietta, GA 30062.

The parties further acknowledge that Company has granted to Consultant the following options to purchase shares of common stock of Company or restricted stock (as indicated) as compensation for services performed under this Agreement:

1/23/2012  – Options to purchase 10,000 shares at $1.17 per share
3/19/2012  – Options to purchase 10,000 shares at $1.20 per share
8/1/2012    – Options to purchase 25,000 shares at $2.33 per share
4/17/2013  – Options to purchase 20,000 shares at $4.99 per share
11/18/2013 – Options to purchase 35,000 shares at $5.52 per share
6/11/2015  – 15,000 shares of restricted stock

The options and restricted stock shall vest on designated anniversary dates in accordance with the terms of the applicable grant agreements, provided that this Agreement is in effect upon each such anniversary. The option and restricted stock awards are subject to all the terms of the Company's 2006 Assumed Stock Incentive Plan and the applicable grant agreements."

4. In all other respects, the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this Second Amendment to Consulting Agreement effective as of the date first set forth above.

**MIMEDX GROUP, INC.**                                        **MARK BROOKS**

By:_____                 By:_____
William C. Taylor                                                      Mark Brooks
President & COO
Date:_____                 Date:_____

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_DSCL_0000099
USAO_SDNY_R_002014660

**SECOND AMENDMENT TO CONSULTING AGREEMENT**

This SECOND AMENDMENT TO CONSULTING AGREEMENT amends that certain Consulting Agreement that was effective January 23, 2012 and amended effective January 23, 2013 (together, the "Agreement") between MiMedx Group, Inc., a Florida corporation (the "Company") and Mark Brooks, an individual whose business address is 1565 North Central Expressway, Suite 200, Dallas, TX 75080 (the "Consultant"), and is effective as of the ___ day of _____, 2015.

WHEREAS the Consultant has an ownership interest in CPM Medical Consultants, LLC ("CPM"); and

WHEREAS the Company and CPM are parties to a Distributor Agreement that was effective November 27, 2012, and amended on November 27, 2012, January 20, 2014, and March 25, 2014 (together, the "Distributor Agreement");

WHEREAS the Company and Consultant desire to amend the Agreement;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Consultant agree that the Agreement shall be, and hereby is, amended as follows:

1. Section 2 of the Agreement shall be deleted and replaced with the following:

   "<u>Duties</u>. In conjunction with designated Company staff and under the direction and control of the Company's President & COO or his designee, Consultant shall provide market intelligence, sales consulting and distribution services as requested by the Company from time to time, and other services on a project basis as agreed to by both parties. "

2. Section 3 of the Agreement shall be deleted and replaced with the following:

   "<u>Term</u>. The engagement of Consultant hereunder shall commence on the date hereof and shall continue through July 11, 2018 unless sooner terminated by the happening of any of the following events:

   (a) The death of Consultant;
   (b) Fifteen (15) days following written notice to the Consultant from Company that Consultant has committed a material breach of the Agreement or the Distributor Agreement and such breach has not been cured;
   (c) Fifteen (15) days following written notice to Company from Consultant indicating Consultant's decision to terminate the Agreement."

3. Section 4 of the Agreement shall be deleted and replaced with the following:

   "<u>Compensation</u>. In consideration of the performance by Consultant of the services set forth herein, Company shall pay to Consultant a one-time consulting fee in the amount of two hundred thousand dollars ($200,000.00). Company shall also pay to Consultant $5,000 for each of the months of July, August, September, October, and November 2015 for monthly meetings relative

**Commented [LH1]:** This extends the term of the agreement for 1 month past the vesting of the last tranche of stock given.

**Commented [LH2]:** This language restricts MiMedx from canceling this Agreement without cause. In order to terminate, there will have to be a material breach, MiMedx will have to notify you of the material breach, and then MiMedx has to give you an opportunity to cure the breach, before MiMedx can ever terminate the agreement.

**Commented [LH3]:** This language is just to protect MiMedx if you walk away from the contract without cause.

to the duties described in Section 2. Such meetings shall ordinarily be conducted as conference calls or held in person in Consultant's metro area. If such meetings are mutually agreed to outside of Consultant's metro area, Consultant will be entitled to a $5,000 travel allowance. Additional expenses, if applicable, must be contained in a statement of work that is agreed upon by the parties in advance of the expenses being incurred. Invoices for consulting services shall be submitted to the attention of Accounts Payable, MiMedx Group, Inc., 1775 West Oak Commons Ct., Marietta, GA 30062.

The parties further acknowledge that Company has granted to Consultant the following options to purchase shares of common stock of Company or restricted stock (as indicated) as compensation for services performed under this Agreement:

1/23/2012  – Options to purchase 10,000 shares at $1.17 per share
3/19/2012  – Options to purchase 10,000 shares at $1.20 per share
8/1/2012   – Options to purchase 25,000 shares at $2.33 per share
4/17/2013  – Options to purchase 20,000 shares at $4.99 per share
11/18/2013 – Options to purchase 35,000 shares at $5.52 per share
6/11/2015  – 15,000 shares of restricted stock

The options and restricted stock shall vest on designated anniversary dates in accordance with the terms of the applicable grant agreements, provided that this Agreement is in effect upon each such anniversary.  The option and restricted stock awards are subject to all the terms of the Company's 2006 Assumed Stock Incentive Plan and the applicable grant agreements."

4.  In all other respects, the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this Second Amendment to Consulting Agreement effective as of the date first set forth above.

**MIMEDX GROUP, INC.**                    **MARK BROOKS**

By:_____        By:_____
William C. Taylor                         Mark Brooks
President & COO
Date:_____        Date:_____

**Commented [LH4]:** This language clarifies that the vesting of the stock is tied only to this consulting agreement, and not to the distributor agreement.

| Message | |
|---|---|
| **From:** | Mike Carlton [/O=MIMEDX/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=0FD076B358B4428696E86C16D4C21C0E-MIKE CARLTON] |
| **Sent:** | 6/26/2015 3:25:11 PM |
| **To:** | Bill Taylor [btaylor@mimedx.com] |
| **CC:** | Lexi Haden [lhaden@mimedx.com]; Pete Petit [ppetit@mimedx.com]; Chris Cashman [ccashman@mimedx.com] |
| **Subject:** | Re: Brooks draft agreement |

In Pete's office

Sent from my iPhone

On Jun 26, 2015, at 3:18 PM, Bill Taylor <BTaylor@mimedx.com> wrote:

> I thought we needed him to forgo the stock from June 11 of this year for the $200k?
>
> Sent from my iPhone
>
> On Jun 26, 2015, at 3:08 PM, "Lexi Haden" <LHaden@mimedx.com> wrote:
>
>> Here is a draft of the Brooks agreement.  Let me know if you have comments, revisions, etc.  Based on what I heard on the phone, I don't think Brooks was completely understanding the benefit of some of the things that had been put into the last draft of the agreement.  I do not want to send him this version with my comments in it, as that would be inappropriate for me to do as an attorney.  However, I inserted these explanations for your benefit, in case you need to be prepared to explain how certain terms of the agreement help him.
>>
>> Alexandra O. Haden
>> *General Counsel & Secretary*
>> Office 770-651-9217 | Fax 770-590-3567 | Mobile 678-595-8823
>>
>> MiMedx Group, Inc.
>> 1775 West Oak Commons Ct.
>> Marietta, GA  30062
>> lhaden@mimedx.com
>> www.mimedx.com
>>
>>
>> <Brooks, Mark Second Amendment to Consulting Agreement 6.26.15.docx>

```
DEFENDANTS'
EXHIBIT

140A

19 Cr. 850 (JSR)
```

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_DSCL_0000029
USAO_SDNY_R_002014590

| | |
|---|---|
| **From:** | Bill McLaughlin |
| **Sent:** | Wednesday, October 01, 2014 6:56 PM |
| **To:** | 'Bill Taylor' |
| **Cc:** | 'Mark Brooks' |
| **Subject:** | RE: Proposed Forecast - 2014/2015 |
| **Attachments:** | Mimedx Fcst 10012014.pdf |

Bill,

Sorry to drop-off for a little bit – there are a lot of moving parts right now (no pun intended).  Hopefully the attached forecast is more closely aligned with what MDXG is looking for. From this point, Mark will need to be directly involved if this were to progress to a contract/commitment – and that should speed thing up a bit.

Please let either Mark or me know if you have questions or want to discuss.  Thank you for leaving the door open – we look forward to working with you guys!

Bill

Bill McLaughlin, CPA
Chief Financial Officer

CPM Medical Consultants, LLC and Affiliated Companies
1565 North Central Expy, 2nd Floor
Richardson, TX 75080

Office:  972.354.5566
Mobile: 972.740.3072
Email: bmclaughlin@surgicalservice.com

**CONFIDENTIALITY NOTICE:** This email message and any attachments are for the sole use of the above-named intended recipient(s). This email and any attachments are confidential and proprietary to CPM Medical Consultants, LLC and its affiliated companies, and may also contain certain privileged attorney-client information. This information is intended only for the use of the individual entity or intended recipient addressed above. You are not to use, disclose, distribute or disseminate this email by any means without the expressed permission of CPM Medical Consultants, LLC and its affiliated companies. If you are not the intended recipient, or the employee or agent responsible for delivering this email to the intended recipient, you are hereby notified that any use, disclosure, printing, copying, distribution or dissemination by any means of this email or any attachments is strictly prohibited. If you have received this email in error, please immediately notify the sender by telephone at (972) 354-5566 or by reply email and delete this email and any attachments and destroy all hard copies. Thank you.

**From:** Bill Taylor [mailto:BTaylor@mimedx.com]
**Sent:** Wednesday, October 01, 2014 1:14 PM
**To:** Bill McLaughlin
**Subject:** RE: Proposed Forecast - 2014/2015

**DEFENDANTS' EXHIBIT**

**51**

19 Cr. 850 (JSR)

Bill – Any chance we can finish the discussions?  I thought we were close, just needing to payment schedule to completed the updated agreement on weekly purchases.  I don't understand what is taking so long since you said you had it last week.  Like I texted you, if we can't get this finished, then we will just have to go back to the December

**CONFIDENTIAL**

**MB00000629**
USAO_SDNY_R_000701648

agreement, which means the 5% would necessarily go away. I don't want to do that, but with the absence of communication from you, what other choices are you giving me? The preference is to align on the shipment and payment projection per our discussion and move forward, as it will be in both our company's benefit. If you are not interested, then we can go back to the way we were managing it. You tell me which direction you want to go so I can have accounting either put in the 5% or take it out. If you want to leave it in, we need to finish the updated plan.
Bill

---

**From:** Bill McLaughlin [mailto:bmclaughlin@surgicalservice.com]
**Sent:** Wednesday, September 24, 2014 9:17 PM
**To:** Bill Taylor
**Cc:** 'Mark Brooks'
**Subject:** Proposed Forecast - 2014/2015

Bill,

Please find attached our proposed forecast by week from the period September 19, 2014 to September 28, 2015. In summary, this forecast supersedes the 2014 Goals (excluding Epifx) and extends our goals and terms and conditions (including current pricing level and 5% additional discount) to September 28, 2015 and will be achieved through weekly purchases. Additionally as reflected on the attached schedule, our 2014 goal is now $5.0MM and the goal for third quarter 2015 year-to-date is $5.8MM.

Would you consider a 50,000 Stock Option grant to Mark to help us get this locked down for the next twelve months along with working with you on Amino.

How does this sound for a start?

Bill


Bill McLaughlin, CPA
Chief Financial Officer

CPM Medical Consultants, LLC and Affiliated Companies
1565 North Central Expy, 2nd Floor
Richardson, TX 75080

Office: 972.354.5566
Mobile: 972.740.3072
Email: bmclaughlin@surgicalservice.com

**CONFIDENTIALITY NOTICE:** This email message and any attachments are for the sole use of the above-named intended recipient(s). This email and any attachments are confidential and proprietary to CPM Medical Consultants, LLC and its affiliated companies, and may also contain certain privileged attorney-client information. This information is intended only for the use of the individual entity or intended recipient addressed above. You are not to use, disclose, distribute or disseminate this email by any means without the expressed permission of CPM Medical Consultants, LLC and its affiliated companies. If you are not the intended recipient, or the employee or agent responsible for delivering this email to the intended recipient, you are hereby notified that any use, disclosure, printing, copying, distribution or dissemination by any means of this email or any attachments is strictly prohibited. If you have received this email in error, please immediately notify the sender by telephone at (972) 354-5566 or by reply email and delete this email and any attachments and destroy all hard copies. Thank you.


This email message and any attachments are for the sole use of the above-named intended recipient(s). This email and any attachments are confidential and proprietary to MiMedx Group, Inc. and may also contain certain privileged attorney-client information. This information is intended only for the use of the individual entity or

intended recipient addressed above. You are not to use, disclose, distribute or disseminate this email by any means without the expressed permission of MiMedx Group, Inc. If you are not the intended recipient, or the employee or agent responsible for delivering this email to the intended recipient, you are hereby notified that any use, disclosure, printing, copying, distribution or dissemination by any means of this email or any attachments is strictly prohibited. If you have received this email in error, please immediately notify the sender by telephone at (678) 384-6720 or by reply email and delete this email and any attachments and destroy all hard copies. Thank you.

**CONFIDENTIAL**

**MB00000631**

USAO_SDNY_R_000701650

**CPM Medical Consultants, LLC**
**MDXG - Rolling 4 QTRs Forecast**
**25-Sep-14**

| | Beg Oustanding | Purchases | Payments | End Oustanding |
|---|---|---|---|---|
| **1Q 2014** | | 585,015.70 | | Target Met |
| **2Q 2014** | | 1,391,203.75 | | Target Met |
| **July** | | | | 1,382,415.72 |
| **August** | 1,382,415.72 | 85,166.50 | 715,231.25 | 752,350.97 |
| 9/1/2014 | 752,350.97 | | | 752,350.97 |
| 9/2/2014 | 752,350.97 | | | 752,350.97 |
| 9/3/2014 | 752,350.97 | 47,044.00 | | 799,394.97 |
| 9/4/2014 | 799,394.97 | | | 799,394.97 |
| 9/5/2014 | 799,394.97 | 44,631.00 | | 844,025.97 |
| 9/6/2014 | 844,025.97 | | | 844,025.97 |
| 9/7/2014 | 844,025.97 | | | 844,025.97 |
| 9/8/2014 | 844,025.97 | | | 844,025.97 |
| 9/9/2014 | 844,025.97 | 57,237.50 | 100,000.00 | 801,263.47 |
| 9/10/2014 | 801,263.47 | 39,586.50 | | 840,849.97 |
| 9/11/2014 | 840,849.97 | 42,750.00 | | 883,599.97 |
| 9/12/2014 | 883,599.97 | | 300,000.00 | 583,599.97 |
| 9/13/2014 | 583,599.97 | | | 583,599.97 |
| **Week of September 14, 2014** | | | | |
| 9/14/2014 | 583,599.97 | | | 583,599.97 |
| 9/15/2014 | 583,599.97 | | 100,000.00 | 483,599.97 |
| 9/16/2014 | 483,599.97 | 37,620.00 | | 521,219.97 |
| 9/17/2014 | 521,219.97 | | | 521,219.97 |
| 9/18/2014 | 521,219.97 | 497,491.25 | | 1,018,711.22 |
| 9/19/2014 | 1,018,711.22 | | | 1,018,711.22 |
| 9/20/2014 | 1,018,711.22 | | | 1,018,711.22 |
| **Week of September 21, 2014** | | | | |
| 9/21/2014 | 1,018,711.22 | | | 1,018,711.22 |
| 9/22/2014 | 1,018,711.22 | | 270,000.00 | 748,711.22 |
| 9/23/2014 | 748,711.22 | 554,177.75 | | 1,302,888.97 |
| 9/24/2014 | 1,302,888.97 | | | 1,302,888.97 |
| 9/25/2014 | 1,302,888.97 | | | 1,302,888.97 |
| 9/26/2014 | 1,302,888.97 | | | 1,302,888.97 |
| 9/27/2014 | 1,302,888.97 | | | 1,302,888.97 |
| **Week of September 28, 2014** | | | | |
| 9/28/2014 | 1,302,888.97 | | | 1,302,888.97 |
| 9/29/2014 | 1,302,888.97 | | | 1,302,888.97 |
| 9/30/2014 | 1,302,888.97 | | | 1,302,888.97 |
| 10/1/2014 | 1,302,888.97 | | | 1,302,888.97 |
| 10/2/2014 | 1,302,888.97 | | | 1,302,888.97 |
| 10/3/2014 | 1,302,888.97 | | | 1,302,888.97 |
| 10/4/2014 | 1,302,888.97 | | | 1,302,888.97 |
| **3Q 2014** | 1,302,888.97 | 1,405,704.50 | 1,485,231.25 | 1,302,888.97 |
| **3Q Target** | | 2,297,040.00 | | |
| | | (891,335.50) | | |
| **4Q Week of:** | | | | |
| 10/6/2014 | 1,302,888.97 | 50,000.00 | 150,000.00 | 1,202,888.97 |
| 10/13/2014 | 1,202,888.97 | 50,000.00 | 100,000.00 | 1,152,888.97 |
| 10/20/2014 | 1,152,888.97 | 75,000.00 | 100,000.00 | 1,127,888.97 |
| 10/27/2014 | 1,127,888.97 | 75,000.00 | 100,000.00 | 1,102,888.97 |
| 11/3/2014 | 1,102,888.97 | 100,000.00 | 100,000.00 | 1,102,888.97 |
| 11/10/2014 | 1,102,888.97 | 100,000.00 | 150,000.00 | 1,052,888.97 |
| 11/17/2014 | 1,052,888.97 | 175,000.00 | 150,000.00 | 1,077,888.97 |
| 11/24/2014 | 1,077,888.97 | 175,000.00 | 150,000.00 | 1,102,888.97 |
| 12/1/2014 | 1,102,888.97 | 175,000.00 | 150,000.00 | 1,127,888.97 |
| 12/8/2014 | 1,127,888.97 | 175,000.00 | 150,000.00 | 1,152,888.97 |
| 12/15/2014 | 1,152,888.97 | 175,000.00 | 150,000.00 | 1,177,888.97 |
| 12/22/2014 | 1,177,888.97 | 175,000.00 | 150,000.00 | 1,202,888.97 |
| 12/29/2014 | 1,202,888.97 | 175,000.00 | 150,000.00 | 1,227,888.97 |
| **4Q 2014** | 1,227,888.97 | 1,675,000.00 | 1,750,000.00 | 1,227,888.97 |
| **4Q Target** | | 1,675,000.00 | | |

