UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

PARKER H. PETIT and WILLIAM TAYLOR

Defendants.

No. 19 Cr. 850 (JSR)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT PARKER H. PETIT'S
MOTION FOR A JUDGMENT OF ACQUITTAL OR FOR A NEW TRIAL**

FRESHFIELDS BRUCKHAUS DERINGER US LLP

Eric B. Bruce
Jennifer B. Loeb
Sarah M. Caruana
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4577
Email: Eric.Bruce@freshfields.com
Email: Jennifer.Loeb@freshfields.com
Email: Sarah.Caruana@freshfields.com

KOBRE & KIM LLP

Matthew I. Menchel
Amanda N. Tuminelli
800 Third Avenue
6th Floor
New York, NY 10022
Telephone: (212) 488-1200
Email: Matthew.Menchel@kobrekim.com
Email: Amanda.Tuminelli@kobrekim.com

*Attorneys for Parker H. Petit*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 1

LEGAL STANDARDS ........................................................................................................... 2

I.      Rule 29 of the Federal Rules of Criminal Procedure ........................................... 2

II.     Rule 33 of the Federal Rules of Criminal Procedure ........................................... 3

III.    Securities Fraud ................................................................................................... 3

ARGUMENT ....................................................................................................................... 5

I.      The Court Should Enter A Judgment of Acquittal on the Substantive Securities Fraud Count ............................................................................................................... 5

        A.     The Government Failed to Present Sufficient Evidence that MiMedx's Recorded Revenues Did Not Comply with GAAP ................................... 7

        B.     No Reasonable Juror Could Have Found Beyond a Reasonable Doubt that Mr. Petit Intended to Defraud Investors ................................................. 8

               1.     An Executive's Motivation to Improve Company Performance Cannot Support a Reasonable Inference of Criminal Intent to Defraud Investors ................................................................. 8

               2.     The Failure to Disclose Sales Terms to An External Auditor Cannot Support a Reasonable Inference of Criminal Intent to Defraud Investors ............................................................... 10

        C.     No Reasonable Juror Could Have Found Beyond a Reasonable Doubt that Mr. Petit Knew MiMedx's Recorded Revenues Did Not Comply With GAAP .................................................................................................. 12

               1.     The Government Failed to Present Sufficient Evidence that Mr. Petit Knew Revenues Recorded for the CPM Sales in Q2 Did Not Comply With GAAP ......................................................... 12

                      a.     Alleged $200,000 Sales Incentive ............................... 13

                      b.     Alleged Swap Agreement ........................................... 14

               2.     The Government Failed to Present Sufficient Evidence that Mr. Petit Knew Revenues Recorded for the SLR Sales in Q3 Did Not Comply With GAAP ......................................................... 15

               3.     The Government Failed to Present Evidence that Mr. Petit Knew Revenues Recorded for the Stability Biologics Sales in Q3 and Q4 Did Not Comply With GAAP ........................................... 17

                      a.     Alleged Flexible Payment Terms ................................. 18

                      b.     Alleged Right of Return ............................................. 19

4.      The Government Failed to Present Evidence that Mr. Petit Knew
        Revenues Recorded for the Q4 First Medical Sales Did Not
        Comply With GAAP ................................................................................. 22

II.   In the Alternative, the Court Should Grant Mr. Petit a New Trial ................................... 23

CONCLUSION ............................................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Acito v. IMCERA Grp., Inc.*,
    47 F.3d 47 (2d Cir. 1995) ...........................................................................9

*Anderson v. First Sec. Corp.*,
    249 F.Supp.2d 1256 (D. Utah 2002)...........................................................9

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988)......................................................................................4

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976)......................................................................................4

*In re Focus Enhancements, Inc. Sec. Litig.*,
    309 F. Supp. 2d 134 (D. Mass. 2001) .......................................................21

*United States ex rel. Grabcheski v. AIG*,
    687 Fed. App'x 84 (2d Cir. 2017)..............................................................24

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001).........................................................................9

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
    289 F. Supp. 2d 416 (S.D.N.Y. 2003).........................................................4

*Pross v. Katz*,
    784 F.2d 455 (2d Cir. 1986).........................................................................4

*SEC v. Zandford*,
    535 U.S. 813 (2002)......................................................................................4

*Staples v. United States*,
    511 U.S. 600 (1994)......................................................................................1

*In re The Hain Celestial Grp. Inc. Sec. Litig.*,
    No. 2:16-cv-04581 (ADS)(SIL), 2019 WL 1429560 (E.D.N.Y. Mar. 29, 2019) .....................9

*United States v. Archer*,
    977 F.3d 181 (2d Cir. 2020)....................................................................3, 23

*United States v. Brown*,
    459 F.3d 509 (5th Cir. 2006) .......................................................................9

*United States v. Cassese*,
    428 F.3d 92 (2d Cir. 2005)...........................................................................5

*United States v. Coriaty,*
　　No. 99 CR. 1251, 2001 WL 1910843 (S.D.N.Y. July 16, 2001)............................................4

*United States v. Corsey,*
　　723 F.3d 366 (2d Cir. 2013)..............................................................................................24

*United States v. D'Amato,*
　　39 F.3d 1249 (2d Cir. 1994)................................................................................2, 3, 9, 19

*United States v. Ebbers,*
　　458 F.3d 110 (2d Cir. 2006)...............................................................................................6

*United States v. Ferguson,*
　　246 F.3d 129 (2d Cir. 2001)..........................................................................................3, 23

*United States v. Gjurashaj,*
　　706 F.2d 395 (2d Cir.1983)................................................................................................2

*United States v. Glenn,*
　　312 F.3d 58 (2d Cir. 2002)................................................................................................3

*United States v. Goyal,*
　　629 F.3d 912 (9th Cir. 2010) .................................................................................. *passim*

*United States v. Gramins,*
　　939 F.3d 429 (2d Cir. 2019)..............................................................................................4

*United States v. Litvak,*
　　889 F.3d 56 (2d Cir. 2018)...........................................................................................4, 24

*United States v. Lopez,*
　　74 F.3d 575 (5th Cir. 1996) ...............................................................................................3

*United States v. Martinez,*
　　54 F.3d 1040 (2d Cir. 1995)...............................................................................................2

*United States v. McCourty,*
　　562 F.3d 458 (2d Cir. 2009)...............................................................................................3

*United States v. Mulheren,*
　　938 F.2d 364 (2d Cir. 1991)...............................................................................................3

*United States v. Rigas,*
　　490 F.3d 208 (2d Cir. 2007)...............................................................................................7

