UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

PARKER H. PETIT and WILLIAM TAYLOR

Defendants.

No. 19 Cr. 850 (JSR)

**DEFENDANT PARKER H. PETIT'S MEMORANDUM IN AID OF SENTENCING**

FRESHFIELDS BRUCKHAUS DERINGER US LLP

Eric B. Bruce
Jennifer B. Loeb
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4577
Email: Eric.Bruce@freshfields.com
Email: Jennifer.Loeb@freshfields.com

KOBRE & KIM LLP

Matthew I. Menchel
Amanda N. Tuminelli
800 Third Avenue
6th Floor
New York, NY 10022
Telephone: (212) 488-1200
Email: Matthew.Menchel@kobrekim.com
Email: Amanda.Tuminelli@kobrekim.com

*Attorneys for Parker H. Petit*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

MR. PETIT'S PERSONAL BACKGROUND AND CHARACTER ..................................... 1

I.    MR. PETIT'S PERSONAL BACKGROUND ...................................................... 1

    *A.    Mr. Petit's Early Life ...................................................................... 1*
    *B.    Georgia Institute of Technology .................................................... 3*
    *C.    Military Service .............................................................................. 4*
    *D.    Personal Tragedy ........................................................................... 4*
    *E.    Georgia State University ................................................................ 5*
    *F.    Healthdyne ..................................................................................... 5*
    *G.    Mr. Petit's Marriage to Sally Knight Simpson .............................. 6*
    *H.    Matria Healthcare ......................................................................... 6*
    *I.    MiMedx Group, Inc. ....................................................................... 7*
    *J.    Mr. Petit's Marriage to Janet Petit ............................................... 8*
    *K.    Mr. Petit's Cancer Diagnosis ........................................................ 9*

II.    MR. PETIT'S CHARACTER ....................................................................... 9

    *A.    Integrity .......................................................................................... 9*
    *B.    Devotion to Family ....................................................................... 11*
    *C.    Commitment to Hard Work ........................................................... 13*
    *D.    Empathy ........................................................................................ 14*
    *E.    Generosity ..................................................................................... 15*

ADVISORY GUIDELINES CALCULATION ........................................................... 18

I.    THE PSR CALCULATION ........................................................................ 19

II.    THE PSR GUIDELINES CALCULATION IS FLAWED ................................... 20

    *A.    The Government's Alleged Loss Amount is Based on Pure Speculation ...................... 20*
    *B.    There is Insufficient Evidence to Support the Enhancement for Obstruction .............. 24*
    *C.    There is Insufficient Evidence Mr. Petit Directed Five or More People ..................... 26*
    *D.    There is Insufficient Evidence that Mr. Petit Used Sophisticated Means ................... 27*

III.    A SENTENCE BASED ON THE GUIDELINE § 2B1.1 LOSS TABLE WOULD PRODUCE A PATENTLY
     UNJUST RESULT ................................................................................... 28

A NON-INCARCERATION SENTENCE IS WARRANTED UNDER

18 U.S.C. § 3553(A) .................................................................................... 32

I.    OVERVIEW OF THE SECTION 3553(A) FACTORS ...................................... 32

II.    APPLICATION OF THE SECTION 3553(A) FACTORS ................................... 32

A.  *An Individualized Assessment of Mr. Petit's Personal History and Characteristics Warrants a Non-Incarceration Sentence (§ 3553(a)(1))* ............................................... 32

B.  *The Nature and Circumstances of the Offense Support a Mitigated Sentence (§ 3553(a)(1))* ................................................................................................................ 42

C.  *A Non-Incarceration Sentence Provides Just Punishment Under These Specific Circumstances (§ 3553(a)(2)-(3))* ................................................................................ 43

D.  *A Non-Incarceration Sentence is Necessary to Avoid Unwanted Sentencing Disparities (§ 3553(a)(4)-(6))* .......................................................................................................... 49

E.  *The Government is Not Seeking Restitution in this Case (§ 3553(a)(7))* ..................... 52

**THE SENTENCE WE REQUEST ON BEHALF OF MR. PETIT** ......................................... 52

**MR. PETIT'S REQUEST FOR A PRESIDENTIAL PARDON** ............................................. 53

**CONCLUSION** .............................................................................................................................. 54

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*In re Bristol-Myers Squibb Sec. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004)....................................................................................42

*Kimbrough v. United States*,
   552 U.S. 85 (2007)....................................................................................................29, 49

*Koon v. United States*,
   518 U.S. 81 (1996)..........................................................................................................42

*Pepper v. United States*,
   562 U.S. 476 (2011)........................................................................................................32

*Rita v. United States*,
   551 U.S. 338 (2007)........................................................................................................29

*SEC v. Espuelas*,
   698 F. Supp. 2d 415 (S.D.N.Y. 2010)............................................................................42

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006)....................................................................*passim*

*United States v. Alvaran-Velez*,
   914 F.3d 665 (D.C. Cir. 2019)........................................................................................35

*United States v. Anderson*,
   533 F.3d 623 (8th Cir. 2008) ..........................................................................................47

*United States v. Araujo*,
   539 F.2d 287 (2d Cir. 1976)............................................................................................50

*United States v. Archer*,
   671 F.3d 149 (2d Cir. 2011)......................................................................................25, 27

*United States v. Austin*,
   468 F. Supp. 3d 641 (S.D.N.Y. 2020)............................................................................38

*United States v. Autery*,
   555 F.3d 864 (9th Cir. 2009) ..........................................................................................32

*United States v. Barbato*,
   No. 00-cr-1028, 2002 WL 31556376 (S.D.N.Y. 2002) ..................................................35

*United States v. Bayfield*,
   796 F. App'x 19 (2d Cir. 2019) ......................................................................................31

*United States v. Beck*,
   425 F. Supp. 3d 573 (M.D.N.C. 2019) ................................................................37

*United States v. Brady*,
   No. 02-cr-1043, 2004 WL 86414 (E.D.N.Y. 2004) ..............................................43

*United States v. Carrozzella*,
   105 F.3d 796 (2d Cir. 1997) .................................................................................26

*United States v. Cavern*,
   550 F.3d 180 (2d Cir. 2008) .................................................................................19

*United States v. Chammas*,
   No. 1:16-cr-00171, 2018 WL 6680924 (D.D.C. Dec. 19, 2018) ..........................35

*United States v. Corsey*,
   723 F.3d 366 (2d Cir. 2013) .................................................................................29

*United States v. Coughlin*,
   No. 06-cr-20005, 2008 WL 313099 (W.D. Ark. 2008) ........................................43

*United States v. Cunniffe*,
   No. 15-cr-287, Dkt. 265 (S.D.N.Y. 2019) ...........................................................34

*United States v. Cuti*,
   2011 WL 3585988 (S.D.N.Y. July 29, 2011) ......................................................21

*United States v. Deutsch*,
   987 F.2d 878 (2d Cir. 1993) .................................................................................21

*United States v. Edwards*,
   595 F.3d 1004 (9th Cir. 2010) .............................................................................47

*United States v. Emmenegger*,
   329 F. Supp. 2d 416 (S.D.N.Y. 2004) .................................................................49

*United States v. Faibish*,
   No. 12-cr-265, Dkt. 271 (E.D.N.Y. May 13, 2014) ............................................31

*United States v. Fellela*,
   No. 3:19-cr-79, 2020 WL 1457877 (D. Conn. Mar. 20, 2020) ............................38

*United States v. Garcia*,
   No. 11-cr-989, 2020 WL 7212962 (S.D.N.Y. 2020) ...........................................40

*United States v. Goyal*,
   629 F.3d 912 (9th Cir. 2010) ...............................................................................42

*United States v. Guillen*,
   No. 18-cr-640, Dkt. 271 (S.D.N.Y. Mar. 31, 2020)....................................................38

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012)............................................................29, 33

*United States v. Harding*,
   No. 05-cr-1285-02, 2006 WL 2850261 (S.D.N.Y. 2006).......................................4

*United States v. Henareh*,
   No. 11-cr-93-1, 2021 WL 119016 (S.D.N.Y. 2021)............................................40

*United States v. Hernandez*,
   83 F.3d 582 (2d Cir. 1996)............................................................................25

*United States v. Howe*,
   543 F.3d 128 (3d Cir. 2008)..........................................................................33

*United States v. Jacoby*,
   No. 17-cr-676, Dkt. 19 (S.D.N.Y. 2018) ................................................34, 50, 51

*United States v. Kennedy*,
   233 F.3d 157 (2d Cir. 2000)..........................................................................26

*United States v. Kent*,
   821 F.3d 362 (2d Cir. 2016)..........................................................................26

*United States v. Lumiere*,
   No. 16-cr-483, Dkt. 105 (S.D.N.Y. June 27, 2017)........................................21, 23

*United States v. Lumiere*,
   No. 16-cr-483, Dkt. 115 (S.D.N.Y. June 27, 2017)........................................20, 23

*United States v. Martinez*,
   No. 04-cr-48-20, 2020 WL 7128951 (S.D.N.Y. 2020)........................................38

*United States v. Morales*,
   972 F.2d 1007 (9th Cir. 1992) ......................................................................33

*United States v. Ng*,
   No. 11-cr-161, Dkt. 149 (S.D.N.Y. 2011) .....................................................46

*United States v. Nkanga*,
   No. 18-cr-713, 2020 WL 1529535 (S.D.N.Y. 2020) .........................................37

*United States v. Oakford Corp.*
   79 F. Supp. 2d 357 (S.D.N.Y. 1999)...........................................................23, 24

*United States v. Oujaddou.*,
    No. 18-cr-579, Dkt. 167 (S.D.N.Y. Nov. 7, 2019) ................................................51

*United States v. Paccione*,
    202 F.3d 622 (2d Cir. 2000)................................................................................26

*United States v. Parris*,
    573 F. Supp. 2d 744 (E.D.N.Y. 2008) ......................................................23, 24, 27

*United States v. Pauley*,
    511 F.3d 468 (4th Cir. 2007) ...............................................................................48

*United States v. Rioux*,
    97 F.3d 648 (2d Cir. 1996)............................................................................35, 46

*United States v. Rivernider*,
    No. 10-cr-222, Dkt. 583 (D. Conn. Dec. 23, 2013) ..............................................31

*United States v. Robert Stewart*,
    No. 15-cr-287, Dkt. 95 (S.D.N.Y. May 18, 2016) ............................................46, 51

*United States v. Rodriguez*,
    No. 00-cr-761-2, 2020 WL 5810161 (S.D.N.Y. 2020)......................................38, 40

*United States v. Senesey*,
    1997 WL 187345 (S.D.N.Y. 1997)....................................................................34, 51

*United States v. Skys*,
    637 F.3d 146 (2d Cir. 2011)................................................................................27

*United States v. Stewart*,
    590 F.3d 93 (2d Cir. 2009).................................................................................47

*United States v. Stuart*,
    22 F.3d 76 (3d Cir. 1994) ...................................................................................24

*United States v. Tzolov*,
    435 F. App'x 15 (2d Cir. 2011) ..........................................................................23

*United States v. Valente*,
    688 F. App'x 76 (2d Cir. 2017) ..........................................................................27

*United States v. Walters*,
    87 F.3d 663 (5th Cir. 1996) ................................................................................24

*United States v. Ware*,
    577 F.3d 442 (2d Cir. 2009)................................................................................27

*United States v. Wills*,
    476 F.3d 103 (2d Cir. 2007)...................................................................................49, 50

**Statutes**

15 U.S.C. § 78.............................................................................................................19, 20

18 U.S.C. § 3553 ......................................................................................................... *passim*

U.S.S.G. § 2A1.3..............................................................................................................28

U.S.S.G. § 2A2.1..............................................................................................................28

U.S.S.G. § 2A3.1..............................................................................................................28

U.S.S.G. § 2B1.1..........................................................................................20, 21, 27, 50

U.S.S.G. § 2G2.1..............................................................................................................28

U.S.S.G. § 2E1.4..............................................................................................................28

U.S.S.G. § 3B1.1..............................................................................................................26

U.S.S.G. § 3C1.1..............................................................................................................25

U.S.S.G. § 5E1.2..............................................................................................................20

**Other Authorities**

Am. Bar Ass'n, A Report on Behalf of the American Bar Association Criminal
    Justice Section Task Force on the Reform of Federal Sentencing for Economic
    Crimes (2014),
    https://www.americanbar.org/content/dam/aba/publications/criminaljustice/ec
    onomic_crimes.pdf..............................................................................................29, 30, 31

ACLU, *At America's Expense: The Mass Incarceration of the Elderly* 28-29 (June
    2018), https://www.aclu.org/report/americas-expense-mass-incarceration-
    elderly ..................................................................................................................37

Allyson Chiu, *Yes, people with coronavirus vaccinations should still distance
    from each other,* Washington Post (Jan. 20, 2021),
    https://www.washingtonpost.com/lifestyle/wellness/mask-distance-vaccine-
    safety-covid/2021/01/20/f80eeab6-55ce-11eb-a08b-f1381ef3d207_story.html ...................39

Andrew Wilper et al., *The Health and Health Care of US Prisoners: Results of a
    Nationwide Survey*, American Journal of Public Health (Apr. 2009)......................37

BOP, *Care Level Classification for Medical and Mental Health Conditions or
    Disabilities* (May 2019), https://www.bop.gov/resources/pdfs/ .............................36

BOP, *COVID-19 Coronavirus* (last accessed Jan. 30, 2021),
https://www.bop.gov/coronavirus/ ..................................................................................40, 41

BOP, COVID-19 Vaccine Guidance (Jan. 22, 2021),
https://www.bop.gov/resources/pdfs/covid19_guidance_20210122.pdf................................39

BOP, *Our Locations* (last accessed Jan. 29, 2021),
https://www.bop.gov/locations/list.jsp....................................................................36

BOP, *Program Statement P5100.08: Inmate Security Designation and Custody
Classification* (Sept. 12, 2006),
https://www.bop.gov/policy/progstat/5100_008.pdf ..............................................35

CDC, *COVID-19 Hospitalization and Death by Age* (last updated August 18,
2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-
discovery/hospitalization-death-by-age.html .......................................................40

CDC, *New Variants of the Virus that Causes COVID-19* (last updated Feb. 2,
2021), https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html...................39

CDC, *People with Certain Medical Conditions* (last updated August 14, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-
with-medical-
conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoro
navirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-
risk.html ...................................................................................................40

Johns Hopkins Office of Critical Event Preparedness and Response, *COVID-19
Vaccine: What You Need to Know* (accessed on Feb. 9, 2021),
https://www.hopkinsmedicine.org/ health/conditions-and-
diseases/coronavirus/covid-19-vaccine-what-you-need-to-know...........................39

Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just.. 199
(2013) .......................................................................................................46

