# EXHIBIT A



*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 5, 2021

**BY EMAIL**

Robert Flemen
Pamela Flemen
United States Probation Officers
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Parker H. Petit & William Taylor,* **19 Cr. 850 (JSR)**

Dear Officers Flemen and Flemen:

      The Government writes in response to defendant Petit's January 29, 2021 letter and defendant Taylor's February 2, 2021 letter setting forth their respective objections to the Initial Presentence Investigations Reports in this case. As an initial matter, the Government opposes the defendants' general objections to the offense conduct sections. The offense conduct in the PSRs is consistent with the proof presented at trial. Second, the Government opposes the defendants' objections to the U.S. sentencing guidelines calculations. Through their letters, both Petit and Taylor contest the PSRs' calculation of the U.S. sentencing guidelines, in particular the application of enhancements for loss under U.S.S.G. § 2B1.1(b)(1), for number of victims under 2B1.1(b)(2), for sophisticated means under 2B1.1(b)(10), and for enhancements based on role under § 3B1.1. Defendant Petit also objects to an enhancement for obstruction of justice under § 3C1.1. For the reasons set forth below, all of these enhancements are applicable here.

      I.    Loss

      The Government submits that a reasonable and conservative estimate for loss in this case is $34.6 million based on the January 20, 2021 report of SEC economist Artur Minkin. As set forth in his report, Dr. Minkin arrived at this loss figure by engaging in an event study – a widely accepted economic methodology – that analyzed the drop in MiMedx's stock price on February 20, 2018, after the first indication of potential fraud was revealed to the market and controlling for other factors, including other stock market events and the normal fluctuation of MiMedx's stock price. Significantly, Dr. Minkin's analysis is a highly conservative measure of loss for at least three reasons: first, it assumes the fraud began in February 2016 when MiMedx's 2015 year end revenue was announced, even though the proof at trial demonstrated that the fraud began with the reported revenue for the second quarter of 2015; second, it assumes the fraud ended in February 2018, even though additional information about the fraud continued to be disclosed to the market causing additional decreases in MiMedx's stock price until March 2020; and third, it calculated

loss based only on stock trading by institutional investors, which accounts for only approximately between 42.5 and 82.6% of MiMedx's shares.

The defendants contest this loss calculation on the grounds that the defendants did not intend any loss to shareholders and that the actual loss is cannot be reasonably determined here. These arguments are misplaced. First, the defendants' contention that they did not intend any loss to shareholders is inconsistent with the evidence at trial and the jury's verdict. The evidence at trial clearly demonstrated that the defendants understood the correlation between MiMedx's reported revenue and stock price, and thus sought to inflate revenue to positively impact the stock price. (*See, e.g.*, GX-1056 (email from Petit to Taylor and others explaining that MiMedx's "valuation all hinges on revenue growth rate. We all need to focus on that issue.")). The evidence that the defendants engaged in a willful scheme to inflate revenue thus demonstrates that, under the circumstances, the defendants understood that their conduct would affect MiMedx's stock price and thus harm investors. (*See* U.S.S.G. § 2B1.1, application note 3(A)(iii) (defining "'reasonably foreseeable pecuniary harm' [as] pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.")).

Furthermore, Dr. Minkin's analysis presents a reasonable calculation of actual loss. In calculating the loss amount under the Guidelines, a sentencing court need only make a "reasonable estimate." *See* U.S.S.G. § 2B1.1, application note 3(c). The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75 (2d Cir. 1997). Moreover, the calculation of loss need only be determined by a preponderance of the evidence. *See United States v. Watts*, 519 U.S. 148, 156 (1997). As relevant here, the Second Circuit has explicitly approved of the use of the type of analysis conducted by Dr. Minkin in securities fraud cases. *See, e.g.*, *United States v. Ebbers*, 458 F.3d 110, 126–27 (2d Cir. 2006) ("In this case, therefore, the loss is that suffered by those investors who bought or held WorldCom stock during the fraud period either in express reliance on the accuracy of the financial statements or in reliance on what *Basic, Inc. v. Levinson* described as the "integrity" of the existing market price.")). Both defendants nevertheless contest Dr. Minkin's analysis on the ground that the February 20, 2018 disclosure – the date that Dr. Minkin uses to determine the effect on stock price - did not disclose all the details of the fraud. The fact that the February 20 disclosure was incomplete and preliminary does not undermine the loss analysis however. To the contrary, as noted above, it demonstrates that the analysis is conservative and takes into account only the stock reaction to the initial disclosure on February 20 while ignoring later stock drops in response to continuing disclosures. The defendants further attempt to undermine Dr. Minkin's analysis by arguing that "unknown factors unrelated to the alleged fraud" affected the stock price (Petit Letter), and that there was no statistically significant correlation between MiMedx's revenue and stock price. (Taylor Letter). These arguments are also meritless. Dr. Minkin's analysis takes care to distinguish the effect of the February 20 disclosure on the stock price as opposed to other variables and demonstrates that there was in fact a statistically significant drop in response to the February 20 announcement. Accordingly, the PSR properly relies on Dr. Minkin's analysis for loss. Under the guidelines it would therefore be improper to substitute gain. (*See* U.S.S.G. § 2B1.1, application

