

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 19, 2021

**BY E-MAIL**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *United States v. Parker H. Petit & William Taylor,* 19 Cr. 850 (JSR)

Dear Judge Rakoff:

      The Government respectfully writes to respond to particular arguments made by defendants Parker H. Petit and William Taylor in their sentencing submissions (Petit Mem. (Dkt. 144) & Taylor Mem. (Dkt. 147). For the reasons discussed below and in the Government's sentencing submission (Dkt. 145), a substantial term of imprisonment for Petit and a Guidelines sentence of five years' imprisonment for Taylor are warranted. Such sentences are sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

**I.    The Guidelines Calculation**

      The Court should find that (1) Petit's total offense level is 43 (based upon a 22-level increase for a loss amount greater than $25 million, a four-level increase for leadership, a two-level increase for ten or more victims, a two-level increase for sophisticated means, and a two-level increase for obstruction of justice) and (2) Taylor's total offense level is 39 (based upon a 22-level increase for a loss amount greater than $25 million, a three-level increase for leadership, a two-level increase for ten or more victims, and a two-level increase for sophisticated means). The defendants' arguments to the contrary are without merit and should be rejected.

    **A.  Loss Amount**

      The defendants challenge the $34.6 million loss figure on the ground that the analysis conducted by the Government's expert witness, Dr. Artur Minkin, is flawed and based on "pure speculation." (Petit Mem. 20; Taylor Mem. 16). Because, they claim, the loss amount cannot be determined with certainty, the defendants urge the Court to adopt the gain to the defendants as alternative means of calculating the loss amount. These arguments should be rejected.

      As an initial matter, Petit's argument concerning intended loss is beside the point. (Petit Mem. 21). "Loss" is defined by the Guidelines as "the *greater* of actual loss or intended loss." U.S.S.G. § 2B1.1, comment. n.3(A) (emphasis added). Here, the Court need not assess the intended loss, as Dr. Minkin properly determined that the actual loss is $34.6 million.

There is, moreover, no merit to the defendants' contention that Dr. Minkin's analysis is flawed. In calculating loss amount under the Guidelines, a sentencing court need only make a "reasonable estimate." *See* U.S.S.G. § 2B1.1, comment n.3(c). The "Guidelines do not require that the sentencing court calculate the amount of loss with certainty or precision." *United States v. Bryant*, 128 F.3d 74, 75 (2d Cir. 1997). Dr. Minkin conducted an event study that provides a reasonable estimate for loss and is based upon a widely accepted methodology and valid assumptions. Indeed, the methodology of calculating loss by comparing the stock price during the fraud and after the fraud has been revealed has been specifically endorsed by the Second Circuit for accounting fraud cases like this one, even where it is "no easy task." *See United States v. Ebbers*, 458 F.3d 110, 126–27 (2d Cir. 2006).

The defendants' attempt to undermine Dr. Minkin's analysis based upon the report of Dr. Saha is unpersuasive. Dr. Minkin's responses to the defendants' report are set forth in detail in a supplemental report, enclosed as Exhibit A ("Minkin Supp.," with accompanying exhibits, enclosed as Exhibit B). In short, Dr. Saha's critiques are based upon faulty and misleading analyses and should be rejected. Correcting for these errors, Dr. Saha's analysis supports Dr. Minkin's conclusions. *First,* Dr. Saha's claim that there was no correlation, or that there is a negative correlation, between revenue and MiMedx stock price is based upon a flawed analysis that (1) focuses only on the lower bound of guidance and ignores revenue announcement dates with confounding news and (2) uses incorrect and illogical dates. (Petit Mem. 22; Taylor Mem. 16). Dr. Minkin corrects this analysis by looking at instances in which MiMedx's reported revenue fell in relation to the lower and upper bound of guidance and by excluding three dates on which revenue reports were overshadowed by confounding news. (Minkin Supp. 4-5). Dr. Minkin also corrects for eight instances in which Dr. Saha incorrectly used dates to measure MiMedx's stock price change where revenue had been preannounced. (Minkin Supp. 6). When Dr. Saha's faulty assumptions are corrected, Dr. Saha's analysis demonstrates that there is a one hundred percent correlation between revenue and stock price. (Minkin Supp. 7). This conclusion is entirely consistent with defendants' own understanding of how the market worked (*see* GX-1056), as well as common sense and overwhelming economic literature (Minkin Supp. 8-9).