| 2014 Purchased | 5,056,923.95 |
|---|---|
| 2014 Target | 5,948,259.45 |
| | (891,335.50) |

| | Beg Oustanding | Purchases | Payments | End Oustanding |
|---|---|---|---|---|
| **1Q Week Of:** | | | | |
| 1/5/2015 | 1,227,888.97 | 125,000.00 | 100,000.00 | 1,252,888.97 |
| 1/12/2015 | 1,252,888.97 | 125,000.00 | 100,000.00 | 1,277,888.97 |
| 1/19/2015 | 1,277,888.97 | 125,000.00 | 100,000.00 | 1,302,888.97 |
| 1/26/2015 | 1,302,888.97 | 125,000.00 | 100,000.00 | 1,327,888.97 |
| 2/2/2015 | 1,327,888.97 | 125,000.00 | 100,000.00 | 1,352,888.97 |
| 2/9/2015 | 1,352,888.97 | 125,000.00 | 100,000.00 | 1,377,888.97 |
| 2/16/2015 | 1,377,888.97 | 125,000.00 | 200,000.00 | 1,302,888.97 |
| 2/23/2015 | 1,302,888.97 | 125,000.00 | 100,000.00 | 1,327,888.97 |
| 3/2/2015 | 1,327,888.97 | 125,000.00 | 100,000.00 | 1,352,888.97 |
| 3/9/2015 | 1,352,888.97 | 125,000.00 | 100,000.00 | 1,377,888.97 |
| 3/16/2015 | 1,377,888.97 | 125,000.00 | 200,000.00 | 1,302,888.97 |
| 3/23/2015 | 1,302,888.97 | 125,000.00 | 100,000.00 | 1,327,888.97 |

CONFIDENTIAL

MB00000632

USAO_SDNY_R_000701651

**DX 51-004**

| | | | | |
|---|---|---|---|---|
| 3/30/2015 | 1,327,888.97 | 125,000.00 | 100,000.00 | 1,352,888.97 |
| **1Q 2015** | 1,327,888.97 | 1,625,000.00 | 1,500,000.00 | 1,352,888.97 |
| **1Q Target** | | 1,625,000.00 | | |
| | | | - | |

**2Q Week of:**

| | | | | |
|---|---|---|---|---|
| 4/6/2015 | 1,352,888.97 | 100,000.00 | 100,000.00 | 1,352,888.97 |
| 4/13/2015 | 1,352,888.97 | 100,000.00 | 100,000.00 | 1,352,888.97 |
| 4/20/2015 | 1,352,888.97 | 100,000.00 | 20,000.00 | 1,432,888.97 |
| 4/27/2015 | 1,432,888.97 | 100,000.00 | 100,000.00 | 1,432,888.97 |
| 5/4/2015 | 1,432,888.97 | 100,000.00 | 100,000.00 | 1,432,888.97 |
| 5/11/2015 | 1,432,888.97 | 100,000.00 | 100,000.00 | 1,432,888.97 |
| 5/18/2015 | 1,432,888.97 | 100,000.00 | 200,000.00 | 1,332,888.97 |
| 5/25/2015 | 1,332,888.97 | 100,000.00 | 100,000.00 | 1,332,888.97 |
| 6/1/2015 | 1,332,888.97 | 100,000.00 | 100,000.00 | 1,332,888.97 |
| 6/8/2015 | 1,332,888.97 | 100,000.00 | 100,000.00 | 1,332,888.97 |
| 6/15/2015 | 1,332,888.97 | 100,000.00 | 100,000.00 | 1,332,888.97 |
| 6/22/2015 | 1,332,888.97 | 100,000.00 | 200,000.00 | 1,232,888.97 |
| 6/29/2015 | 1,232,888.97 | 100,000.00 | 100,000.00 | 1,232,888.97 |
| **2Q 2015** | 1,232,888.97 | 1,300,000.00 | 1,420,000.00 | 1,232,888.97 |
| **2Q Target** | | 1,300,000.00 | | |
| | | | - | |

**3Q Week of:**

| | | | | |
|---|---|---|---|---|
| 7/6/2015 | 1,232,888.97 | 221,154.00 | 200,000.00 | 1,254,042.97 |
| 7/13/2015 | 1,254,042.97 | 221,154.00 | 200,000.00 | 1,275,196.97 |
| 7/20/2015 | 1,275,196.97 | 221,154.00 | 200,000.00 | 1,296,350.97 |
| 7/27/2015 | 1,296,350.97 | 221,154.00 | 200,000.00 | 1,317,504.97 |
| 8/3/2015 | 1,317,504.97 | 221,154.00 | 200,000.00 | 1,338,658.97 |
| 8/10/2015 | 1,338,658.97 | 221,154.00 | 200,000.00 | 1,359,812.97 |
| 8/17/2015 | 1,359,812.97 | 221,154.00 | 200,000.00 | 1,380,966.97 |
| 8/24/2015 | 1,380,966.97 | 221,154.00 | 300,000.00 | 1,302,120.97 |
| 8/31/2015 | 1,302,120.97 | 221,154.00 | 200,000.00 | 1,323,274.97 |
| 9/7/2015 | 1,323,274.97 | 221,154.00 | 200,000.00 | 1,344,428.97 |
| 9/14/2015 | 1,344,428.97 | 221,154.00 | 200,000.00 | 1,365,582.97 |
| 9/21/2015 | 1,365,582.97 | 221,154.00 | 200,000.00 | 1,386,736.97 |
| 9/28/2015 | 1,386,736.97 | 221,154.00 | 300,000.00 | 1,307,890.97 |
| **3Q 2015** | 1,386,736.97 | 2,875,002.00 | 2,800,000.00 | 1,307,890.97 |
| **3Q Target** | | 2,875,000.00 | | |
| | | | 2.00 | |

**4Q Week of:**

| | | | | |
|---|---|---|---|---|
| 10/5/2015 | 1,307,890.97 | | | 1,307,890.97 |
| 10/12/2015 | 1,307,890.97 | | | 1,307,890.97 |
| 10/19/2015 | 1,307,890.97 | | | 1,307,890.97 |
| 10/26/2015 | 1,307,890.97 | | | 1,307,890.97 |
| 11/2/2015 | 1,307,890.97 | | | 1,307,890.97 |
| 11/9/2015 | 1,307,890.97 | | | 1,307,890.97 |
| 11/16/2015 | 1,307,890.97 | | | 1,307,890.97 |
| 11/23/2015 | 1,307,890.97 | | | 1,307,890.97 |
| 11/30/2015 | 1,307,890.97 | | | 1,307,890.97 |
| 12/7/2015 | 1,307,890.97 | | | 1,307,890.97 |
| 12/14/2015 | 1,307,890.97 | | | 1,307,890.97 |
| 12/21/2015 | 1,307,890.97 | | | 1,307,890.97 |
| 12/28/2015 | 1,307,890.97 | | | 1,307,890.97 |
| **4Q 2015** | 1,307,890.97 | - | - | 1,307,890.97 |
| **4Q Target** | | | | |
| | | | - | |

**CONFIDENTIAL**

MB00000633

USAO_SDNY_R_000701652

**DX 51-005**

| Date | Time (UTC) | Time (Eastern) | From | To | Text Message |
|------|-----------|----------------|------|-----|--------------|
| 06/16/2015 | 09:35:24 PM | 05:35:24 PM | Mark Brooks | Charlie Hopper | How much did Mimedx ask for ? $$$$$$$$$ |
| 06/17/2015 | 12:18:12 PM | 08:18:12 PM | Mark Brooks | Charlie Hopper | Sweet !! Pete Petit was just on CNBC. Mimedx stock is going crazy !! |
| 06/23/2015 | 03:13:20 PM | 11:13:20 AM | Mark Brooks | Charlie Hopper | It looks like I'm not going to order Anything from Mimedx this quarter. I caught them selling direct into 4 more hospitals. They're response was oops sorry but can you still order 2mm please. I give up. My non-compete is up in November!! |

USAO_SDNY_R_000701240



DEFENDANTS'
EXHIBIT

111

19 Cr. 850 (JSR)

| Date | Time (UTC) | Time (Eastern) | From | To | Text Message |
|------|-----------|----------------|------|-----|--------------|
| 06/23/2015 | 03:06:29 PM | 11:06:29 AM | Mark Brooks | Bill McLaughlin | Carlton is blowing up Reeg now. Tell Taylor we put up with to much crap from them. 50k shares now & 50k in a year!!! 0.00 $ value & no restrictions. They can take from petite personal stash. 1.2mm in stock is a lot less then the 30+% drop in Mimedx stock value. We also want to see ALL there Texas contracts they have hidden from us. try that out sunshine |

USAO_SDNY_R_000701240



DEFENDANTS'
EXHIBIT

116

19 Cr. 850 (JSR)

Message

| From: | Bill Taylor [/O=MIMEDX/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=A7876DEF816848E2B2A81E81404578B3-BILL TAYLOR] |
| Sent: | 6/24/2015 6:27:01 PM |
| To: | Brent Miller [bmiller@mimedx.com]; David Nix [dnix@mimedx.com]; Chris Cashman [ccashman@mimedx.com]; |
| | Mike Carlton [mcarlton@mimedx.com]; Mark Diaz [mdiaz@mimedx.com] |
| CC: | Jeff Schultz [jschultz@mimedx.com] |
| Subject: | FW: CPM Proposed 2Q 2015 Mix |
| Attachments: | CPM Proposed 2Q 2015 Mix.pdf |

David,

Take a look and let me know if this mix will work. If not, please tell me what portion you can do, and then what a proposed updated mix would look like that we can deliver.

Thanks.

BT

**From:** Bill McLaughlin [mailto:bmclaughlin@surgicalservice.com]
**Sent:** Wednesday, June 24, 2015 6:24 PM
**To:** Bill Taylor
**Subject:** CPM Proposed 2Q 2015 Mix

Bill

Does this work for you guys?

Bill



DEFENDANTS'
EXHIBIT

**118**

19 Cr. 850 (JSR)

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_SDNY_0000380
USAO_SDNY_R_001781147

| Item | Qty | Value/ea | Total Value |
|---|---|---|---|
| ABP-5050 | 1500 | $ 198.00 | $ 297,000.00 |
| ABP-5460 | 600 | $ 684.00 | $ 410,400.00 |
| AI-5050 | 3000 | $ 198.00 | $ 594,000.00 |
| ABP-5200 | 200 | $ 788.00 | $ 157,600.00 |
| ABP-5125 | 1000 | $ 545.00 | $ 545,000.00 |
| | | | $ 2,004,000.00 |

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_SDNY_0000381
USAO_SDNY_R_001781148

**DX 118-002**

**From:** Mark Brooks <incaremed@aol.com>
**Sent:** Friday, June 26, 2015 11:36 AM
**To:** Bill McLaughlin
**Subject:** Fwd: Updated MiMedx and CPM Agreement 6.26.15
**Attachments:** Updated MiMedx and CPM Agreement 6.26.15.docx; ATT00001.htm


Sent from my iPhone

Begin forwarded message:

> **From:** Pete Petit <PPetit@mimedx.com>
> **Date:** June 26, 2015 at 11:13:11 AM CDT
> **To:** "incaremed@aol.com" <incaremed@aol.com>
> **Cc:** Pete Petit <PPetit@mimedx.com>
> **Subject: Updated MiMedx and CPM Agreement 6.26.15**
>
> Mark,
> Please review the attached and give me or Mike Carlton a call. Thank you for your patience.
> Pete
> Parker H. "Pete" Petit
> Chairman and CEO
> MiMedx
> 1775 West Oak Commons Court
> Marietta, GA 30062
> Office (770) 651-9101
> www.mimedx.com

This email message and any attachments are for the sole use of the above-named intended
recipient(s). This email and any attachments are confidential and proprietary to MiMedx Group,
Inc. and may also contain certain privileged attorney-client information. This information is
intended only for the use of the individual entity or intended recipient addressed above. You are
not to use, disclose, distribute or disseminate this email by any means without the expressed
permission of MiMedx Group, Inc. If you are not the intended recipient, or the employee or
agent responsible for delivering this email to the intended recipient, you are hereby notified that
any use, disclosure, printing, copying, distribution or dissemination by any means of this email
or any attachments is strictly prohibited. If you have received this email in error, please
immediately notify the sender by telephone at (678) 384-6720 or by reply email and delete this
email and any attachments and destroy all hard copies. Thank you.

<div style="float:right; border:1px solid black; text-align:center;">

**DEFENDANTS'
EXHIBIT**

**136A**

19 Cr. 850 (JSR)

</div>

1

Confidential

MB00001239
USAO_SDNY_R_000701940

DX 136A-001

Updated MiMedx and CPM Agreement
June 26, 2015

1. CPM will place the net $2 million order in a mix that MiMedx can ship by June 30, 2015.

2. In replacement of the June 2015 RSAs (15,000), MiMedx will convert it to a $200,000 consulting fee.

3. Compensation. In consideration of the performance by Consultant of the services set forth herein, MiMedx shall pay to Consultant $5,000.00 for monthly meetings for July – November to be held as conference calls or in Consultant's metro area related to the consulting services duties. If such meetings are mutually agreed to outside of Consultant's area, Consultant will be entitled to a $5,000.00 travel allowance.

4. MiMedx will provide CPM a 25% override on all sales to Universal Instrumentation effective January 1, 2015 thru November 27, 2015; payable by check or offset to Consultant's accounts receivable with the Company.

5. In Texas, MiMedx will give CPM visibility to hospitals we are working with to join GPO contracts, and where possible allow CPM to opt into the contracts. In addition, by July 17, MiMedx will provide a comprehensive list of all known hospitals in Texas that MiMedx is aware of an interest in opting into a GPO contract. MiMedx will advise CPM of these cases and do so prior to MiMedx signing such GPO's.

6. In the accounts where contract issues have developed, we will submit an override proposal or other solutions by July 31st, after you have shared the account metrics.

7. MiMedx will continue to provide a 5% price discount, subject to historically agreed outstanding accounts receivable.

8. The Consultant will no longer receive evaluation product as an incentive.

Confidential

**Confidential**

MB00001240
USAO_SDNY_R_000701941

| Date | Time (UTC) | Time (Eastern) | From | To | Text Message |
|---|---|---|---|---|---|
| 06/26/2015 | 03:00:52 PM | 11:00:52 AM | Bill Cochrane | Mark Brooks | Jeff just said Pete listened to the call that I had with mike and Jeff after we left you. Mike had either recorded it or took good notes on about all the ways I said Mimedx had fuck you and other distributors. Supposedly that's when he said well guys. Regardless of how this turns out we owe the man an apology. So thats when He called you according to Jeff. |

USAO_SDNY_R_000701240

DEFENDANTS' EXHIBIT

138

19 Cr. 850 (JSR)

| | |
|---|---|
| **From:** | Bill McLaughlin |
| **Sent:** | Friday, June 26, 2015 3:49 PM |
| **To:** | LHaden@mimedx.com; MCarlton@mimedx.com |
| **Cc:** | Mark Brooks (incaremed@aol.com) |
| **Subject:** | RE: Brooks agreement |
| **Attachments:** | Brooks Mark Second Amendment to Consulting Agreement 6 26 15 v 3.docx |

Lexi & Mike,

Please consider the attached proposed changes to Mark's amended consultant agreement.

Thank you!