*United States v. Rowland,*
　　No. 3:14CR79 (JBA), 2014 WL 7399358 (D. Conn. Dec. 30, 2014).......................................2

*United States v. Simon*,
  425 F.2d 796 (2d Cir.1969)................................................................................6

*United States v. Smith*,
  155 F.3d 1051 (9th Cir. 1998) ........................................................................11

*United States v. Vilar*,
  729 F.3d 62 (2d Cir. 2013)................................................................................3

*VanCook v. SEC*,
  653 F.3d 130 (2d Cir. 2011)..............................................................................3

**Statutes**

15 U.S.C. § 78..............................................................................................1, 3, 4, 11

18 U.S.C. § 371........................................................................................................1

False Claims Act, 31 U.S.C. §§ 3729 - 3733 .......................................................25

**Other Authorities**

17 C.F.R. § 240.10b-5 .......................................................................................1, 3, 5

Fed. R. Crim. P. 29 .......................................................................................*passim*

Fed. R. Crim. P. 33 ...................................................................................1, 2, 3, 25

Fed. R. Evid. 801(d)(2)(E)....................................................................................15

Defendant Parker H. Petit respectfully submits this memorandum in support of his motions for judgment of acquittal pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure or, in the alternative, for a new trial pursuant to Rule 33.

## PRELIMINARY STATEMENT

The conviction in this case was not supported by evidence. The Government presented merely the shell of a case, establishing only that MiMedx engaged in perfectly legal business practices at the end of quarterly reporting periods to meet its revenue guidance. The crucial element that prevents this otherwise innocent conduct from being treated like a crime is intent. A defendant generally must "know the facts that make his conduct fit the definition of the offense." *Staples v. United States*, 511 U.S. 600, 607 (1994).   The Government presented insufficient evidence to support a juror's reasonable inference that Mr. Petit knew that revenue was improperly recorded or knowingly and willfully concealed information from MiMedx's accountants and auditors in order to deceive investors. The Court should enter a judgment of acquittal for Mr. Petit because of this total failure of proof regarding his knowledge or intent.

## BACKGROUND

In an Indictment dated November 25, 2019, the Government charged Mr. Petit with one count of conspiracy to commit securities fraud, make false filings with the SEC, and improperly influence the conduct of audits, in violation of 18 U.S.C. § 371 (Count One), and one count of securities fraud, in violation of 15 U.S.C. §§78j(b) and 78ff and 17 C.F.R. § 240.10b-5. (Count Two). Dkt. No. 1. Following a four-week jury trial, the jury returned a verdict acquitting Mr. Petit of Count One (conspiracy) and convicting Mr. Petit of Count Two (securities fraud). As argued at the close of the Government's case-in-chief in a motion for a judgment of acquittal under Rule 29(a), the evidence at trial was insufficient to sustain a conviction with respect to

each element of Count One and each element of Count Two of the Indictment. Tr. 2187:4–2188:24. Mr. Petit now renews that Rule 29 motion for judgment of acquittal as to each element of Count Two to ensure that all arguments are preserved for appeal. *See, e.g.*, *United States v. Rowland*, No. 3:14CR79 (JBA), 2014 WL 7399358, at *1 (D. Conn. Dec. 30, 2014) ("[T]he defendant need not specify the ground of the motion in order to preserve a sufficiency claim for appeal[.]") (citing *United States v. Gjurashaj*, 706 F.2d 395, 399 (2d Cir.1983)). Mr. Petit therefore respectfully asks the Court to enter a judgment of acquittal on Count Two pursuant to Rule 29(c) or, in the alternative, to grant a new trial on Count Two pursuant to Rule 33.

## LEGAL STANDARDS

### I.      Rule 29 of the Federal Rules of Criminal Procedure

"After the government closes its evidence […] the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Pursuant to Rule 29(c), the Court must separately consider the sufficiency of the evidence at the close of all of the evidence. In either case, the standard is the same: the Court must determine whether the evidence presented at trial was sufficient for a rational juror to find the defendant guilty beyond a reasonable doubt. Fed. R. Crim. P. 29(a), (c).

For purposes of Rule 29, the Court views the evidence in the light most favorable to the Government, but "where a fact to be proved is also an element of the offense […] which is usually established only by inference – it is not enough that the inferences in the government's favor are permissible." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995). The Court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Id.* "[A] conviction based on speculation and surmise alone cannot stand." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).

Additionally, where "the evidence viewed in the light most favorable to the prosecution gives 'equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence,' then 'a reasonable jury must necessarily entertain a reasonable doubt.'" *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (quoting *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996)). In short, the Government "must do more than introduce evidence 'at least as consistent with innocence as with guilt.'" *D'Amato*, 39 F.3d at 1256 (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991)).

## II.      Rule 33 of the Federal Rules of Criminal Procedure

Rule 33 of the Federal Rules of Criminal Procedure allows a court to vacate a judgment and grant a new trial where the evidence "preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020).  A district court must "defer to the jury's resolution of conflicting evidence" *id*. (quoting *United States v. McCourty*, 562 F.3d 458, 475–76 (2d Cir. 2009), unless the evidence was "patently incredible or defie[d] physical realities," or where an "evidentiary or instructional error compromised the reliability of the verdict." *Id*. (quoting *United States v. Ferguson*, 246 F.3d 129, 134–37 (2d Cir. 2001)).

## III.      Securities Fraud

The sole substantive offense of which Mr. Petit was convicted—securities fraud under 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5—requires the Government to prove "that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device," and that he "willfully violated the law." *United States v. Vilar*, 729 F.3d 62, 88 (2d Cir. 2013) (quoting *VanCook v. SEC*, 653 F.3d 130, 138 (2d Cir. 2011)).

First, a securities fraud conviction requires the Government to show that the allegedly fraudulent conduct was committed "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). Although this element should be construed "flexibly to effectuate its remedial purposes," *SEC v. Zandford*, 535 U.S. 813, 819 (2002), the Second Circuit has made clear that a merely tangential relationship between a misrepresentation and the purchase or sale of a security cannot suffice. Rather, any alleged fraud must be "integral to the securities transaction" at issue. *Pross v. Katz*, 784 F.2d 455, 459 (2d Cir. 1986); *United States v. Coriaty*, No. 99 CR. 1251, 2001 WL 1910843, at *7 (S.D.N.Y. July 16, 2001) (granting Rule 29 motion because "[t]he connection between the misrepresentations and the sale of the securities is too tenuous to satisfy the 'in connection with' requirement of the securities laws.").