David Harding et al., *A natural experiment study of the effects of imprisonment on
violence in the community,* Nature Human Behaviour (May 2019) ........................44

Dep't of Justice Office of the Inspector General, *Top Management and
Performance Challenges Facing the
Department of Justice—2020* (Oct. 16, 2020),
https://oig.justice.gov/sites/default/files/reports/2020.pdf....................................44

H. Comm. on the Judiciary, Letter on DOJ's Handling of Novel Coronavirus,
ECF No. 660-4 at 1 (Mar. 19, 2020),
https://judiciary.house.gov/uploadedfiles/2020-03-
19_letter_to_ag_barr_re_covid19.pdf?utm_campaign=2631-519..........................37

Hon. Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should be Scrapped,*
26 Fed. Sent. R. 6 (2013) ................................................................................28, 29

Leah McGrath Goodman, *Nonsensical Sentences for White Collar Criminals*,
Newsweek (June 26, 2014) ..........................................................................................29

Letter from Attorney General to Director of Bureau of Prisons (Mar. 26, 2020),
https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf ........................41

Matt Zapotosky, *Michael Cohen will be allowed to leave prison due to pandemic,*
Washington Post (Apr. 16, 2020), https://www.washingtonpost.com/national-
security/michael-cohen-prison-coronavirus/2020/04/16/24d851a6-8053-11ea-
a3ee-13e1ae0a3571_story.html ................................................................................41

Memo from Attorney General to Director of Bureau of Prisons (Apr. 3, 2020),
https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3
.pdf ....................................................................................................................41, 44

United States Courts, *Incarceration Costs Significantly More than Supervision*
(Aug. 17, 2017), https://www.uscourts.gov/news/2017/08/17/incarceration-
costs-significantly-more-supervision ......................................................................44

United States Sentencing Comm'n, *Interactive Data Analyzer* (last accessed Jan.
31, 2021), https://ida.ussc.gov/analytics/saw.dll?Dashboard ..................................50

United States Sentencing Comm'n, *U.S. Sentencing Commission Announces
2017-2018 Policy Work, Proposes Guideline Amendments* (Aug. 17, 2017)
https://www.ussc.gov/about/news/press-releases/august-17-2017 ..........................44

Victoria Bekiempis*, Don't Get Cancer if You're in Prison,* Newsweek (July 22,
2015), https://www.newsweek.com/2015/07/31/dont-get-cancer-if-youre-
prison-356010.html ................................................................................................37

Zvi D. Gabbay, "Exploring the Limits of the Restorative Justice Paradigm:
Restorative Justice and White Collar Crime," 8 Cardozo J. Conflict Resol.
421, 448-49 (2007) ............................................................................................46, 47

## PRELIMINARY STATEMENT

Parker "Pete" Petit is an 81-year-old father to three living children, grandfather to seven, and the quintessential patriarch of his extended family. He is a self-made man who worked hard from a young age, put himself through school, and ultimately, turned one of the most traumatic human experiences—the loss of a young child—into a lifelong passion for advancing healthcare and helping others avoid similar tragedy. This conviction is a total aberration in what has otherwise been a successful and honorable life and career. Moreover, Mr. Petit's age and ill health counsel in favor of a mitigated sentence, particularly during this unprecedented global pandemic, which places him at a greater risk of death if incarcerated. For these reasons and more, a sentence within the Guidelines range is patently unfair, and Mr. Petit respectfully requests a variant, non-incarceration sentence. Such a sentence is "sufficient, but not greater than necessary" to provide a just punishment for the offense for which Mr. Petit has been convicted.

## MR. PETIT'S PERSONAL BACKGROUND AND CHARACTER

As Your Honor has indicated, the focus in sentencing on the history and characteristics of the defendant stems from the "elementary principle of weighing the good with the bad" and assessing "immediate misconduct . . . in the context of [the defendant's] overall life hitherto," particularly "at the moment of [the defendant's] sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006) (Rakoff, J.), *aff'd*, 301 F. App'x 93 (2d Cir. 2008). As explained below, Mr. Petit came from a modest background and in his 81 years, has demonstrated that he is a man of exceptional character.

### I.      Mr. Petit's Personal Background

#### A.      Mr. Petit's Early Life

Parker H. "Pete" Petit was born in Atlanta, Georgia, on August 4, 1939. His parents, James Percival "Percy" Petit and Ethel Stockton Holmes, raised Mr. Petit together until they

divorced when Mr. Petit was 5 years old. He was their only child. Following the divorce, Mr. Petit went to live with his mother and maternal grandparents. Mr. Petit loved his mother very much, and she him. But Mr. Petit's mother suffered from schizophrenia, which limited her ability to maintain steady work and provide for herself and Mr. Petit.[1] As a result, Mr. Petit often went without. He wore the same pair of jeans every day until he grew out of them, and he often went without food and other necessities. Pretrial Services Investigation Report (**PSR**) ¶¶ 91-94.

Although Mr. Petit's mother often struggled to give him the material things, his mother and grandmother, in particular, taught him about the importance of faith. From a young age, Mr. Petit went with his family to church every week, where he developed a strong faith in God and a desire to serve his community. PSR ¶ 94. He nurtured this faith throughout his life through reading Oswald Chambers' *My Utmost for His Highest*. Today, Mr. Petit still reads from the same book he had as a young adult, which is now held together with packing tape and is heavily underlined and highlighted throughout.

When Mr. Petit was old enough, he took a job at a grocery store, and used his earnings to help support the family. Even the little money that Mr. Petit was able to save for himself—$300 by the time he was 16 years old—was eventually "loaned" to his father for family support, though the "loan" was never repaid. PSR ¶ 95.

For his junior and senior years in high school, Mr. Petit went to live with his father in Charleston, South Carolina. His father had remarried, and his father and stepmother had five children of their own. Shortly after Mr. Petit relocated to South Carolina, his father resigned his position as the manager of a hardware store, which put the family in financial jeopardy. PSR ¶

---

[1] Later in life, Mr. Petit's mother came to live with him, and he supported her, including getting her mental health treatment for the first time in her life, dramatically improving the quality of her life in her final years. She died in 1976, when Mr. Petit was 37 years old.

95. They moved several times during Mr. Petit's junior year in high school as his father struggled to gain his footing, forcing Mr. Petit to enroll in three different high schools that year. The family finally settled in a two-bedroom house on the Isle of Palms, South Carolina, where Mr. Petit shared a bedroom with his four younger half-brothers.

Despite these financial upheavals, Mr. Petit demonstrated a desire to support his family. During his senior year of high school, he sacrificed his place on the track team to take a part-time job after school as a soda jerk at a pharmacy on Sullivan's Island, where he earned $0.60 per hour. The store was a good distance away from his home, and he hitchhiked home every night. When he eventually got home late into the evenings, there often was not enough food leftover from the family's dinner, and on many nights, he went to bed hungry. When Mr. Petit went to college that fall, he quickly put on 20 pounds because he finally had enough food to eat.

B.    Georgia Institute of Technology

After high school, Mr. Petit went to the Georgia Institute of Technology with not much more than the clothes on his back and the $550 he had managed to save in order to pay for his first quarter's tuition. As he walked out of his front door on the morning he left for school, his father handed him a $10 bill and wished him well.

At Georgia Tech, Mr. Petit participated in a cooperative program in which he alternated between work and school each quarter. During his "work" quarters, Mr. Petit worked at Robbins Air Force base in Macon, Georgia. He made $1.42 per hour, which amounted to just enough to pay for his own way through his next quarter of school.

Mr. Petit earned his bachelor's degree in mechanical engineering in 1962. He continued at Georgia Tech through 1964, where he completed a master's degree in engineering mechanics. While he wrote his master's thesis, Mr. Petit worked at nearby Lockheed Martin. While enrolled at Georgia Tech, Mr. Petit also met and married his first wife, Jo Ann Armour. PSR ¶¶ 97, 108.

### C.     Military Service

After college, Mr. Petit served his country as an Army officer stationed on a Naval Air Station in Corpus Christi, Texas. The Army took over all of the Navy's aircraft maintenance and overhaul facilities on this Naval Air Station in preparation for the buildup of the war in Vietnam. Mr. Petit was involved in quality assurance of the overhauled and repaired aircraft, including flight test. He reached the rank of First Lieutenant before being honorably discharged in 1968.

Later, in his role as a public company CEO, Mr. Petit always made it a personal priority to hire disabled veterans whenever he could. *See Pamela Martin* at 1.[2] Even when there was no appropriate position available, Mr. Petit honored his commitment to the military by offering these veterans "counseling and advice to help them find their way." *Id.* Mr. Petit's military training also impacted his leadership style. As recalled by Chris Cashman, former Executive Vice President and Chief Commercialization Officer at MiMedx, and a veteran himself: "Pete is a proud veteran and the many lifelong lessons learned from his time in the military . . . shaped his communication and leadership style. He was honest, direct, committed, unwavering, and accountable." *Chris Cashman* at 1.

During Mr. Petit's service, he and his wife had their first child, William. PSR ¶ 97.

### D.     Personal Tragedy

After the military, Mr. Petit returned to Atlanta and accepted a promising position at Lockheed, where he had also worked during his master's program. PSR ¶ 110. His life seemed to

---

[2] This citation refers to a letter of support from Pamela Martin, Mr. Petit's executive assistant for five years at MiMedx. Ms. Martin's letter is one of 22 letters from friends and family submitted to the Court regarding Mr. Petit's sentence. This group stands ready to support Mr. Petit during any period of probation, which supports the issuance of a variant sentence. *See United States v. Harding*, No. 05-cr-1285-02, 2006 WL 2850261, at *5 (S.D.N.Y. 2006) (awarding non-Guidelines sentence, noting "the significant network" ready to support defendant).

All of the letters of support are attached to this memorandum as Appendix A and ordered alphabetically by last name.

be coming together when, a year later, Mr. Petit and his wife excitedly welcomed their second son, Brett. But, on June 30, 1970, when Brett was only seven months old, he tragically died due to Sudden Infant Death Syndrome ("SIDS"). PSR ¶ 97. Mr. Petit was devastated by this loss, but he channeled that grief into a what would become a life-long desire to help others.

At the time of Brett's death, Mr. Petit had a good job at Lockheed. Staying at Lockheed provided him with a safe path to professional success, and a steady ability to provide for his family. Yet Mr. Petit felt a calling to do something bigger, motivated by his own personal tragedy to help other parents avoid the grief of losing a child. And so, even though it was a less-stable path forward, Mr. Petit quit his job at Lockheed and took a chance on building a new technology to help vulnerable infants like his son. He formed a company called Life Systems, which was later renamed Healthdyne, and began collaborating with his son's pediatrician on a prototype for an at-home infant monitor to monitor breathing and heartrates. PSR ¶ 111.

### E.    Georgia State University

Mr. Petit recognized that if he was going to achieve any measure of success at Healthdyne, he needed to obtain an advanced business education. And so, while he was busy with his new venture during the day, Mr. Petit used his GI Bill benefits to attend Georgia State University at night. In June 1973, he earned his MBA in finance. PSR ¶ 109.

### F.    Healthdyne

Armed with his new degree, Mr. Petit helped Healthdyne bring to market the first home physiological monitor for infants at risk for SIDS. The "Infant Monitor" was endorsed by the American Academy of Pediatrics, saved the lives of countless infants, and helped usher in an era of high-technology home healthcare in the United States. Healthdyne went public in 1981 and continued to develop a diverse portfolio of home healthcare products and services, including additional high-technology healthcare devices, healthcare information systems and technology,

and home healthcare services for disease management. PSR ¶ 111-13. Mr. Petit's experience at Healthdyne taught him that when guided by the courage of your convictions, even the greatest of hardships can lead to the most extraordinary of successes.

### G.    Mr. Petit's Marriage to Sally Knight Simpson

In 1985, Mr. Petit married Sally Knight Simpson, who had been widowed four years earlier. Ms. Simpson had four children from her first marriage, three older sons and a young daughter, Meredith. Mr. Petit had come to know the family through coaching the boys in youth football alongside his son, Bill. After his marriage to Ms. Simpson, Mr. Petit helped put Ms. Simpson's boys through college,[3] and he officially adopted Meredith, whom he had known since she was only months old. PSR ¶ 98. As recounted by Meredith in her letter of support to the Court:

> I am Dad's youngest daughter, but I am not his biological child. I was eight years old when he married my mother and adopted me. They divorced several years later, but Dad did not separate from me. He has always just referred to me as "his daughter," and has never treated me any differently than his biological children. In fact, I doubt many of his associates are even aware that we are not related by blood. This is a man who lovingly welcomed another child into his family, even when he was no longer married to her mother.

*Meredith Martin* at 1. To this day, Mr. Petit and Meredith enjoy a very close relationship.

### H.    Matria Healthcare

Over time, Healthdyne was split into several different publicly traded companies. One of these spinoffs was Healthdyne Maternity Management, which became the preeminent at-home manager of high-risk pregnancies in the United States. In 1995, Healthdyne Maternity Management merged with another company to form Matria Healthcare. PSR ¶ 113. At Matria,

---

[3] The three boys grew up to have successful careers as a doctor, a lawyer, and in a nod to Mr. Petit's influence, a biomedical engineer. Mr. Petit is still in contact with them and occasionally spends time with them and their families.

Mr. Petit had the opportunity to marry his passions for technology and healthcare. Mr. Petit is committed to innovative healthcare, and at Matria he endeavored to align the best and the brightest healthcare minds with aspirational ideas that were always focused on helping others. Under his leadership, Matria became the biggest and fastest growing disease management company in the United States, expanding from high-risk maternity management to treatment of people with diabetes, COPD, and heart disease, among other illnesses.

In 2008, Inverness Medical bought Matria, and Mr. Petit retired, at least for a short while.