note 3(b) ("The court shall use the gain that resulted from the offense as an alternative measure of loss *only* if there is a loss but it reasonably cannot be determined.")).[1]

Relatedly, because Dr. Minkin's analysis includes over 20 investors who were harmed by the effects of the defendants' fraud on MiMedx's stock price (*see* Report, Exhibits 4 & 5), a 2-level enhancement is warranted based on the involvement of 10 or more victims.[2]

II. Sophisticated Means

The PSR rightly includes a 2-level enhancement for sophisticated means pursuant to U.S.S.G. § 2B1.1(b)(10). Under application note 9(b), "'sophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." Here, both the execution and the concealment of the fraudulent revenue scheme were complex. The scheme proven at trial involved secret agreements with four different distributors, the use of a shell company to disguise the nature of a transaction (in the case of SLR), a sham consulting agreement to disguise a cash inducement (in the case of CPM), and a sham distribution agreement to hide the true circumstances of a distributor sale (in the case of Stability Biologics). Moreover, the defendants used sophisticated means to conceal the offense, including, an attempt to interfere with audit confirmations that were supposed to provide independent verification from third parties to external accountants (in the case of First Medical). These forms of complex financial fraud and concealment warrant an enhancement.

The defendants' arguments that their conduct is not especially complex are misplaced. With respect to Petit, the fact that he was acquitted of conspiracy does not mean his conduct was not sophisticated or that he did not participate in an elaborate scheme (Petit Letter). To the contrary, the evidence demonstrated that Petit was the prime mover with respect to the creation and use of Torpin LLC, a shell company that was used to funnel money that he gifted to his children in order to artificially pay down MiMedx's receivables from SLR. Taylor's argument that his conduct with respect to First Medical was not especially complex is also misplaced. (Taylor Letter). Even focusing on First Medical alone, as described above, Taylor engaged in sophisticated machinations to hide his side deal with First Medical, including trying to interfere with the submission of an audit confirm to MiMedx's external auditor thereby making the scheme, and the cover-up, more complex than routine misreporting of revenue. These sophisticated acts committed by experienced businessman warrant an enhancement.

---

[1] Even if the PSR were to adopt a guidelines analysis based on gain, the defendants' purported gain numbers are substantially understated because they rely only on the amount of their non-equity compensation attributable to the fraud, and omit the substantially greater gains they obtained through the appreciate of their MiMedx stockholding – both realized and unrealized.

[2] Notwithstanding that the loss amount is properly calculated, the Government is not seeking restitution in this case given the market-wide nature of the harm and the difficulty in apportioning loss.

### III. Role Enhancements

The PSR also correctly applied 4-point and 3-level role enhancements to Petit and Taylor for their respective roles in the scheme.