*Second*, the defendants' reliance upon purported confounding factors or other "irrelevant variables" that supposedly affected MiMedx's stock price on February 20, 2018 is unfounded. (Petit Mem. 22; Taylor Mem. 18). As Dr. Minkin explains, there were no significant external events that affected MiMedx's stock price on that date. To the extent there was any "uncertainty" in the market, it was the result of MiMex's February 20, 2018 revelation of the internal investigation that resulted in the discovery of the fraud proven at trial. (Minkin Supp. 11-12). Put simply, Dr. Saha "mischaracterized a direct effect of this announcement as confounding news," and his critique is therefore incorrect. (*Id.*).

*Third*, Dr. Minkin's reliance upon the February 20, 2018 disclosure date was appropriate. Regardless of whether the precise nature of the scheme proven at trial was described in the February 2018 disclosure, it is standard practice to rely on a partially corrective disclosure when measuring price inflation where that disclosure is directly linked to the ultimate findings of fraud. (Minkin Supp. 12-13 & n.30 (citing article by Dr. Saha); *cf. Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011) ("Because the Supreme Court acknowledged the relevant truth may "leak out," subsequent decisions have recognized that neither a single complete disclosure nor a

fact-for-fact disclosure of the relevant truth to the market is a necessary prerequisite to establishing loss causation (although either may be sufficient)."). The defendants' proposed alternative disclosure date of March 17, 2020 is nonsensical and should be rejected because it took place months *after* the indictment in this case revealed the charged scheme to the investing public. Moreover, Dr. Minkin demonstrates that even accepting Dr. Saha's favored March 17, 2020 date and applying the Guideline analysis set forth in U.S.S.G. § 2B1.1, Application Note 3(F)(ix), yields a loss between $40.5 and $80.5 million. (Minkin Supp. 14-15). In other words, such an analysis would yield a *higher* loss amount than the more conservative figure advanced by Dr. Minkin.

The handful of cases cited by the defendants in support of their arguments are inapposite. For example, in *Lumiere* the Court found the Government's loss analysis to be unpersuasive because it incorrectly assumed that the instruments investors purchased were worthless. *United States v. Lumiere*, 16 Cr. 483 (JSR), Dkt. 105, at 3. By contrast, Dr. Minkin's analysis represents a reasonable effort to identify only the portion of MiMedx's stock price that is attributable to the charged fraud. *United States v. Tzolov*, 435 Fed. App'x 15, 17 (2d Cir. 2011), is also easily distinguishable. In *Tzolov*, which did not involve revenue inflation at a public company, the Second Circuit reaffirmed that gain is an appropriate alternative where loss is incalculable. Similarly, in *United States v. Parris*, 573 F. Supp. 2d 744, 748 (E.D.N.Y. 2008), the Government advocated for the use of gain as an alternative measure because the loss was incalculable. Here, by contrast, the Government and the PSR support the use of actual loss based upon a reasonable analysis that more accurately – and in many ways conservatively – captures the harm to the market that resulted from the defendants fraud.