Bill

> **From:** Mark Brooks [mailto:incaremed@aol.com]
> **Sent:** Friday, June 26, 2015 3:17 PM
> **To:** Bill McLaughlin
> **Subject:** Fwd: Brooks agreement
>
>
>
> -----Original Message-----
> From: Mike Carlton <MCarlton@mimedx.com>
> To: Mark Brooks <incaremed@aol.com>
> Sent: Fri, Jun 26, 2015 3:14 pm
> Subject: Fwd: Brooks agreement
>
>
>
> Sent from my iPhone
>
> Begin forwarded message:
>
>> **From:** Lexi Haden < LHaden@mimedx.com>
>> **Date:** June 26, 2015 at 4:12:39 PM EDT
>> **To:** Mike Carlton < MCarlton@mimedx.com>
>> **Subject: Brooks agreement**
>>
>> Mike, here is updated draft with the additional stock grant added in.  Sorry I did not realize that needed to be added before.  Thx
>> Lexi

**Alexandra O. Haden**
*General Counsel & Secretary*
Office 770-651-9217 | Fax 770-590-3567 | Mobile 678-595-8823

**MiMedx Group, Inc.**
1775 West Oak Commons Ct.
Marietta, GA  30062
lhaden@mimedx.com

> **DEFENDANTS'**
> **EXHIBIT**
> **142A**
> 19 Cr. 850 (JSR)

CONFIDENTIAL

MB00000604

USAO_SDNY_R_000701630

www.mimedx.com

This email message and any attachments are for the sole use of the above-named intended recipient(s). This email and any attachments are confidential and proprietary to MiMedx Group, Inc. and may also contain certain privileged attorney-client information. This information is intended only for the use of the individual entity or intended recipient addressed above. You are not to use, disclose, distribute or disseminate this email by any means without the expressed permission of MiMedx Group, Inc. If you are not the intended recipient, or the employee or agent responsible for delivering this email to the intended recipient, you are hereby notified that any use, disclosure, printing, copying, distribution or dissemination by any means of this email or any attachments is strictly prohibited. If you have received this email in error, please immediately notify the sender by telephone at (678) 384-6720 or by reply email and delete this email and any attachments and destroy all hard copies. Thank you.

**CONFIDENTIAL**

**MB00000605**

USAO_SDNY_R_000701631

**DX 142A-002**

**SECOND AMENDMENT TO CONSULTING AGREEMENT**
**June 26, 2015**
~~SECOND AMENDMENT TO CONSULTING AGREEMENT~~

This SECOND AMENDMENT TO CONSULTING AGREEMENT amends that certain Consulting Agreement that was effective January 23, 2012 and amended effective January 23, 2013 (together, the "Agreement") between MiMedx Group, Inc., a Florida corporation (the "Company") and Mark Brooks, an individual whose business address is 1565 North Central Expressway, Suite 200, Dallas, TX 75080 (the "Consultant"), and is effective as of the 26th day of June, 2015.

WHEREAS the Consultant has an ownership interest in CPM Medical Consultants, LLC ("CPM"); and

WHEREAS the Company and CPM are parties to a Distributor Agreement that was effective November 27, 2012, and amended on November 27, 2012, January 20, 2014, and March 25, 2014 (together, the "Distributor Agreement");

WHEREAS the Company and Consultant desire to amend the Agreement;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Consultant agree that the Agreement shall be, and hereby is, amended as follows:

1. Section 2 of the Agreement shall be deleted and replaced with the following:

   "Duties".  In conjunction with designated Company staff and under the direction and control of the Company's Chairman or CEO ~~or his designee~~, the Consultant shall provide reasonable and mutually agreed upon market intelligence and other reasonable sales consulting ~~services~~ as requested by the Company from time to time, and other services on a project basis as agreed to by both parties. "

2. Section 3 of the Agreement shall be deleted and replaced with the following:

   "Term".  The engagement of Consultant hereunder shall commence on the date hereof and shall continue through July 11, 2018 unless sooner terminated upon a change in control of the Company or a change in the Company's Chairman and CEO at which time all unvested stock based awards granted by the Company,  shall immediately vest with any and all restrictions on such stock based awards being removed.~~by the happening of any of the following events:~~

   ~~(a)      The death of Consultant;~~

   ~~(b)      Fifteen (15) days following written notice to the Consultant from Company that Consultant has committed a material breach of the Agreement or the Distributor Agreement and such breach has not been cured;~~

   ~~(c)      Fifteen (15) days following written notice to Company from Consultant indicating Consultant's decision to terminate the Agreement."~~

3. Section 4 of the Agreement shall be deleted and replaced with the following:

   "Compensation".  In consideration of duties or services provided by ~~the performance by the~~  Consultant ~~of the services~~ set forth herein, Company shall pay to Consultant a one-time consulting fee in the amount of

CONFIDENTIAL

MB00000606
USAO_SDNY_R_000701632

DX 142A-003

## SECOND AMENDMENT TO CONSULTING AGREEMENT
### June 26, 2015

two hundred thousand dollars ($200,000.00) to be paid to Consultant on or before June 30, 2015. Company shall also pay to Consultant $5,000.00 for each of the months of July, August, September, October, and November 2015 for monthly meetings relative to the duties described in Section 2. Such meetings shall ordinarily be conducted as conference calls or held in person in Consultant's metro area. If such meetings are mutually agreed to outside of Consultant's metro area, Consultant will be entitled to a $5,000.00 travel allowance. Additional expenses, if applicable, must be contained in a statement of work that is agreed upon by the parties in advance of the expenses being incurred. Invoices for consulting services shall be submitted to the attention of Accounts Payable, MiMedx Group, Inc., 1775 West Oak Commons Ct., Marietta, GA 30062 and shall be paid to the Consultant on or before July 1, 2015, August 1, 2015, September 1, 2015 and November 15, 2015.,

The parties further acknowledge that Company has granted to Consultant the following options to purchase shares of common stock of Company or restricted stock grants (as indicated below) as compensation for services performed under this Agreement:

1/23/2012  – Options to purchase 10,000 shares at $1.17 per share
3/1920/2012    – Options to purchase 10,000 shares at $1.20 per share
8/1/2012    – Options to purchase 25,000 shares at $2.33 per share
4/17/2013 – Options to purchase 20,000 shares at $4.99 per share
11/18/2013 – Options to purchase 35,000 shares at $5.52 per share
6/11/2015  – 15,000 shares of restricted stock
6/26/2015  – 2,455 shares of restricted stock

The options and restricted stock shall vest on grant designated anniversary dates in accordance with the terms of the applicable grant agreements, provided that this Agreement is in effect upon each such anniversary. The option and restricted stock awards are subject to all the terms of the Company's "2006 Assumed Stock Incentive Plan and the applicable grant agreements."

4.    In all other respects, the Agreement shall remain in full force and effect.

5.    The Company will provide CPM a 25% override on all sales to Universal Instrumentation effective January 1, 2015 thru November 27, 2015; payable by check or offset to Consultant's accounts receivable with the Company.

6.    The Company will continue to provide a 5% price discount, subject to historically agreed outstanding accounts receivable.

7.    MiMedx will provide CPM written advance notice of hospitals in which MiMedx are pursuing a GPO contract(s), and will permit CPM to participate at its option within a reasonable time prior to MiMedx signing such contract. Further, by July 17, 2015, MiMedx will provide a comprehensive list of all known hospitals in Texas that MiMedx has established a GPO contract and will reasonable assist CPM in begin added to these arrangement upon CPM's request.

CONFIDENTIAL

MB00000607
USAO_SDNY_R_000701633

**SECOND AMENDMENT TO CONSULTING AGREEMENT**

**June 26, 2015**

8.   In the accounts where contract issues have developed and future accounts with similar issues, MiMedix

will submit a reasonable override solution agreeable to the CPM no later than July 31st

4.

IN WITNESS WHEREOF, the undersigned have executed this Second Amendment to Consulting Agreement effective as of the date first set forth above.

**MIMEDX GROUP, INC.**                              **MARK BROOKS**

By:_____                        By:_____

Parker H. Petit                                    Mark W. Brooks

Chief Executive Officer_____                    Chief Executive Officer and Founder

Date:_____                      Date:_____

CONFIDENTIAL

MB00000608

USAO_SDNY_R_000701634

**DX 142A-005**

| Message | |
|---|---|
| **From:** | Lexi Haden [/O=MIMEDX/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EB1498A0723241F297337826F11C6B75-LEXI HADEN] |
| **Sent:** | 7/2/2015 3:31:30 PM |
| **To:** | Bill Taylor [btaylor@mimedx.com]; Pete Petit [ppetit@mimedx.com]; Chris Cashman [ccashman@mimedx.com] |
| **CC:** | John Cranston [jcranston@mimedx.com]; Michael Senken [msenken@mimedx.com] |
| **Subject:** | Money for Mark Brooks |
| **Attachments:** | Brooks Mark Second Amendment to Consulting Agreement_signed by Brooks.pdf; Brooks Mark Second Amendment |
| | to Consulting Agreement 6 26 15 v 4 (2) FIN....pdf |

Hi, we need to pay Mark Brooks the $200,000 consulting fee per the attached final agreement. Whoever is authorized to approve this request, will you please let accounting know so they can process? Thx
Lexi

Alexandra O. Haden
*General Counsel & Secretary*
Office 770-651-9217 | Fax 770-590-3567 | Mobile 678-595-8823

MiMedx Group, Inc.
1775 West Oak Commons Ct.
Marietta, GA 30062
lhaden@mimedx.com
www.mimedx.com

```
DEFENDANTS'
EXHIBIT

165
19 Cr. 850 (JSR)
```

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_00667409
USAO_SDNY_R_001375341

## SECOND AMENDMENT TO CONSULTING AGREEMENT
### June 26, 2015

This SECOND AMENDMENT TO CONSULTING AGREEMENT amends that certain Consulting Agreement that was effective January 23, 2012 and amended effective January 23, 2013 (together, the "Agreement") between MiMedx Group, Inc., a Florida corporation (the "Company") and Mark Brooks, an individual whose business address is 1565 North Central Expressway, Suite 200, Dallas, TX 75080 (the "Consultant"), and is effective as of the 26th day of June, 2015.

WHEREAS the Consultant has an ownership interest in CPM Medical Consultants, LLC ("CPM"); and

WHEREAS the Company and CPM are parties to a Distributor Agreement that was effective November 27, 2012, and amended on November 27, 2012, January 20, 2014, and March 25, 2014 (together, the "Distributor Agreement");

WHEREAS the Company and Consultant desire to amend the Agreement;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Consultant agree that the Agreement shall be, and hereby is, amended as follows:

1. Section 2 of the Agreement shall be deleted and replaced with the following:

   "Duties. In conjunction with designated Company staff and under the direction and control of the Company's Chairman or CEO, the Consultant shall provide reasonable and mutually agreed upon market intelligence and other reasonable sales consulting as requested by the Company from time to time, and other services on a project basis as agreed to by both parties."

2. Section 3 of the Agreement shall be deleted and replaced with the following:

   "Term. The engagement of Consultant hereunder shall commence on the date hereof and shall continue through July 11, 2018 unless sooner terminated by the happening of any of the following events:

   (a) A change in control of the Company as defined in the applicable plan documents, at which time all unvested stock based awards granted by the Company shall vest in accordance with the terms of the applicable plan documents;
   (b) The death of Consultant;
   (c) Fifteen (15) days following written notice to the Consultant from Company that Consultant has committed a material breach of the Agreement (by way of example, including, without limitation, failure to provide particular market intelligence and sales consulting services mutually agreed upon by the parties, violation of Consultant's non-disclosure obligations) or that CPM has committed a material breach of the Distributor Agreement (by way of example, including, without limitation, failure to pay outstanding A/R in the timeframe consistent with past practice during the prior 12 months, violation of the non-compete obligation) and such breach has not been cured;
   (d) Fifteen (15) days following written notice to Company from Consultant indicating Consultant's unilateral decision to terminate the Agreement."

3. Section 4 of the Agreement shall be deleted and replaced with the following:

   "Compensation. In consideration of duties or services provided by the Consultant set forth herein, Company shall pay to Consultant a one-time consulting fee in the amount of two hundred thousand dollars

MMDX_00667410
USAO_SDNY_R_001375342

## SECOND AMENDMENT TO CONSULTING AGREEMENT
### June 26, 2015

($200,000.00) to be paid to Consultant on or before June 30, 2015.  Company shall also pay to Consultant $5,000.00 for each of the months of July, August, September, October, and November 2015 for monthly meetings relative to the duties described in Section 2.  Such meetings shall ordinarily be conducted as conference calls or held in person in Consultant's metro area.  If such meetings are mutually agreed to outside of Consultant's metro area, Consultant will be entitled to a $5,000.00 travel allowance.  Additional expenses, if applicable, must be contained in a statement of work that is agreed upon by the parties in advance of the expenses being incurred.  Invoices for consulting services shall be submitted to the attention of Accounts Payable, MiMedx Group, Inc., 1775 West Oak Commons Ct., Marietta, GA  30062 and shall be paid to the Consultant on or before July 1, 2015, August 1, 2015, September 1, 2015 and November 1, 2015.

The parties further acknowledge that Company has granted to Consultant the following options to purchase shares of common stock of Company or restricted stock grants (as indicated below) as compensation for services performed under this Agreement:

1/23/2012   – Options to purchase 10,000 shares at $1.17 per share
3/20/2012   – Options to purchase 10,000 shares at $1.20 per share
8/1/2012     – Options to purchase 25,000 shares at $2.33 per share
4/17/2013   – Options to purchase 20,000 shares at $4.99 per share
11/18/2013 – Options to purchase 35,000 shares at $5.52 per share
6/11/2015   – 15,000 shares of restricted stock
6/26/2015   – 2,455 shares of restricted stock

The options and restricted stock shall vest on grant anniversary dates in accordance with the terms of the applicable grant agreements, provided that this Agreement is in effect upon each such anniversary.  The option and restricted stock awards are subject to all the terms of the Company's 2006 Assumed Stock Incentive Plan and the applicable grant agreements."

In all other respects, the Agreement shall remain in full force and effect.
IN WITNESS WHEREOF, the undersigned have executed this Second Amendment to Consulting Agreement effective as of the date first set forth above.

**MIMEDX GROUP, INC.**

By:_____
Parker H. Petit
Chief Executive Officer
Date:_____

**MARK BROOKS**

By:_____
Mark W. Brooks
Chief Executive Officer and Founder
Date:   6-26-15

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_00667411
USAO_SDNY_R_001375343

**DX 165-003**

**SECOND AMENDMENT TO CONSULTING AGREEMENT**
**June 26, 2015**

This SECOND AMENDMENT TO CONSULTING AGREEMENT amends that certain Consulting Agreement that was effective January 23, 2012 and amended effective January 23, 2013 (together, the "Agreement") between MiMedx Group, Inc., a Florida corporation (the "Company") and Mark Brooks, an individual whose business address is 1565 North Central Expressway, Suite 200, Dallas, TX 75080 (the "Consultant"), and is effective as of the 26th day of June, 2015.

WHEREAS the Consultant has an ownership interest in CPM Medical Consultants, LLC ("CPM"); and

WHEREAS the Company and CPM are parties to a Distributor Agreement that was effective November 27, 2012, and amended on November 27, 2012, January 20, 2014, and March 25, 2014 (together, the "Distributor Agreement");

WHEREAS the Company and Consultant desire to amend the Agreement;

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and Consultant agree that the Agreement shall be, and hereby is, amended as follows:

1.  Section 2 of the Agreement shall be deleted and replaced with the following:

    "Duties.   In conjunction with designated Company staff and under the direction and control of the Company's Chairman or CEO, the Consultant shall provide reasonable and mutually agreed upon market intelligence and other reasonable sales consulting as requested by the Company from time to time, and other services on a project basis as agreed to by both parties."

2.  Section 3 of the Agreement shall be deleted and replaced with the following:

    "Term.  The engagement of Consultant hereunder shall commence on the date hereof and shall continue through July 11, 2018 unless sooner terminated by the happening of any of the following events:

    (a) A change in control of the Company as defined in the applicable plan documents, at which time all unvested stock based awards granted by the Company shall vest in accordance with the terms of the applicable plan documents;
    (b) The death of Consultant;
    (c) Fifteen (15) days following written notice to the Consultant from Company that Consultant has committed a material breach of the Agreement (by way of example, including, without limitation, failure to provide particular market intelligence and sales consulting services mutually agreed upon by the parties, violation of Consultant's non-disclosure obligations) or that CPM has committed a material breach of the Distributor Agreement (by way of example, including, without limitation, failure to pay outstanding A/R in the timeframe consistent with past practice during the prior 12 months, violation of the non-compete obligation) and such breach has not been cured;
    (d) Fifteen (15) days following written notice to Company from Consultant indicating Consultant's unilateral decision to terminate the Agreement."

3.  Section 4 of the Agreement shall be deleted and replaced with the following:

    "Compensation.   In consideration of duties or services provided by the Consultant set forth herein, Company shall pay to Consultant a one-time consulting fee in the amount of two hundred thousand dollars

FOIA Confidential Treatment Requested by Sidley Austin LLP

## SECOND AMENDMENT TO CONSULTING AGREEMENT
### June 26, 2015

($200,000.00) to be paid to Consultant on or before June 30, 2015.  Company shall also pay to Consultant $5,000.00 for each of the months of July, August, September, October, and November 2015 for monthly meetings relative to the duties described in Section 2.  Such meetings shall ordinarily be conducted as conference calls or held in person in Consultant's metro area.  If such meetings are mutually agreed to outside of Consultant's metro area, Consultant will be entitled to a $5,000.00 travel allowance.  Additional expenses, if applicable, must be contained in a statement of work that is agreed upon by the parties in advance of the expenses being incurred.  Invoices for consulting services shall be submitted to the attention of Accounts Payable, MiMedx Group, Inc., 1775 West Oak Commons Ct., Marietta, GA  30062 and shall be paid to the Consultant on or before July 1, 2015, August 1, 2015, September 1, 2015 and November 1, 2015.