Second, a securities fraud conviction requires the Government to show that the alleged misstatement made in connection with a securities transaction is material, meaning there is "a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision." *United States v. Gramins*, 939 F.3d 429, 445 (2d Cir. 2019) (quoting *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018)). A misrepresentation is important to a reasonable investor if there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id*. (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)).

Third, not every material misrepresentation gives rise to criminal liability under the securities laws. The Government must show that a defendant acted with a "mental state embracing intent to deceive, manipulate, or defraud," also referred to as scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n.12 (1976); *see also In re Merrill Lynch & Co., Inc. Research*

*Reports Sec. Litig.*, 289 F. Supp. 2d 416, 427 (S.D.N.Y. 2003) ("[T]he requisite state of mind for actionable securities fraud under Rule 10b-5 is the intent to deceive, manipulate or defraud, not merely the intent to utter an untruth."). In the criminal context, the Government must further prove that a defendant acted willfully—that is, with "a realization on the defendant's part that he was doing a wrongful act." *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005).

For the reasons set forth below, the Government failed to present sufficient evidence to prove the elements of securities fraud.

## ARGUMENT[1]

### I.    The Court Should Enter A Judgment of Acquittal on the Substantive Securities Fraud Count

The Court should enter a judgment of acquittal for Mr. Petit because the Government failed to prove that revenues were recorded in violation of GAAP or that Mr. Petit knew revenue was improperly recorded, and thereby intended to deceive MiMedx investors.  While not every securities fraud prosecution requires the Government to prove a GAAP violation, this case is different because the Government's entire theory of prosecution was that MiMedx's revenue was improperly recorded specifically because it did not meet the revenue recognition criteria under GAAP. As the Court charged the jury in its final instructions, "the indictment alleges that in 2015, Mr. Petit and Mr. Taylor entered into agreements with four distributors [. . .] to hide the fact that, as to certain sales to those distributors, the criteria for revenue recognition were not met and, therefore, the revenue from those sales was not properly being recorded under generally accepted accounting principles or GAAP." Tr. 2492:20-2493:2. Indeed, in pre-trial motions, the

---

[1]    Mr. Petit hereby adopts and incorporates by this reference the Rule 29 Motion for Acquittal or, in the alternative, for a New Trial, filed by his co-defendant, William Taylor, as well as the arguments presented by Mr. Taylor at the close of the Government's case that the Government presented insufficient evidence that the defendants made a material misrepresentation in connection with the purchase or sale of a security. Tr. 2184:3-2186:18.

Government embraced its theory of prosecution, promising that it would "establish, through the testimony of a MiMedx accountant and representatives of the company's external auditor, that *the transactions described in the Indictment were not recorded in compliance with GAAP*" and "that the defendants understood this." Dkt. No. 71 at 14 (emphasis added).

Early in the trial, however, the Government tried to pivot away from this GAAP-based theory when it objected to the Court's proposed preliminary instruction that Mr. Petit could not be guilty of securities fraud even if he "actually caused MiMedx to improperly record revenue," unless he "not only knew the revenue was improperly recorded but also intended thereby to deceive MiMedx's investors." Tr. 352:4–18 (discussing instruction); 378:16–20 (giving instruction to jury). The prosecutors tried to argue that "the issue is not going to be whether the revenue was properly or not recorded under GAAP, but whether the defendants executed a fraudulent scheme." Tr. 352:13–18. The Court rejected that makeweight argument because the Government's Indictment here was different: they were "not contending, like the government in *Simon*, that, oh, everything was recorded properly, but it was still a fraudulent scheme." Tr. 352:19–353:1; *see United States v. Simon*, 425 F.2d 796, 805-06 (2d Cir.1969) (proof of noncompliance with GAAP not required based on the specific Indictment in that case); *United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) (same). Simply put, since the entire theory of prosecution was that revenues were improperly recorded in this case *because* they did not meet the revenue recognition criteria under GAAP, the Government had to present sufficient evidence to support the reasonable inference that Mr. Petit knew revenues were improperly recorded under GAAP.

Ultimately, the Government did not meet this burden. The Government failed to prove that revenues were recorded in violation of GAAP or that Mr. Petit knew revenue was

improperly recorded, and thereby, intended to deceive MiMedx investors. Instead, the Government presented a case based entirely on statements from cooperating witnesses (testifying under Immunity Orders and a Non-Prosecution Agreement) that MiMedx engaged in certain business practices in an effort to "hit a number" at the end of quarterly reporting periods, and testimony from MiMedx's auditor that he "would have wanted" to be aware of those practices because they may implicate revenue recognition rules. Critically, the Government presented insufficient evidence to support a juror's reasonable inference that Mr. Petit *knew* that revenue was improperly recorded or *knowingly* and *willfully* concealed information from MiMedx's accountants and auditors in order to deceive investors. For the reasons set forth below, the conviction in this case cannot stand.

### A.    The Government Failed to Present Sufficient Evidence that MiMedx's Recorded Revenues Did Not Comply with GAAP

The Government failed to meet its burden of proof, *inter alia*, because it did not present expert testimony that MiMedx's recorded revenues did not comply with GAAP.  Expert testimony is not necessarily required to prove securities fraud if GAAP violations are not essential to the allegations. *See United States v. Rigas*, 490 F.3d 208, 220–21 (2d Cir. 2007) ("The government was not required to present expert testimony about GAAP's requirements because these requirements are not essential to the securities fraud alleged here."). Unlike *Rigas*, however, for all the reasons discussed above, proving a GAAP violation was essential to support a conviction of Mr. Petit. In this case, the Indictment devotes an entire section to GAAP and revenue recognition rules and specifically alleges that Mr. Petit and Mr. Taylor understood the rules and their application. Dkt. No. 1 ¶¶ 9–12, 38. Moreover, the Indictment alleges that Mr. Petit intentionally made false representations concerning the application of revenue recognition rules under GAAP and that Mr. Petit and Mr. Taylor withheld information from accountants and

auditors that they knew would cause the incorrect application of those same revenue recognition rules. Dkt. No. 1 ¶¶ 50, 61. So while the law is well established in the Second Circuit that the Government need not present expert testimony to support every securities fraud conviction, it was required to do so here where a violation of the revenue recognition rules under GAAP was the linchpin of the Government's case. The Court should enter a judgment of acquittal because the Government needed to present expert testimony to establish that MiMedx's revenue was actually recorded in violation of GAAP.