### I.      MiMedx Group, Inc.

After only a few months, Mr. Petit likes to say that he "flunked" retirement. In February 2009, a friend of Mr. Petit's recruited him to become the Chairman, President, and CEO of MiMedx Group, which was near bankruptcy at the time. PSR ¶ 114. Mr. Petit immediately raised $5 million dollars for the Company, including $3 million of his own money. Mr. Petit believed in MiMedx's products, and he put his heart and soul into turning the Company around. As recalled by Kevin Lilly, a former Senior Vice President at MiMedx, Mr. Petit "believed . . . that [the] products [developed and sold by MiMedx] should be in the hands of every person who needs them," which "would make the world a better place." *Kevin Lilly* at 1. At MiMedx as elsewhere, Mr. Petit "was a champion of serving . . . patients." *Id.*

Under Mr. Petit's leadership, MiMedx grew to become a global processor, marketer, and distributor of human amniotic tissue grafts, which are used in multiple therapeutic areas, including ophthalmology, spine, chronic wounds, dental, orthopedic surgery, sports medicine, and urology. MiMedx products leverage the healing power of protein-rich amniotic membranes, which the company obtains from human donors. After the tissue grafts are applied during surgical procedures or after serious injuries, MiMedx products can significantly reduce a patient's overall healing time. During Mr. Petit's tenure as CEO, MiMedx's products improved

clinical outcomes, increased patients' quality of life, and reduced financial burdens on the U.S. healthcare system. By way of just a single example, General Lou Hennies recalls learning of a veteran who was suffering from chronic diabetic foot ulcers and had been told his foot would need to be amputated. General Hennies contacted Mr. Petit directly on behalf of this veteran, and Mr. Petit "offered immediate assistance," ultimately dispatching MiMedx products to the veteran's medical team *pro bono*. *Gen. Lou Hennies* at 2. In the end, "the wound closed sufficiently in several weeks and [the veteran's] foot was saved." *Id.*

While MiMedx saved people's lives under Mr. Petit's stewardship, Mr. Petit also helped create hundreds of new jobs in the Marietta, Georgia area and around the country. When Mr. Petit left MiMedx in June 2018, the company employed more than 1,000 workers.

### J.      Mr. Petit's Marriage to Janet Petit

Mr. Petit finally met his match in the lovely Janet Lewis, to whom he has been married for almost 25 years. Several years after his divorce from Ms. Simpson, Mr. Petit was encouraged by his secretary at the time to get back into the dating world. To that end, he went to a singles ministry at the First Baptist Church of Atlanta. As he walked into the social hall, he met eyes with and was smitten by Janet. Mr. Petit made it his mission to seek out Janet and introduce himself. He learned that she worked at the Arthritis Foundation in Atlanta, and he could immediately feel her warmth and kindness. Mr. Petit would spend the next two years pursuing Janet. They married six months after their first date and they have proved to be a perfect match. Janet softens Mr. Petit, and brings out his inner kindness and gentility. They spend their time together dining out with friends and taking bicycling trips in Europe. And while Janet is not the biological mother to any of Mr. Petit's children, she treats them as her own, and she is without a doubt the grandmother to their grandchildren, who affectionately call her their "Jannie."

The Court may recall seeing Janet throughout these proceedings—she sat in the Courtroom during every minute of the trial to support Mr. Petit during this difficult time.

### K.     Mr. Petit's Cancer Diagnosis

Mr. Petit was diagnosed with incurable bladder cancer in May 2018. His type of cancer, high-grade urothelial cancer, tends to grow aggressively and has the potential to spread to other parts of the body. He had his first surgery to remove cancerous tumors in June 2018. Following his surgery, he underwent a 6-week course of intravesical immunotherapy. PSR ¶ 102.

Mr. Petit's cancer has returned several times since then—including in February, May, September, and December 2019, and most recently, December 2020, just a few weeks after the conclusion of the trial in this case. On each occasion, Mr. Petit has undergone surgery to remove the tumors and a course of intravesical immunotherapy, which he is still in the midst of receiving at the time of the filing of this memorandum. PSR ¶ 103.

Mr. Petit's continued survival depends on aggressive monitoring of his cancer for the rest of his life, including scoping for new growths every three months and maintenance immunotherapy for at least the next three years. Mr. Petit will also require additional surgery and immunotherapy treatment if and when his cancer returns. PSR ¶ 104.

## II.    Mr. Petit's Character

### A.     Integrity

Although Mr. Petit didn't live with his father for much of his adolescent life, his father nonetheless had a profound impact on Mr. Petit's notion of what it means to be a good man. One of the core tenants he imparted to Mr. Petit was the importance of honesty and accountability.[4] Mr. Petit felt this edict in his core, and he always tried to lead a life of integrity.

---

[4] Mr. Petit continued this tradition as a father. His daughter, Meredith, adds: "Telling the truth was expected in our household, no matter the consequences." *Meredith Martin* at 1.

Mr. Petit's integrity was on display even throughout this trial. The Court may recall evidence regarding the tumultuous business dealings between MiMedx and CPM's Mark Brooks. Every Government witness who dealt with Mark Brooks testified that Mr. Brooks was a "crude," "difficult," "hostile," "volatile," and "unprofessional" person, who "played games" during negotiations and "goug[ed] customers" during sales. Tr. 1037:2–23, 1040:3–17, 1114:25–1115:1, 1220:2–9. Yet the Government's own evidence also showed that when Mr. Petit learned that MiMedx had unintentionally violated Mr. Brooks' exclusive distributor agreement in Texas, Mr. Petit quickly worked to rectify the oversight and told Mr. Carlton, "at a minimum, we owe [Mr. Brooks] an apology." Tr. 860:11–19; DX-135 (Mr. Petit apologizing to Mr. Brooks in writing).

The individuals who have written letters in support of Mr. Petit all comment on this integrity. For example, Patrick Cua, an executive who has known Mr. Petit for 17 years, writes: "[T]he characteristics that I saw in Pete Petit in executive meetings, strategy meetings and in the board room were always and without exception honest and full of integrity. . . . I will always be appreciative for Pete's lead by example [nature]." *Patrick Cua* at 2. According to Mr. Cua, Mr. Petit would often say that "the view from the high road is the best view." *Id.*

Likewise, in her letter to the Court, Mr. Petit's daughter, Meredith, recalls:

> I began working in the mail room of his company when I was 15 years old. As I delivered the mail to his floor, I could see the way he interacted with his coworkers. It was the exact same way he acted at home. Firm, but supportive. Strict, but positive. He expected honesty and integrity from his coworkers, just like he did at home. Dad always said to tell the good, the bad, the ugly, but tell the truth. Then you deal with the consequences. No excuses, just honesty. Those weren't just words or a catchy phrase to him, they were the standard []to which he held himself and those around him.

*Meredith Martin* at 1. One of those former coworkers, Mr. Lilly, similarly writes in his letter to the Court: "[Mr. Petit] was a champion of an open, honest, and ethical culture" at MiMedx. *Kevin Lilly* at 1. Another former colleague, Tom Underwood, writes, "[Mr. Petit] always

10

exhibited the highest level of integrity." *Tom Underwood* at 1. His executive assistant, Ms. Martin, writes that, "Mr. Petit always demonstrated professionalism and honesty with everything [in which] he was involved." *Id.*; *see also James Trivette* ("[Mr. Petit] is of the utmost character and integrity and I have been blessed by him personally and professionally."); *Laura Trivette* ("I worked for [Pete] for 20 years because of Pete's leadership, professional integrity and commitment to the company and the [healthcare] industry."); *Dean Sikes* ("Pete Petit is a man of unquestioned integrity.").

### B. Devotion to Family

Family comes first for Mr. Petit, "regardless of his commitments to [his work]." *Tom Underwood* at 2. When his children were young, Mr. Petit spent considerable time at work, building his business. Even so, he found time to coach his son, Bill's, youth football teams, and was a staple at his daughter, Patricia's, gymnastics meets. Meredith chose music as her passion, and when she was in high school, she decided she wanted to be the band major and lead the band. Mr. Petit likes to think that was his CEO tendencies rubbing off on her.

Mr. Petit has always tried to instill in his children (and grandchildren) gratitude for the many blessings with which they have been bestowed. He has spent many Memorial Days over the years with his family in Charleston, South Carolina, which is a way for him to connect his family to their humble roots. On one such visit, Mr. Petit made a special point to take his grandchildren to the two-bedroom house on the Isle of Palms, where he lived with his father, stepmother, and half-siblings. His grandchildren could hardly believe that he shared a bedroom with his *four* siblings. A few years ago, Mr. Petit was also fortunate to have the means to take his grandchildren on a special trip to Normandy, France, where he taught them about the sacrifice that took place on the beach, and encouraged them to be thankful for those who have served and continue to serve their country.

"Family" also means more to Mr. Petit than those related to him by blood. He has always regarded his co-workers and employees as his "business family." Marlene DeSimone, who worked at both Matria and MiMedx and who has known Mr. Petit for more than 15 years, writes in her letter to the Court:

> [Mr. Petit built] trusting and personal relationships with his employees. He invested in people and engaged with them on a regular basis. Pete treated us like his business family; whether a lab worker, administrative assistant or senior level staff person, he knew everyone's name and showed interest in learning about their families and outside hobbies. I have been most moved by how he supported woman business leaders in both these companies and his commitment to their career development opportunities.

*Marlene DeSimone* at 1.

Mr. Lilly similarly writes: "[Mr. Petit] constantly took the time to talk one-on-one with members of the sales team and his door was always open. He was never too busy to stop and meet with anyone about anything and to do whatever was needed to help the patients, customers, and the team." *Kevin Lilly* at 2; *see also Pamela Martin* at 1 ("I was amazed at the care and compassion he showed for all his employees."). Mr. Underwood, who was an executive at Matria Healthcare, writes in his letter to the Court: "Pete cared deeply for the people who worked in his company, regardless of their title or responsibility, and he spent personal time to ensure that they felt valued, appreciated, and informed." *Tom Underwood* at 2. As just one example, Mr. Underwood recalls an employee who struggled to do her job while caring for a child with a life-threatening chronic illness. Mr. Underwood made Mr. Petit aware of the situation, and "without hesitation, he instructed [Mr. Underwood] to create a position . . . that allowed the employee the flexibility of working remotely so that she had the ability to care for her child." *Id.* at 1. According to Mr. Underwood, Mr. Petit "made the decision 'on the spot,' without fanfare, and without considering the impact on the business." *Id.*

### C.        Commitment to Hard Work

Mr. Petit has consistently demonstrated a strong work ethic from a young age. His father had been one of the first Eagle Scouts in the United States in the 1920s, and even when Mr. Petit was living with his mother, it was personally important to him to carry forward his father's legacy. And so, he too put in the work to become an Eagle Scout. (Mr. Petit's son, Bill, would later do the same, as would Bill's two sons.) To this day, Mr. Petit remains extremely proud of the hard work that went into becoming an Eagle Scout and, in many ways, his achievement paved the way for what would become a lifetime of service and leadership.

Mr. Petit will be the first to admit that he was not naturally the best or brightest student. But what he lacked in innate intellectualism, he made up for in perseverance. In school, he found that he needed to study longer and harder than some of his peers just to get the same grades, but that was fine by him. He wanted to excel at everything he did, no matter the effort that was required, and so he worked as hard as he could, always driven by a passion to be better.

This same drive served Mr. Petit well in business. As his wife and children recall in their letters to the Court, Mr. Petit has always been a bit of a workaholic. Janet writes of her husband: "Pete is the hardest working individual I have ever known. He has a passion for using the talents, common sense and business skills . . . to improve the lives of others." *Janet Petit* at 2. Meredith adds, "He instilled this work ethic into his children." *Meredith Martin* at 1. But to Mr. Petit, it never seemed like work. The long hours and late nights were made easier by the fact that Mr. Petit loved what he was doing, and he felt a special calling to each of his business endeavors and to make people's lives better. Mr. Petit takes deep and personal pride in his role over his lifetime developing more than 100 new healthcare products and technologies that improved the lives of a countless number of individuals. But, as Janet writes in her letter, for Mr. Petit, "it has never

been about the money, power, [or] prestige [] that comes with success," as he is "a humble and self-confident individual who doesn't need those accolades." *Janet Petit* at 2.

Mr. Petit's belief in MiMedx, and desire to see the Company succeed, is perhaps best demonstrated by the fact that in nearly ten years as the Company's CEO, Mr. Petit never sold a single share of stock. He left his money invested, confident the Company would continue to grow and bring innovation to more patients in need. On several occasions, Mr. Petit also turned down salary increases offered to him by the MiMedx Board, choosing instead to leave the money invested in the Company, where it could help the Company grow. *See, e.g.*, MiMedx Group, Inc. Current Report (Form 8-K) (Feb. 23, 2012), at 13 ("[G]iven the current goals of the Company, [Mr. Petit] requested his salary be held to the same salary as [Mr. Taylor's]."); MiMedx Board of Directors, Compensation Committee Minutes (Feb. 22, 2016) ("Mr. Kuntz[,] [Senior Vice President of Administration,] noted that in his quantitative analysis, he had proposed a greater increase for Mr. Petit based on the peer group data, but Mr. Petit had asked that his increase be reduced. . . . The Committee noted that it believed Mr. Petit's salary should be higher than that recommended by management, but agreed to honor Mr. Petit's request.").

### D.    Empathy

Several individuals write about Mr. Petit's empathy. For example, Mr. Cua shared:

Pete cares about people and has empathy for those who are struggling. I can only assume the loss of his own son Brett taught him the value that supporting friends and family can have when someone needs [another's] help the most. It was humbling to see so many over the years come to Pete to be supported in whatever way they needed it. His empathy is a quality so many including myself admire.

*Patrick Cua* at 1.

Similarly, Ross Mason, who is quadriplegic and the founder of the non-profit High Impact Network of Responsible Innovators (**HINRI**), writes in his letter to the Court that in addition to providing financial assistance to HINRI, Mr. Petit has supported Mr. Mason

personally over the dozen years they have known each other. He writes that "[w]ithout what Mr. Petit has done for me personally (outside of HINRI), I would have lost my home, lost my caregivers (24-hour care), my family would have gone bankrupt, and I would have died long ago in a nursing home." *Ross Mason* at 1. Indeed, Mr. Mason believes that Mr. Petit literally saved his life. *Id.*; *see also Gregg Raybuck* at 1 ("[Pete] silently and without fanfare assisted many people who were in need financially or emotionally.").

Mr. Petit's former co-worker Ms. DeSimone also shares in her letter: "I was diagnosed with breast cancer a few years ago. Pete has shown concern for my health and well-being through prayers and having people in his life who experienced this same cancer journey reach out to support me." *Marlene DeSimone* at 1. Ms. DeSimone concludes: "This man has consistently been there for others throughout his life in so many supportive ways." *Id.* at 2.

### E.  Generosity

Mr. Petit is a man of faith, and "[h]is faith is steady and real." *Janet Petit* at 2; *see also Rev. Mary Cox* at 1 ("It has been my honor to know Pete [for nearly 20 years] through his membership at Roswell Presbyterian Church and to witness his heartfelt commitment to God."). Rooted in that faith is Mr. Petit's firm belief that he has an obligation to give to and help others who are less fortunate than him. As recalled by his wife:

> One Christmas Eve a few years ago when all the children and grandchildren were at our house, [Pete] took the five oldest grandchildren into his office for one of his 'life's lessons,' as [he] liked to call them. He asked them one question, 'Why do you think God put you here on this earth?' When there wasn't much response, Pete answered by saying, 'God put you here to serve your fellow man, not yourself!' At the time, the grandkids probably rolled their eyes, as teenagers are prone to do at their grandparents. Over time, though, I am hopeful that those words will take root, and our grandchildren's selfless acts will make their granddad proud.