With respect to Petit, the evidence demonstrated that he was a leader in the scheme that involved five or more participants. (*See* U.S.S.G. § 3B1.1(a)). Petit carried out the fraud in his role as CEO and chairman of MiMedx and the scheme involved the complicity and participation of numerous counterparties with whom Petit dealt as well as numerous MiMedx employees that Petit relied on to carry out the details. First, the evidence demonstrated that Petit and Taylor had a "close working relationship" and the evidence thus supports an inference that Petit and Taylor were knowledgeable about each other's dealings, including those that led to the intentional inflation of revenue. (*See, e.g.*, Tr. at 96). Second, the evidence showed that numerous MiMedx distributors were complicit with Petit in the fraudulent scheme by ordering product under fraudulent pretenses with the understanding that those orders would boost MiMedx's revenue including Brian Martin (who agreed to make purchases on behalf of Stability, *see, e.g.,* Tr. at 1477), Jerry Morrison (who agreed to take a fraudulent loan for SLR, *see, e.g.*, GX-1079), and Mark Brooks (who agreed to sign a consulting agreement to order product, *see* GX-709). Third, the evidence showed that MiMedx employees acted at Petit's direction in carrying out the scheme and/or obtained his authorization before doing so, including Carlton (*see, e.g.*, 554-55) and Schultz (*see, e.g.*, Tr. at 1012). Accordingly, a 4-level enhancement applies to Petit. Petit's only response to this straightforward analysis is that he was acquitted of the conspiracy count in the indictment and therefore, according to Petit, could not have led any other participants in a crime. (Petit Letter). However, the guidelines calculation may be based on a preponderance of the evidence and neither the Court nor Probation is limited by what the jury found. As the evidence set forth above showed, Petit carried out his securities fraud in connection with numerous MiMedx employees and counterparties and the enhancement squarely applies.

With respect to Taylor, the evidence easily showed that he was a supervisor of criminal activity that involved five or more participants. (*See* U.S.S.G. § 3B1.1(b)). Taylor was the COO, the second highest position within MiMedx, and he also worked closely with Petit as well as other MiMedx employees and underlings to commit the fraud. And, unlike Petit, Taylor was actually convicted of conspiracy, demonstrating the jury's finding that Taylor acted in concert with others who bear criminal liability. For example, both Carlton and Schultz testified that they took orders from Taylor in connection with their dealings with First Medical and CPM, respectively, to fraudulently inflate revenue. (*See, e.g.*, Tr. at 591 (Carlton); Tr. at 1012 (Schultz)). Likewise, email evidence showed that at least three other MiMedx employees were obeying Taylor's orders in hiding the fraudulent CPM swap from MiMedx's external auditors. (GX-1033). In addition, the evidence was sufficient to support the inference that various MiMedx distributors were complicit with Taylor in helping MiMedx recognize fraudulent revenue, including Brian Martin of Stability (who, along with Taylor, signed a sham distribution agreement, *see* GX-716), and Bassam El-Hage of First Medical (who agreed to purchase product under the terms of a side agreement documented in a secret email, *see* GX-1094). Accordingly, Taylor's argument that Taylor's fraud involved only the participation of Carlton is easily rebutted by the evidence presented at trial.

IV.    Obstruction of Justice

Finally, Petit objects to an enhancement for obstruction of justice based on his conversation with Carlton.  Petit argues that the enhancement is not warranted because he did not "threaten or intimidate" Carlton, or ask him explicitly to "lie, minimize, or shade the information."  (Petit Letter).  These arguments are beside the point.  Under U.S.S.G. § 3C1.1, application note 4(A), an enhancement is warranted for "threatening, intimidating, or *otherwise unlawfully influencing* a co-defendant, witness, or juror, directly or indirectly, or attempting to do so."  While Petit may not have explicitly asked to Carlton to lie, the circumstances of Petit reaching out to Carlton through an intermediary, in a location where they did not usually meet, acknowledging that they should not be speaking, and trying to feed false, innocent explanations to Carlton was plainly intended to improperly influence Carlton's testimony.  (Tr. at 664-65; GX-1510).  In addition, this exchange occurred immediately before Carlton was set to meet with the Government and was thus clearly intended to influence that meeting.  Indeed, Carlton testified to his own belief that the purpose of Petit's contact was to get him to "change his story" for the Government.  (Tr. at 669).  This evidence is thus sufficient to meet the standards of § 3C1.1 and warrants a 2-level enhancement.

Please do not hesitate to contact us with any questions.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By:   /s/_____
Edward Imperatore
Scott Hartman
Daniel Tracer
Assistant United States Attorneys
(212) 637-2327/2357/2329

cc: Counsel of record