Even if the Court were to conclude that the loss "reasonably cannot be determined," such that the "court should use the gain that resulted from the offense as an alternative measure of loss," U.S.S.G. § 2B1.1 cmt. n.3(B), the defendants' calculation of the gain is incorrect. The components of gain to the defendants must include, at the very least, (1) the cash bonus they received at year-end 2015 that was attributable to their offense, (2) the value of the stock bonus they received at year-end 2015 that was attributable to their offense, (3) the extent to which the value of the MiMedx stock they owned at the time of the offense was inflated as a result of the fraud, and (4) the extent to which the proceeds Taylor received by selling MiMedx stock in 2016 were inflated. First, as the Government proved at trial, Petit and Taylor received at least $165,224 and $125,208 in cash compensation that they would not have received absent the fraud. (GX-500, at 19-20). Second, Petit and Taylor were awarded approximately $1,088,080 and $690,200, respectively, in equity compensation for 2015. (GX-50, at 22). Third, at the time MiMedx announced its 2015 annual revenue, Petit and Taylor held MiMedx shares worth $38.26 and $4.22 million, respectively. (GX-50, at 23). Fourth, Taylor made approximately $556,741 through the sale of MiMedx stock in 2016, after his fraud had caused MiMedx's stock price to be falsely inflated. To determine the gain the defendants received from (1) their MiMedx stockholdings and (2) the proceeds Taylor received from his sale of Mimedx stock, the Court would need to determine the extent to which the stock price was inflated by the fraudulently reported revenue. An accurate gain calculation thus would require the same type of event study that Dr. Minkin has conducted. At the very least, the gain calculation advanced by the defendants is incomplete and inaccurate.

Accordingly, the Court should adopt the loss figure of $34.6 million as set forth in Dr. Minkin's analysis.

B. **Ten or More Victims**

Pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense involved 10 or more victims, two levels should be added. The Probation Office agrees with position.

Although Petit appears to concede that the enhancement applies on its face, he argues that the Court should adopt a "preferable framework" for identifying victim harm that is not found in the Guidelines. (Petit Mem. 31). Taylor argues, citing *United States v. Skys*, 637 F.3d 146, 154 (2d Cir. 2011), that the Government is required to establish a specific loss calculation for each named, individual investor. That is not the case. In *Skys*, the Second Circuit distinguished between intended losses and actual losses and found that in order for the victim enhancement to be applied, the Government must prove actual loss. *See id.* at 153-54 ("The court's loss calculation under subsection (b)(1) was based on intended loss. . . . The district court itself made no determination that any of the four financial institutions mentioned in the PSR suffered any actual loss."); U.S.S.G. § 2B1.1 app. note 1 (defining "victim" in relevant part as "any person who sustained any part of the actual loss determined under subsection (b)(1)"). Similarly, in *United States v. Abiodum*, 536 F.3d 162, 168-69 (2d Cir. 2008), also cited by Taylor, the Second Circuit held that in order for victims to be counted for purposes of the victim enhancement, their losses had to be included in the loss calculation. Here, as set forth above, the loss determined under subsection (b)(1) is the actual loss actually suffered by actual shareholders of MiMedx as a result of the defendants' conduct. The defendants cannot seriously contend that there were fewer than ten shareholders of MiMedx at the time the fraud was disclosed and who suffered losses. Indeed, MiMedx's 2015 10-K provides that "[b]ased upon information supplied from our transfer agent, there were approximately 739 shareholders of record of our common stock as of February 10, 2016." (GX-105, at 30).[1] Thus, the record clearly establishes – certainly by a preponderance of the evidence – that there were *at least* 10 victims who suffered actual losses as a result of the defendants' fraud.

C. **Aggravating Role**

The Court should apply a four-level leadership enhancement to Petit and a three-level management enhancement to Taylor. The defendants challenge the leadership enhancement on two grounds. First, Petit argues that because he was acquitted of the conspiracy charge, he could not have directed any knowing participants in the offense. (Petit Mem. 27). Taylor similarly argues that because Petit was acquitted of conspiracy, Taylor's offense involved no participants other than Carlton. Second, Petit argues that he did not direct five or more participants. Their arguments are wrong, both factually and legally.