The parties further acknowledge that Company has granted to Consultant the following options to purchase shares of common stock of Company or restricted stock grants (as indicated below) as compensation for services performed under this Agreement:

1/23/2012  – Options to purchase 10,000 shares at $1.17 per share
3/20/2012  – Options to purchase 10,000 shares at $1.20 per share
8/1/2012   – Options to purchase 25,000 shares at $2.33 per share
4/17/2013  – Options to purchase 20,000 shares at $4.99 per share
11/18/2013 – Options to purchase 35,000 shares at $5.52 per share
6/11/2015  – 15,000 shares of restricted stock
6/26/2015  – 2,455 shares of restricted stock

The options and restricted stock shall vest on grant anniversary dates in accordance with the terms of the applicable grant agreements, provided that this Agreement is in effect upon each such anniversary.  The option and restricted stock awards are subject to all the terms of the Company's 2006 Assumed Stock Incentive Plan and the applicable grant agreements."

In all other respects, the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this Second Amendment to Consulting Agreement effective as of the date first set forth above.

**MIMEDX GROUP, INC.**                              **MARK BROOKS**

By:_____     By:_____
Parker H. Petit                                   Mark W. Brooks
Chief Executive Officer                           Chief Executive Officer and Founder
Date:_____June 29, 2015_____     Date:_____

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_00667413
USAO_SDNY_R_001375345

**DX 165-005**

| Message | |
|---|---|
| From: | Lexi Haden [/O=MIMEDX/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EB1498A0723241F297337826F11C6B75-LEXI HADEN] |
| Sent: | 7/2/2015 4:19:17 PM |
| To: | Pete Petit [ppetit@mimedx.com] |
| CC: | Bill Taylor [btaylor@mimedx.com]; Chris Cashman [ccashman@mimedx.com]; John Cranston [jcranston@mimedx.com]; Michael Senken [msenken@mimedx.com] |
| Subject: | RE: Money for Mark Brooks |

Oh goody.  That's what I need.

By the way, I don't think we could issue check today because there is no one here with check signing authority.  So, I will just let Bill M. know the check will go out Monday.  I think they will be fine with that.

Alexandra O. Haden
*General Counsel & Secretary*
Office 770-651-9217 | Fax 770-590-3567 | Mobile 678-595-8823

MiMedx Group, Inc.
1775 West Oak Commons Ct.
Marietta, GA  30062
lhaden@mimedx.com
www.mimedx.com

---

**From:** Pete Petit
**Sent:** Thursday, July 02, 2015 4:16 PM
**To:** Lexi Haden
**Cc:** Bill Taylor; Chris Cashman; John Cranston; Michael Senken
**Subject:** Re: Money for Mark Brooks

Yep.....let Lexi try to collect Brooks cash. Certainly could not hurt. She might get a new responsibility!

Parker H. "Pete" Petit
Chairman and CEO
MiMedx
1775 West Oak Commons Court
Marietta, GA 30062
Office (770) 651-9101
www.mimedx.com

On Jul 2, 2015, at 10:13 PM, "Lexi Haden" <LHaden@mimedx.com> wrote:

> Since McLaughlin emailed me, I am happy to respond and give him the message if you would like.  I will forward the email I received so you all have it.
>
> Alexandra O. Haden
> *General Counsel & Secretary*
> Office 770-651-9217 | Fax 770-590-3567 | Mobile 678-595-8823
>
> MiMedx Group, Inc.
> 1775 West Oak Commons Ct.
> Marietta, GA  30062
> lhaden@mimedx.com
> www.mimedx.com



DEFENDANTS'
EXHIBIT
**171**
19 Cr. 850 (JSR)

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_DSCL_0000149
USAO_SDNY_R_002014710

DX 171-001

**From:** Pete Petit
**Sent:** Thursday, July 02, 2015 4:11 PM
**To:** Bill Taylor
**Cc:** Lexi Haden; Chris Cashman; John Cranston; Michael Senken
**Subject:** Re: Money for Mark Brooks

I would cut the check immediately AND ask him to bring his AR reasonably current. Who will ask?

Parker H. "Pete" Petit
Chairman and CEO
MiMedx
1775 West Oak Commons Court
Marietta, GA 30062
Office (770) 651-9101
www.mimedx.com

On Jul 2, 2015, at 10:03 PM, "Bill Taylor" <BTaylor@mimedx.com> wrote:

> Ok. I'm ok with it but Pete should weigh in. We may want to also ask when they will
> catch up A/R. They are behind historical 12 months payment history.
>
> Sent from my iPhone
>
> On Jul 2, 2015, at 4:00 PM, "Lexi Haden" <LHaden@mimedx.com> wrote:
>
> > It was supposed to be paid June 30. Bill McLaughlin is asking. I think if I
> > just provided him with a date on which the check will be cut so they
> > know it is in progress, they will probably be satisfied with that. But, we
> > need to do it soon.
> >
> > Alexandra O. Haden
> > *General Counsel & Secretary*
> > Office 770-651-9217 | Fax 770-590-3567 | Mobile 678-595-8823
> >
> > MiMedx Group, Inc.
> > 1775 West Oak Commons Ct.
> > Marietta, GA 30062
> > lhaden@mimedx.com
> > www.mimedx.com
> >
> > **From:** Bill Taylor
> > **Sent:** Thursday, July 02, 2015 3:58 PM
> > **To:** Lexi Haden
> > **Cc:** Pete Petit; Chris Cashman; John Cranston; Michael Senken
> > **Subject:** Re: Money for Mark Brooks
> >
> > Does it have to happen today?
> >
> > Sent from my iPhone
> >
> > On Jul 2, 2015, at 3:31 PM, "Lexi Haden" <LHaden@mimedx.com>
> > wrote:

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_DSCL_0000150
USAO_SDNY_R_002014711

Hi, we need to pay Mark Brooks the $200,000
consulting fee per the attached final
agreement.  Whoever is authorized to approve this
request, will you please let accounting know so they can
process?  Thx
Lexi

Alexandra O. Haden
*General Counsel & Secretary*
Office 770-651-9217 | Fax 770-590-3567 | Mobile 678-595-8823

MiMedx Group, Inc.
1775 West Oak Commons Ct.
Marietta, GA  30062
lhaden@mimedx.com
www.mimedx.com

<Brooks Mark Second Amendment to Consulting
Agreement_signed by Brooks.pdf>

<Brooks Mark Second Amendment to Consulting
Agreement 6 26 15 v 4 (2) FIN....pdf>

FOIA Confidential Treatment Requested by Sidley Austin LLP

| **From:** | Claudia Bell [/O=MIMEDX/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=36D8363BEFE7451CAD0CF88A757BD009-CLAUDIA BELL] |
| **Sent:** | 10/5/2015 4:31:35 PM |
| **To:** | Pete Petit [/o=Mimedx/ou=Exchange Administrative Group |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=4b58bba5458449718a9ebfbb9a7a228f-Pete Petit]; Lexi Haden |
| | [/o=Mimedx/ou=Exchange Administrative Group |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=eb1498a0723241f297337826f11c6b75-Lexi Haden] |
| **CC:** | Pam Martin [/o=Mimedx/ou=Exchange Administrative Group |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=2d824bde60f242c7b655b46a5e52dbba-Pam Martin] |
| **Subject:** | FW: Please see attached |
| **Attachments:** | Letter related to 11.27.12 Distributor Agreement (FE).pdf |

<div style="border:1px solid">

# Redacted

</div>

**From:** Claudia Bell
**Sent:** Monday, October 05, 2015 4:31 PM
**To:** 'incaremed@aol.com'
**Subject:** Please see attached


Claudia Bell
*Executive Legal Assistant*
Office 770-651-9316 | Fax 770-590-3567 | Cell 404-402-2508

MiMedx Group, Inc.
1775 West Oak Commons Ct. NE
Marietta, GA 30062
cbell@mimedx.com
www.mimedx.com

<div style="border:2px solid">

**DEFENDANTS'
EXHIBIT**

**249**

19 Cr. 850 (JSR)

</div>

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_00435420
USAO_SDNY_R_001145206

**DX 249-001**



October 5, 2015

<u>Via Email and Federal Express</u>
Mr. Mark Brooks
CPM Medical
1565 N. Central Expressway
2nd Floor
Richardson, TX  75080

      Re:     Distributor Agreement dated November 27, 2012

Dear Mark,

You have indicated that you intend to "take a credit" for Product that was supposed to be shipped to you in exchange for the EpiFix product that we accepted back outside of contract terms. Pursuant to section 15 of the Distributor Agreement, product returns are only accepted for Product that fails to conform with the warranty set forth in Section 15.1. As there was no return at issue here, but rather an exchange, there is no contractual mechanism by which a credit can be taken. Thus, the credit you claim is improper, and the amount owed by CPM sits at $1,121,366.40, which consists of $1,067,968.00 as invoiced, plus a 5% add back for the reasons described below. This balance is overdue.

The base payment terms under the contract are net 60 days from date of shipment, pursuant to the Third Amendment. Under the terms of the Fourth Amendment that we signed in June 2015, we agreed to continue to provide a 5% price discount on products sold to CPM, provided that CPM's accounts receivable was paid consistent with past practice during the prior 12 months. During the 12 months prior to June 30, 2015, CPM's average days in accounts receivable was 74 days. Following the signing of the Fourth Amendment, however, the average days in accounts receivable for the third quarter rose to 139 days. Thus, the 5% discount which was automatically applied to invoices with the assumption that payments would be made within terms no longer applies. Furthermore, even under the more permissive payment terms described in the Fourth Amendment, CPM is in default. Pursuant to Section 16.2(iii) of the Agreement, CPM has 15 days to cure this default, or MiMedx will proceed with its right to terminate the Agreement.

Please let me know if you would like to discuss this matter further.

Sincerely yours,

Parker H. "Pete" Petit
Chairman and CEO

PHP/pm

AmnioFix   EpiFix

*Innovations in Regenerative Biomaterials*

MiMedx Group, Inc.  |  1775 West Oak Commons Ct NE  |  Marietta, GA 30062  |  770.651.9100  |  Fax 770.218.6199  |  www.mimedx.com

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_00435421
USAO_SDNY_R_001145207

| **From:** | Lexi Haden [/O=MIMEDX/OU=EXCHANGE ADMINISTRATIVE GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=EB1498A0723241F297337826F11C6B75-LEXI HADEN] |
| **Sent:** | 10/21/2015 2:21:09 PM |
| **To:** | Thornton Kuntz [/o=Mimedx/ou=Exchange Administrative Group |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=9e6b014e4369437ea00e36a5200155b2-Thornton Kuntz]; Theresa Tardell |
| | [/o=Mimedx/ou=Exchange Administrative Group |
| | (FYDIBOHF23SPDLT)/cn=Recipients/cn=6a9783caf38e45c8a3f509e22ee4cbba-Theresa Tardell] |
| **Subject:** | FW: Letter to Marks Brooks 102115 |
| **Attachments:** | Mark Brooks CPM Final Letter 102115.pdf |

Termination letter sent to Mark Brooks today.  thx

Alexandra O. Haden
*General Counsel & Secretary*
Office 770-651-9217 | Fax 770-590-3567 | Mobile 678-595-8823

MiMedx Group, Inc.
1775 West Oak Commons Ct.
Marietta, GA  30062
lhaden@mimedx.com
www.mimedx.com

**From:** Pam Martin
**Sent:** Wednesday, October 21, 2015 1:16 PM
**To:** Pete Petit; Lexi Haden
**Subject:** Letter to Marks Brooks 102115

Letter has been faxed and I am send out original via Fedex tonight.

Pam

DEFENDANTS'
EXHIBIT

**270**

19 Cr. 850 (JSR)

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_00446660
USAO_SDNY_R_001156446

DX 270-001



October 21, 2015

<u>Via Facsimile: 972-767-3051 and Federal Express</u>
Mr. Mark Brooks
CPM Medical
1565 N. Central Expressway
2nd Floor
Richardson, TX  75080

Dear Mark,

I have not received a response to my October 5, 2015 letter to you regarding your default under the Distributor Agreement.  As the default has not been cured within the 15 day period specified in the Distributor Agreement, this will serve as notice that MiMedx is exercising its right to terminate the Distributor Agreement pursuant to Section 16.2(iii), and the Consulting Agreement pursuant to Section 3(c).

We certainly appreciate the relationship our companies have had and wish you the best in your future endeavors.

Sincerely,

Parker H. Petit
Chairman & Chief Executive Officer

PHP/pm



MiMedx Group, Inc.  |  1775 West Oak Commons Ct NE  |  Marietta, GA 30062  |  770.651.9100  |  Fax 770.218.6195  |  www.mimedx.com

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_00446661
USAO_SDNY_R_001156447

DX 270-002

| From: | Pete Petit [/O=MIMEDX/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=4B58BBA5458449718A9EBFBB9A7A228F-PETE PETIT] |
|---|---|
| Sent: | 9/25/2015 12:45:36 PM |
| To: | Bill Taylor [/o=Mimedx/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=a7876def816848e2b2a81e81404578b3-Bill Taylor]; Michael Senken [/o=Mimedx/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=4ae8549c29b04140af2cceb45c4e8884-Michael Senken]; Lexi Haden [/o=Mimedx/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=eb1498a0723241f297337826f11c6b75-Lexi Haden]; John Cranston [/o=Mimedx/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=168cd2724c32408494aa9e52975f0ddb-John Cranston] |
| CC: | Mike Carlton [/o=Mimedx/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=0fd076b358b4428696e86c16d4c21c0e-Mike Carlton]; Chris Cashman [/o=Mimedx/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=b4b3953da33e4d2db51d9455cc12fbbb-Chris Cashman] |
| Subject: | Fwd: CPM |
| Attachments: | CPM Summary.pdf; ATT00001.htm |

FYI.

Parker H. "Pete" Petit
Chairman and CEO
MiMedx
1775 West Oak Commons Court
Marietta, GA 30062
Office (770) 651-9101
www.mimedx.com

Begin forwarded message:

> **From:** Pete Petit <PPetit@mimedx.com>
> **Date:** September 25, 2015 at 12:27:49 PM EDT
> **To:** Mark Brooks <incaremed@aol.com>
> **Cc:** Pete Petit <PPetit@mimedx.com>
> **Subject: CPM**

Mark,

Here are my thoughts on our situation.

GPOs

MiMedx has completed everything we committed to regarding GPOs and helping CPM access our contracts. Joe and Jeff met with you and went over the details. The open items for CPM are for you to advise which contracts you want to join, details on how you will report the sales, and then how you will pay the GPO fee associated with your sales. You have not delivered this information.

However, with only around 60 days left on our contract with CPM, and no indication from you on whether or not you want to renew the contract, it does not seem worthwhile to expend the effort on GPOs.

AmnioFix Exchange

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_00311940
USAO_SDNY_R_001021726

**DEFENDANTS'
EXHIBIT
658**
19 Cr. 850 (JSR)

There is $392,088 in product that CPM has asked to exchange.   We have also been clear that we will <u>not</u> accept a return only, because it is not in accordance with our company policy.

EpiFix Exchange

CPM has $276,000 worth of EpiFix (the acquisition cost) that you have asked to exchange.  The agreement we had in March 2014 allowed CPM to return EpiFix within 10 days for an exchange value of about 2.8 times their purchase price.  Any remaining consignment inventory at your physician's office could then be sold by CPM.  Contractually MiMedx is <u>not</u> obligated to exchange this remaining EpiFix product.  This was fully addressed in the March 2014 amendment.  CPM could have retrieved the consignment inventory and returned it to MiMedx within the prescribed 10 day period, but you chose not to do so, presumably because you felt CPM could make more money by selling it than our offer.  If we are to make an exchange, the fair and reasonable action here is to swap out the product at the $276,000 acquisition value.

I understand that you claim that CPM could not sell EpiFix any more after Dr. Stone's facility received a letter from MiMedx later in 2014 stating that only MiMedx was authorized to sell EpiFix.  Those letters were sent because the CPM EpiFix product was being sold in states other than Texas, which was outside CPM's contract territory, and this necessitated the letters.  If we mistakenly sent those to some facilities in Texas, we could have easily rectified the situation had CPM simply phoned MiMedx and explained the situation at the time the incident occurred.

Accounts Receivable

Under the terms of the Fourth Amendment that we signed in June 2015, we agreed to continue to provide a 5% price discount on products sold to CPM, provided that CPM's accounts receivable was paid consistent with past practice during the prior 12 months.  During the prior 12 months, CPM made regular payments such that net terms were less than 90 days.  Following the signing of the Fourth Amendment, however, the accounts receivable balance rose well above the 90 day mark.  This is not in keeping with the terms of the Fourth Amendment.  Accordingly, an additional 5% should be added to CPM's accounts receivable balance, as the discount was contingent on payment of invoices to keep accounts receivable at less than 90 days, which did not occur.