### B.   No Reasonable Juror Could Have Found Beyond a Reasonable Doubt that Mr. Petit Intended to Defraud Investors

During four weeks of trial, the Government argued that MiMedx engaged in certain business practices in an effort to "hit a number" at the end of quarterly reporting periods and that MiMedx's auditor "would have wanted" to be aware of those practices. However, neither category of evidence can support a sufficient inference of intent to defraud investors.

#### 1.   An Executive's Motivation to Improve Company Performance Cannot Support a Reasonable Inference of Criminal Intent to Defraud Investors

The trial transcript is rife with statements from the prosecution's cooperating witnesses that MiMedx engaged in certain business practices to "hit a number" at the end of quarterly reporting periods.[2] The same witnesses testified specifically about Mr. Petit's interest in MiMedx meeting its projected revenue forecasts. Tr. 603:2–9 (Carlton testifying that "Pete didn't like surprises on the number."). But Mr. Petit's motivation and efforts to improve his Company's

---

[2]   Trial Tr. 514:19-20 ("we had to hit the number"); 522:5-8 ("to hit number"); 616:20-24 ("to hit a number"); 617:4-12 ("to try to hit number for the second quarter"); 618:4-6 ("we had to hit a number for June"); 645:2-4 ("He was going to try to help us hit number"); 645:9-17 ("He was just trying to help us hit number); 646:3-12 ("To hit number"); 649:16-20 ("We hit number"); 902:23-903:8 ("To hit the number"); 988:11-13 ("to hit the number for that quarter"); 1013:10-12 ("they wanted to hit the number and they needed that order to be at 2.1 or 2.2 million to hit the number); 1051:24-25 ("to hit the numbers"); 1113:11-14 ("hit the quarterly number and then hit the number on Wall Street"); 1350:17-19 ("just to hit the number").

performance and look good to the market cannot support a reasonable inference of fraudulent intent.  Every CEO of a public company has a fiduciary duty to maximize performance. Mr. Petit's desire to meet MiMedx's "revenue targets, and his knowledge of and participation in deals to help make that happen, is simply evidence of [his] doing his job diligently." *United States v. Goyal*, 629 F.3d 912, 919 (9th Cir. 2010) (granting Rule 29 Motion and reversing convictions in case about timing of revenue recognition); *see also Anderson v. First Sec. Corp.*, 249 F.Supp.2d 1256, 1270 (D. Utah 2002) (effort "to meet analysts' numbers and not disappoint Wall Street is merely an example of a company's shared motives to look good" that does not imply "that the company was engaged in fraudulent conduct"); *United States v. Brown*, 459 F.3d 509, 524 (5th Cir. 2006) ("selling an asset quickly to book earnings by a certain date is not, by itself, fraudulent")). Mr. Petit's desire to meet revenue targets is entirely consistent with innocence, and the Government must do more than present evidence of intent that is at least as consistent with innocence as with guilt. *See D'Amato*, 39 F.3d at 1256.

The prosecution also presented evidence that Mr. Petit's bonus was tied to the Company's financial performance, but again, such evidence cannot support a reasonable inference of criminal intent. The Second Circuit has held, in a civil case, that "the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter."  *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) ("If scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions."); *see also Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (reiterating holding in *Acito*); *In re The Hain Celestial Grp. Inc. Sec. Litig.*, No. 2:16-cv-04581 (ADS)(SIL), 2019 WL 1429560, at *21 (E.D.N.Y. Mar. 29, 2019) (same); *Anderson*, 249 F. Supp. 2d at 1270 ("The allegations that

Defendants were motivated by enhancing the value of their stock or their executive positions[] are motives shared by all company executives and cannot raise a strong inference of scienter"); *Goyal*, 629 F.3d 919 (reversing conviction for insufficient evidence where half of defendant's bonus was tied to meeting corporate goals because such an incentive "merely reinforces" duty to maximize company's performance and "seeking to meet expectation cannot be inherently probative of fraud"). The Government's evidence on this score, therefore, was also insufficient to support a reasonable inference of criminal intent.

> 2. The Failure to Disclose Sales Terms to An External Auditor Cannot Support a Reasonable Inference of Criminal Intent to Defraud Investors

The Government alleged that Mr. Petit knowingly and intentionally concealed information from MiMedx's external auditor, Cherry Bekaert, because Mr. Petit was allegedly aware of the revenue recognition implications of certain aspects of the sales to the four distributors. The Government asked the jury to draw this inference based on testimony from Mr. Andersen and Mr. Urbizo (1) that there were inaccuracies in Management Representation Letters; and (2) that it was Mr. Petit's responsibility to disclose certain information about the sales. This evidence is also insufficient to support a reasonable inference of criminal intent.

First, the prosecutors presented testimony from Mr. Andersen and Mr. Urbizo about Management Representation Letters that allegedly contained misleading language about sales to the four distributors. GX-602, Tr. 1792:10-25. An inaccuracy in a management representation letter is insufficient to show that Mr. Petit intended to mislead the auditor in order to manipulate revenues. In *Goyal*, the Government alleged that the defendant CFO affirmed management representation letters to the company's auditor representing (falsely) that the company had fully disclosed all sales terms, including rights of return and price adjustments. The Ninth Circuit explained, however, that even if certain sales terms were not disclosed to the auditor (contrary to

what was stated in the management representation letter), the Government's case suffered from a "total failure of proof" that the CFO willfully and knowingly misled the auditor. *Goyal*, 629 F.3d 921.  The prosecutors in this case relied on similar statements in a management representation letter, including statements that the Company's sales to the four distributors "met the four criteria for revenue recognition," that management had "no knowledge of any fraud or suspected fraud," and that there were "no side agreements." Tr. 1792:10-25. Mr. Goyal was convicted of willfully misleading an auditor, but Mr. Petit's securities fraud conviction is premised on the Government's theory that he allegedly withheld information from auditors in order to cause revenue to be inflated in violation of GAAP. In either case, alleged inaccuracies in a management representation letter are not sufficient to support a reasonable inference of criminal intent without evidence that the inaccuracies were made knowingly and willfully.