*Id.* at 1.

One way that Mr. Petit gave to others was through his hiring decisions. As Mr. Cashman writes in his letter to the Court:

> Several times during my tenure at MiMedx, I personally observed . . . Pete's leadership to hire individuals who had lost their job or needed a break. We didn't have open positions []or the budget in some cases, nonetheless it was the correct action to take in helping others. One individual, a double, lower leg amputee, had handicaps that created perceived barriers to hiring and he had been unemployed for many years, even living out of his car at one point in time. Pete made sure that we could put this individual in a position where he could learn, grow, and contribute, and ultimately become successful in our education group. . . . I have certainly learned from Pete's servants heart and commitment to helping others.

*Chris Cashman* at 2; *see also Marlene DeSimone* at 1 ("[Pete] learned a man we had used as a motivational speaker was struggling financially and had become homeless. This man had been injured years before and was a double amputee Ironman. Pete asked me to hire him and find a place within my team to work which provided an opportunity for him to grow professionally. [The man later] told me we saved his life because he was so depressed and felt hopeless.").

Mr. Petit has also made significant financial contributions to his community. Over the past 45 years, Mr. Petit has donated an extraordinary $28 million dollars to varied charitable, education, and humanitarian causes that are close to his heart. PSR ¶ 138. For example, Mr. Petit is particularly devoted to the Spirit of America Foundation, to which he has donated approximately $703,000. The Spirit of America Foundation is a national organization dedicated to eradicating hopelessness among teenagers and by so doing, bringing an end to teenage suicide.[5] *See Dean Sikes* (the founder of Spirit of America, who writes, "[Pete is] a cheerleader for causes that are truly making a difference in this world").

---

[5] Mr. Petit believes so much in the mission of this organization that he has helped connect those closest to him with the services it provides. *See, e.g.*, *Pamela Martin* at 1 (writing that she was widowed at 38 years old and left to raise four children on her own, two of whom had suicidal tendencies, and Mr. Petit connected her to the Spirit of America organization, through which she "received the help that [she] personally needed").

Mr. Petit has also donated approximately $920,000 to HINRI, which, as noted above, is a nonprofit venture philanthropy organization that partners with leading healthcare innovators to serve at-risk communities. Mr. Petit has been a major donor to the organization since 2013, and its largest donor for the past five years. Through Mr. Petit's support, HINRI has helped bring new technology to the market that has the ability to reverse paralysis for millions of people around the world who have been diagnosed with "permanent" paralysis, including Mr. Mason himself. *Ross Mason*; *see also Jack Williams* (writing of Mr. Petit's support for the IDEALS Foundation, Inc., a 501(c)(3) organization that helps young people learn important life skills).

Mr. Petit is also especially proud of the combined $24 million he has donated to his alma maters, Georgia Institute of Technology and Georgia State University. Mr. Petit was only able to put himself through school through Georgia Tech's cooperative work program, and having never forgotten "the roots from which [he] came," *Pamela Martin* at 1, Mr. Petit considers it his personal obligation to give back to these institutions.

At Georgia Tech, according to Dr. Robert Guldberg, who was the Director of the Institute for Bioengineering and Bioscience for nearly a decade, Mr. Petit's donations have been used to endow the Institute, fund a chair for the director of the Institute, and help support construction of a new biotechnology building. *Robert Guldberg* at 1. Mr. Guldberg writes that today, the Institute "is a model of excellence and includes over 200 faculty members performing world class research in state-of-the-art facilities and translating their work into start-up companies to stimulate the economy and improve the lives of patients." *Id.* Mr. Guldberg believes that Mr. Petit's gifts "helped transform Georgia Tech and propel it to be the [second-ranked] biomedical engineering program in the United States." *Id.*

At Georgia State University—which Mr. Petit attended as a night student on his GI benefits, Mr. Petit's donations have helped fund the Georgia State Science Building and facilitate Georgia State's entry into football and other college athletics.

Beyond these big-name donations, those who know Mr. Petit best report that he has also "quietly supported small churches that struggled financially." *Patrick Cua* at 1; *see also Tom Underwood* at 2 ("[Pete] made . . . investments of his time [to community organizations] without fanfare or recognition."). According to Mr. Cua, Mr. Petit didn't crow about these donations to curry admiration or good favor; rather, Mr. Cua only learned about this support "from someone on the receiving end." *Patrick Cua* at 1. Mr. Cua writes, "You won't read about it, but I know [Pete's] generosity to those small rural churches . . . positively impacted" them. *Id.*

Mr. Petit also gives to others through time spent being a mentor, particularly to students at his beloved Georgia Tech. According to Mr. Cua, "It is rare to see a CEO of a publicly traded company . . . give hours [of his time] to nineteen- or twenty-year old's who are struggling," and yet, Mr. Cua witnessed this from Mr. Petit "too many times to count," even when "[n]o one was watching," and "[t]here were no public accolades." *Patrick Cua* at 1. Mr. Petit's longtime executive assistant, Ms. Martin, similarly writes:

> One of the things I admired most about Mr. Petit was his ability to mentor young people. He loved to encourage children and was always willing to sit down with any young person and help them figure out their path to success and how they might best excel. He would not only counsel these kids, but he would also sometimes offer them internships at MiMedx where they could receive hands-on training.

*Pamela Martin* at 2.

## ADVISORY GUIDELINES CALCULATION

In determining an appropriate sentence, "[t]he Court's first job [is] to calculate what the sentence would be under the Sentencing Guidelines." *Adelson*, 441 F. Supp. 2d at 508. Of

course, the Sentencing Guidelines (**Guidelines**) are only advisory, and courts may "tailor the appropriate punishment to each offense in light of other concerns." *United States v. Cavern*, 550 F.3d 180, 187 (2d Cir. 2008) (*en banc*) (citations omitted).

Mr. Petit's counsel is familiar with Your Honor's clearly articulated views regarding "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense." *United States v. Adelson*, 441 F. Supp. 2d at 512. Nonetheless, since the Court is required to calculate the Guidelines, and there are complicated issues concerning the alleged loss amount in this case, we respectfully offer our views below on the appropriate Guidelines calculation.

## I. The PSR Calculation

The PSR calculates an advisory Guidelines Offense Level of 43, as follows:

| | |
|---|---|
| Base Offense Level | 7 |
| 2B1.1(b)(1) – Loss | 22 |
| 2B1.1(b)(2)(A)(i) – Ten or more victims | 2 |
| 2B1.1(b)(10)(C) – Sophisticated means | 2 |
| 2B1.1(b)(20) – Company officers | 4 |
| 3B1.1 – Leadership | 4 |
| 3C1.1 – Obstruction | 2 |
| | |
| **TOTAL Offense Level** | **43** |

At Offense Level 43 and Criminal History Category I, Mr. Petit faces a Guidelines sentence of 360 months to life, tempered only by the statutory maximum for securities fraud, which is 20 years' imprisonment. 15 U.S.C. §§ 78j(b), 78ff. According to the PSR, the applicable Guidelines range for any fine is between $50,000 and $5,000,000. PSR ¶ 134 (citing U.S.S.G. §5E1.2(c)(3)). The statutory maximum fine is $5,000,000 under the securities fraud statute. 15 U.S.C. § 78ff. *See, e.g., United States v. Lumiere*, No. 16-cr-483, Dkt. 115 at 21 (S.D.N.Y. June

27, 2017) (Rakoff, J.) (noting, in a securities fraud case, the court has "the ability to impose a fine of up to $5 million").

## II.       The PSR Guidelines Calculation is Flawed

Mr. Petit objects to the Guidelines calculation in the PSR on four grounds. *First*, the PSR adopts the Government's calculation of the loss in this case, which is fundamentally flawed. *Second*, the PSR, at the request of the Government, applies a 2-level enhancement for obstruction without adequate factual support. *Third*, the PSR applies a 4-level enhancement for Mr. Petit directing the actions of others, notwithstanding that Mr. Petit was acquitted of the conspiracy charge in this case. And *fourth*, the PSR applies a 2-level enhancement for sophisticated means without sufficient factual basis.

### A.       The Government's Alleged Loss Amount Is Based on Pure Speculation

The Guidelines direct the Court to determine the "greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt n.3(A) (2018). To calculate intended loss, there must be evidence of the "pecuniary harm that the defendant purposely sought to inflict," such as "an insurance fraud in which the claim exceeded the insured value." *Id.* Alternatively, to calculate actual loss, there must be evidence of a "reasonably foreseeable pecuniary harm that resulted from the offense," provided that there is an "appropriate and practicable" method of calculation. *Id.*, cmt. n.3(A), 3(F)(ix). The Guidelines suggest that the Court examine the "average price of the security . . . during the 90-day period after the fraud was disclosed," but caution the Court to look for "significant changes in value not resulting from the offense," including "changes caused by external market forces, such as changed economic circumstances, changed investor expectations, and new industry-specific or firm-specific facts, conditions, or events)." *Id.*, cmt. n.3(F)(ix). If "there is a loss," but "it reasonably cannot be determined" because of such confounding

variables, the "court shall use the gain that resulted from the offense as an alternative measure of loss[.]" *Id.*, cmt. n.3(B).

In this case, the Court should consider the amount of gain to Mr. Petit, because there is no evidence of intended loss and no way to reasonably calculate actual loss. As to intended loss, the Government has offered no evidence that Mr. Petit "sought to inflict" harm. *See United States v. Lumiere*, No. 16-cr-483, Dkt. 105 at 3:22-4:4 (S.D.N.Y. 2017) (Rakoff, J.) (observing that the Guidelines have been "amended to take a much narrower view of intended loss"). To the contrary, the record shows Mr. Petit was a driven and committed business leader, who sought to deliver steady and reasonable company returns. Mr. Andersen, the former Controller at MiMedx, testified that Mr. Petit was "intens[e]," "hard charging," "invested in th[e] company," and "always wanting to move forward;" he was also "fair," "charismatic," and committed to a "family-like environment." Tr. 325:13–326:20. Mr. Carlton, the company's former Senior Vice President of Global Sales, similarly testified that Mr. Petit was "all in," "hands on," "extremely hard-working" and dedicated to "strong convictions"; he was also a "good listener," an "accessible" leader, and a person "open for feedback." Tr. 815:5–817:9. These are attributes of an ideal business leader, not a person seeking to harm investors.

In turn, there is no way to reasonably calculate actual loss without engaging in the kind of "pure speculation" that is "not permissible under the Guidelines." *See United States v. Deutsch*, 987 F.2d 878, 886 (2d Cir. 1993); *United States v. Cuti*, 2011 WL 3585988, at * 4 (S.D.N.Y. July 29, 2011) (quoting *Deutsch*). As Mr. Petit's expert report explains, it is profoundly misleading for the Government to calculate actual losses based on a February 20, 2018, company press release that "provided little clarity to the marketplace about the reasons for the delayed financial results or the reasons for the Audit Committee's actions." Expert Report of Dr. Atanu

Saha (Feb. 12, 2021), at 24. Instead, this ambiguous press release had the opposite effect of a traditional disclosure: it fueled wild speculation, especially among predatory short-sellers, that the entire company was actually "valued at $0." *Id.* at 27-31. As Exhibit 6 to the Report shows, the "considerable uncertainty" triggered a "massive sell-off" that "exceeded MiMedx's entire revenue for the years 2016 and 2017." *Id*. at 26. It is impossible to determine how much of that market reaction related to the four distributor transactions charged in this case, which were unknown at the time, and how much related to alternative distribution transactions not charged in this case, such as those with AvKare, which was the company's largest distributor at the time. *Id.* at 27-29. Significantly, the Government thoroughly investigated the allegations involving AvKare during its investigation but chose not to charge them in the indictment in this case, presumably because the prosecutors concluded that they could not prove those allegations beyond a reasonable doubt. Yet the AvKare concerns were part of MiMedx's internal investigation and those same concerns fueled short-seller speculation about the meaning of the February 20, 2018 press release. *Id.*

It is equally impossible to determine how much of the market reaction related to similarly irrelevant variables alleged by short-sellers themselves, including concerns about Government investigations, regulatory and compliance challenges (e.g., with the Veterans Affairs Department and the Food and Drug Administration), rumors about further fraudulent schemes involving Medicare incentives, speculation about employee involvement in unrelated kickback and bribery schemes, and personal attacks on Mr. Petit's personality and management style. *Id.* at 27-31. Even if it were possible to disentangle these confounding variables, the Government's methodology is not valid because it rests on the flawed assumption that there was a close correlation between revenue targets and stock prices, which was not historically the case for this

particular company, which more often dropped in stock price after meeting or exceeding its revenue targets. *Id.* at 12-22. In fact, when the company actually disclosed the full extent of the accounting issues on March 17, 2020, the stock dropped by just $0.03 on average during the 90-day period that followed the disclosure. *Id.* at 35-36. In this context, the Government's speculative analysis can hardly be the basis for a 22-point enhancement.

Sentencing courts routinely consider the alternative amount of the gain when they cannot reasonably calculate loss. For example, in *United States v. Lumiere*, this Court encountered a similar situation where the Government proposed an actual loss between $15 and $23 million but nevertheless failed to "take[] account of the fact that although investors may not have invested but for the fraudulent elevation of the net asset value, . . . what they got was not worthless." *Lumiere*, No. 16-cr-483, Dkt. 105, at 3:14–21. After finding loss calculation not "adequately supported," the Court instead adopted the "reasonable estimate of the gains . . . between [$]1.5 and [$]3.1 million." *Id.* at 3:22–4:12; Dkt. 115, at 2:2–16. *Accord United States v. Tzolov*, 435 F. App'x 15, 17 (2d Cir. 2011) (affirming the district court's use of gain where the "loss inflicted was not readily calculable"); *United States v. Parris*, 573 F. Supp. 2d 744, 748 (E.D.N.Y. 2008) (Block, J.) (favoring gain amount because, even though it "inured to defendants' benefit," "the difficulties inherent in calculating loss to the market in this case made its use appropriate").

Furthermore, even when sentencing courts determine that measuring loss is appropriate, these courts regularly find that a variance is appropriate when the defendant personally gained just a small proportion of the total loss. In *United States v. Oakford Corp.*, this Court considered a similar circumstance where the "loss or gain was more than $10 million," but each defendant "personally realized only a small portion of the overall gain." 79 F. Supp. 2d 357, 367-68 (S.D.N.Y. 1999). The Court determined—irrespective of whether $10 million was an appropriate

measure of loss or gain—that "such an increase [in penalties under the Guidelines] would substantially overstate the seriousness of the offense." *Id.*; *accord United States v. Walters*, 87 F.3d 663, 671-72, n.8 (5th Cir. 1996) (affirming downward departure where the loss calculation "overstate[d] the seriousness of the particular defendant's conduct" because defendant "fail[ed] to receive a personal benefit" from the scheme); *United States v. Stuart*, 22 F.3d 76, 82-83 (3d Cir. 1994) (finding that a nine-level loss enhancement overstated defendant's criminality because he only personally received less than two percent of the Government's loss figure).