As an initial matter, the defendants' argument that a leadership enhancement does not apply because Petit was acquitted of Count One, which charged Petit with conspiracy, is foreclosed by Second Circuit law. *See United States v. Vaughn*, 430 F.3d 518, 526–27 (2d Cir. 2005) (observing that "district courts may find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct"). Here, the evidence proved by a

---

[1] This number typically understates the number of individual shareholders to a significant degree. For example, as a general matter, when shares are held in a brokerage firm, bank, broker-dealer, or other similar organization, the organization typically is listed as the stockholder of record regardless of how many individual accounts own shares through that entity.

preponderance that Petit "was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive," U.S.S.G. § 3B1.1(a), and that Taylor was a manager or supervisor and "the criminal activity involved five or more participants or was otherwise extensive," U.S.S.G. § 3B1.1(b).

The defendants cannot seriously dispute that the criminal activity of which they were convicted involved five or more participants and was otherwise extensive. Petit also overlooks that the four-level leadership enhancement is appropriate where, as here, the defendant "played a crucial role in the planning, coordination, and implementation of a criminal scheme." *United States* v. *Paccione*, 202 F.3d 622, 624 (2d Cir. 2000). "Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1, comment. (n.4). Here, Petit was the leader of the scheme, and the Guidelines factors weigh in favor of the application of the enhancement in light of, among other things, the scope of Petit's criminal activity, his role in planning and orchestrating the offense, his recruitment of accomplices, and the control he exercised over other participants. The weight of these factors is sufficient to demonstrate a four-level leadership role by at least a preponderance of the evidence.

Petit's argument that "there is insufficient evidence that Mr. Petit directed five or more people" (Petit Mem. 26) is legally incorrect. "A defendant may be subject to a four-level enhancement even if the defendant managed only one other participant." *United States* v. *Mi Sun Cho*, 713 F.3d 716, 722 (2d Cir. 2013). A "participant" is "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, n1. The trial evidence proved by at least a preponderance that Petit provided direction to several participants. (Gov't Mem., Dkt. 145, at 25-26). In any event, Petit does not appear to dispute that he provided direction to at least one other participant in the scheme, which is sufficient for the enhancement to apply. *See* U.S.S.G. § 3B1.1(a) & n.2.

Similarly, Taylor does not appear to dispute that he directed Carlton, at the very least. While there is evidence that Taylor directed other participants as well, the fact that Taylor directed Carlton in a scheme that involved five or more participants warrants the application of a three-level role enhancement to Taylor. *See* U.S.S.G. § 3B1.1(b) & n.2.

### D. Sophisticated Means

Petit challenges the application of a two-level enhancement for sophisticated means on the ground that "there was nothing especially complex or intricate about Mr. Petit's actions." (Petit Mem. 27). Taylor likewise argues that the conspiracy was no more intricate than a "garden variety" fraud scheme. (Taylor Mem. 21). Their arguments are both legally and factually incorrect.

The commentary to that section defines "sophisticated means" as "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1, comment. n.9(B)). It is clear, however, that the sophisticated-means enhancement is not limited to a particular type of especially complicated fraud or the use of

elaborate and complex financial structures to mask the offense. The defendants' attempt to examine certain aspects of their conduct in isolation is legally invalid. Where, as here, a defendant's scheme involves various steps, the enhancement may apply "even if each step in the scheme was not elaborate." *United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003). In other words, "[r]epetitive or coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme." *United States* v. *Finch*, 407 F.3d 908, 915 (8th Cir. 2005); *see also Jackson*, 346 F.3d at 25 (upholding application of enhancement where "the total scheme was sophisticated in the way all the steps were linked together so that [the defendant] could perceive and exploit different vulnerabilities in different systems in a coordinated way").

The defendants' conduct involved a myriad of sophisticated means, including, among other things, (1) orchestrating quarter-end "load" sales to distributors that involved hidden side agreements, designed to reach MiMedx's revenue targets, (2) calculated efforts to conceal those side agreements from internal accountants and outside auditors, (3) sophisticated efforts to cover up the offense and avoid detection, including through the use of fictitious agreements, a false audit confirmation, and a shell company, and (4) misleading accountants and auditors during an internal investigation that scrutinized sales to three of the distributors at issue. Petit also overlooks that the Guidelines commentary provides that "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities [or] corporate shells . . . also ordinarily indicates sophisticated means." U.S.S.G. § 2B1.1, comment. n.9(B). Thus, "the Guidelines own example of sophisticated means"—Petit's use of a shell company to issue a loan to conceal that the SLR receivable was not collectable—"precisely mirrors the conduct here." *United States v. Fiumano*, 721 F. App'x 45, 48 (2d Cir. 2018) (affirming application of enhancement).