Pete


Parker H. "Pete" Petit
Chairman and CEO
MiMedx
1775 West Oak Commons Court
Marietta, GA 30062
Office (770) 651-9101
<u>www.mimedx.com</u>

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_00311941
USAO_SDNY_R_001021727

| CPM Summary as of 9/24/15 | | Comments |
|---|---|---|
| AR balance after payments in transit, net of 5% discount of $116k | $ 2,312,057 | $200k clearing with bank |
| Ammofix exchange | $ (392,088) | |
| Epifix exchange with value including CPM profit | $ (675,880) | CPM pricing of $276k |
| Net balance assuming returns including CPM profit, and no exchange PO | $ 1,244,089 | |
| CPM Profit | $ 400,000 | $676k - $276k |
| Net balance assuming returns without CPM profit | $ 1,644,089 | |

**Note:**
Payments received in Q3 2015

| | |
|---|---|
| July | $ 100,000 |
| August | $ 800,000 |
| September | $ - |
| Total | $ 900,000 |

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_00311942
USAO_SDNY_R_001021728

**CPM Payment Patterns**

| Quarter | Balance | Payments Month 1 | Payments Month 2 | Payments Month 3 | Payments Total |
|---|---|---|---|---|---|
| Q4 2013 | $ 2,275,000 | $ 600,000 | $ 207,380 | $ 850,000 | $ 1,657,380 |
| Q1 2014 | $ 1,202,000 | $ 628,436 | $ - | $ 475,000 | $ 1,103,436 |
| Q2 2014 | $ 814,000 | $ 100,000 | $ 507,615 | $ 977,615 | $ 1,585,230 |
| Q3 2014 | $ 950,000 | $ - | $ 222,496 | $ 1,236,724 | $ 1,459,220 |
| Q4 2014 | $ 543,000 | $ 100,000 | $ 244,422 | $ 598,318 | $ 942,740 |
| Q1 2015 | $ 2,665,000 | $ 400,000 | $ 174,240 | $ 900,000 | $ 1,474,240 |
| Q2 2015 | $ 3,365,000 | $ 100,000 | $ - | $ 800,000 | $ 900,000 |

FOIA Confidential Treatment Requested by Sidley Austin LLP

MMDX_00311943
USAO_SDNY_R_001021729

DX 658-004



DEFENDANTS'
EXHIBIT
**1005**
19 Cr. 850 (JSR)

THOMSON REUTERS STREETEVENTS

# EDITED TRANSCRIPT

MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

EVENT DATE/TIME: JULY 30, 2015 / 2:30PM GMT



©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited
without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its
affiliated companies.



USAO_SDNY_000216625

## JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

### CORPORATE PARTICIPANTS

**Thornton Kuntz** *MiMedx Group, Inc. - SVP - Administration*

**Parker Petit** *MiMedx Group, Inc. - Chairman, CEO*

**William Taylor** *MiMedx Group, Inc. - President, COO*

**Michael Senken** *MiMedx Group, Inc. - CFO*

### CONFERENCE CALL PARTICIPANTS

**William Plovanic** *Canaccord Genuity - Analyst*

**Matthew Hewitt** *Craig-Hallum Capital Group - Analyst*

**Brad Mas** *Needham & Company - Analyst*

**Bruce Jackson** *Lake Street Capital Markets - Analyst*

**Mark Landy** *Northland Capital Markets - Analyst*

**Jason Wittes** *Brean Capital - Analyst*

**Joseph Munda** *First Analysis - Analyst*

### PRESENTATION

**Operator**

Good day, ladies and gentlemen, and welcome to the MiMedx Group Q2 Earnings Call. At this time, all participants are in a listen-only mode.

(Operator Instructions).

As a reminder, today's conference call is being recorded.

I would now like to turn the conference over to Mr. Thornton Kuntz, Senior Vice President of Administration. Please go ahead, sir.

---

**Thornton Kuntz** *- MiMedx Group, Inc. - SVP - Administration*

Thank you, operator, and good morning, everyone. This presentation contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934. These statements are based upon the current beliefs and expectations of our management and are subject to risks and uncertainties. Actual results may differ materially from those set forth in, contemplated by, or underlying the forward-looking statements, based on factors described in this conference call and in our reports filed with the Securities and Exchange Commission, including our Form 10-K for the year ended December 31, 2014, and our most recent 10-Q. We do not undertake to update or revise any forward-looking statements except as may be required by the company's disclosure obligations in filing it makes with the Securities and Exchange Commission under Federal securities laws.

With that, I will turn the call over to Petit, MiMedx's Chairman and CEO.

---

**Parker Petit** *- MiMedx Group, Inc. - Chairman, CEO*

Thank you, Thornton. Welcome and thanks for joining us for our second quarter conference call. I have with me today Bill Taylor, our President and Chief Operating Officer; Mike Senken, our Chief Financial Officer; and Thornton Kuntz, our Senior Vice President of Administration. There are also other executives in the room.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



USAO_SDNY_000216626

JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

We concluded another very strong quarter. We would like shareholders to take note of two key developments that should clearly signify that MiMedx will not experience a revenue drop because of some type of dramatic change in demand for allograft products. First, CMS has issued its proposed payment policy for 2016 for skin substitutes. There are no significant changes in proposed reimbursement. I think there was some considerable misinformation circulating that there would be huge reimbursement reductions by CMS. Frankly, the MiMedx EpiFix allograft should save the Medicare and commercial system significant amounts of costs, and we continue to find ways to provide the most cost-effective solutions for our patients, providers, and payers. We do not foresee any significant issues in reimbursement area in the near future.

Second, but just as important, it has been reported by SmartTRAK, that Medline, a major supplier of healthcare products to the hospital sector, has announced it will be withdrawing its amniotic tissue from the market in September. This should be a clear indication that when a large well-established healthcare supply organization cannot develop significant revenues so that they decide to leave the market, the MiMedx presence should be considered to be the major deterrent.

Over the last several years, we've established a very strong leadership position in advanced wound care sector of healthcare. This has been accomplished through investments in clinical and scientific studies, other investments in corporate infrastructure, and significant investments in a sales force that is very well trained; and a majority of whom have significant experience in advanced wound care. Incidentally, Medline is one of the parties that we have brought suit against for patent infringement because we believe the amniotic tissue product violates our patent; also, of course, their supplier of their product, which is MTF.

Again, I consider these two very significant [advantage] relative to our future presence and growth in the advanced wound care sector of healthcare. It should clearly indicate that we have achieved the leadership role here in a period of several years, and we will remain the leader.

Now, let me reiterate some of our quarterly highlights quickly. The second quarter was our 15th consecutive quarter of meeting or exceeding our revenue guidance. Our second quarter revenues were almost 80% higher than our second quarter a year ago. Our Wound Care sales grew 85% over second quarter last year. Our Surgical, Sports Medicine, Orthopedic revenues increased 114% over second quarter of last year. Our adjusted EBITDA of $10.6 million represented a 265% improvement over the second quarter of 2014. Our net income for the quarter of $5.4 million was 12% of our revenues and should be compared to a loss of almost $400,000 in the second quarter of 2014. Our adjusted EBITDA of $10.6 million was 23% of revenues.

In our opinion, these are extraordinarily good results and an indication of our management expertise throughout the corporation. There are very few issues that we do not effectively manage, and with a number of troublesome issues we have dealt with over last two years, I wish to applaud our executives for managing through those matters exceptionally well while they continue through this very effective financial results.

We had another exceptional period of adding commercial health plan coverage. While this quarter was not quite as exceptional as our first quarter, which I reminded everyone at that time, it was unusually good. This quarter was quite robust with only a small percentage now of commercial lives for whom we have yet to receive coverage. We added another 12 million-plus covered lives for the second quarter, which brings our total commercial coverage to approximately 160 million lives. Medicare has about 36 million covered lives. Also, we have 29 states providing Medicaid coverage.

All of this has been a result of several years of very hard and diligent work by our management staff. The foundation element happens to be our 20-plus publications, six of which were randomized controlled trials and seven of which were scientific studies of significance. We will continue to maintain high standards for our publications and continue to educate our sector of healthcare what many pro-medical evidence happens to be.

So from a revenue standpoint, we had another quarter with significant progress. The strong growth occurred despite the issues associated with the expiration of pass-through status for EpiFix Medicare reimbursement. I know that was a concern. It was an issue for which we developed plans over a year ago. When it had affected the first quarter and a portion of the second quarter, I believe the actions we took in terms of offering new products that would be at or under the bundle price and products that would help alleviate pricing pressures on larger wounds were effective. Also anytime that billing processes and related considerations change, there is a significant lag in wound care centers and hospitals building process on getting back on track. This disruption does affect the rate at which our product or any products of these changes are utilized due to the uncertainty for the provider institutions. We understand these complexities and manage them well.

3

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

USAO_SDNY_000216627

## JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

I believe we resolved the vast majority of those issues and related questions during the second quarter. It looks as if we have dealt with those market changes relatively efficiently in the first and second quarter. And we expect the clinical demand for EpiFix in wound care setting will not be significantly affected by these non-clinical issues in the future.

Relative to our patent suits, we have made some progress. We have had mostly positive results from the litigation. I believe the competitors, who we think are violating our patents, know clearly that we will persevere until we bring these matters to a just conclusion. However, I will remind you again that most product line protection endeavors occur in the marketplace. We review our patent portfolio as a strong company asset, and we will protect it accordingly. We also work very diligently to be sure that our products have the best clinical and scientific evidence, the best reimbursement coverage, the best contractual coverage with IDNs and GPOs, and the best and most highly trained people representing us to providers. That's where the real battles occur and finally where the war is won. Our current leadership position should verify how this is going to end.

Relative to the OIG subpoena we received last year, we have had some developments in finalizing this process. As we previously discussed with you on March 23rd of this year, the government indicated it was declining to intervene at the time in the qui tam action that gave rise to the OIG subpoena. If the relator intended to carry the suit forward, they had 120 days from that date to serve the complaint on MiMedx. The relator has not done so, and we have no indication they intend to proceed with the case. As has been discussed on previous call, it is extremely unusual for an OIG case of this nature to be included in a matter of months, and I'll emphasize, extremely rare. I believe that it's an attribute to our corporate integrity and our business practices.

Relative to the Food and Drug Administration, we have continued to have discussions and written communications with them during the quarter. As we previously noted, at the end of December, the FDA filed an indication of their desire to change or clarify their interpretation of the regulations related to skin substitutes. They did this by issuing new draft guidance documents. This created a major reaction from industry trade associations, including the American Association of Tissue Banks, AdvaMed, and the Alliance for Regenerative Medicine. They all have strong comments relating to the lack of a scientific basis for these proposed changes, their interpretations with the FDA current regulations, and the FDA's legal right to make these changes without going through the formal process of notice and comment rulemaking. Therefore, for the first time, MiMedx has not been standing alone in terms of the issues associated with an untitled letter.

We intend to continue our discussion with the agency relative to issues associated with the untitled letter. However, we're also rapidly progressing down the IND and BLA pathway. We've begun enrolling patients for IND/BLA study for our EpiFix allograft, uses of injectable for plantar fasciitis. We're close to filing our second IND/BLA relative to other uses of the micronized product. We'll keep you informed as this progress unfolds.

I'll turn the discussion over to Bill Taylor, our President and Chief Operating Officer. Bill?

---

**William Taylor** - *MiMedx Group, Inc. - President, COO*

Thanks, Pete. Good morning, everyone. As you've seen, our second quarter was yet another excellent quarter, and we performed at the high-end of our projections. Our Wound Care growth was sizeable, and we're on path to continue that growth. We continue to expand our sales force, our operational infrastructure, and are expanding our product development efforts.

Let me start out by talking about sales. Our second quarter illustrated yet another very strong growth in terms of number of patients treated and revenue, particularly with respect to Wound Care. You will recall that last year when EpiFix had pass-through status, approximately 80% of our Commercial Wound Care business was our smaller grafts, which were 2x3 centimeter size or smaller and about 20% were larger sizes.

With the expiration of pass-through this year, we purposely added sizes and configurations to help treat larger wounds, but yet still be at or under the bundle. We introduced our mesh product in late first quarter of this year. And I know one of the concerns with the expiration of the pass-through was that we would lose all the big wounds, and our revenue would drop substantially. Well, I'm very happy to announce, it was a full quarter of sales of our mesh configuration, which covers wounds up to about 20 square centimeters. We are still at about the 80%, 20% small sizes versus big sizes; so 80% small sizes, 20% big sizes.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



USAO_SDNY_000216628

Our average selling price for the large size is obviously reduced because of the pass-through and the adjustments in our pricing. But we've retained and grown the overall number of procedures and thus the number of patients treated. So looking at it another way, the expiration of pass-through status for EpiFix essentially was realigned in the first quarter. And our average graft price per application was adjusted slightly down. But the average has stabilized and our procedure volume is growing very nicely.

Also, as Pete mentioned, the proposed CMS physician office and hospital outpatient payment for 2016 have been released, and there are no significant changes. This is excellent news and played out as we anticipated with no material price or reimbursement changes. The final rule will be released in November, but based on the perspective of our proposed payment just published, no significant changes should be expected in November.

On a related note, as we Pete mentioned, according to BioMedGPS, there is a lot of information from that on SmartTRAK. MiMedx now is the leading advanced wound care company in terms of revenue. Frankly, based on our informatics data, we actually think that we have a bigger lead than what even BioMedGPS discussed. As our field data showed, some of our competitors actually have smaller revenue than what's reported in the SmartTRAK numbers. Add that to the fact that our average graft price per application is lower than our closest competitor. We, on average, take fewer grafts to heal wounds. We are thus, by far, the leader in terms of patients treated in advanced wound care.

So, additionally, you'll recall that a number of our competitors have tried to duplicate our success over the past year or two. One of them, as Pete mentioned, was a very large company, Medline, with a Revitalon product. And, again, according to SmartTRAK, Medline is dropping the Revitalon product and focusing their attention elsewhere.

This is just one example regarding this market and the fact that it is not easy or simple to enter this market and be successful. We project there will be others that will also exit this market down the road. Advanced wound care may appear to be a market with low barriers to entry. However, I think people are finding that achieving significant market share in this market is not easy, and the barriers are numerous and substantial. It's not difficult to gain a small amount of revenue, but it is very difficult to achieve scale.

Now, some people maybe asking after our report about our federal revenue, which year-over-year was up 34% quarter over this quarter last year, but was down from our sequential quarter, first quarter of this year. I'd also like to point out that year-over-year, year-to-date, we are up 43% in the first six months of this year compared to the first six months of last year. So we have sizable growth in our federal business.

So even though our growth was -- we had a lower quarter in the second quarter than we had in the first quarter where we've had substantial growth. And no, there has not been a large market shift. In fact, as we indicated earlier, our competition is finding that it's getting very difficult to gain traction in these accounts.

Overall, the federal business does have some seasonality as well as fluctuations due to some facilities with stocking orders as well as our surgical cases. You may recall that we've got a very good penetration on the wound care side, but we're growing our surgical business in the federal accounts. So that's one of our growth areas in these areas. So many facilities also give purchase orders as the product is used, but others order maybe one or two months of stock at a time. Also, when we sign our BPAs, or Blanket Purchase Agreements, like the one we've discussed last quarter, which was a $6.5 million overall BPA, we can get large stocking orders under those agreements in increments like $100,000 or $150,000, et cetera. So that can also result in some quarter-to-quarter variation.

So just to remind you, our last three quarters had revenue of $10.8 million, $13.8 million, and then this latest quarter at $12.1 million, which is very strong and we expect this to continue strengthening. So if you're analyzing our federal business, I suggest you focus on the yearly trend lines as it's much more indicative of our strong growth in this market rather than just simply sequential quarter.

So, turning to our sales force or sales team. You'll recall that, at the time of our last shareholder call, we were about 200 field sales personnel. And today, we're approximately 215 people, give or take. We're still on target to be around 240 by the end of the year. And I'd like to also highlight at this time our surgical team, which is doing some great development of the market on the surgical procedure side, and starting to drive some very nice case volume in surgical cases. We found a number of new surgical procedures, where our grafts are now being utilized. I'll wait a few quarters

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

before I go into detail on those for competitive reasons. But I just wanted to give a quick congratulations to our surgical sale team for making that progress.

I also want to congratulate our Wound Care team and that they continue to drive significant incremental procedure volume, which in our view is not only capturing market share from our competitors, but it's also growing the market by enabling patients who in the past did not receive advanced wound care due to price, now they can receive it based on the cost-effectiveness of our products.

Now, turning to intellectual property, I want to expand on what Pete said earlier. As you know, we've filed three patent infringement lawsuits against companies whom we believe are infringing our patents. In two of these cases, as we predicted, these companies had filed for an inter partes review or IPR. This process is relatively new and essentially is designed to challenge specific claims in patents. Each of these IPR cases have at least two patents that are being challenged.

Now, in the earlier case, the first major ruling came down and did so in our favor. It was related to our EpiFix patent. And basically, the IPR was denied for that patent. This means the appeal board felt there was not sufficient evidence to even allow the review to go forward. So this is a very significant win for MiMedx, and we expect more on this front down the road.