Second, the prosecutors elicited testimony from Mr. Andersen, MiMedx's former Controller, that it was Mr. Petit's affirmative "responsibility" to disclose certain information about transactions with distributors. Tr. 210:14–23; 217:7–9. However, even if Mr. Petit had an affirmative responsibility to disclose certain sales terms, "his failure to do so does not indicate scienter" because it would "make[] a strict-liability crime out of one that requires willful and knowing deception." *Goyal*, 629 F.3d 921–22; cf. *United States v. Smith*, 155 F.3d 1051, 1068 n. 25 (9th Cir. 1998) (declining to adopt a construction of 15 U.S.C. § 78ff(a) that "de facto eliminates the mens rea requirement"). Lacking any evidence that Mr. Petit knowingly and willfully made any misrepresentation to MiMedx's auditors in order to inflate revenues, the Government suggested to the jury several times that Mr. Petit could be liable simply for failing to fulfill an affirmative responsibility to disclose certain information that the auditors would have expected or liked to know about. Tr. 1740:1–17 (Mr. Urbizo would have expected to be told

about the $200,000 payment to CPM);  1737:17–1738:4 (Mr. Urbizo "would have wanted" to know about the alleged swap arrangement with CPM); Tr. 1754:15–22 (Mr. Urbizo would have expected to be told about the loan SLR received);  Tr. 1758:12–15, 1778:11–14 (Mr. Urbizo "would have expected" the Stability letter to be disclosed). For the same reasons just discussed, therefore, this testimony that Mr. Petit did not affirmatively disclose information that Mr. Urbizo would have wanted to know about is insufficient to support a reasonable inference of criminal intent to defraud investors.

### C. No Reasonable Juror Could Have Found Beyond a Reasonable Doubt that Mr. Petit Knew MiMedx's Recorded Revenues Did Not Comply With GAAP

To meet its burden of proof, the Government had to show that Mr. Petit "not only knew the revenue was improperly recorded but also intended thereby to deceive MiMedx's investors." Tr. 378:16–20 (the Court's instruction). The Government did not meet this burden. Even viewed most favorably to the Government, the evidence presented at trial showed only that MiMedx engaged in certain business practices with four distributors (CPM, SLR, Stability, and First Medical) about which MiMedx's accountants and auditors would have wanted more information. But for each of the four distributors, the Government failed to present sufficient evidence that revenue was improperly recorded under GAAP, much less that Mr. Petit *knew* revenues were materially misstated or that he knowingly and willfully concealed information from MiMedx's accountants and auditors in order to deceive investors.

1. The Government Failed to Present Sufficient Evidence that Mr. Petit Knew Revenues Recorded for the CPM Sales in Q2 Did Not Comply With GAAP

The Government alleged that, in an effort to hit its quarterly revenue guidance for the second quarter of 2015, MiMedx (1) paid CPM Medical $200,000 as an incentive to place an order, and (2) agreed at the time of that order to allow CPM to swap product in a subsequent

quarter. The Government presented insufficient evidence that Mr. Petit knew the revenue for the CPM order was improperly recorded.

a.      Alleged $200,000 Sales Incentive

With respect to the $200,000 payment, even taking all of the CPM evidence in the light most favorable to the Government,[3] a reasonable juror could only conclude that MiMedx engaged in a completely legal business practice—giving a sales incentive—which implicated revenue recognition. When the Government asked Matt Urbizo, a member of the external audit team, about the impact of a $200,000 sales incentive on revenue recognition, he did not respond that sales incentives are *per se* prohibited under GAAP. Rather, Mr. Urbizo explained that if an incentive is provided to induce a sale, the amount of revenue recorded for the sale should be reduced by the amount of the incentive. Tr. 1738:13–1739:5. Ultimately, the Government did not present expert testimony to establish that the CPM Q2 sales were not recorded in compliance with GAAP, but it also completely failed to prove that the allegedly improper accounting was material. The Government's evidence of materiality was based on investor testimony that MiMedx management's ability to meet revenue guidance was an important factor in their investment decisions. Tr. 1430:2–8. Even with a $200,000 reduction in revenues, the Company would have met its revenue guidance for the second quarter of 2015. GX-50, at slide 13. As a result, no reasonable juror could have found that a mistake in reported revenues due to the $200,000 payment was material. Moreover, the Government failed to present any evidence whatsoever that Mr. Petit knew that the $200,000 payment should receive any particular

---

[3]    The Government's focus on the $200,00 payment was a convenient vehicle for prosecutors to inject prejudice into the proceedings by using the word "bribe." All direct, contemporaneous evidence presented at trial indicated that that payment was for settlement of a business dispute. The Government relied on Mr. Schultz's assumptions about that payment even though Mr. Schultz was not in the room during the call when the payment was negotiated. Mike Carlton's testimony was even less reliable because Mr. Carlton admitted that he learned everything about these negotiations second-hand from Mr. Schultz. Tr. 603:10–604:21.

13

treatment under GAAP, regardless of whether he understood it to be a sales incentive or a settlement for a GPO dispute. Finally, the Government presented insufficient evidence that Mr. Petit attempted to conceal the $200,000 payment from anyone at MiMedx or Cherry Bekaert. In fact, the evidence introduced by the defense on cross-examination proved that MiMedx's legal and accounting departments were aware of the payment. DX-168.

b.    Alleged Swap Agreement

The Government also alleged that MiMedx agreed at the time of the sale in the second quarter of 2015 to allow CPM to swap any product it purchased in a subsequent quarter. As an initial matter, for reasons explained below in Section 2, the Government failed to present sufficient evidence that any alleged right of return or exchange caused revenue to be improperly recorded. Also, as with the alleged sales incentive, the Government completely failed to prove that the allegedly improper accounting for the swap arrangement was material. Even with a $1.4 million reduction in revenues, the Company would have met its revenue guidance for the second quarter of 2015. GX-50, at slide 13. As a result, no reasonable juror could have found that a mistake in reported revenues due to the alleged swap agreement was material.