In this case, the Court should consider the limited personal gain to Mr. Petit resulting from the alleged fraud. The Government's own expert, Dr. Carina Chambarry, testified at trial that Mr. Petit received between $165,224 and $202,436 in non-equity compensation based on inflated revenue. Tr. 2067:12–14 (discussing GX-050 at 21). Indeed, this relatively limited personal gain is a far cry from the $34.6 million in losses that the Government suggests in this case, without a reasonable basis for attributing the losses to Mr. Petit, personally, or the four distributors, specifically. And when the Guidelines are applied to Mr. Petit's gains, the resulting increase in the offense level is a still-significant 10 points, rather than the Government's proposed (and rather astronomical) 22-point increase.

### B.     There is Insufficient Evidence to Support the Enhancement for Obstruction

A two-level enhancement for obstruction is plainly inappropriate in this case. As the Court is aware, the Government did not formally charge Mr. Petit with obstruction of justice, but nonetheless argued at trial that he attempted to influence witnesses. In order for the "obstruction" enhancement to apply under the Guidelines, the Court must find "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice." U.S.S.G. § 3C1.1. The Guidelines state that obstruction includes "threatening, intimidating, or otherwise unlawfully influencing a . . . witness," but qualify that a defendant's "denial of guilt"

does not meet this threshold. *Id.* cmt. nn.2, 4(A). Indeed, the Second Circuit has observed that "[m]ost cases where we have upheld the application of this enhancement involve *clear and direct threats* against cooperating witnesses." *United States v. Archer*, 671 F.3d 149, 167 (2d Cir. 2011) (emphasis added) (no enhancement where the defendant sent texts that "he wished to know whether [a person] would testify for the government" and "was displeased that [the person] would do so"); *see also United States v. Hernandez*, 83 F.3d 582, 586 (2d Cir. 1996) ("Fury may be exceedingly unpleasant, but alone, it bespeaks no intent to obstruct justice.").

In this case, the Government's evidence regarding Mr. Petit's limited contact with two former employees prior to the indictment, both of whom were friends and former co-workers at the time, does not support an enhancement for obstruction. The cornerstone of the Government's argument is a five-minute meeting between Mr. Petit and Mr. Carlton, during which Mr. Petit "read" from notes that described his belief that a payment to Mark Brooks was "for consulting for market intelligence," and expressed his desire "to get us all [*i.e.*, Mr. Petit and Mr. Carlton] back to the company." Tr. 665:1–666:3, 819:23–820:2. After the meeting, Mr. Petit sent Mr. Carlton public articles that reflected Mr. Petit's belief about the consulting payment and a published book that reflected Mr. Petit's concern that, in other cases, Government prosecutors had pressured witnesses. Tr. 931:12–932:4. At trial, Mr. Carlton testified that he was concerned about the meeting because he "had been directed by [his] counsel not to have contact with Mr. Petit," but not because Mr. Petit said or did anything inappropriate. Tr. 821:4–16. In fact, Mr. Carlton clearly testified that Mr. Petit never asked him to "lie," "minimize," or "shade the information" that he was going to share with the Government. Tr. 832:13–19. Mr. Petit merely told Mr. Carlton to "hang in there," "stand your ground," and resist pressure to "say[] something you wouldn't otherwise say." Tr. 823:4–824:23. The public documents that Mr. Petit sent to Mr.

Carlton contained no further messages crafted or designed to threaten, intimidate, or otherwise unlawfully influence. At most, they reflected Mr. Petit's view that "he was going to rigorously defend himself," Tr. 831:19–25, which is not obstruction of justice.

In the absence of any proof of "threatening, intimidating, or otherwise unlawfully influencing a . . . witness," the obstruction enhancement does not apply.

### C.     There is Insufficient Evidence Mr. Petit Directed Five or More People

A four-point enhancement for leadership is likewise inappropriate under the Guidelines. In order for the enhancement to apply, the Guidelines require that the defendant was "an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1. A "participant" in criminal activity is further defined as someone "criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1., cmt. n.1. The Second Circuit has held that "only knowing participants are included" in the definition of "five or more participants." *United States v. Paccione*, 202 F.3d 622, 624 (2d Cir. 2000). In turn, an "otherwise extensive" crime can include unknowing participants, U.S.S.G. § 3B1.1, cmt. n.3, but the Second Circuit has held that the enhancement applies only where the "scheme was the functional equivalent of one involving five or more knowing participants." *United States v. Kent*, 821 F.3d 362, 369 (2d Cir. 2016) (internal emphasis and quotations marks omitted). [6] Even if "unknowing" persons provide services "utilized by" the defendant, they are not "participants" "within the above Guidelines definition of that term" where there is "no indication in the record that they would be criminally liable."

---

[6] *See also United States v. Carrozzella*, 105 F.3d 796 (2d Cir. 1997), *abrogated on other grounds, in United States v. Kennedy*, 233 F.3d 157, 160–61 (2d Cir. 2000) ("[A]n adjustment . . . is based primarily on the number of people involved, . . . rather than other possible indices of the extensiveness of the activity," because "many characteristics that might ordinarily be considered evidence of 'extensive' activity are dealt with elsewhere in the Guidelines.").

*United States v. Ware*, 577 F.3d 442, 453 (2d Cir. 2009); *accord United States v. Skys*, 637 F.3d 146, 158 (2d Cir. 2011) (reversing an enhancement absent "any finding that there was a significant number of persons who were culpable").

In this case, the jury acquitted Mr. Petit of the conspiracy charge. The jury's acquittal on this count demonstrates its conclusion that whatever crime it believed Mr. Petit committed, he acted alone. Since the jury found he was not part of a conspiracy, Mr. Petit could not have directed "knowing" participants (who could be criminally liable for the same actions). *Cf. United States v. Archer*, 671 F.3d 149, 166 (2d Cir. 2011) (finding enhancement warranted where the defendant was convicted of participating in an "overarching conspiracy"). Under these circumstances, there is insufficient evidence to justify this enhancement.

### D.    There is Insufficient Evidence that Mr. Petit Used Sophisticated Means

Finally, in order for the sophisticated means enhancement to apply, the defendant's wrongdoing must "involve[] sophisticated means and the defendant [must have] intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10). "Sophisticated means" entail "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." *Id.*, cmt. n.9(B). District courts often narrowly define "sophisticated means." *See, e.g., United States v. Parris*, 573 F. Supp. 2d 744, 749 (E.D.N.Y. 2008) (finding "nothing particularly complex about issuing false press releases," compared to a scheme that also included "kickbacks" and "pseudonyms"). Accordingly, rather than simple non-disclosure, the enhancement requires further evidence, such as "fabrication of sophisticated false documents." *United States v. Valente*, 688 F. App'x 76, 80 (2d Cir. 2017).

In this case, there was nothing especially complex or intricate about Mr. Petit's actions. The jury acquitted Mr. Petit of the charged conspiracy, thereby finding that Mr. Petit acted alone. Notwithstanding the acquittal, the PSR chiefly relies on, *inter alia*, the allegation rejected by the

jury that "Petit and Taylor crafted agreements and sales to distributors in order to keep auditors from discovering that they were improperly recognizing revenue" as the justification for this enhancement. PSR at ⁋ 75. The enhancement should not apply in this case.

### III.   A Sentence Based on the Guideline § 2B1.1 Loss Table Would Produce A Patently Unjust Result

The severity of Mr. Petit's sentencing range is driven in significant measure by the § 2B1.1 loss table. Parroting a number provided by the Government, the PSR states that Mr. Petit is responsible for causing a loss of at least $34,601,475, which results in a *staggering* 22-level enhancement under the Guidelines. Even under the defense's alternative loss calculation, Mr. Petit's is still catapulted from a range of 37 to 46 months (offense level 21), to a range of 108 to 135 months (offense level 31).[7] The bottom line here: if the Court uses the § 2B1.1 loss table to sentence Mr. Petit, then nothing else matters. Mr. Petit, already 81 years old and in ill health, will die in prison. This draconian result is plainly unreasonable and unjust. *See, e.g.*, *Adelson*, 441 F. Supp. 2d at 506 (this Court characterizing that case as one "in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors"); *see also* Hon. Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should be Scrapped*, 26 Fed. Sent. R. 6, 7 (2013) (discussing the unfairness that results, particularly in white collar cases, from the Guidelines' "overwhelming focus" on a single factor, simply because that factor is easier to measure than other, equally important factors); Leah McGrath Goodman, *Nonsensical Sentences for White Collar Criminals*,

---

[7] At offense level 31, Mr. Petit's sentence would be greater than if he had committed criminal sexual abuse (offense level 30 under Guidelines § 2A3.1), voluntary manslaughter (level 29, § 2A1.3), or assault with intent to commit murder (level 27, § 2A2.1), and would approach the sentence of a defendant who sexually exploited a minor by production of sexually explicit visual or printed material (level 32, § 2G2.1), or who used interstate commerce facilities in the commission of a murder-for-hire scheme (level 32, § 2E1.4).

Newsweek (June 26, 2014) (quoting this Court's observation that "the arithmetic behind the sentencing calculations is all hocus-pocus—it's nonsensical, and I mean that sincerely. It gives the illusion of something meaningful with no real value underneath.").[8]

The fraud guideline is not based on empirical evidence, and it does not "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Rita v. United States*, 551 U.S. 338, 338 (2007); *see also Kimbrough v. United States*, 552 U.S. 85, 89 (2007); *United States v. Corsey*, 723 F.3d 366 (2d Cir. 2013). Indeed, as this Court has previously observed:

> "[T]he . . . Commission chose to focus largely on a single factor as the basis for enhanced punishment: the amount of monetary loss or gain occasioned by the offense. By making a Guidelines sentence turn, for all practical purposes, on this single factor, the . . . Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, see 18 U.S.C. §3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face."

*United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014). By treating loss as "the be all and the end all," the Guidelines, even as just a starting point in a post-*Booker* world, do not "fairly convey the reality of the crime or the criminal." Hon. Rakoff, 26 Fed. Sent. R. at 7.

In 2013, in recognition of these fundamental flaws, this Court joined other prominent judges and law professors well known for their scholarship and insight into sentencing to propose to the Sentencing Commission a desperately needed alternative. In 2014, that group proposed substantial amendments to the Guidelines for economic crimes. The report (***ABA Report***), sometimes also referred to as the "Shadow Guidelines," begins with a base offense

---

[8] *Available at* https://www.newsweek.com/2014/07/04/nonsensical-sentences-white-collar-criminals-256104.html.

level, and then requires specific calculations relating to: (1) actual loss; (2) culpability; and (3)

victim impact.[9] Applying the guidelines to this case would result in the following offense level:

| | |
|---|---|
| Base Offense Level | 7 |
| Loss[10] | 0 |
| Culpability[11] | 0 |
| Victim Impact[12] | 0 |
| Officer/Director | 4 |
| **TOTAL Offense Level** | **11** |

At worst, under the Government's theory, the offense level would also include a 2-point

enhancement for sophisticated means, a 2-point enhancement for obstruction, and a 4-point

enhancement for leadership, all of which we challenge above. Mr. Petit's maximum offense level

would therefore be 19, in dramatic contrast to the offense level 43 that is reflected in the PSR.

Most notably, however, the ABA Task Force proposes that first-time offenders like Mr.

Petit who have committed offenses that are not "otherwise serious" be subject to an offense level

cap of 10, with the note that "a sentence other than imprisonment is generally appropriate" in

---

[9] Am. Bar Ass'n, A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on the Reform of Federal Sentencing for Economic Crimes (2014), https://www.americanbar.org/content/dam/aba/publications/criminaljustice/economic_crimes.pdf.

[10] The ABA Report offers a modified loss table that focuses exclusively on actual loss. Because, for the reasons we argue above, the actual loss cannot accurately and reasonably be calculated in this case, there would be no enhancement for loss if the ABA Report were applied to this case.

[11] The ABA Report proposes five levels of "culpability" that range from lowest to highest. Defendants whose culpability is determined to be "moderate" receive no change to their base offense level. Notably, the report drafters state that "it is anticipated that the middle culpability category—'moderate culpability'—would account for the largest number of defendants sentenced under the guideline." ABA Report at Application Note 2. In this case, many of the enumerated factors, including, but not limited to, motive, speculative loss, and lack of personal gain, all weigh in favor of assigning Mr. Petit a low or, at the very worst, moderate culpability level, which, at worst, would result in no change to his offense level.

[12] The ABA Report proposes four levels of "victim impact." See ABA Report at Economic Offense § (b)(3). When the report's multifactor analysis is applied here, the absence of vulnerable victims, the difficulty of calculating loss, and the absence of other non-economic harm all weigh in favor of no enhancement to Mr. Petit's offense level.

those cases. ABA Report at 2, 6-7. The proposal sets forth a long list of factors in determining whether an offense is "otherwise serious" including, but not limited to, the amount of loss, whether loss was intended at the outset, whether the defendant's conduct lacked sophistication, the duration of the offense conduct, and the nature of the victim impact caused by the offense.

In this case, the ABA Report offers a preferable framework for evaluating Mr. Petit's culpability, and appropriately addressing the statutory sentencing factors. Indeed, district courts have increasingly turned to the alternative guidelines in order to reach fair and just sentences. *See, e.g.*, *United States v. Faibish*, No. 12-cr-265, Dkt. 271 at 23:13–26:8 (E.D.N.Y. May 13, 2014) (Vitaliano, J.), (finding the ABA shadow guidelines "usable" because the "current guidelines system does not provide a reasonable way to achieve the kind of sentencing objectives the guidelines are supposed to achieve, . . . to provide fair and just punishment, and not a punishment that is not disproportionate"); *United States v. Rivernider*, No. 10-cr-222, Dkt. 583 at 212:5–14 (D. Conn. Dec. 23, 2013) (Chatigny, J.),  (finding the ABA shadow guidelines "helpful" and "preferable to what emerges from the existing guideline," under which "overemphasis on loss" and "overlapping enhancements" resulted "in a range that [was] clearly excessive"); *see also United States v. Bayfield*, 796 F. App'x 19, 22-24 (2d Cir. 2019) (acknowledging that the district court "recalculated [defendant's] sentence under 'shadow guidelines' promulgated by the American Bar Association").

We respectfully ask the Court to consider these alternative guidelines in this case, as well, and sentence Mr. Petit to "a sentence other than imprisonment." ABA Report at 2.