### E. Obstruction of Justice

A two-level enhancement for obstruction of justice applies to Petit for two independent reasons. First, Petit committed perjury in sworn SEC testimony by falsely testifying that the $200,000 payment to Mark Brooks was for "G-2" intelligence information on competitors. (PSR ¶ 62). The circumstances reflect that Petit willfully committed perjury on a material matter—the basis for the $200,000 payment. *United States v. Salim*, 549 F.3d 67, 73 (2d Cir. 2008). Petit's testimony before the SEC was demonstrably false, as it conflicted with extensive documentary evidence introduced at trial that (1) Petit made the payment as an inducement to Brooks to purchase product from MiMedx and (2) Petit and Brooks—who apparently despised one another—did not contemplate that Brooks would do any consulting work for that payment. Petit's testimony also squarely conflicts with his argument at trial that the $200,000 payment was made to resolve a dispute over GPO contracts. Petit does not appear to address this excerpt from his SEC testimony, which serves as an independent basis to apply an obstruction enhancement.

Second, an obstruction enhancement is warranted based upon Petit's repeated attempts to influence Mike Carlton during the Government's criminal investigation. In response, Petit attempts to view aspects of his interaction with Carlton in isolation and put a positive spin on them. (Petit Mem. 25). This approach is legally improper. "In determining the intent with which a defendant acted, the district court is entitled to rely on circumstantial evidence and on all reasonable inferences that may be drawn from all of the evidence." *United States v. Cassiliano*, 137 F.3d 742, 747 (2d Cir. 1998). "The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence." *United States v.*

*Cassiliano*, 137 F.3d 742, 747 (2d Cir. 1998). *Id*. Here, the trial evidence proved by at least a preponderance that Petit attempted to obstruct justice: Petit (1) contacted Carlton repeatedly during the Government's investigation, while Carlton was proffering with the Government, (2) arranged two of the contacts through an intermediary to avoid detection, (3) acknowledged to Carlton that he was not supposed to be speaking with him, and (4) repeatedly fed Carlton demonstrable lies about the $200,000 payment to Brooks and directed Carlton to "stand his ground" in meetings with the Government. Carlton testified that he understood that Petit was attempting to get him to "change his story." (Tr. 669). The reasonable inference drawn from these facts is that Petit was attempting to "unlawfully influenc[e]" Carlton. U.S.S.G. ¶ 3C1.1. That Petit did not threaten Carlton overtly is beside the point.

## II.    The Section 3553(a) Factors

Petit argues in favor of a sentence of probation based principally upon his history and characteristics, including his age and cancer diagnosis. While the Government recognizes that Petit's age and cancer are mitigating circumstances that the Court should consider at sentencing, the Section 3553(a) factors nevertheless weigh decidedly in favor of a substantial sentence of imprisonment for Petit. Similarly, Taylor's self-serving effort to minimize the offense of which he was convicted rings hollow, and a Guidelines term of five-years' imprisonment is appropriate.

As an initial matter, the defendants' argument that the Guidelines overstate the seriousness of the offense overlooks that (1) the Government is not seeking a Guidelines sentence for Petit, and the Guidelines for both defendants are capped by the statutory maximum sentences in any event, and (2) the Guidelines for both defendants are the product of their own knowing and intentional misconduct, their relative culpability, and the harm their conduct caused to investors. Taylor's contention that "the jury found only that Mr. Taylor conspired with Mr. Carlton to mislead MiMedx's auditors, and no more than that" (Taylor Mem. 25) is both entirely speculative and legally irrelevant, as the Court should consider any conduct that has been proven by a preponderance of the evidence. *Vaughn*, 430 F.3d at 526–27.