Now, the second challenged patent in that case relates to our embossment of our grafts, which is a novel way to tell which side of the graft should be placed up. We also received a significant win in this patent. This was allowed to go forwarded in the IPR process unlike the other one. But there were five claims that were originally challenged.

Our win here is that on the IPR, only two of the five challenges were accepted by the Patent and Trials Appeal Board (sic - Patent Trial and Appeal Board). Only those two claims now will be reviewed. So the bottomline here is that based on this decision, the worst that could happen is that we will have two claims either revived or eliminated, but overall we'll still have the patent stand. So we feel very good about our position. Also, I just want to remind you that we have a number of new patents pending as well that should further strengthen our patent portfolio.

Now, I know since we announced our accelerated efforts on CollaFix, our collagen fiber technology, many of you maybe looking for an update. Other than saying our team is fully engaged and almost completely staffed and progressing forward rapidly, I'm not going to go into much more details until a little bit later this year, again for competitive reasons. So we'll go into that hopefully by the time of our analyst meeting in October.

Last, I just want to remind you that we completed our construction and initial move into our additional new building, which is about a half mile away from our headquarters building. And our team did a great job to finish that construction on time and moved our teams into it in early June. That gives us some good room from growth, and I want to congratulate everybody for pulling that off during a very busy quarter without missing a beat.

With that, I'll turn it back over to Pete.

---

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Thank you, Bill. Hopefully that clarified a number of key issues. And let's go now to Mike Senken.

---

**Michael Senken** - *MiMedx Group, Inc. - CFO*

Thanks, Pete. Company recorded revenues for the second quarter were approximately $45.7 million, an increase of 79% or $20.1 million over prior-year second quarter revenue of $25.6 million. Growth was driven by both Wound Care, and Surgical, Sports Medicine, and OEM, or SSO market.

The company added over 400 new customers in the quarter, while also increasing product usage in existing accounts. Wound Care revenue was $35.6 million, which represents a 73% increase over prior year. We saw strong unit sales growth, including the recently launched mesh configurations

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



USAO_SDNY_000216630

**JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call**

in wound care. SSO revenue was $10.1 million, which represents a 104% increase over prior year. Growth was driven by direct sales and surgical applications as well as distributor sales.

On a customer segment basis, Commercial revenue was $33.6 million, which represents a 103% increase over prior year; while Federal revenue was $12.1 million, which is a 34% increased over prior year. For the six months ended June 30, 2015, reported revenues were $86.4 million, which represents an increase of 92% as compared to prior year.

Gross margins for the quarter were 89%, which is equivalent to the second quarter of 2014, bringing total year-to-date gross margins to 88% as compared to 87% in the prior year. Our strong gross margins are driven by Wound Care sales.

R&D expenses for the quarter were approximately $2.1 million or 4% of quarterly revenue as compared to $1.8 million in second quarter of 2014. On a year-to-date basis, R&D spending is up 22% over prior year. The year-over-year increase in R&D spending is driven primarily by increased investments in animal studies and clinical trials.

Selling, general, and administrative expense was approximately $32.7 million for the quarter or 71% of quarterly revenue as compared to $21.2 million or 83% of quarterly revenue in 2014. The year-over-year increase in SG&A spending was due to the continued build-out of our direct sales force in both wound care and surgical markets, additions to the reimbursement team, and other support areas as well as increased legal cost, primarily related to our patent lawsuits. We added 20 direct sales reps in the quarter, bringing the total direct sales headcount to 210. On a year-to-date basis, SG&A expense was 72%.

The company reported positive adjusted EBITDA margin of 23% or approximately $10.6 million for the quarter ended June 30, 2015, which is a $7.7 million improvement as compared to an adjusted EBITDA of $2.9 million in the second quarter of 2014.

It is the 14th consecutive quarter of reporting positive adjusted EBITDA. Included in our press release is a reconciliation of adjusted EBITDA to reported net income. The improvement is driven by increased sales volume and corresponding operating leverage. For the six months ended June 30, 2015, adjusted EBITDA was $19.3 million.

Operating income in the second quarter was approximately $5.7 million or 12.4% of quarterly revenue, which represents an improvement of $6 million as compared to an operating loss of $392,000 in the second quarter of 2014. On a year-to-date basis, operating income was $9.9 million or 11% of total revenue as compared to an operating loss of $1.3 million in 2014.

The company reported net income for the second quarter of approximately $5.4 million or $0.05 per basic and diluted common share as compared to a net loss of approximately $390,000 or $0.00 per basic and diluted common share in the second quarter of 2014. Year-to-date net income was $9.5 million or $0.08 per diluted common share as compared to year-to-date net loss of $1.3 million or a $0.01 per share in 2014.

Turning now to the balance sheet. The company reported approximately $91.8 million in current assets, including $38.6 million in cash; $7.3 million in short-term investments, which are comprised of fully insured and liquid bank certificates of deposits; $39.5 million in accounts receivable; and $3.9 million in inventory.

Days sales outstanding for the quarter were 78 days as compared to 68 days at the end of the prior quarter. Due to the continuing growth in new customers, we have added key staff in the credit and collection function to keep up with the growth. Inventory turns were 5.3 for the quarter as compared to 4.9 at the end of the prior quarter.

Current liabilities were $19.5 million as compared to $18.5 million at the end of the prior quarter, with the increase in line with the growth in the business. The company repurchased 459,000 shares in the quarter under the share repurchase program, bringing the cumulative total to approximately 2.8 million shares repurchased under the plan.

Turning now to the statement of cash flow. The company reported positive cash flow from operating activities of approximately $2.9 million for the quarter as compared to positive $1.2 million for the second quarter of 2014. Positive cash flow from operating activities for the quarter was

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

USAO_SDNY_000216631

JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

driven mainly by an increase in adjusted EBITDA, somewhat offset by increased accounts receivable. As mentioned previously, we have added additional resources to the credit and collection area in support of the continued rapid growth in direct customers.

Cash used in investing activities in the quarter of $117,000 includes $1.2 million in purchases of equipment, somewhat offset by a reduction investments in certificates of deposits. Fixed asset purchases are related to our outfitting of our new building, our IT infrastructure and production-related activities including CollaFix.

We expect capital expenditure spending in the second half of the year to be at a slightly higher pace than the first half of this year as we continue to build out our CollaFix production as well as our tissue processing activities. Cash flow from financing activities for the quarter was a negative $2.9 million, including $4.3 million for share repurchases, somewhat offset by the proceeds received from the exercise of stock options.

And finally, we added a total of 60 associates in the quarter, bringing our total headcount to 484, which represent a 51% increase as compared to June 30, 2014. In addition to the previously mentioned sales force additions, we have added a number of tissue processors in the quarter in support of increased demand.

Turning now to our guidance. The company has reiterated our 2015 guidance of between $180 million and $190 million in revenue. Due to accelerated investments in several growth areas, including CollaFix, we have lowered our operating margin guidance to between 12% and 14% from greater than 15%. Our guidance for the third quarter is $47 million to $50 million in revenue, and an operating profit of between 13% and 14%.

And finally, management will be participating in the 35th Annual Canaccord Genuity Growth Conference, on August 12, at the Intercontinental Hotel in Boston, Massachusetts. Please check back to the Investor Relations page on our website for further updates.

With that, I will turn the call back over to Pete.

---

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Thank you, Mike. We've achieved rapid success in obtaining our leadership role in advanced wound care. We will maintain that leadership position. We will continue to grow our market share in wound care. We've probably only penetrated about half of the market at this point in time.

Now, watch our progress in the surgical area. We expect to acquire leadership role in certain sectors where our biologics can play a role in the procedure. I'm sure that our progress will also climb a "wall of worry" as we have experienced with our climb to our leadership role in wound care; just patiently watch our progress.

We want to let you know that we will hold our Annual Analyst Meeting in New York on October 13. Certain institutional investors and analysts will be invited to that meeting. It was certainly quite a success last year, and we hope to build off that success for this year's meeting.

We thank you for joining us today. We appreciate your confidence in MiMedx and our management team. And always, we'll attempt to keep you very informed on our progress.

Now, we'll open the call to questions and answers.

---

## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions) And our first question comes from the line of William Plovanic of Canaccord Genuity. Your line is now open.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



USAO_SDNY_000216632

**William Plovanic** - *Canaccord Genuity - Analyst*

Hi, great. Thanks. Good morning. So I think the first question I have here is just, you alluded to it several times, I don't know if you will provide granularity on it. But in terms of the wound care, obviously, ASP is coming down just because of the mix on sizing. I'm curious as to what the growth of the units was year-over-year in that wound care business?

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Bill, it was substantial but we don't have it in front of us. And it looks like probably [interest] going forward will be in that number, and we'll try to give you some guidance on that going forward.

**William Plovanic** - *Canaccord Genuity - Analyst*

And then what -- I think it's interesting, but what do you think kind of the long-term growth for wound care? How should we think about that business for the next kind of three to five years once you really penetrate into the commercial piece that you have and you have been able to cannibalize from your competitors?

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Well, let me make a comment and then Bill can give maybe some specifics. I think from our standpoint, we still have a lot of market share to garner. We also have a lot of growth to broaden the market. As Bill mentioned earlier, we're going to market, because previously the two market leaders had a $1,600 to $1,800 product, and that just wasn't going to be used on smaller wounds. Now, those smaller wounds grow to be larger wounds using conventional care. So what's happening is physicians are using advanced wound care, namely our small grafts to close wounds earlier, and that reduces the possibility of infections and reduces costs also from that standpoint.

So we're going the market, also we're taking market share, and we'll continue to do that. We have the most cost effective product. And even though there is a lot of noise in the market at this stage, a lot of it is just noise and it will dissipate; evidence, Medline. If anybody had feet on the street in terms of, probably over 1,000 sales people, Medline could have gotten the job done. But we've said all we need to say about that. Bill?

**William Taylor** - *MiMedx Group, Inc. - President, COO*

Yes. And then I'll just add, again, we're seeing evidence. And I think in our October meeting, Analyst Meeting, we'll get to even more detail from our analytics group. But we are clearly seeing an expansion of the marketplace in terms of number of patients treated, and there needs to be, because as of right now, there is roughly 1.2 million people with just a hard-to-heal diabetic foot ulcers and venous leg ulcers, and forget about pressure ulcers and some of the other products, but 1.2 million people with somewhere in the neighborhood of 15% of them getting treatment with advanced wound care when -- so that leads to huge amount of growth to be had there when you can get a cost effective product like what EpiFix is.

On top of that, we're really starting to expand our efforts internationally. So I think you're going to see for the next three to five years some continued strong growth, definitely double-digit growth for the next several years when you look at the cost effectiveness as well as the international expansion.

**William Plovanic** - *Canaccord Genuity - Analyst*

And then my second question and then I'll get back into queue is just your accounts receivable was up pretty significantly on a sequential basis. I think it was up double the revenues. I've had a bunch of questions on that this morning. Any special terms, stocking, anything in there or could you just -- color you could provide us?

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



USAO_SDNY_000216633

## JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Well, one thing, we had a strong, very strong June, and when revenues come in late in the quarter, that just shows. Mike?

**Michael Senken** - *MiMedx Group, Inc. - CFO*

Yes, I think I'd mentioned it in my prepared remarks. Obviously, you're adding the number of accounts that we're adding. We have a little bit of ketchup to do in terms of just having the resources to keep on top of it. Really, other than that, it's just the normal back and forth with our accounts.

**William Taylor** - *MiMedx Group, Inc. - President, COO*

And our long-term planning is really right around that mid-70 to 75 time frame. We've been unusually strong in the last several quarters. So I think long-term, that 75 days are probably where we're going to target.

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

And we've been as high as 88 days, 89 days in the last year or so, and down as low as low 60s, but it will fluctuate depending on mix, ramp-up, and customers, et cetera. But we don't have special bunch of special terms.

**William Plovanic** - *Canaccord Genuity - Analyst*

Thank you.

**Operator**

And our next question comes from Matt Hewitt of Craig-Hallum Capital Group. Your line is now open.

**Matthew Hewitt** - *Craig-Hallum Capital Group - Analyst*

Good morning, gentlemen. I've got actually just a few questions in a couple of different areas; maybe first with Mike. Could you give us the percentage of revenues that micronized represents today?

**Michael Senken** - *MiMedx Group, Inc. - CFO*

It's consistent with last year, Matt.

**Matthew Hewitt** - *Craig-Hallum Capital Group - Analyst*

So roughly around 12% to 14% in that neighborhood?

**Michael Senken** - *MiMedx Group, Inc. - CFO*

That's correct.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



**Matthew Hewitt** - *Craig-Hallum Capital Group - Analyst*

Okay, great. And then I guess on the micronized topic, you mentioned in the press release and that it's kind of been out for a little bit, but the congressional letter to the FDA regarding their use of untitled letters, could you provide a little bit of background for those that haven't been following that closely, what does that mean? And more importantly how can that help you with your untitled letter for the micronized product?

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Well, there is a lot of communications back and forth between various congressional committees and FDA on this subject. There was a letter sent May 6 of last year by four senators, specifically on untitled letters and changes in regulations through guidance documents; so very lengthy detail letter. FDA finally gave them answer about 60 days ago, the night before they were holding on a hearing on this subject. That's still an ongoing inquiry.

There has been a formal of the House Energy and Commerce Subcommittee on investigations, filed a formal investigation on this subject about 60 days ago. That's in a public record. So there is a lot of issues associated with untitled letters and guidance documents, trying to change the regulations.

And from our standpoint, we're kind of poster child for some of that. And of course, there's other companies that have issues, and it's just a hot topic at this stage with not only industry but with Congress. And generally, when something like this becomes as prevalent as it has and with much activity going on, there are issues.

So, to me, it just highlights the fact that we're not standing alone any longer. That there is industry trade associations now as well as a numerous congressional committees focused on this subject because it is a problem. It's an industry problem. It's a problem for the American populous and healthcare system.

**Matthew Hewitt** - *Craig-Hallum Capital Group - Analyst*

Okay, great. Thank you. And then shifting gears to international, you've touched on this here briefly. Where do you stand today as far as number of people, maybe in Europe? I think that's the first area you were going to. Do you have any countries where you are already selling product? Or when should we anticipate that really starting to roll into the mix?

**William Taylor** - *MiMedx Group, Inc. - President, COO*

Yes. So we're -- the challenges with tissue in Europe is a little different than devices, and that in devices you can get a CE mark and get in to all the European Union countries. Tissue is kind of different than that. You have to go country-by-country because there is still not a unified regulation that everybody has adopted over there. So it depends on the country. We're actually in and registered in the U.K, and Italy, not an EU country, but we're in Switzerland, Ireland, and a number of countries.

Our revenue in those countries are still pretty minor, but we're just really working with some distributors over there to drive those sales. I think in terms of having a meaningful material size of international sales, we're still looking at the back half of 2016 and 2017. Because once you get through the regulatory side, you still have to deal with the reimbursement side, and it can't be different even within the countries as well.

So we've got a lot of push on it from both the regulatory side as well as our sales management side. And I think we're going to get some additional wins and additional volume this year. But in terms of large percentage of our revenue, that's going to be back half of next year. But I think we're getting some good momentum.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



USAO_SDNY_000216635

**JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call**

**Matthew Hewitt** - *Craig-Hallum Capital Group - Analyst*

Okay, great. And then one last one from me. With the Zimmer-Biomet acquisition closed now, have you seen, or have you been getting some resumes that you can use those, I would assume, strong sales people with good rolodexes to augment your team and your growth as we hit the second half of the year?

---

**William Taylor** - *MiMedx Group, Inc. - President, COO*

Well, probably all I can say relative to the resumes and rolodexes is we have continued to receive unsolicited resumes from a lot of different folks, some in that organization and others. So I think that's going quite well. We've actually, relative to the launch that we've had, a number of now training sessions. Since that deal is closed, the Biomet specialist is here now so that they can include our products in their sales pattern as well.

So it's not happened as quickly as we'd like in terms of their uptake, but now that they've closed, we've got the Biomet people trained now. We think it's going to start picking up in the back half of the year. So I really don't want to speak specifically to the folks that we've hired. But between these organizations and others, there are some good people that are out there and available, and we've taken advantage where appropriate.

---

**Matthew Hewitt** - *Craig-Hallum Capital Group - Analyst*

Great. Thank you very much.

---

**Operator**

And our next question comes from Mike Matson of Needham & Company.

---

**Brad Mas** - *Needham & Company - Analyst*

Hey, guys, good morning. This is actually Brad in for Mike. Just the first one, Pete, I'm just wondering what -- I'm just kind of trying to take your brain what you expect from the guidance update from the FDA for the homologous use.

---

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Brad, state that question again. I didn't quite understand it.

---

**Brad Mas** - *Needham & Company - Analyst*

Just wondering what you expect from the guidance update from the FDA in the homologous use?

---

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Well, to be brutally frank, I don't know. The homologous use, what information we have is it probably this fall, late fall, they will come with that decision. And then early next year, the minimal manipulation in homologous use will all kind of come together, and they'll try to figure out how to move forward.