Second, lacking any evidence that Mr. Petit was even aware of the alleged swap negotiations, the Government repeatedly invited cooperating witnesses to speculate about the extent of Mr. Petit's knowledge. For example, Mr. Schultz speculated that, "Pete had to be aware of everything that was going on with CPM." Tr. 1012:15–16. The Government even asked Mr. Schultz to draw inferences about Mr. Petit's knowledge of product swaps based on *Mr. Schultz's decision* to include Mr. Petit on an email in which Mr. Schultz was executing the swap. Tr. 1012:22–25 ("Q. Mr. Schultz, would you have put Mr. Petit on this email if he weren't aware of the fact that you were offering to swap out this product?  A. No."). In any event, even if the Government had presented actual evidence of Mr. Petit's awareness of a swap arrangement,

14

there was a total failure of proof that Mr. Petit knew revenue for the CPM transaction was recorded improperly as a result of the swap agreement or willfully concealed the swap arrangement from accountants or auditors.[4]

> 2. The Government Failed to Present Sufficient Evidence that Mr. Petit Knew Revenues Recorded for the SLR Sales in Q3 Did Not Comply With GAAP

The Government alleged that, in an effort to hit its quarterly revenue guidance for the third quarter of 2015, MiMedx improperly recognized revenue for a large sale to SLR Medical ("SLR"). The Government's proof at trial regarding SLR was limited to Mr. Urbizo's testimony that the loan SLR received from Mr. Petit's adult children "is a strong indicator that collectibility was not reasonably assured" for the SLR sales in the third quarter. Tr. 1755:11–15.[5] But again, the Government presented insufficient evidence that Mr. Petit knew that revenue was improperly recorded for this transaction. Indeed, not even Mark Andersen, MiMedx's former controller and a Government witness at trial, testified that revenue was improperly recorded for the SLR sales. Mr. Andersen only testified that based on the information he knew about the SLR sale, he would have wanted more information to evaluate any revenue recognition implications. Tr. 389:17–390:5.

---

[4] The single piece of evidence the Government introduced to attempt to meet its burden is a July 10, 2015 email from Brent Miller to David Nix and Mark Diaz that the Court admitted under the co-conspirator hearsay exception in FRE 801(d)(2)(E). GX–1033; Tr. 626-627 (Carlton testimony), 1935-1936 (Urbizo testimony). In the email, Mr. Miller references an upcoming audit and the desired timing for an exchange, but Mr. Petit is not mentioned or included in the email communication.

[5] The Government elicited some testimony about consulting payments made to Jerry Morrison, but the record shows that those consulting payments were not in any way hidden from MiMedx's accounting department. Tr. 202:18–20; 204:4–9; 314:18–315:15. Mark Andersen reviewed the consulting payments and backed out associated revenue without any interference. Tr. 317:3–14.

The record fails to prove that Mr. Petit knew that a loan to a customer could impact the collectability analysis for revenue recognition purposes. Unable to present such a key piece of evidence, the prosecutors asked hypothetical questions with no factual basis to impermissibly suggest that Mr. Petit himself was the driving force behind the loan. For example, the prosecutors asked, "And if, in fact, Mr. Petit had *encouraged* family members to make that loan, what impact, if any, would that have on your analysis of revenue recognition?" Tr. 210:24–211:1 (emphasis added). Critically, Mr. Andersen conceded on cross-examination that if the facts did not establish that Mr. Petit encouraged or requested that his children make a loan (and, indeed, the record did not ultimately show Mr. Petit's encouragement or request), Mr. Andersen would need to "understand the full set of facts and circumstances to make an evaluation of revenue recognition." Tr. 389:17-390:5. So when asked to consider only the facts in the record (and not baseless suggestions by the prosecution), Mr. Andersen did not conclude that revenue from the SLR sales was recorded improperly, only that he would have wanted more information to determine how revenue should be recorded. For this reason, even though Mr. Urbizo testified that *he* ultimately would not have allowed any revenue to be recorded for the SLR sales, no reasonable juror could have found that Mr. Petit *knew* revenue for the SLR sales was improperly recorded. Indeed, even MiMedx's own Controller did not "know" that revenues should not have been recorded based solely on SLR's receipt of a loan. The jury could not have found that Mr. Petit, who in contrast, is not a trained accountant with education on these specialized matters, knew better than his own Controller.

Further, the Government presented insufficient evidence that Mr. Petit intentionally concealed the loan from auditors in order to manipulate MiMedx's revenues. The Government elicited testimony from Mr. Urbizo that he was under the impression that SLR's payment to

MiMedx in the fourth quarter of 2015 was sourced from SLR's revenues and that it would have made a difference to him if the payment was instead sourced from a loan. Tr. 1754:7-1755:15. Even viewing this testimony in the light most favorable to the Government, the evidence does not prove that Mr. Petit knowingly and willfully misrepresented the source of SLR's payment. Mr. Urbizo testified that Mr. Petit never told him that SLR's payment came from revenue. Tr. 1831:2-4. Moreover, it was disclosed to Mr. Urbizo that by December 2015, SLR had "developed a total of $500,000 in revenue," and had also paid MiMedx $1.4 million. Tr. 1866:7-16 (discussing DX-418), demonstrating that not all of SLR's payments directly correlated to revenues. Based on this evidence, no reasonable juror could find that Mr. Petit misled Mr. Urbizo about SLR's revenues and/or whether SLR's payment to MiMedx was sourced solely from those revenues.

Finally, as discussed above, neither Mr. Urbizo's testimony that he "would have expected" the loan to be disclosed, nor Mr. Andersen's testimony that it would have been Mr. Petit's "responsibility" to disclose the loan, can support a reasonable inference that Mr. Petit intended to commit fraud. Tr. 1754:15–22; 210:14–23.[6] If the Government were able to bring a criminal fraud case for every executive's failure to meet an auditor's expectations, it would effectively eliminate any intent requirement, thereby making securities fraud a strict liability offense. *See Goyal*, 629 F.3d at 921.

> 3.    The Government Failed to Present Evidence that Mr. Petit Knew Revenues Recorded for the Stability Biologics Sales in Q3 and Q4 Did Not Comply With GAAP

The Government alleged that in an effort to hit its quarterly revenue guidance for the third and fourth quarters of 2015, Mr. Petit (1) "suggested" to Brian Martin, the owner of

---

[6]    Mr. Andersen testified that he never had any discussion with Mr. Petit about a duty to disclose how a customer was financing its payments. Tr. 390:21–25.