## A NON-INCARCERATION SENTENCE IS WARRANTED UNDER 18 U.S.C. § 3553(A)

**I.    Overview of the Section 3553(a) Factors**

Section 3553(a)(2) requires that a sentence be "sufficient, but not greater than necessary":

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). Full consideration of these factors in this case demonstrates that the sentence the Court is required to impose—a sentence "not greater than necessary" to serve the purposes of sentencing—is a non-incarceration sentence. Specifically, Mr. Petit respectfully requests a period of probation that includes 12 months of home confinement, 1,500 hours of community service, and other conditions that the Court deems appropriate.

Here, the § 3553(a) factors overwhelmingly support a variant sentence that is far below the suggested Guidelines range. Instead of prison, a non-incarceration sentence is "sufficient, but not greater than necessary" to satisfy the § 3553(a) factors.

**II.    Application of the Section 3553(a) Factors**

**A.    An Individualized Assessment of Mr. Petit's Personal History and Characteristics Warrants a Non-Incarceration Sentence (§ 3553(a)(1))**

In determining the particular sentence to be imposed, 18 U.S.C. § 3553(a)(1) directs the Court to consider the "history and characteristics of the defendant." This ensures "that the punishment will suit not merely the offense but the individual defendant." *Pepper v. United States*, 562 U.S. 476, 488 (2011) (citation omitted).

**(1)   Mr. Petit's Unwavering Commitment to Supporting Important Charitable Endeavors and Individuals in Need, as Well as the Manner in Which He Has Lived His Life Prior to the Offense Conduct, Warrant a Non-Incarceration Sentence**

As a preliminary matter, a variant sentence is appropriate where, as here, a defendant has no criminal history. *See United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (because "Criminal History Level I did not fully account for [defendant's] *complete* lack of criminal history, considering it as a mitigating factor was not redundant or improper." (emphasis added)); *United States v. Morales*, 972 F.2d 1007, 1011 (9th Cir. 1992) ("[A] district court may depart below Criminal History Category I in instances where the court concludes that the offense of conviction is a single aberrant act of criminal behavior[.]").[13]

A variant sentence is also warranted where, as here, the defendant's life has demonstrated exceptional good works for the community, as well as consistent support for others in need. Indeed, this Court has frequently given defendants credit when the alleged crimes suggest a marked departure from a lifetime of good deeds and charitable contributions. *See, e.g., Gupta*, 904 F. Supp. 2d at 354 ("[The] Court can say without exaggeration that it has never encountered a defendant whose prior history suggests such an extraordinary devotion, not only to humanity writ large, but also to individual human beings in their times of need."); *Adelson*, 441 F. Supp. 2d at 513–14 ("[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing[.]"). Courts have similarly given credit to individuals who, like Mr. Petit, have served

---

[13] Contrary to the Government's assertions in pre-trial filings, Mr. Petit's previous work with Healthdyne does not suggest otherwise. The 1987 Healthdyne consent agreement, which is more than three decades old, was between the SEC and the company, not Mr. Petit personally. Further, the company did not admit or deny any wrongdoing in that case. It is wholly improper to suggest that this ancient and unproven allegation suggests Mr. Petit's propensity for criminal activity.

in the military. *See United States v. Howe*, 543 F.3d 128, 139 (3d Cir. 2008) (district court appropriately considered "lengthy and positive records of past military service").

As demonstrated above, Mr. Petit is a self-made man who throughout his life felt entitled to nothing. He has worked (or gone to school or served in the military) virtually every day since he was 13 years old. His path has often been marked by tragedy and setbacks, but he has persevered. And as soon as Mr. Petit reached a measure of success, he began to give back to his community and others less fortunate than him. We respectfully request that the Court consider Mr. Petit's lifetime of good works and strong moral character and show leniency in his sentence.

### (2)   A Non-Incarceration Sentence is Appropriate Based on Mr. Petit's Ongoing Battle with Bladder Cancer

#### (i)   Mr. Petit's Age and Ill Health

Mr. Petit is 81 years old and suffers from recurring and life-threatening cancerous lesions on his bladder that will require constant treatment for at least the next three years, if not the rest of his life. Specifically, as explained by his treating physician, for at least the next three years, Mr. Petit will require continuing surveillance cystoscopy procedures to monitor his bladder, recurring resections to remove cancerous tissue, and continuous "maintenance immunotherapy" on six-week intervals (*i.e.,* six weeks of BCG intravesical immunotherapy and/or chemotherapy, followed by six weeks of no treatment, followed by another six weeks of immunotherapy, on a continuous pattern). *See* App. B (Letter from James M. Libby (February 8, 2021)). Mr. Petit's advanced age, high-risk cancer, and compromised immune system all weigh in favor of a non-incarceration sentence. *See, e.g., United States v. Cunniffe*, No. 15-cr-287, Dkt. 265, at 22:23–24 (S.D.N.Y. 2019) (Swain, J.) (a 63-year-old defendant received 12 months' probation and 100 hours of community service, following a guilty plea to conspiracy and securities fraud, because he had "health issues and managed many [related] challenges"); *United States v. Jacoby*, No. 17-

cr-676, Dkt. 19 at 13:3–10 (S.D.N.Y. 2018) (Cote, J.) (a 65-year-old defendant received 24 months supervised release, following a guilty plea for false statements to auditors, because "all of the challenges that you face because of your health" mean "sending you to prison at this time would not be appropriate"); *United States v. Senesey*, 1997 WL 187345, at *1 (S.D.N.Y. Apr. 15, 1997) (Sweet, J.) (an 83-year-old defendant received 60 months of probation, following a guilty plea to conspiracy to commit bribery and mail fraud, where he "suffered from numerous physical ailments and disabilities"); *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996) (affirming the district court's decision to sentence a 62-year-old defendant, who was convicted of violating the Travel Act and engaging in an extortion scheme, to 6 months home confinement, 36 months of probation, and 500 hours of community service, where defendant "had a kidney transplant over 20 years ago, and his new kidney is diseased"); *United States v. Barbato*, No. 00-cr-1028, 2002 WL 31556376 (S.D.N.Y. 2002) (Kram, J.) (an 81-year-old defendant, who pleaded guilty to extortion, received 12 months home confinement and 24 months of supervised release, where defendant "suffer[ed] from a variety of serious medical ailments, including hypertension, carotid artery disease and coronary artery disease").[14]

### (ii)    Mr. Petit Would Require Treatment at Specialized BOP Medical Facilities

Incarceration may also mean that Mr. Petit serves his sentence in a prison where the security level is disproportionately higher than his conviction warrants. According to Federal

---

[14] *See also United States v. Alvaran-Velez*, 914 F.3d 665, 667 (D.C. Cir. 2019) (acknowledging that the district court entered a sentence "significantly below the applicable range" due, in part, to the defendant's "poor health"); *United States v. Chammas*, No. 1:16-cr-00171, 2018 WL 6680924, at *9 (D.D.C. Dec. 19, 2018) (district court "'recognize[d] that [defendant's] age and health conditions pose some challenges,' which it considered in imposing a below-Guidelines sentence" (quoting plea hearing transcript)).

Bureau of Prisons (**BOP**) policy,[15] Mr. Petit should serve his sentence at a minimum security prison.[16] Given his health, Mr. Petit should also be a "Care Level 4" inmate who requires "active treatment" cancer services "available only at a BOP Medical Referral Center."[17] Yet, there are only two male prisons with medical centers and minimum security camps, both of which have limited capacity within the minimum security camps—166 inmates at Lexington, Kentucky, and 51 inmates at Devens, Massachusetts.[18] These low populations increase the probability that Mr. Petit will be held in a facility with higher than necessary security.[19] It is also possible that Mr. Petit would be held in Devens, Massachusetts, which is nearly one thousand miles further away, compared to Lexington, Kentucky, from his doctors and family members in Atlanta, Georgia.

> ### (iii)   Even Then, Mr. Petit Would Not Have Access to Adequate Medical Care

Incarceration may further mean that Mr. Petit receives inadequate health care, regardless of the final prison facility. As explained by Mr. Petit's physician, Mr. Petit requires continuing

---

[15] BOP, *Program Statement P5100.08: Inmate Security Designation and Custody Classification* (Sept. 12, 2006), *available at* https://www.bop.gov/policy/progstat/5100_008.pdf. Per the BOP program, male offenders qualify for minimum security if they score 0-11 points based on seven factors. *Id.* at 2. Mr. Petit would likely receive a score of 3 or lower because: (1) voluntary surrender is not applicable (0 points); (2) there is no criminal history (0 points); (3) there is no history of violence (0 points); (4) there is no history of escape / attempts (0 points); (5) there are no existing charges or detainers (0 points); (6) Mr. Petit is over 55 years-old (0 points; and (7) the severity of the offense is either lowest, low moderate, or moderate (0-3 points).

[16] According to the BOP website, there are seven minimum security prisons: (1) Alderson FPC; (2) Bryan FPC; (3) Duluth FPC; (4) Montgomery FPC; (5) Morgantown FCI; (6) Pensacola FPC; and (7) Yankton FPC. However, none have an adjacent medical center. *See* BOP, *Our Locations* (last accessed Jan. 29, 2021), *available at* https://www.bop.gov/locations/list.jsp.

[17] BOP, *Care Level Classification for Medical and Mental Health Conditions or Disabilities* (May 2019), https://www.bop.gov/resources/pdfs/ care_level_classification_guide.pdf.

[18] According to the BOP website, there are six prisons with medical centers: (1) Butner FMC; (2) Carswell FMC; (3) Devens FMC; (4) Fort Worth FMC; (5) Lexington FMC; and (6) Rochester FMC. Of note, Carswell FMC is a female-only prison. *See* BOP, *Our Locations* (last accessed Jan. 29, 2021), *available at* https://www.bop.gov/locations/list.jsp.

[19] For example, FMC Butner has a hospital with oncology specialists, but does not have an adjacent minimum-security camp. *Id.*

surveillance cystoscopy procedures to monitor the bladder, recurring resections to remove cancerous tissue, and continuous on-again, off-again intravesical "maintenance immunotherapy" over six-week intervals. *See* App. B (Letter from James M. Libby). Yet, the BOP prison system has historically provided sub-standard care for such health conditions. According to a 2009 article in the *American Journal of Public Health*, among federal prison inmates, 13.9 percent with a persistent medical problem had not seen a doctor or nurse since incarceration, 20.9 percent with a prior prescription for an active medical problem were not continued on that prescription during incarceration, and 96.1 percent with an active medical problem that required routine laboratory monitoring had not undergone a blood test since incarceration. The authors concluded that "health care in prisons and jails is far from adequate."[20] Indeed, there have been countless cases where the BOP has been unable to provide adequate cancer care for inmates. *See, e.g., United States v. Beck*, 425 F. Supp. 3d 573, 573 (M.D.N.C. 2019) (finding the BOP's "gross mismanagement of medical care for defendant's invasive breast cancer qualified as an extraordinary and compelling reason to support . . . compassionate release").[21]

---

[20] Andrew Wilper et al., *The Health and Health Care of US Prisoners: Results of a Nationwide Survey*, American Journal of Public Health (Apr. 2009), 669-671; *see also* ACLU, *At America's Expense: The Mass Incarceration of the Elderly* 28-29 (June 2018), *available at* https://www.aclu.org/report/americas-expense-mass-incarceration-elderly ("[T]he prison environment is, by design, an extremely poor place to house and care for people as they age or become increasingly ill or disabled. […] Very often, correctional and healthcare staff lack appropriate training and technical expertise and have not been properly trained to treat age-related illnesses[.]").

[21] *See also* Victoria Bekiempis, *Don't Get Cancer if You're in Prison*, Newsweek (July 22, 2015), *available at* https://www.newsweek.com/2015/07/31/dont-get-cancer-if-youre-prison-356010.html ("There are constitutional requirements for providing adequate health care […] however, frequent reports and lawsuits charging negligent care of inmates—including numerous deaths—strongly suggest that many U.S. prisons and jails have ignored these rulings.").

### (iv)    COVID-19 Poses Unique Risks to Mr. Petit

Apart from these significant baseline risks, the COVID-19 pandemic adds an additional layer of danger to Mr. Petit. Both Congress and the courts have advocated for reducing the number of at-risk individuals in the federal prison system during the COVID-19 pandemic. *See United States v. Nkanga*, No. 18-cr-713, 2020 WL 1529535, at *1 (S.D.N.Y. 2020) (Furman, J.) (noting that "the best—perhaps the only—way to mitigate the damage and reduce the death toll [of inmates from COVID-19] is to decrease the jail and prison population").[22] Accordingly, at sentencing, courts in this Circuit have employed strategies to reduce exposure, including release prior to sentence and delay prior to surrender. *See, e.g., United States v. Fellela*, No. 3:19-cr-79, 2020 WL 1457877, at *1 (D. Conn. Mar. 20, 2020) (Meyer, J.) (granting release prior to sentencing where defendant was "62 years old, weighs 300 pounds, and is afflicted with diabetes among several other ailments"); *United States v. Guillen*, No. 18-cr-640, Dkt. 271 (S.D.N.Y. Mar. 31, 2020) (Abrams, J.) (extending, *sua sponte*, defendant's surrender date because, "[i]n light of the ongoing public health crisis, there is substantial concern about increasing the prison population at this time if it can be avoided") (collecting cases).

Further, in several cases, this Court has granted sentence reductions and compassionate release petitions because of COVID-19-related risks to inmates with health conditions. *See, e.g., United States v. Austin*, 468 F. Supp. 3d 641, 646 (S.D.N.Y. 2020) (Rakoff, J.) (granting a reduction in sentence where, among other factors, the "risk that this defendant would face from COVID-19 inside a prison facility where, because of crowded and unsanitary conditions, the

---

[22] *See also* H. Comm. on the Judiciary, Letter on DOJ's Handling of Novel Coronavirus, ECF No. 660-4 at 1 (Mar. 19, 2020), https://judiciary.house.gov/uploadedfiles/2020-03-19_letter_to_ag_barr_re_covid19.pdf?utm_campaign=2631-519 ("With large numbers of people living in close proximity to one another, many of them elderly or living with chronic diseases, DOJ must act now to save lives.").

virus can sometimes flourish, adds to the combined elements warranting release."); *United States v. Martinez*, No. 04-cr-48-20, 2020 WL 7128951, at *2 (S.D.N.Y.2020) (Rakoff, J.) (granting compassionate release because "the risks presented by his recent COVID-19 diagnosis, the 'history and characteristics of the defendant' and the 'need . . . to provide the defendant with needed . . . medical care,' § 3553(a), now weigh strongly in favor of Martinez's release, given the severe health risk that continued incarceration poses to him"); *United States v. Rodriguez*, No. 00-cr-761-2, 2020 WL 5810161, at *3 (S.D.N.Y.  2020) (Rakoff, J.) (granting a sentence reduction for health reasons and noting "courts have consistently held that the presence of underlying health conditions that increase the risks associated with COVID-19 can constitute extraordinary and compelling reasons for a sentence reduction") (collecting cases).