In seeking sentences of probation, the defendants overlook the compelling need in this case for a term of imprisonment that is sufficient to afford adequate deterrence and just punishment and promote respect for the law. As this Court has recognized, "in the case of white-collar offenses, prison time is particularly important as a general deterrent," and a sentence of imprisonment that is too short "becomes the proverbial slap on the wrist. It has, if anything, no deterrent effect; maybe the opposite." *United States v. Johnson*, 17 Cr. 482 (JSR), Aug. 13, 2018 Sentencing Tr. at 13-14. As to general deterrence, this Court has reasoned: "Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail," and a sentence of probation "would, in this Court's view, totally fail to send this message." *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012). The Court further explained, in the context of insider trading: "While all of the other factors under Section 3553 partake to a lesser or greater degree of policy considerations, 'just punishment' taps a deeper vein. . . . While no defendant should be made a martyr to public passion, meaningful punishment is still necessary to reaffirm society's deep-seated need to see justice triumphant. No sentence of probation, or anything close to it, could serve this purpose." *Id.* These principles squarely apply here. A substantial term of imprisonment is necessary to deter corporate executives and other members of

the business community from committing white-collar offenses, and to ensure that the defendant's flagrant violations of their investors' trust is justly punished.

Nor should the Court be deterred from imposing a sentence of incarceration by Petit's age and health issues. As set forth in the letter of Diane Sommer, M.D., the Northeast Regional Medical Director of the Bureau of Prisons ("BOP"), which is enclosed as Exhibit C, the BOP is entirely capable ensuring that Petit receives adequate medical attention during any period of incarceration. As for the threat posed by the COVID-19 pandemic, the risk to Petit is substantially mitigated by the fact that, based upon representations by his lawyers, it appears he will be fully vaccinated before he would be required to begin any sentence of imprisonment. The BOP has also taken extensive measures to limit and monitor the spread of the disease within its facilities. Recognizing that fact, and the need to balance the risks posed by the pandemic with the other objectives of sentencing, judges in this district have not hesitated to impose incarceratory sentences, where appropriate, even on defendants who would be considered to be at high-risk for complications from COVID-19 due to their age or medical condition. *See United States v. Silver*, No. 15 Cr. 93 (VEC) (public corruption defendant age 76 years old and suffering from multiple health ailments, including a history of cancer, sentenced to 78 months' imprisonment); *United States v. Von der Goltz and Gaffey*, No. 18 Cr. 693 (RMB) (83-year old and 76-year old tax fraud defendants sentenced to 48 months' and 39 months' imprisonment, respectively); *United States v. Paul Rinfret*, No. 19 Cr 535 (GHW) (71-year-old securities fraud defendant sentenced to 63 months' imprisonment); *United States v. James Booth*, No. 19 Cr 699 (JGK) (74-year-old securities fraud defendant sentenced to 42 months' imprisonment).

Finally, Petit's attempt to compare his case to that of Thomas Jacoby, the former chief executive of Osiris Therapeutics, is unavailing. *United States v. Jacoby*, 17 Cr. 676 (DLC) (S.D.N.Y. 2018). Jacoby pled guilty to only of a single count of making a false statement to auditors, not securities fraud. Jacoby's Guidelines range was only 4 to 10 months' imprisonment. Petit, by contrast, was found guilty after trial of orchestrating a brazen accounting fraud that spanned nearly a year, involved efforts to conceal his offense and obstruct justice, and resulted in millions of dollars in harm to victims. *Jacoby* is therefore inapposite.

Respectfully submitted,

AUDREY STRAUSS
United States Attorney

By: /s/
    Edward Imperatore/Scott Hartman/Daniel Tracer
    Assistant United States Attorneys
    (212) 637-2327/2357/2329

Encls.

cc: Counsel of record (by ECF)