They're going to get a lot of pressure from Congress in terms of going through the normal rulemaking process. And I think because of all the focus on this, from congressional members, committee heads, as well as industry, there is a good case that that might be the way they have to proceed but we'll see. In meantime, we're running our business and trying to stay informed and help them understand industry position on this matter.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

USAO_SDNY_000216636

**Brad Mas** - *Needham & Company - Analyst*

And then regarding CollaFix, I know, Bill, you said you didn't really want to talk about it. Just wondering if I can get anymore information on the potential regulatory pathway, I mean any anticipated broad timing sense and just any spending requirements that you could provide.

**William Taylor** - *MiMedx Group, Inc. - President, COO*

Yes. So, on our call, you may remember last time when we talked about the first one or two products we anticipate being 510(k), and then there's definitely some that are likely to be PMAs as well. Our current plan is to launch with the 510(k) products first. And the earliest would be probably 15, 16 months from now, at the earliest. So we still are refining those schedules as we're pulling the project back together. And I think come the Analyst Meeting in October, we'll have a little bit better clarity for the first product line there and the timing associated with it. But if you look at that 15- to 18-month range, that earliest window on the first 510(k), that's probably the best estimate we're going to able to give you right now. Relative to investment, I don't know that we've disclosed that yet, and Mike can talk about it.

**Michael Senken** - *MiMedx Group, Inc. - CFO*

I did mention in my prepared remarks we had some expectation or forecasting out in our CapEx for the second half of the year. We're, I guess, in effect, building a clean room at our Kennesaw facility in anticipation of getting up and running with production there. So that's included in the forecast. And again, if you look at the first half of the year, we'll be up slightly in the second half of the year in terms of CapEx and CollaFix is part of that.

**Brad Mas** - *Needham & Company - Analyst*

And then, Mike, inventory turns were up a bit. I mean inventory kind of dipped down. Just wondering if there's anything to point out?

**Michael Senken** - *MiMedx Group, Inc. - CFO*

Well, here, again, one of the things that we're dealing with as we're ramping up here and we have different configurations that are part of this, part of the challenge is forecasting all of that out and having the right mix. And if you wonder, if you understate certain configurations and they're not in stock, it kind of bleeds down the inventory. We would actually expect the turns to actually come down. As we learned more quarter-by-quarter in terms of the mix demand, we'd like them to come down a little bit. We'd like more safety stock and we will fix that as we go along. We'll learn more about the demand for these new configurations.

**Brad Mas** - *Needham & Company - Analyst*

And then just last quick one from me. Just wondering, I mean I know Medline is dropping out of the market in September, but I mean competition is obviously rising. Just wondering if you foresee that lead-in into any pressure on pricing?

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Well, if anybody could have brought pressure on pricing it was Medline. They walked around in the market with 10% and 20% discounts and more in some cases. Our product is very, very, very well respected, not only clinically, but cost-wise because of the very effective sizes we have, et cetera.

And on the commercial side, the pricing is pretty well locked down. We understand what happened with the CMS pricing. So we don't think for another year, until CMS makes some moves perhaps on the physician side, then I'm just using that as an example, there's going be any significant pricing changes.

13

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**

USAO_SDNY_000216637

## JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

**Brad Mas** - *Needham & Company - Analyst*

Okay. Thanks very much, guys.

**Operator**

And our next question comes from Bruce Jackson of Lake Street Capital Markets. Your line is now open.

**Bruce Jackson** - *Lake Street Capital Markets - Analyst*

Going on with the patents right now, is Medline [a slow] party in the patent litigation?

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Yes, they are.

**Bruce Jackson** - *Lake Street Capital Markets - Analyst*

And then in terms of the litigation strategy here, is the idea to get a resolution on these first three cases and then move onto the other companies or might you consider expanding out further?

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Well, we haven't filed all the actions that we plan to file. We're just buying our time. We have more patents issuing for each month. And we've got our strategy well-planned.

**Bruce Jackson** - *Lake Street Capital Markets - Analyst*

And then right now, is the litigation expense hitting the SG&A line?

**Michael Senken** - *MiMedx Group, Inc. - CFO*

Yes, it is.

**Bruce Jackson** - *Lake Street Capital Markets - Analyst*

Could you give us just -- I know patent litigation expense can be kind of lumpy sometimes. Is it like a consistent amount per quarter? And do you have a rough idea of -- can you give us a rough idea of how much it is?

**Michael Senken** - *MiMedx Group, Inc. - CFO*

This quarter it was little over $1 million.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



USAO_SDNY_000216638

JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

**Bruce Jackson** - *Lake Street Capital Markets - Analyst*

Did you get any orders from Medtronic or Zimmer?

**William Taylor** - *MiMedx Group, Inc. - President, COO*

We did have some Medtronic and Zimmer was close. I'm not sure that we had that shipment yet. I have to go back and double check.

**Michael Senken** - *MiMedx Group, Inc. - CFO*

Yes, I believe we shipped Medtronic.

(Crosstalk)

**Michael Senken** - *MiMedx Group, Inc. - CFO*

I don't believe we shipped the Zimmer order in the quarter.

**William Taylor** - *MiMedx Group, Inc. - President, COO*

Okay. It was close.

**Bruce Jackson** - *Lake Street Capital Markets - Analyst*

Then on last question with the clinical trial that you're running for the micronized product to support your BLA, how is the enrollment proceeding and how many patients do you so far?

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

The enrollment is proceeding -- nothing ever happens fast enough for Pete Petit, but anyway, the enrollment is proceeding at a normal pace. We're trying to increase that. I'd just simply say we're under 25 patients probably enrolled.

**William Taylor** - *MiMedx Group, Inc. - President, COO*

But as far as we can tell right now, we brought a number of our facilities online. And I think we are still planning on completing the enrollment by the end of this year. We're pretty close to that.

**Bruce Jackson** - *Lake Street Capital Markets - Analyst*

Okay. That's it for me. Thank you.

**Operator**

And our next question comes from Mark Landy of Northland Capital Markets. Your line is now open.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



USAO_SDNY_000216639

JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

**Mark Landy** - *Northland Capital Markets - Analyst*

Good morning, folks. Thanks for taking my questions. Mike, I guess a question for you to [sparkle us]. In terms of the accelerated or the additional growth spending that you incurred this quarter, was that accelerated spending that perhaps would have come out of 2016? Or is that new spending that you guys have decided to incur given where the business is?

**Michael Senken** - *MiMedx Group, Inc. - CFO*

Well, we're ahead of our plan in terms of adding sales individuals. And we also added a few resources focused on CollaFix that weren't in our original plan or were in our plan later rather than earlier. So it's decisions we make. We've always indicated we're going to give guidance on bottomline, that we always reserved the right to pull in expenses if we see an opportunity. We've done that now for three years going all the way back to when the sales people became available out of Shire, and we'll continue to do that.

So there are some of that going on. We can't disclose all of it just for competitive reasons, not to indicate where we maybe moving in some other areas, but its all of those things, Mark.

**Mark Landy** - *Northland Capital Markets - Analyst*

Okay, fair enough.

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Mark, when we have an opportunity -- let me add this. When we have an opportunity, and we've said this before, before we were on the calls, when we have an opportunity on this to hire a sales person or persons, we get a tremendous return on investment there, tremendous at this stage of our growth. And so, we're selective, but at the same time, sometimes we just can't pass up opportunities, and so trying to give guidance on our EBITDA or operating earnings if we see opportunities and we move on.

**Mark Landy** - *Northland Capital Markets - Analyst*

I guess, Pete, that kind of dovetails into my next question, which was what do you think the increase or when do you think we'll see some of the increased sales or growth come through from the accelerated or the new spending that you've incurred? Or is that just kind of too tough to patch up right now?

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Well, with a smile on my face, "subsequent quarters."

**Mark Landy** - *Northland Capital Markets - Analyst*

All right, fair enough. And then just a last one from me, Pete. I think you probably discuss this maybe more one on one, but with Integra buying TEI and getting into the industry, certainly that's a big positive, big validation for the space. But how do you guys see it going forward with accelerating penetrations? Certainly, there is a lot of penetration and education to just happen in this market. How does that help you, of course, with having a solid competitor such as Integra in the market?

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



USAO_SDNY_000216640

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Well, I think, good professional, well-run corporate entities entering into the market are good for the market. They had credibility, et cetera. What's troublesome is smaller entities who are not as professional and do things that create credibility issues. So Integra is -- as I've said to our group here, Integra to us is a first real competitive entity that's, a large entity that's well-run and well-organized.

They're going to focus primarily in the surgical area in lower extremity. That's an area that where we have some focus. If they try to attack wound care directly, they're going to have the same I think disappointing point results that Medline did, although again, they'll have a better trained sales organization. So we respect that and conducting ourselves accordingly.

**Mark Landy** - *Northland Capital Markets - Analyst*

Well, thanks, guys. That's all I got.

**Operator**

And our next question comes from Jason Wittes of Brean Capital. Your line is now open.

**Jason Wittes** - *Brean Capital - Analyst*

Hi, thanks for taking my question. One or two, it sounds like the Medtronic-Zimmer contribution was limited at this quarter at best. I think you're not sure if one of them shipped. Should we be anticipating much for the rest of the year from those two parties or realize that's something and someone out of your control, but I'd be curious to know if you had any visibility?

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Well, let me say something then Bill can comment. Again, we have been so busy with other opportunities that we really haven't had a lot of time to stress with their upper management and middle management some of the opportunities. We've had some training sessions, but we haven't had the kind of conversations that we probably should attempt to have. But, again, we'd only have certain control over that, and they've been, in the case of Zimmer, very busy with other things. Bill?

**William Taylor** - *MiMedx Group, Inc. - President, COO*

Yes, we've actually been working and reaching out to see what we can do to help them drive additional business. And I think we're going to continue that over this last half of the year. But in terms of what impact to our revenue, we still expect it to be very, very minor and non-material.

**Jason Wittes** - *Brean Capital - Analyst*

Okay, that's fair. And I wanted to ask about surgical sports medicine. It's obviously becoming a major focus for you, guys. My understanding is that you started dedicating sales people sort of at the beginning this year. So does that translate into, I imagine, you've doubled your revenues there already this quarter. But I imagine, with the gestation period, et cetera, with the sales force, that's something that should see even more significant growth in the second half or how we should we'd be thinking about sort of the progression for surgical, sports medicine?

**William Taylor** - *MiMedx Group, Inc. - President, COO*

We do expect that to continue to grow in the second half just from -- we've told some people in the past, too, in that particular area, we do expect it's going to take a little longer for our folks to get up to our target revenue than it does in wound care, at least our historical wound care. Historically,

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

we've estimated around six month to get up to there, roughly 1 million dollar annual run rate. We expect in the surgical area, it's going to generally take longer, probably more like eight, nine months on average to get to those kind of run rates. We still don't have enough experience there yet to validate that assumption. Although, I think we're on track from what we're seeing so far with that, but we don't have enough experience to fully validate it.

So it takes a little bit longer, but we do expect to get there. So the expectation in the back half of the year, we'll see some additional, very solid growth there. And we'll keep adding to that team as well and gain some momentum not only through the penetration of our existing people, but with the new folks that we bring on board.

**Jason Wittes** - *Brean Capital - Analyst*

Did you disclose what the breakout was between sports and wound care with your direct sales force?

**William Taylor** - *MiMedx Group, Inc. - President, COO*

On the direct side, we did not break it out that way because everything includes our sales agents, distributors, and direct on the Surgical, Sports Medicine side.

**Jason Wittes** - *Brean Capital - Analyst*

How about from the total perspective, what is the rough percent breakdown?

**Michael Senken** - *MiMedx Group, Inc. - CFO*

If you're just going back to, call it, our SSO revenue for the quarter, as a percentage of total, the Wound Care is 78% and the SSO is 22%.

**Jason Wittes** - *Brean Capital - Analyst*

One last question. You mentioned that you're sort of back to an 80-20 mix in Wound Care on small versus large grafts. It sounds like you think that's kind of like the normalized number to think about that's not going to move much. That fits in with the way things work with pre-reimbursement changes. And it sounds like you feel that sort of the way the market will remain? Or is that something that's also likely to change?

**Michael Senken** - *MiMedx Group, Inc. - CFO*

No, that's our feeling as we were back to where we were basically last year and the year before in terms of the mix. Obviously, first quarter was a little bit up because we didn't have our mesh fully up to speed on at that time. But if you look at the statistics, there was an article probably two years ago or so out of Healogics that indicated that if you look at the size of the wounds, particularly diabetic foot ulcers and venous leg ulcers, roughly 75% to 80%, just off the top of my head, are 5 square centimeters or less. So we're right in line with the published data on wound sizes in area that we're in, give or take a couple of percent. So we feel that this is likely to get a long-term mix for us from large sizes, the small sizes based on that data.

**Jason Wittes** - *Brean Capital - Analyst*

Great. Thank you.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

USAO_SDNY_000216642

## JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

**Operator**

(Operator Instructions) And our next question comes from Joe Munda of First Analysis. Your line is now open.

**Joseph Munda** - *First Analysis - Analyst*

Good morning, guys. Thanks for taking the questions. First off, last quarter, you guys talked a little bit more in depth about EPIBURN. I didn't see a mention of it in the release or in the prepared remarks. Any clarity there as far as EPIBURN and a percentage of Surgical Sports revenues and just the underlying growth that you're seeing in that segment would be great?

**William Taylor** - *MiMedx Group, Inc. - President, COO*

Yes, on EPIBURN, as you know, last quarter, we talked about the launch of that. We're still early in the development of that market. So we expect that's going to be a little bit lumpy in the developmental market going forward. So we did not have a large growth in that in the second quarter. We do expect the back half of the year we'll start growing nicely in that area. But, again, we're early on, we're not really in all the -- we're just in a smaller number of the burn centers across the country. We have a lot of room for growth there.

**Joseph Munda** - *First Analysis - Analyst*

And as far as revenues were concerned, any shot at giving us what the percentage was as the total of the segment?

**William Taylor** - *MiMedx Group, Inc. - President, COO*

Yes, we haven't disclosed that yet. I expect that down the road, if that grows and becomes a more meaningful part of our business, we'll get into that.

**Joseph Munda** - *First Analysis - Analyst*

And then some of the key points here. You guys talked about, obviously about international sales expansion and I appreciate the color of the markets that you're registered in. Can you give us some sense of the size of the European market as well as the plans to attack that market? I mean is it going to continue to be a distribution model? Or is it going to replicate what you've done here in the U.S. as far as putting feet on the street?

**William Taylor** - *MiMedx Group, Inc. - President, COO*

Well, in term of the sales force side, I think we're initially are looking at distribution partners. But the way we're setting things up is to make sure that we are in control of the registration. That way, if at some point in time, we either need to change partners or if we want to go direct in those markets, we can. I think at the moment, it's very similar to what we did early on here as we went through distributors and sales agents early on and then converted to a direct sales force when we got the right momentum. I expect that would be similar internationally. So we're setting ourselves up, so we can make similar translation to the right points in time.

Now, in terms of the market size, I don't have that information in front of me. I would say, generally speaking, the ASP in those international countries are less than the U.S. Certainly, there is still a huge amount of chronic wounds in those countries. Some of the countries use types of advanced wound care, but the use of, what we call in the U.S., advanced wound care products is not as prevalent in some of those countries. So there is going to be a little bit of a shift in the way that they treat them. A lot of the countries use autograft, so they take a piece of skin from a different area of the body and utilize it. But, again, I think we're going to have a very good shot with our cost of goods and our cost to closure being able to really penetrate those markets over the coming years because we've got a solution that's so cost effective compared to what there used to, and can limit and reduce the amount of amputations and other complications.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



USAO_SDNY_000216643

So in terms of market size, I think you're just going to have to look at Europe as probably from a dollar perspective, smaller than the United States from a dollar perspective. But from a unit perspective, it's probably more or so, I would expect, just based on the population.

**Joseph Munda** - *First Analysis - Analyst*

Helpful, thank you. As far as the surgical side of the business, I know, Pete, you're very bullish on what lies ahead for the company. I mean can you give us some clarity, do you think it's going to be volume growth? Do you think it's going to be the fact that you're building out a dedicated sales force and you're touching more accounts? Or is there a possible reimbursement down the line that you think could actually help accelerate adoption of the product?

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

From the surgical area, it's a little bit different market and different approach in a number of ways. We've got some innovative technology that positions, see some real advantages, too, and bring in faster closure to surgical procedure, less complications, less pain, et cetera, et cetera. So it's going to be used and works its way through, generally speaking, the DRG process. So we have to keep our products priced so that they can affectively be used and priced into procedure.

So it's a different market than advanced wound care. We have to select our niches carefully. We've got a publication already in the urology area. So it will be a niche-by-niche approach with the hiring of people who have experience in those particular areas.

So we're going to be picking up accounts because we hire the right people, and that's where the growth will come from initially. And then, as we get wider usage and more publications out, then physicians will broaden the usage of the products.

**Joseph Munda** - *First Analysis - Analyst*

Just two more here. Mike, your comments on hiring additional head people in the credit collection area. Taking into account the sales guidance on the top line, are we expecting that we're at the peak of DSOs here and we're going to see them come down in the back half to a more normalized level going forward?