Stability, that Stability and MiMedx "would figure out a payment plan at a later date," Tr. 1705:14–17, and (2) agreed to allow Stability to return or exchange product it could not sell in a subsequent quarter. The Government presented insufficient evidence that Mr. Petit knew revenue was improperly recorded for the sales to Stability or concealed anything about the Stability transactions from auditors.

a.    Alleged Flexible Payment Terms

The Government alleged that MiMedx improperly recorded revenues for sales to Stability in the third and fourth quarters because the sales did not meet the revenue recognition requirement that payment terms be fixed and determinable. This allegation is based entirely on the speculation of a cooperating witness, Brian Martin, who testified under a Non-Prosecution Agreement. Mr. Martin's purported understanding that he did not have to pay MiMedx was based solely on Mr. Petit's allegedly suggesting to him that they could "figure out a payment plan at a later date." Tr. 1705:14–17. This alleged suggestion was made before Brian Martin negotiated a distributor agreement with MiMedx's General Counsel and before MiMedx invoiced Stability with 30–day payment terms.[7] Tr. 1680:22–1681:4. Mr. Martin's supposed belief that a pre-sale suggestion from Mr. Petit about working out payment terms would override the sales terms in the sales invoices and in the distributor agreement he was actively negotiating with MiMedx's General Counsel is not enough to show that *Mr. Petit* believed the payment terms were not fixed and determinable. In fact, the defense elicited strong evidence that Mr. Petit

---

[7]    Nonetheless, Mr. Martin testified that *he believed* the verbal "agreement" he had with Mr. Petit would override the payment terms both in the written invoices and the distributor agreement he was negotiating with MiMedx's General Counsel. Tr. 1682:3–10. But Mr. Martin said nothing about the basis for that belief. Similarly, when asked if he understood that the draft distributor agreement he was exchanging with MiMedx's General Counsel would ultimately be the controlling document, he responded, "Yes, but I had no intention of signing this document in its current state." Tr. 1678:14–22.  Mr. Martin's testimony may have proved his own intent to deceive Mr. Petit, but it was completely lacking in any reliable evidence of Mr. Petit's intent.

did, in fact, expect payment through Mr. Martin's testimony that Mr. Petit called him in December 2015 and asked for payment of $1 million, which Brian Martin refused (ultimately sending only $225,000). Tr. 1560:4–1561:10; 1672:2–10.

In any event, Mr. Martin's testimony about the supposed lack of final agreement on payment terms sheds no light at all on Mr. Petit's knowledge of the revenue recognition implications of his alleged suggestion to Brian Martin about a payment plan. Additionally, there was insufficient evidence that Mr. Petit intentionally concealed anything about the Stability payment terms from auditors. The Government asked Mr. Martin to speculate about Mr. Petit's reason for requesting payment from Mr. Martin in December 2015. Mr. Martin testified regarding his opinion that the purpose of the payment was to allay any concerns from MiMedx's auditors about the Stability purchases. Tr. 1564:15–21, 1572:14–1573:2. But Mr. Martin later admitted on cross-examination that there was nothing unusual about Mr. Petit's request for payment, that he had no discussion with Mr. Petit about auditors at all, and that his testimony about the purpose of the request for payment was only his "surmise." Tr. 1670:20–1671:16. As discussed earlier in this motion, "a conviction based on speculation and surmise alone cannot stand." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).

b.      Alleged Right of Return

The Government also alleged that Mr. Petit caused revenue to be improperly recorded for sales to Stability Biologics because he offered Brian Martin the right to return or exchange product in subsequent quarters. For the reasons set forth below, the Government failed to present sufficient evidence that an alleged right of return extended to Stability Biologics caused MiMedx to record revenue in violation of GAAP or that Mr. Petit knew revenues were recorded in violation of GAAP.

19

There is nothing inherently problematic from a revenue recognition standpoint with offering a right to return. Tr. 318:5–7; 319:6–319:9. Mark Andersen, MiMedx's former Controller, explained that "if you *can't* estimate how much product is going to be returned at the time of the sale, then you're precluded from recognizing those sales at that time." Tr. 218:3–5 (emphasis added). He further testified that the reasonable estimation of future returns is a decision that requires judgment and discretion. Tr. 320:1–9. Mr. Andersen explained that a company establishes return reserves when it expects product to be returned, but when defense counsel tried to elicit testimony from Mr. Andersen about whether MiMedx was adequately reserved, the Court sustained the Government's objection on relevance grounds. Tr. 402:4–403:17.  Ultimately, Mark Andersen testified only that the letter "*would have been a factor* in determining whether or not you can recognize revenue on the sales to Stability Biologics" and that he "most likely" would not have recognized the revenue on the sales to Stability Tr. 217:10–218:1 (emphasis added). The Government needed more than Mr. Andersen's testimony that he "most likely" would not have recorded revenue for the Stability sales, so it elicited testimony from the Company's external auditor, Matt Urbizo, that had the letter been disclosed to him, he believed <u>none</u> of the revenue from the Stability sales should have been recognized. Tr. 1758:16–25 (emphasis added). Mr. Urbizo's baseless testimony that no revenue should have been recognized from the Stability sales led to an unreliable verdict that must be vacated.

Indeed, the Ninth Circuit vacated a criminal conviction where the Government failed to meet its burden of proof because, among other things, no reasonable juror could have found a GAAP violation based on an "unlimited" right of return without evidence that returns were not amenable to reasonable estimation. *Goyal*, 629 F.3d 917–18. In *Goyal*, the Ninth Circuit

determined that that prosecution failed to present actual evidence that the returns made pursuant to an "unlimited" right of return were not amenable to reasonable estimation:

> Stavers testified, in response to a hypothetical question, that "if the distributor had an unlimited right of return, then ... we do not believe it would have been possible to estimate the return." But he did not base this statement on an analysis of NAI's actual return estimations. FAS 48 lays out four "factors [that] may impair the ability to make a reasonable estimate" of future returns. FAS 48, ¶ 8. No witness applied these factors to NAI's buy-in deals or concluded that NAI could not accurately estimate returns. The prosecution needed to prove what NAI did, not what the buy-in terms made hypothetically possible. Without evidence that Ingram's returns were not amenable to reasonable estimation, no reasonable juror could have found that using sell-in accounting for these sales violated GAAP.

*United States v. Goyal*, 629 F.3d 912, 917–18 (9th Cir. 2010); *see also In re Focus Enhancements, Inc. Sec. Litig.*, 309 F. Supp. 2d 134, 151 (D. Mass. 2001) ("unsupported allegation that Focus was unable to make reasonable estimates of returns does not materially advance the claim" because absent information about "past return rates, the size of its reserve, or how the reserve changed over time, it is difficult to infer on that basis that Focus' decision to recognize revenue upon sale to resellers instead of to end-users violates GAAP or gives rise to a strong inference of scienter."). As was the case in *Goyal*, the Government failed to elicit any evidence of MiMedx's estimation of returns or its reserves to show that revenue was improperly recognized for the Stability sales. The Government's evidence was therefore insufficient to even show a GAAP violation, much less a fraudulent one. In addition to failing to meet its own evidentiary burden, when the Government elicited this testimony from Mr. Urbizo about the effect of the alleged right of return it effectively and inappropriately shifted the burden of proof to Mr. Petit to show that MiMedx could and did reasonably estimate returns from Stability and took appropriate reserves as an offset from revenue.