On February 9, 2021, Mr. Petit received his second shot of Pfizer's COVID-19 vaccine. However, as the Court is likely aware, the Pfizer and Moderna vaccines vaccine is only "approximately 95%" effective, meaning that "1 out of 20 people to whom the vaccine is administered may not have protection from getting the illness."[23] Moreover, the CDC has recognized that several new variants of COVID-19 are emerging, and scientists still do not know "[h]ow widely these new variants have spread" or "[h]ow these variants may affect existing therapies, vaccines, and tests."[24] With so much uncertainty about vaccine effectiveness and virus adaptation, experts recommend that people who receive the vaccine still wear masks and practice social distancing because, in part, protection is not immediate or guaranteed.[25] Indeed, the BOP's

---

[23] Johns Hopkins Office of Critical Event Preparedness and Response, *COVID-19 Vaccine: What You Need to Know* (accessed on Feb. 9, 2021), https://www.hopkinsmedicine.org/ health/conditions-and-diseases/coronavirus/covid-19-vaccine-what-you-need-to-know.

[24] CDC, *New Variants of the Virus that Causes COVID-19* (last updated Feb. 2, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/transmission/variant.html.

[25] Allyson Chiu, *Yes, people with coronavirus vaccinations should still distance from each other,* Washington Post (Jan. 20, 2021), *available at*

own guidelines provide that even as inmates become vaccinated, "[a]ll current recommendations for preventing and managing SARS-CoV-2 infection should continue to be followed," thus implicitly recognizing that vaccines are not a total panacea.[26]

Notwithstanding his vaccination, Mr. Petit is still at particularly high risk because of his age and active cancer diagnosis. Mr. Petit is 81 years old. The Centers for Disease Control and Prevention (**CDC**) notes that the risk for severe illness from COVID-19 increases with age.[27] For instance, the hospitalization rate for those in Mr. Petit's age group is ***8 times higher*** than those between the ages of 18 and 29 years. *Id.* Likewise, the death rate for those in Mr. Petit's group is ***220 times higher*** than those between the ages of 18 and 29 years. *Id.* As someone who is actively fighting a recurrence of bladder cancer, Mr. Petit is also at heightened risk of severe illness as a result of a COVID-19 infection.[28] Indeed, as this Court has recognized on multiple occasions, COVID-19 infection rates have been particularly dangerous in federal prisons, where there have been many rampant outbreaks. *See, e.g., United States v. Henareh*, No. 11-cr-93-1, 2021 WL 119016, at *3 (S.D.N.Y. 2021) (Rakoff, J.) ("It is difficult to find words to describe FCC Lompoc's tragic failure to protect its inmates during the pandemic."); *United States v. Garcia*, No. 11-cr-989, 2020 WL 7212962, at *1 (S.D.N.Y. 2020) (Rakoff, J.) ("More than a quarter of all inmates at Loretto have tested positive. At least 167 inmates - about one in five - are currently

---

*h*ttps://www.washingtonpost.com/lifestyle/wellness/mask-distance-vaccine-safety-covid/2021/01/20/f80eeab6-55ce-11eb-a08b-f1381ef3d207_story.html.

[26] Federal Bureau of Prisons Clinical Guidance, "COVID-19 Vaccine Guidance (Jan. 22, 2021), *available at* https://www.bop.gov/resources/pdfs/covid19_guidance_20210122.pdf.

[27] *See* CDC, *COVID-19 Hospitalization and Death by Age* (last updated August 18, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html.

[28] *See* CDC, *People with Certain Medical Conditions* (last updated August 14, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

infectious, along with 22 staff members."). Moreover, in a prison setting, Mr. Petit has a much higher risk of being exposed to a high viral load, which would heighten the risks he faces. At FMC Lexington, Kentucky, a 1,096-inmate facility that would ordinarily be the most appropriate facility for Mr. Petit's incarceration, there are currently 43 confirmed active cases of COVID-19 among inmates, and there have previously been 712 confirmed cases among inmates. These conditions pose a very high risk to Mr. Petit's life.[29]

Finally, after sentencing, the BOP has regularly released individuals similar to Mr. Petit, who have committed non-violent offenses. On March 26, 2020, former Attorney General Barr urged the BOP to consider release of "at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than in BOP facilities."[30] On April 3, 2020, former Attorney General Barr issued a related directive that ordered the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" at "BOP facilities where COVID-19 is materially

---

[29] *See* BOP, *COVID-19 Coronavirus* (last accessed Jan. 30, 2021), *available at* https://www.bop.gov/coronavirus/ ("There are 3,117 federal inmates and 1,782 BOP staff who have confirmed positive test results for COVID-19 nationwide. Currently, 42,671 inmates and 4,321 staff have recovered. There have been 210 federal inmate deaths and 3 BOP staff member deaths attributed to COVID-19 disease."). Even if Mr. Petit were sent to one of the four other (male or mixed population) prison facilities with medical centers, he would also encounter significant virus risks. Specifically, among staff and inmates: (1) there are 13 active cases and there were 196 previous cases (including 1 death) at FMC Butner; (2) there are 27 active cases and there were 428 previous cases (including 9 deaths) at FMC Devens; (3) there are 43 active cases and there were 718 previous cases (including 14 deaths) at FMC Fort Worth; and (4) there are 26 active cases and 413 previous cases at FMC Rochester. *Id.*

[30] Letter from Attorney General to Director of Bureau of Prisons (Mar. 26, 2020), *available at* https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf.

affecting operations."[31] The BOP has since "significantly increased its placement of offenders on home confinement," releasing more than 21,067 inmates to home confinement sentences.[32]

In sum, on the basis of these many health-related concerns, we respectfully request that the Court consider Mr. Petit's advanced age and ailing health and not impose a sentence of incarceration in this case.

### B.   The Nature and Circumstances of the Offense Support a Mitigated Sentence (§ 3553(a)(1))

The Court must also consider the "nature and circumstances of the offense" in determining the sentence to be imposed. 18 U.S.C. § 3553(a)(1). Because "[a]typical cases were not adequately taken into consideration" by the Guidelines, "factors that may make a case atypical provide potential bases for departure." *Koon v. United States*, 518 U.S. 81, 94 (1996).

Having presided over trial in this case, the Court is well aware of the facts, and we will not repeat them here. Additionally, the offense for which the jury convicted Mr. Petit is serious, and the defense does not argue otherwise. But this was not a crime of greed as the Government argued at trial, and repeated in the statement of the offense submitted to the Probation Office. As discussed above, even under the Government's theory, Mr. Petit stood to gain a proportionately small amount of money—no more than $202,436 in non-equity compensation based on inflated revenue. Tr. 2067:12–14 (discussing GX-050 at 21).

Moreover, the sales at issue in this case were among thousands of sales that MiMedx made in 2015.[33] And as the Company itself noted in a recent public filing, notwithstanding any

---

[31] Memo from Attorney General to Director of Bureau of Prisons (Apr. 3, 2020), *available at* https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf.

[32] *See* BOP, *COVID-19 Coronavirus* (last accessed Jan. 30, 2021), *available at* https://www.bop.gov/coronavirus/. *See, e.g.,* Matt Zapotosky, *Michael Cohen will be allowed to leave prison due to pandemic*, Washington Post (Apr. 16, 2020), *available at* https://www.washingtonpost.com/national-security/michael-cohen-prison-coronavirus/2020/04/16/24d851a6-8053-11ea-a3ee-13e1ae0a3571_story.html.

of the alleged conduct in this case, "the Company recovered the majority of its billings made between 2012 and 2017 with insignificant write-offs recorded." MiMedx Group, Inc., Annual Report (Form 10-K) (July 6, 2020), at F-15. Although the billings were collected after payment was due under the contractual terms, the fact that MiMedx eventually collected payment demonstrates that the sales at issue were real sales, to real customers, of real products. There were no phony orders or fake transactions. This fact sets this case apart from the "typical" accounting fraud case and is worthy of the Court's consideration in fashioning a fair sentence.

## C. A Non-Incarceration Sentence Provides Just Punishment Under These Specific Circumstances (§ 3553(a)(2)-(3))

This Court must ensure that the sentence it imposes "reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] [a] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). A rigorous non-incarceration sentence, coupled with an appropriate financial penalty, would accomplish these statutory goals.

### (1) Probation is the Most Appropriate Kind of Sentence in This Case

Several courts have recognized that in an appropriate case, and if used wisely, probation is sufficiently serious punishment to satisfy statutory mandates. See *United States v. Brady*, No. 02-cr-1043, 2004 WL 86414, at *8-9 (E.D.N.Y. 2004) (Gleeson, J.) (probation "may be used as

---

[33] There is nothing unlawful or improper about the sales techniques decried in the Government's statement of the offense, including offering incentives or flexibility to important customers to win sales and meet revenue targets. *See, e.g.*, *United States v. Goyal*, 629 F.3d 912, 919 (9th Cir. 2010) ("[Defendant's] desire to meet . . . revenue targets, and his knowledge of and participation in deals to help make that happen, is simply evidence of [him] doing his job diligently."); *SEC v. Espuelas*, 698 F. Supp. 2d 415, 430 (S.D.N.Y. 2010) ("Searching for ways to meet revenue targets, however, contributes little to a strong inference of fraud because such actions are common practice." (internal quotation marks omitted); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004) ("Offering incentives to meet sales or earnings goals is a common practice, and, without additional allegations not present here, the allegation that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior[.]").

an alternative to incarceration, provided that the terms and conditions of probation can be fashioned so as to meet fully the statutory purposes of sentencing" (quoting U.S.S.G. Manual ch. 5, pt. B, introductory cmt.)); *United States v. Coughlin*, No. 06-cr-20005, 2008 WL 313099, at *5 (W.D. Ark. 2008) ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive."). In *Coughlin*, after recognizing that white-collar offenses are "gravely serious and demanding of considerable punishment," the court found that probation and home detention could accomplish the goals of punishment "more effectively than imprisonment" and that "[n]ot all defendants must be sentenced to imprisonment to be duly punished." *Id.*

Such an alternative sentence has many societal benefits. A sentence of probation costs significantly less than incarceration and can be a very effective means of reparation to society.[34] A non-incarceration sentence would also further the Justice Department's stated goal of finding alternatives to incarceration in appropriate cases in order to alleviate the "challenges" related to, among other concerns, "rising medical care costs due to an aging prison population" and "the

---

[34] *See* United States Courts, *Incarceration Costs Significantly More than Supervision* (Aug. 17, 2017), *available at* https://www.uscourts.gov/news/2017/08/17/incarceration-costs-significantly-more-supervision (explaining that, in 2016, the cost to imprison a person after sentencing was $34,770 per year, whereas the cost to supervise a person in the community after sentencing was $4,392 per year, meaning that "[p]lacing an offender in a residential reentry center was about seven times more costly than supervision."); United States Sentencing Commission, *U.S. Sentencing Commission Announces 2017-2018 Policy Work, Proposes Guideline Amendments* (Aug. 17, 2017) *available at* https://www.ussc.gov/about/news/press-releases/august-17-2017 ("Among the proposed amendments published today are changes that would increase the number of federal offenders eligible for alternatives to incarceration. Informed by the Commission's multi-year study on recidivism, one of the proposed amendments would add a downward adjustment to the guidelines for first offenders."); David Harding et al., *A natural experiment study of the effects of imprisonment on violence in the community*, Nature Human Behaviour (May 2019) (finding that, "for individuals on the current policy margin between prison and probation, imprisonment is an ineffective long-term intervention for violence prevention, as it has, on balance, no rehabilitative or deterrent effects after release").

unexpected and unprecedented challenges presented by the COVID-19 pandemic[.]" [35] In particular, on April 3, 2020, former Attorney General Barr issued a directive that ordered the BOP to "immediately maximize appropriate transfers to home confinement of all appropriate inmates" at "BOP facilities where COVID-19 is materially affecting operations."[36]

### (2)    Probation Combined with a Meaningful Sentence of Community Service Will Benefit, Rather than Burden, the Community

As discussed above, and by the people who love Mr. Petit and know him best, Mr. Petit has long demonstrated a commitment to bettering his community. In lieu of incarceration, which is a greater punishment than is necessary under the circumstances and will serve no societal benefit, Mr. Petit respectfully requests that the Court sentence him to a period of probation that includes a meaningful sentence of community service.

Mr. Petit has already identified worthwhile causes and organizations that would benefit from his services. Letters from three of these organizations, to which Mr. Petit has already demonstrated a history of giving, are appended to this memorandum. Specifically, Kelly McCutchen, the Executive Director of HINRI, envisions that Mr. Petit's experience as a CEO would be an invaluable resource to HINRI's partner organizations as they navigate strategy, finance, and marketing in their quest to develop innovate products and services designed to help the most people in need. App. C (Letter from Kelly McCutchen (Feb. 12, 2021). Mr. McCutcheon writes of three exciting HINRI partnerships that would benefit from Mr. Petit's counsel and advice—the "Reversing Paralysis" project, which is currently raising money to fund a clinical trial at UCLA, the Center for Global Health Innovation, which has a goal of developing

---

[35] Dep't of Justice Office of the Inspector General, *Top Management and Performance Challenges Facing the Department of Justice—2020* at 16 (Oct. 16, 2020), *available at* https://oig.justice.gov/sites/default/files/reports/2020.pdf.

[36] Memo from Attorney General to Director of Bureau of Prisons (Apr. 3, 2020), *available at* https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf.

and distributing life-saving medical devices and technology, and the Creative Destruction Lab, which is dedicated to building up young science- and technology-based companies, particularly those focused on COVID response. *Id.* Dean Sikes, the President of the Spirit of America Foundation, proposes to partner with Mr. Petit to lead a capital campaign to raise additional funds to combat teen homelessness, thereby reducing teen suicide. *See* App C. (Letter from Dean Sikes (Feb. 9, 2021)). Mr. Sikes also believes that Mr. Petit would be an excellent mentor to the youth served through his organization. *Id.* Jack Williams, the Founder and CEO of the IDEALS Foundation, likewise envisions a partnership with Mr. Petit that will help his organization grow and continue to reach more young people. App. C (Letter from Jack Williams (Feb. 9, 2021).