**Michael Senken** - *MiMedx Group, Inc. - CFO*

Yes, Joe, that's certainly our plan. As Bill mentioned, and I don't like to bring this out, in case any customer is listening, we target around 75 days. We were doing better than that. And it's not that we offer extended terms, we don't. And we haven't changed our terms, whether that be distributor or otherwise. Part of what happens as you're growing and you're adding, let's say, new commercial accounts and new reimbursements, typically there is a slower process upfront in terms of getting the claims paid to the hospital or the clinic or the doctor's office. And then over time, it becomes more normalized. And even though our terms say, we don't care, if you don't get reimbursed, you still owe it to us. Practically speaking, the payments are a reflection of how quickly they get reimbursed. And that's a big part of what's happening.

**Joseph Munda** - *First Analysis - Analyst*

And then my final question, I mean as far as the guidance itself is concerned on the op margin side, I know you guys cited investments and accelerated growth now, but I mean how much of that revision can be related to, let's say, you have R&D, the hiring that you're doing on SG&A side and the litigation. I mean any clarity there as far as what's driving that op guidance down -- I'm sorry, the operating margin guidance down, would be really appreciated.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

USAO_SDNY_000216644

## JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Well, generally in the past, we've given the following comment. We pay a lot of respect to EBITDA and operating margin. That's just embedded in our culture. But when we have opportunities particularly with very talented and experienced sales people, and we find niches where we're going to make a commitment and make it quickly, we're going to take those because the return on investment is huge. We're not talking about percentages. We're talking about Xs.

So we'll make those commitments. We budget here very, very precisely, and we know what our business is doing. But we make these commitments and have opportunities that flash in front of us, we will take them. So that's what you're seeing here. It's not -- and of course, the legal expenses related to patents and other things, right now, they're higher, they should be coming down. But those are just part of the flow that we generally have knowledge of. It's these opportunities that flash in front of us, and we'll take advantage of them because of the huge ROI.

**Joseph Munda** - *First Analysis - Analyst*

Okay, thank you.

**Operator**

And our next question comes from William Plovanic of Canaccord Genuity. Your line is now open.

**William Plovanic** - *Canaccord Genuity - Analyst*

Hey, great. Thanks for taking my follow-up. Just on that operating margin question. Pete, is there any reason to think that as we look at 2016 and 2017 for that kind of longer-term guidance that you had provided that there would be any change to that in getting to that 25% operating margin guidance in a couple of years?

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Bill, we don't see any major deterrents to that. Again, these are a little quarter-to-quarter perturbations that you see are going to be driven by these specific opportunities. But long-term, a company with the kind of operating leverage we have, I said it many times, should be producing those kind of operating profits and these large EBITDA.

**Michael Senken** - *MiMedx Group, Inc. - CFO*

Bill, maybe I can add to that as well. You consider the somewhat dramatic change that occurred with the expiration of pass-through and trying to kind of forecast out what the impact was going to be in terms of the different configurations. As we learn more, we'll adjust our spending in certain areas to get to where we think the investors want us to be.

**William Plovanic** - *Canaccord Genuity - Analyst*

Well, the investors want you to be what you guide to. So just making sure there is no change there. And then just on kind of a nuance, I know, Mike, that you had shifted some revenue out of Wound and into SSO. I think that was the burn, and that started in Q1 and kind of flows into Q2. I don't know if there are any other products that were with that. But I was just wondering, what was the magnitude to that in the year-ago quarter? Because I think what's happening also we might be underreporting the wound care and over-reporting the SSO line. And I'm just trying to kind of understand what the real comp is?

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



USAO_SDNY_000216645

## JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

**Michael Senken** - *MiMedx Group, Inc. - CFO*

There is some impact year-over-year, but honestly it's not material where burn was reported last year. Again, burn became more of a focus for us, I think late third quarter more into the fourth quarter. So comparing year-over-year to date would not be material.

---

**William Plovanic** - *Canaccord Genuity - Analyst*

And then my last nuance question is just on taxes. You have been profitable for a while typically when we get to this situation and you print money for four quarters and then a full year. You're going to move at least on the P&L to a fully tax reporting company. I think I have 40% of my model as I look at '16 and '17. But what do you think that you'll be reporting on a GAAP P&L basis as we look at '16 and '17, understanding you're going to have tax loss carryforwards in your cash, it will be much different?

---

**Michael Senken** - *MiMedx Group, Inc. - CFO*

Yes, I'd say 35% to 40%. What you have in your model is I think fine, Bill.

---

**William Plovanic** - *Canaccord Genuity - Analyst*

Perfect. Thank you very much.

---

**Operator**

Thank you. And I'm showing no further questions at this time. I'd like to turn the conference back over to Mr. Petit for closing remarks.

---

**Parker Petit** - *MiMedx Group, Inc. - Chairman, CEO*

Well, thank you. Well, I think we've had a very informative call and a lot of really excellent questions. We will keep you intimately informed. As we have always said, if we have good news that's going to come and if we have bad news, we'll get it out to you ahead of time.

Okay, thanks so much. We look forward to keeping you well-informed and giving you good results, and doing what we tell you we're going to do. Thanks.

---

**Operator**

Ladies and gentlemen, thank you for participating in today's conference. This does conclude the program and you may all disconnect. Have a great day, everyone.

---

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



## JULY 30, 2015 / 2:30PM, MDXG - Q2 2015 MIMEDX GROUP INC Earnings Conference Call

### DISCLAIMER

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2015, Thomson Reuters. All Rights Reserved.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

©2015 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



USAO_SDNY_000216647

PP_000001_T

| Begbates | PP_000001 |
|---|---|
| Date | 7/19/2018 |
| Time | 01:24:52.000 |
| Date | "Carlton W. Mike" <+16785963100> |
| **Total Voicemail Duration** | 00:00:39 |

Hey Pete, just talked to John Sasko.  He is in Mexico on vacation, but took my call.  We spoke for about 20 minutes.  He will call you, uh, on Friday morning, if that's ok.  He's gonna be way out at sea tomorrow, unable to call – out of cell phone range.  But tomorrow – Friday morning, he will call you.  His number, by the way, is 561-213-0459.  Once again, 561-213-0459.  Thanks, Pete.

PP_000003_T

| Begbates | PP_000003 |
|---|---|
| Date | 7/25/2018 |
| Time | 22:45:59.000 |
| Date | "Carlton W. Mike" <+16785963100> |
| Total Voicemail Duration | 00:00:14 |

Hey Pete, it's Mike, it's uh 6:45.  I've got some, uh, feedback from today's meetings that I thought might be relevant, uh, for your preparation for tomorrow.  Um, give me a call and uh, we'll talk soon.  Thanks.

PP_000005_T

| Begbates | PP_000005 |
|---|---|
| Date | 8/10/2018 |
| Time | 12:13:50.000 |
| Date | "Carlton W. Mike" <+16785963100> |
| Total Voicemail Duration | 00:00:42 |

Hey Pete, Mike, uh, the only uh company that I can think of that uh was a perceived competitor that starts with an A is uh Amniox um Biotissue in Miami, Amniovox or Biovance.  Uh, Biovance doesn't start with an A, but that was a annoying little uh, uh cellularity, I think they went to cellularity, um, and not cell genes, so it could be Biovance.  But it might be Amniox if it started with an a. They're tied to biotissue out of Miami. Uh, they competed with us in the [inaudible] space and also cord. Uh, wish I could help better, um, that's all I got.  Thanks.

PP_000007_T

| Begbates | PP_000007 |
|---|---|
| Date | 8/14/2018 |
| Time | 15:41:06.000 |
| Date | "Jeff Schultz" <+13124422244> |
| Total Voicemail Duration | 00:00:41 |

Hey Pete, it's Schultzie.  Uh, just checking in on you, buddy.  Seeing how you're feeling.

I know, uh, you went over to Europe for a couple weeks. Hopefully you, you and Janet had a nice trip and got a- got away from all this bullshit over here.

But, ah, just checking in with you, buddy.  I wanna see what's going on and see what the status is with this organization moving forward.  And, uh, what's happening - if you got any insights for me.

But, ah, give a call if you get a chance. I know you're probably really busy with different things. But, ah, tell Janet, ah, take care and, ah, I love you buddy.  Call me when you can.

 See ya. Bye.

PP_000009_T

| Begbates | PP_000009 |
|---|---|
| Date | 8/22/2018 |
| Time | 22:01:26.000 |
| Date | "Jeff Schultz" <+13124422244> |
| **Total Voicemail Duration** | 00:00:26 |

Hey Pete, it's Schultzie.

Just checking in on you, buddy.  Was thinking about you today and wanted to see how you're feeling and how everything's going.

I know you're probably busy with stuff, but just, ah, concerned about ya and, ah, just want you to know, I love you buddy, and I'm thinking about you, praying for ya, and, uh, hope everything's going as, as good as it can be.

Alright buddy.  Take care.  Call me soon.

PP_000011_T

| Begbates | PP_000010 |
|---|---|
| Date | 9/14/2018 |
| Time | 16:12:51.000 |
| Date | "Carlton W. Mike" <+16785963100> |
| Total Voicemail Duration | 00:00:13 |

Hey, uh, Pete, it's Mike.  Uh, calling you back.  Uh, 12:15 on Friday. Uh, good timing for your call - I got a couple of things to, uh, share with you. Talk to you soon.  Thanks.

PP_000013_T

| Begbates | PP_000013 |
|---|---|
| Date | 9/18/2018 |
| Time | 15:04:15.000 |
| Date | "Jeff Schultz" <+13124422244> |
| Total Voicemail Duration | 00:00:17 |

Hey, Pete, it's, uh, Schultzie.

Hey, can you gimme a call when you get a chance? Thanks, buddy. It's 312-442-2244.  312-442-2244.  Thanks. Bye.

PP_000015_T

| Begbates | PP_000015 |
|---|---|
| Date | 9/19/2018 |
| Time | 14:00:40.000 |
| Date | "Jeff Schultz" <+13124422244> |
| **Total Voicemail Duration** | 00:00:12 |

Hey, Pete, it's Schultzie.

Um, all good. Uh, you'll have it tomorrow morning via Fedex and, um, I just wanna say thank you and I love you buddy. Talk to you soon.

PP_000018_T

| Begbates | PP_000018 |
|---|---|
| Date | 9/20/2018 |
| Time | 17:09:31.000 |
| Date | "Jeff Schultz" <+13124422244> |
| Total Voicemail Duration | 00:00:24 |

Hey, Pete, it's Schultzie.

I got two things for you. Number one - did you receive the letter and number two - Bill Rust resigned today. He got another opportunity and uh, he's gone on – he's left the organization, so I wanted you to know that.  You heard it from me, they're starting to lose their area Vice Presidents now, so, uh, will talk to you soon.

Take care. Bye.

PP_000019_T

| Begbates | PP_000019 |
|---|---|
| Date | 9/20/2018 |
| Time | 22:35:32.000 |
| Date | "Jeff Schultz" <+13124422244> |
| Total Voicemail Duration | 00:00:33 |

Hey Pete, it's Schultzie.

I just saw the news, buddy. I'm thinking about you, praying for ya, and uh, you know I love you and I'm always in your corner, so, uh, these guys don't know what the hell they're doing. They have no fuckin' idea about a healthcare company. There's no leadership in this organization and it's absolutely disheartening.

And, I-I-I, I'm so sorry for what they are doing to you, and Bill. I, I am deeply, deeply saddened by it, buddy.  But I just want you to know I'm thinking about you and praying for ya.

Alright, I love you buddy.  See ya.

PP_000020_T

| Begbates | PP_000020 |
|---|---|
| Date | 9/26/2018 |
| Time | 14:47:38.000 |
| Date | "Jeff Schultz" <+13124422244> |
| Total Voicemail Duration | 00:00:11 |

Hey Pete, it's Schultzie.

Ah, just checking in on ya, man.  And, uh, seeing how things are going.  So if you get a chance, gimme a call back and, uh, we can catch up.

Talk to you soon, buddy.  Take care.

PP_000022_T

| Begbates | PP_000022 |
|---|---|
| Date | 10/16/2018 |
| Time | 19:12:21.000 |
| Date | "Jeff Schultz" <+13124422244> |
| Total Voicemail Duration | 00:00:22 |

Hey Pete, it's Schultzie.

You keep butt dialing me. I just wanna talk to ya – that's all I wanna do is talk to my buddy.

I hope you're staying strong, bud.  You're in my prayers every damn day, and I love ya. I love ya and I'm with ya.  Alright, talk to you later.  Call me when you wanna talk. Bye.

PP_000024_T

| Begbates | PP_000024 |
|---|---|
| Date | 1/9/2019 |
| Time | 21:04:25.000 |
| Date | "Jeff Schultz" <+13124422244> |
| Total Voicemail Duration | 00:00:27 |

Pete, call me back. It's Schultzie.

Got some stuff for you.  Hope you're doing well.

You hung up on me - don't understand. I didn't say anything offensive. I thought you just got tired of me, telling you about how I uh, how I took your company to greater heights and through 2012 to 17, and I thought you hung up on me, but gimme a call. See ya.

PP_000026_T

| Begbates | PP_000026 |
|---|---|
| Date | 3/8/2019 |
| Time | 18:49:57.000 |
| Date | "Jeff Schultz" <+13124422244> |
| Total Voicemail Duration | 00:00:24 |

Hey Pete, It's Schultzie. It's just about ten to two your time on Friday.  Hope you're doing good, General.

Uh, give me a call when you get a chance. I'm hoping you can give some good news. Uh, starting next week buddy. Uh, I'm fired up and hopefully we got some things figured out that I can start working hand-in-hand with Gloria and, uh, getting some things moving.

So gimme a call if you get a chance.  Thanks buddy.

PP_000028_T

| Begbates | PP_000028 |
|---|---|
| Date | 3/12/2019 |
| Time | 15:16:27.000 |
| Date | "Jeff Schultz" <+13124422244> |
| Total Voicemail Duration | 00:00:19 |

Hey Pete, It's Schultzie.

Uh, Give me a call when you can.  I think you're heading to Houston, uh, tomorrow, so I wish you all the best of luck, buddy and I'm praying for ya and I love ya. So, uh, stay strong, stay focused and, uh, go down there and kick some ass.

Alright, I love ya, bye

PP_000030_T

| Begbates | PP_000030 |
| --- | --- |
| Date | 8/1/2019 |
| Time | 18:11:03.000 |
| Date | "Jeff Schultz" <+13124422244> |
| Total Voicemail Duration | 00:00:32 |

Hey Pete, it's Schultzie and I got big, bad Mike Carlton on the phone with me. We were just talking about you and wondering how, number one, how the health is, how you're doing.  I know Mike ran into you in grocery store and said you, you look good and things were moving forward, but I just wanted to get a chance to catch up with ya.  So, if you get a chance, give me a call and, and uh, we can all catch up and see how things are going, buddy.

Uh, we miss you. We love you. We appreciate everything you've done for us in our life and, uh, we just wan- really want to see how you're doing.

Okay, buddy.  Take care. Bye.

# SLR Cash Balance by Month



DX 608-001



**Source:** DX-559 - DX-593



## SLR Cash Payments To MiMedx from November 2015 Through September 2016 Paying Down SLR's ~$4.6M Order in September 2015

**Grand Total Cash Received: $3,434,362**

DX 672-001

DX-671

**DEFENDANTS'
EXHIBIT
672
19 Cr. 850 (JSR)**

# Payment Timing: Days From Invoice To Payment

## Count Of All Payments By Days From Invoice To Payment (2014 – 2015 Invoices)



**Source:** DX-558

DEFENDANTS'
EXHIBIT
**604**
19 Cr. 850 (JSR)



# Reserves Available at End of Period

DX 0605-001

**Source:** DX-615, DX-616, DX-617, DX-619, DX-620, DX-621, DX-618, DX-622

**DEFENDANTS' EXHIBIT**
**605**
**19 Cr. 850 (JSR)**

# MiMedx Stock: Reaction To Revenue Announcement

| Quarter And Year | Stock Price Before Announcement | Stock Price After Announcement | Range Met Or Exceeded | Percent Change |
|---|---|---|---|---|
| Q1 2014 | $5.62 | $5.71 | Yes | ⬆ 1.6% |
| Q2 2014 | $6.28 | $7.03 | Yes | ⬆ 11.9% |
| Q3 2014 | $6.91 | $7.24 | Yes | ⬆ 4.8% |
| Q4 2014 | $9.27 | $8.79 | Yes | ⬇ -5.2% |
| Q1 2015 | $10.85 | $10.18 | Yes | ⬇ -6.2% |
| Q2 2015 | $12.41 | $11.15 | Yes | ⬇ -10.2% |
| Q3 2015 | $9.84 | $8.44 | Yes | ⬇ -14.2% |
| Q4 2015 | $8.55 | $8.45 | Yes | ⬇ -1.2% |
| Q1 2016 | $8.99 | $8.20 | No | ⬇ -8.8% |

Average -7.95%

DX-548, DX-549, DX-550, DX-551, DX-552, DX-554, DX-555, DX-556, DX-596, DX-557

DX 607-001

**DEFENDANTS' EXHIBIT**
**607**
**19 Cr. 850 (JSR)**