Finally, even assuming for the sake of argument that the Government had shown a GAAP violation, it did not present sufficient evidence to support a reasonable inference that Mr. Petit

knew that revenue was improperly recorded for the sales to Stability. The only piece of evidence that could, theoretically, support an inference that anyone at MiMedx understood the revenue recognition implications of a right of return is a revenue recognition memorandum sent to MiMedx employees on March 29, 2016. Tr. 652:13–655:3 (re: GX–1129). There is no dispute that this document was created *months after the transactions at issue*, and it came on the heels of Mr. Andersen's raising concerns about revenue recognition and an audit committee investigation into the same. A memo circulated months after the alleged revenues in this case had already been booked cannot support a reasonable inference about Mr. Petit's knowledge and intent *at the time* with respect to sales made in the second, third, and fourth quarters of 2015.

4.     The Government Failed to Present Evidence that Mr. Petit Knew Revenues Recorded for the Q4 First Medical Sales Did Not Comply With GAAP

The Government alleged that, in an effort to hit its quarterly revenue guidance for the fourth quarter of 2015, MiMedx negotiated a purchase from First Medical by offering contingent payment terms and a right of return or exchange. Tr. 224:2-14. Yet again, the Government failed to present any evidence that Mr. Petit knew revenue was improperly recorded for the First Medical sales.

As discussed above, the Government did not present sufficient evidence at trial to show that an alleged right of return caused revenues to be recorded in violation of GAAP. Regarding the alleged right of return extended to First Medical, the Government elicited baseless testimony from Mr. Urbizo that "you would have to reasonably be able to estimate what's going to happen. And this is a very unique situation that you would not be able to estimate." Tr. 1766:4–12. Mr. Urbizo later reiterated that he simply did not believe it was possible to estimate returns from First

Medical. Tr. 1944:20–23. Mr. Urbizo's conclusory testimony about return estimations is the functional equivalent of the testimony that the Ninth Circuit found insufficient in Goyal.

Finally, the only evidence presented at trial that Mr. Petit was even involved in the First Medical transaction was that he was allegedly present for a phone call when the Government argued a right of return was negotiated. Tr. 545:12–547:19; 2461:18–22. Mr. Carlton also testified that he copied Mr. Petit on an email during the negotiations because revenue was a "priority" of Mr. Petit's, and Mr. Petit would have wanted to know if a sale would not be completed. Tr. 544:22–545:4. As noted earlier, however, Mr. Carlton's testimony that Mr. Petit prioritized revenues cannot support a reasonable inference of Mr. Petit's knowledge or intent to defraud.

## II.     In the Alternative, the Court Should Grant Mr. Petit a New Trial

In the alternative, the Court should grant Mr. Petit a new trial because an "evidentiary or instructional error compromised the reliability of the verdict." Archer, 977 F.3d 187–88 (quoting United States v. Ferguson, 246 F.3d 129, 134–37 (2d Cir. 2001)). In addition to the reasons discussed above, the Government improperly suggested to the jury in summation that any mistake in recorded revenue, however slight, was material.

During trial, the Government elicited testimony from Mr. Russell, an asset manager at one of the institutional investors that held MiMedx shares in 2015 and 2016, that "any overstatement" of a company's revenue "by any amount for whatever reason" would be important, even an overstatement of one dollar. Tr. 1988:2–1989:1.  The Government then argued in its summation that "a misstatement of revenue by even a dollar would be of significance." Tr. 2251:24–2252:2. The Government's argument misled the jury about its evidentiary burden with respect to materiality when it suggested that it met its burden if it proved that revenue was misstated by a single dollar.

"Fraud requires more than deceit.  A person can dissemble about many things, but a lie can support a fraud conviction only if it is material, that is, if it would affect a reasonable person's evaluation of a proposal."  *United States v. Corsey*, 723 F.3d 366, 373 (2d Cir. 2013); *United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) (a fact is material if there is "a substantial likelihood that a reasonable investor would find" it "important in making an investment decision.").  The Government argued that any misstatement, by definition, is material.  As a result, the prosecutor effectively urged the jury to eliminate the materiality requirement from its consideration entirely.

Nor does Jeffrey Russell's testimony make the Government's argument permissible.  Mr. Russell testified "any overstatement by any amount for whatever reason is important for [him] to understand," even if the overstatement is only "one dollar."  Tr. 1988–89.  Testimony from an investor about what he finds important in making investment decisions can establish materiality *only if* the Government shows that it is "within the parameters of the thinking of reasonable investors in the particular market at issue.  In other words, there must be evidence of a nexus between a particular trader's viewpoint and that of the mainstream thinking of investors in that market."  *Litvak*, 889 F.3d at 65.  "Mistaken beliefs" are not sufficient to establish materiality. *Id*.  First, whether or not a question about the integrity of management is important to investors, no reasonable investor would find one dollar of revenue material for a company that reported annual revenue of $187.3 million.  *Cf. United States ex rel. Grabcheski v. AIG*, 687 Fed. App'x 84, 87 (2d Cir. 2017) (summary order) (affirming dismissal of False Claims Act complaint where plaintiff alleged overstatement of $100 million in the context of transaction of more than $24 billion).  Second, even if a reasonable investor, in fact, would find a 0.000001% difference in revenue material, that would create the same problem described in the preceding paragraph—a

defendant could be convicted of fraud on the basis of any misstatement, no matter how trivial or inconsequential.  The theory improperly dispenses with the materiality element entirely.

Because of the Government's misleading argument to the jury about an essential element of Count Two, the Court can have no confidence that the jury reached its verdict based on a justifiable understanding of materiality.  The Court should vacate Mr. Petit's conviction.

## **CONCLUSION**

For the foregoing reasons, Mr. Petit respectfully requests that the Court grant Mr. Petit's motion for a judgment of acquittal pursuant to Rule 29(c) or, in the alternative, for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Dated: January 8, 2021

Respectfully submitted,

Matthew I. Menchel
Amanda N. Tuminelli
Kobre & Kim LLP
800 Third Avenue
6th Floor
New York, NY 10022
Telephone: (212) 488-1200
Email: Matthew.Menchel@kobrekim.com
Email: Amanda.Tuminelli@kobrekim.com

/s/ Eric B. Bruce
Eric B. Bruce
Jennifer B. Loeb
Sarah M. Caruana
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4577
Email: Eric.Bruce@freshfields.com
Email: Jennifer.Loeb@freshfields.com
Email: Sarah.Caruana@freshfields.com

*Attorneys for Parker H. Petit*