Mr. Petit respectfully requests that the Court fashion a sentence that recognizes all that he still has to contribute to these organizations and to society at large, so that some good may come from his conviction. *See, e.g.*, *United States v. Ng*, No. 11-cr-161, Dkt. 149 (S.D.N.Y. 2011) (Rakoff, J.) (sentencing a 43-year-old former trader who pleaded guilty to conspiracy to commit securities and wire fraud to 24 months' probation, including 400 hours of community service); *United States v. Robert Stewart*, No. 15-cr-287, Dkt. 95 at 30:17-20 (S.D.N.Y. May 18, 2016) (Swain, J.) (sentencing a 61-year-old former managing director who pleaded guilty to conspiracy to commit securities fraud and fraud in connection with a tender offer to 48 months of probation, including 750 hours of community service, in part, because of the defendant's "age, [] health issues, and [] otherwise lawful and positive life"); *Rioux*, 97 F.3d at 652 (sentencing a 62-year-old former sheriff convicted under the Travel Act to 6 months of home confinement followed by 36 months of probation to include 500 hours of community service).

(3)     **Mr. Petit's Conviction and a Sentence Including Meaningful Community Service Are Powerful Deterrents to Future Criminal Conduct**

While the Court must impose a sentence that "afford[s] adequate deterrence to criminal conduct," 18 U.S.C. § 3553(a)(2)(B), it is not necessary to imprison Mr. Petit, at 81 years of age, to accomplish that goal. Instead, putting Mr. Petit to work doing community service during his final years, even while he continues to battle bladder cancer, provides sufficient specific and general deterrence. Indeed, "there is little evidence of a specific deterrent effect arising from the experience of imprisonment compared with the experience of noncustodial sanctions such as probation. Instead, the evidence suggests that reoffending is either unaffected or increased." Daniel S. Nagin, Deterrence in the Twenty-First Century, 42 Crime & Just.. 199, 201 (2013); Zvi D. Gabbay, "Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime," 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) (no evidence supporting "the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders").

Moreover, the question of what punishment is appropriate in this case must take into consideration the extent to which Mr. Petit has already been punished. *See, e.g.*, *id.* (particularly for white collar criminals, "informal sanctions (such as social censure, shame, and loss of respect)" are "equally [as] important [as imprisonment] in producing the deterrent outcome"). Two of the more painful consequences of Mr. Petit's conviction are the impact on his beloved wife, Janet, and the dismantling of a reputation Mr. Petit has spent virtually his entire life building. *First*, to have caused Janet to suffer is perhaps the cruelest punishment of all for Mr. Petit. *Second*, Mr. Petit has experienced the public and, equally devastating, private shame that comes with being branded a convicted felon. Following the jury's verdict, much of the life that Mr. Petit has spent decades building is in ruins. This resounding fallout provides more than

enough punishment and deterrence. *See, e.g.*, *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) (sentencing court properly considered that the "conviction itself already visit[ed] substantial punishment" on the defendant by likely barring him from future work in his profession); *Adelson*, 441 F. Supp. 2d at 514 ("With his reputation ruined by his conviction, it was extremely unlikely that [the defendant] would ever involve himself in future misconduct."); *see also United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir. 2010) (holding that § 3553 "does not require the goal of general deterrence be met through a period of incarceration," and upholding district court's determination that probation and restitution provided adequate deterrence, despite range of 27-33 months imprisonment); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (court properly considered "atypical punishment such as the loss of [defendant's] reputation").

Further, Mr. Petit has already lost considerable assets through the termination that followed the allegations in this case, providing additional powerful deterrence and significant punishment. *See, e.g.*, *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (departure warranted where defendant "lost his teaching certificate and his state pension as a result of his conduct," which provided adequate deterrence under 3553(a)(2)(B)). When the company terminated Mr. Petit in September 2018, it stripped Mr. Petit of $14.3 million in vested unexercised options and unvested restricted stock provided to Mr. Petit based on company performance from 2015 to 2018. *See* MiMedx Group, Inc., Annual Report (Form 10-K) (March 17, 2020), at 99. Moreover, even after this Court has sentenced Mr. Petit, including any fine the Court may impose, Mr. Petit still faces additional significant civil liability in a pending SEC enforcement matter, which was stayed pending the outcome of this litigation, as well as shareholder litigation pending in the Northern District of Georgia against him, MiMedx, and

others. Mr. Petit also faces significant civil liability in a lawsuit recently filed by MiMedx to recover legal fees previously advanced on Mr. Petit's behalf in this criminal case, the SEC enforcement action, and numerous other lawsuits. The suit by MiMedx also seeks a declaratory judgment that MiMedx is no longer contractually required to continue advancing Mr. Petit's future legal expenses after sentencing in this matter.

Thus, irrespective of whatever sentence the Court may issue in this proceeding, Mr. Petit has already been punished a great deal, and he continues to face significant additional financial punishment, in more lasting and harmful ways than any temporary period of incarceration.

### (4)    Incarceration is Not Necessary to Protect the Public

The Court must impose a sentence that "protect[s] the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). There is no need to imprison Mr. Petit to accomplish that goal because there is zero risk that he will commit crimes in the future. Mr. Petit's alleged crime was "particularly adapted to [Mr. Petit's] chosen career," and, in no uncertain terms, "[t]hat career is over." *United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) (Lynch, J.) (finding no chance of recidivism because defendant's career was over). Mr. Petit poses no societal risk, and there is no need for him to be deterred—through a prison sentence or otherwise—from engaging in any similar conduct in the future.

### D.    A Non-Incarceration Sentence is Necessary to Avoid Unwanted Sentencing Disparities (§ 3553(a)(4)-(6))

A non-incarceration sentence is necessary in this case in light of the sentences received by similarly situated offenders both within this Circuit and across the country. 18 U.S.C. § 3553(a)(6) instructs the Court to impose a sentence that "avoid[s] unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." *Id.*; *see also United States v. Wills*, 476 F.3d 103, 110 (2d Cir. 2007) (noting that § 3553(a)(6) seeks to

"minimize nationwide disparities"), *abrogated on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007). Mr. Petit, who at 81 years old and battling high-grade bladder cancer after a lengthy and laudatory business career, respectfully seeks a sentence informed by the sentences of similarly situated defendants.

At a baseline level, an analysis of similarly situated defendants both within this Circuit and beyond demonstrates that courts frequently impose sentences *significantly* below the applicable Guidelines range and in line with the non-incarceration sentence Mr. Petit seeks. In 2019, the average length of sentence in the entire United States for someone like Mr. Petit—a U.S. citizen convicted of a crime falling under § 2B1.1 and with no criminal history (3,400 total cases)—was 18 months, with the median sentence being 7 months. That's before factoring in Mr. Petit's age and ongoing battle with bladder cancer. Among those over 60 years old in the same group, 39.5 percent received probation or probation combined with alternative (i.e., non-incarceration) punishments.[37] Although the sample size is much smaller for just this Circuit, the numbers are quite similar: over the past five years (from 2015-2019), there have been 1,804 cases involving a similarly-situated defendant (*i.e.*, a U.S. citizen, convicted of a crime governed by § 2B1.1 with no criminal history), and the average sentence was just 16 months, with the median sentence being only 6 months. As above, among those over 60 years old in the same group, 34.8 percent received probation or probation combined with alternative (*i.e.*, non-incarceration) punishments. *Id.*

---

[37] *See* United States Sentencing Commission, *Interactive Data Analyzer* (last accessed Jan. 31, 2021), *available at* https://ida.ussc.gov/analytics/saw.dll?Dashboard (using "Sentence Type" and "Sentence Length").

By way of example, in *United States v. Jacoby*, Judge Cote presided over the case of the former Chief Financial Officer for Osiris Therapeutics ("Osiris"),[38] a MiMedx competitor accused of similar channel-stuffing practices, after Mr. Jacoby pleaded guilty to making false statements to auditors.[39] Although the alleged accounting fraud at issue involved distributor relationships, false disclosures to auditors, and millions of dollars in transactions, Judge Cote appropriately cautioned that the "case is not WorldCom, and it's not Enron." *United States v. Jacoby*, No. 17-cr-676, Dkt. 19 at 5:9–14, 11:25–12:6 (S.D.N.Y. Feb. 27, 2018). Judge Cote was also "very influenced here by [defendants'] health," which was in decline at the time. *Id.* at 12:7–10. On the whole, Judge Cote determined that a non-incarceration sentence was appropriate after "weighing [the defendant's] age and health and all of the challenges that [he] face[d] because of [his] health, the fact that [his] working days [were] over, the fact that this [was] the only criminal activity for which you will have been convicted[.]" *Id.* at 13:3–10. In the end, Judge Cote sentenced the defendant to 24 months of supervised release and ordered a $10,000 fine.

Other courts in this Circuit have followed this practice when sentencing older defendants. For example, in the recent case of Abell Oujaddou, a 55-year-old defendant who pleaded guilty to conspiracy and securities fraud, this Court determined that 24 months of supervised release was appropriate because, in part, the offense was likely a "temporary mistake," which appeared

---

[38] The Court may recall that Brian Martin, the owner of Stability Biologics and a Government cooperating witness, testified that he was committing fraud both *with* Osiris and *against* Osiris. *See* Tr. 1494:4–1495:23, 1604:22–1605:25, 1616:13–1618:4 (discussing DX-543), 1620:16–1621:7 (discussing DX-187).

[39] Although Mr. Jacoby received credit for acceptance of responsibility, Mr. Petit should not be penalized for exercising his constitutional right to a trial by a jury of his peers. *See, e.g.*, *United States v. Araujo*, 539 F.2d 287, 292 (2d Cir. 1976) (affirming that "augmentation of sentence" because a defendant "put the Government to its proof rather than plead guilty" is "improper" and observing that "[a] show of lenience to those who exhibit contrition by admitting guilt does not carry a corollary that the Judge indulges a policy of penalizing those who elect to stand trial." (internal quotation marks and citation omitted)).

to depart from the otherwise "very good character as attested . . . [to at sentencing] and in the materials, including the letters that [the Judge] received." *United States v. Oujaddou.*, No. 18-cr-579, Dkt. 167 at 16:8–22 (S.D.N.Y. Nov. 7, 2019) (Rakoff, J.); *see also United States v. Robert Stewart*, No. 15-cr-287, Dkt. 95 at 30:17–20 (S.D.N.Y. May 18, 2016) (Swain, J.) (a 61-year-old defendant received 48 months of probation following a guilty plea for conspiracy and fraud in connection with a tender offer, because of his "age, his health issues, and his otherwise lawful and positive life[.]"); *United States v. Senesey*, 1997 WL 187345, at *1 (S.D.N.Y. 1997) (Sweet, J.) (an 83-year-old defendant received 60 months of probation following a guilty plea for conspiracy to commit bribery and mail fraud because he "suffered from numerous physical ailments and disabilities").

### E.     The Government is Not Seeking Restitution in this Case (§ 3553(a)(7))

In its letter responding to the draft PSR and the defense objections thereto, the Government stated that "the Government is not seeking restitution in this case given the market-wide nature of the harm and the difficulty in apportioning loss." Letter from Edward Imperatore et al. to Robert Flemen et al., *Re: United States v. Parker H. Petit & William Taylor*, 19-cr-850 (JSR) (Feb. 5, 2021), at 3 n.2.

### <u>THE SENTENCE WE REQUEST ON BEHALF OF MR. PETIT</u>

For all of the foregoing reasons, on behalf of Mr. Petit we respectfully request that the Court sentence him in a manner that will allow him to continue to use his business acumen, work ethic, and limited remaining years to pay his debt to society by meaningfully contributing to his community, rather than becoming a burden to the community. We respectfully submit that such a sentence would include:

- A term of 24 months of probation, including

- 12 months of home confinement;

- A special condition that Mr. Petit complete 1,500 hours of community service;

- A fine that Your Honor deems just and appropriate in this case, given the significant additional punishment still facing Mr. Petit in the SEC enforcement action, shareholder litigation in the Northern District of Georgia, and fee claw-back litigation pending against him in Florida state court; and

- The mandatory $100 special assessment.

The proposed term of probation and significant sentence of community service will ensure that every day over the next two years Mr. Petit will be punished for this offense and will be very cognizant that he is still paying his debt to society. It will also serve as a general deterrent to others. However, given Mr. Petit's otherwise laudable life's work, such a sentence also provides him with a light at the end of the tunnel, at which time he has paid his debt to society, that is hopefully achievable before he departs this earth.

## MR. PETIT'S REQUEST FOR A PRESIDENTIAL PARDON

Mr. Petit recently submitted a request for a Presidential pardon. Given his age and recent re-diagnosis with bladder cancer for the fifth time, Mr. Petit is acutely aware that the remainder of his life, and the manner and location of his death, are in Your Honor's hands. He is very concerned by the prospect of being sentenced to and dying in prison, away from Janet and his children, and therefore decided to take any and all lawful steps to seek mercy through a Presidential pardon. Given the real possibility that he could die in prison, especially since he will require continuing intravesical immunotherapy and/or chemotherapy treatments during any period of incarceration, Mr. Petit hoped that former President Trump would have mercy on him and grant him a pardon. As a result, Mr. Petit took lawful measures to retain an attorney and hire a registered lobbyist to present his petition for a Presidential pardon, which was ultimately

unsuccessful. Mr. Petit now stands before this Court with the understanding that he will be punished, but with the same hope that Your Honor will have mercy on him by not imposing a sentence of incarceration to avoid the real possibility that he will die in prison.

## **CONCLUSION**

A prison sentence is not needed in this case to reflect the seriousness the offense, promote respect for the law, afford adequate deterrence to criminal conduct, or protect the public from further crimes of the defendant. Indeed, the only conceivable rationale for a prison sentence in this case is to punish Mr. Petit even more than he has already been punished (and will continue to be punished in the SEC enforcement proceeding and other litigation). Imprisoning Mr. Petit will serve only to separate him from a wife who relies on him and a community to which he has made and continues to make significant and meaningful contributions, during the final chapter of his life. At Mr. Petit's age, with his health complications and in light of the global pandemic, a term of imprisonment could very likely be a death sentence for Mr. Petit.

Given Mr. Petit's history and characteristics, the sentences levied against similarly situated defendants both in this Circuit and across the country, and the effects this conviction has already had on his life and the lives of his loved ones, we respectfully request that the Court show Mr. Petit mercy, and impose a sentence that does not call for incarceration.


[Signature Block on Next Page]

Dated: February 16, 2021

Respectfully submitted,

/s/ *Eric B. Bruce*
Eric B. Bruce
Jennifer B. Loeb
Freshfields Bruckhaus Deringer US LLP
700 13th Street, NW
10th Floor
Washington, DC 20005
Telephone: (202) 777-4577
Email: Eric.Bruce@freshfields.com
Email: Jennifer.Loeb@freshfields.com

Matthew I. Menchel
Amanda N. Tuminelli
Kobre & Kim LLP
800 Third Avenue
6th Floor
New York, NY 10022
Telephone: (212) 488-1200
Email: Matthew.Menchel@kobrekim.com
Email: Amanda.Tuminelli@kobrekim.com

*Attorneys for Parker H. Petit*