UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA          :
                                   :
                                   :      19-cr-850 (JSR)
       -v-                :
                                   :
PARKER H. PETIT and WILLIAM TAYLOR, :      OPINION AND ORDER
                                   :
                                   :
             Defendants.     :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

On November 19, 2020, defendant Parker H. Petit was convicted of one count of substantive securities fraud and defendant William Taylor was convicted of one count of conspiring to commit securities fraud, to make false statements in filings with the Securities and Exchange Commission ("SEC"), and to mislead the conduct of audits. Now before the Court are the respective motions of defendants for a judgment of acquittal under Federal Rule of Criminal Procedure 29 and, in the alternative, for a new trial under Rule 33. For the reasons set forth below, the motions are denied.

## Background

The Indictment in this case charged both defendants with two counts: Count One charged a conspiracy to commit securities fraud, make false filings with the SEC, and improperly influence the conduct of audits, in violation of 18 U.S.C. § 371. Count Two charged substantive securities fraud, in violation of 15 U.S.C.

1

§§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5. Dkt. No. 1 (the "Indictment").

The defendants were high-level executives of MiMedx Group, Inc. ("MiMedx"), a publicly traded biomedical company. Petit served as MiMedx's CEO, while Taylor was the company's COO. Indictment ¶¶ 2, 3. During the years prior to 2016, the company enjoyed success with investors, allegedly because it continuously met its quarterly revenue goals and predictions (known as "revenue guidance."). The Indictment alleges that around 2015, however, MiMedx struggled to reach its publicly-stated revenue guidance because of decreased demand from distributers of its products. Indictment ¶ 19. Confronted with these difficulties, Petit and Taylor engaged in a fraudulent scheme to falsely recognize revenue prematurely upon the shipment of products to some of its distributers. Id. The Indictment alleges that Petit and Taylor entered into secret side agreements with four distributers -- known as CPM, SLR, Stability Biologics ("Stability"), and First Medical -- to hide from the company's accountants and outside auditors the fact that, as to certain sales to those distributers, the criteria for revenue recognition under generally accepted accounting principles ("GAAP"), had not been met and that therefore recognizing the revenues from those sales was not proper. See id. ¶¶ 19-59.

At the end of the Government's case, both defendants made motions for a judgment of acquittal on both of the charges, on the ground of insufficiency of evidence pursuant to Federal Rule of Criminal Procedure 29. The Court denied both motions. See Tr. 2185 (denying Taylor's motion); id. at 2189 (denying Petit's motion).[1] Defendants now renew their respective Rule 29 motions and, in the alternative, seek new trials under Rule 33.

## Rule 29 Motions

### I.  Legal Standard

"On a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, the court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Aguiar, 737 F.3d 251, 264 (2d Cir. 2013).[2] Unless "the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt

---

[1]    Apart from his sufficiency argument, Taylor also contended that the Government had not offered evidence to establish that the false statements Taylor caused to be made regarding MiMedx's reported revenue were made "in connection with the purchase or sale of [a] security." 15 U.S.C. § 78j(b). The Court initially reserved decision on the "purchase or sale" issue, Tr. 2185, but later denied this prong of the motion as well, id. at 2309-2310.

[2]    Unless otherwise indicated, in quoting cases all internal quotation marks, alterations, emphases, footnotes, and citations are omitted.

beyond a reasonable doubt," a Rule 29 motion must be denied. United States v. Cuti, 720 F.3d 453, 461 (2d Cir. 2013). "The evidence must be considered in its totality, not in isolation, and the government need not negate every theory of innocence." Aguiar, 737 at 264. Witness testimony that is "incredible on its face," however, does not meet the threshold for sufficiency. United States v. Truman, 688 F.3d 129, 139 (2d Cir. 2012).

## II.  Discussion

### A. Petit's Security Fraud Conviction

As mentioned, Petit was convicted on one count of substantive securities fraud under 15 U.S.C. §§ 78j(b), 78ff, and 17 C.F.R. § 240.10b-5. To prevail on his Rule 29 motion, Petit must establish that no reasonable jury could have found "that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device," and that he "willfully violated the law." United States v. Vilar, 729 F.3d 62, 88 (2d Cir. 2013). Petit maintains that he is entitled to a judgment of acquittal because the Government failed to prove either (1) that MiMedx's revenues were actually recorded in violation of GAAP; and/or (2) that to the extent the revenues were improperly recorded, Petit knew the revenues were improperly recorded and that he intended to deceive investors thereby. Memorandum of Law in Support of Defendant Parker H.

4

Petit's Motion for a Judgment of Acquittal or for a New Trial ("Petit Mem."), Dkt. No. 124, at 5.

### 1. Whether the Government had to Prove GAAP Violations

Petit argues that the Government failed to meet its burden of proof because it did not present expert testimony that MiMedx's recorded revenues did not comply with GAAP. The Government responds that it need not establish a GAAP violation in order to prove accounting fraud, let alone by expert testimony. The Government's Memorandum of Law in Opposition to Defendants' Motions for a Judgment of Acquittal or a New Trial ("Gov. Opp."), Dkt. No. 139, at 19.

It is well-established in this Circuit that securities fraud may be proved, even where improper accounting is alleged as the basis for misrepresentation, without showing violations of GAAP. See United States v. Rigas, 490 F.3d 208, 220 (2d Cir. 2007) (citing United States v. Simon, 425 F.2d 796, 805-06 (2d Cir. 1969) (Friendly, J.)); see also United States v. Ebbers, 458 F.3d 110, 125 (2d Cir. 2006) (So long as "the government proves that a defendant was responsible for financial reports that intentionally and materially misled investors, the [penalty provision of the Exchange Act] is satisfied," even if the challenged accounting method were technically proper under some GAAP rule). Thus, "compliance with GAAP is relevant only as evidence of whether a

defendant acted in good faith." <u>Rigas</u>, 490 F.3d at 220; <u>see also</u> <u>Ebbers</u>, 458 F.3d at 125 ("GAAP may have relevance in that a defendant's good faith attempt to comply with GAAP or reliance upon an accountant's advice regarding GAAP may negate the government's claim of an intent to deceive.").

Petit's efforts to distinguish these cases are unavailing. He argues that "while the law is well established in the Second Circuit that the Government need not present expert testimony to support every securities fraud conviction, it was required to do so here where a violation of the revenue recognition rules under GAAP was the linchpin of the Government's case." Petit Mem. at 8. Petit points out that the <u>Rigas</u> court explained that the "government was not required to present expert testimony about GAAP's requirements because <u>these requirements are not essential</u> <u>to the securities fraud alleged here</u>." 490 F.3d at 220-21 (emphasis added). Petit contends that unlike in <u>Rigas</u>, where the indictment contained a single reference to GAAP, here the "Indictment devotes an entire section to GAAP and revenue recognition rules and specifically alleges that [the defendants] understood the rules and their application." Petit Mem. at 7.

Although Petit is correct that the Indictment in this case quotes more extensively from GAAP than the indictment in <u>Rigas</u>, that is irrelevant. In <u>Rigas</u>, the panel explained that the Government was not required to introduce evidence of GAAP

miscompliance because "[t]he jury heard testimony that the [challenged accounting methods] were specifically designed to mislead investors about the amount of money the [defendants] and their other companies owed [the company at issue], and it could have reasonably found that Defendants committed fraud." 490 F.3d at 221. Thus, "[e]ven if Defendants complied with GAAP, a jury could have found . . . that Defendants intentionally misled investors" and were therefore guilty of securities fraud. Likewise here, the Government introduced sufficient evidence, which is reviewed below, from which a reasonable jury could have concluded that Petit specifically intended to mislead investors about MiMedx's revenue by causing the company to report revenue figures that, had the true terms of certain transactions been disclosed to the company's accountants and outside auditors, would have been materially lower. Such evidence is sufficient to sustain his securities fraud conviction, regardless whether or not the particular accounting methods happened to comply with GAAP.

### 2. Whether the Government Sufficiently Proved Fraudulent Intent

Petit's next argument is that no reasonable jury could have found that he intended to defraud investors. He claims that the Government's evidence showed, at most, (1) that he was motivated to report favorable revenue figures for MiMedx because he stood to gain financially from doing so; and (2) that he failed to disclose

material sales terms to the company's accountants and outside auditors. Petit Mem. at 8-12. Relying on United States v. Goyal, 629 F.3d 912 (9th Cir. 2010), Petit argues that the first category of evidence is insufficient because his "desire to meet . . . . revenue targets, and his knowledge of and participation in deals to help make that happen" is "simply evidence of [his] doing his job diligently," id. at 919, and the second category of evidence is insufficient because allowing a jury to infer fraudulent intent simply from an executive's failure to turn over certain information to accountants and outside auditors would make "a strict-liability crime out of one that requires willful and knowing deception," id. at 921-922.

Goyal, a Ninth Circuit decision, is, of course, not binding on this Court.[3] But, in any event, it is also, as the Government observes, distinguishable. Unlike in Goyal, where the evidence showed only that the defendant failed to disclose certain terms to

---

[3]    In fact, Goyal may well be inconsistent with the law of the Second Circuit. In Goyal, the defendant was convicted of, inter alia, securities fraud for "concealing the allegedly improper accounting from [the company's] outside auditors and for filing reports with the Securities and Exchange Commission that, because of [the Company's] accounting, allegedly misstated revenue." Id. at 913. The panel explained that "[t]he government's contention that [the company] materially overstated its revenue necessarily entailed" the claim that the company "actually violated GAAP." Id. at 915. To the extent that Goyal holds that, where improper accounting is alleged as the basis for misrepresentation, securities fraud must be proved by showing GAAP violations, it is inconsistent with the law of the Second Circuit.

the auditors, here, the evidence showed that Petit "acted affirmatively to hide" evidence of the side deals from them. Indeed, Goyal itself suggests that such evidence of "willful concealment" could support an inference of fraudulent intent. So long as the evidence, taken in the light most favorable to the Government, allowed the jury to find that Petit was responsible for financial reports that, as he intended, materially misled investors, that is sufficient to sustain his conviction.

The jury had ample evidence to make such a finding. Consider, for example, the SLR transaction. The Government sought to show that, in the third quarter of 2015, Petit caused MiMedx to fraudulently recognize $4.6 million in revenue for a large sale to SLR. See Tr. 2249. The Government's theory was that to conceal the fact that the collectability of payments from SLR was not reasonably assured -- one of the requirements for revenue recognition under GAAP -- Petit arranged for his adult children to create and use a "shell company" to secretly loan $1.5 million to SLR, with the understanding that the loan proceeds would be used in substantial part to pay down SLR's debt to MiMedx. Id. at 2275. Matt Urbizo, an outside auditor at Cherry Bekaert, testified that if he had been made aware of the loan, he would have concluded that the revenue was improperly recorded. Id. at 1755.

Contrary to Petit's argument, the Government produced sufficient evidence to allow the jury to find that Petit

intentionally concealed the loan from the outside auditors. For one thing, a jury could have found that the fact that Petit structured the loan to flow through a "shell company" despite having the means to loan the money himself meant that Petit was trying to keep the source of the funding hidden. Furthermore, in response to concerns raised by a member of MiMedx's accounting department about the propriety of recognizing revenue from SLR, Petit approved the submission of a response to the outside auditor, Cherry Bekaert, that, in relevant part, stated that SLR "has paid over $1.4M since the first shipments had been made. Their payment history to date is very similar to that of other distributors." GX-1118. A reasonable jury could have found that Petit intentionally kept the existence of the SLR loan from Cherry Bekaert in order to cause MiMedx to record the $4.6 million in revenue during the third quarter of 2015, and that Petit would have only done so if he believed that the existence and source of the loan would affect how MiMedx's quarterly revenue would be recorded.

Independently, a reasonable jury could have convicted Petit on the basis of the CPM transaction. The Government sought to show that, in the second quarter of 2015, Petit caused MiMedx to fraudulently recognize $1.4 million in revenue for a sale to CPM. The Government's theory was that Petit (1) orchestrated a $200,000 sham "consulting" payment to CPM's owner, Mark Brooks, to induce

him to buy MiMedx product, and (2) secretly agreed to send CPM approximately $1.2 million of product that CPM did not want and had no intention to sell, while agreeing that CPM would return the product to MiMedx and swap it for different product in a subsequent quarter. See Gov. Mem. at 3-6. At trial, Urbizo, the outside auditor, testified that if he had been made aware of the payment and product swap, he would have concluded that the revenue was improperly recorded in the second quarter of 2015. Tr. 1738-44.

Again, contrary to Petit's argument, the Government produced sufficient evidence to allow the jury to find that Petit specifically intended to mislead investors about MiMedx's revenue by causing the company to report revenue figures from the CPM transaction that, had the true terms of the transaction been disclosed to the accountants and outside auditors, would have been materially lower. For example, the Government introduced evidence that Petit provided contradictory and inconsistent explanations as to the purpose of the $200,000 payment, testifying under oath to the SEC that it was for consulting work, GX 1612, telling investors that it was for "very valid intelligence information," GX 354, and reporting in an email sent to MiMedx's general counsel that the money was intended to settle a dispute regarding MiMedx's sales to group purchasing organizations, GX 146. The Government also introduced evidence that Petit sought to pressure Jeff Shultz, a MiMedx employee who participated in the CPM transaction, to tell

11

investigators that the payment was for lost stock. Tr. 1019. To be sure, during closing argument, Petit sought to harmonize these different explanations, see Tr. 2324-3248, but a reasonable jury could have found the Government's theory more persuasive and concluded that Petit's inconsistent explanations of the $200,000 payment was evidence that Petit was trying to hide its true nature.

The same is also true with respect to the product swap. Although Petit maintains that the Government failed to produce evidence that he was aware of the product swap or that he willfully concealed the swap from the accountants or outside auditors, Petit Mem. at 14-15, there was sufficient evidence for the jury to conclude otherwise. For one thing, Schultz testified that he included Petit on an email regarding the swap because Petit "had to be aware of everything that was going on at CPM." Tr. at 1012. The Government also introduced evidence that Petit sent Brooks a list of products that MiMedx expected would be coming back. GX 1041; Tr. 1331-1332 (testimony regarding the exhibit). As to whether Petit knew the swap was wrongful, the Government elicited testimony from Schultz and Mike Carlton, a MiMedx senior vice president of sales, that they understood the swap arrangement made little sense other than as a tool to artificially inflate revenue. Tr. 617-18 (Carlton); id. at 975-76, 1013-14 (Schultz). And the Government introduced an email from Brent Miller, a MiMedx executive vice president, that indicated that Taylor wanted to

manage the timing of the CPM product swap to avoid a "revenue recognition issue," noting that the auditors would be "here in the end of July looking at the books." GX 1033. Although the email does not mention Petit, a jury could infer that, given Petit's involvement in the CPM negotiations, he shared Taylor's instruction to hide the swap from the auditors.

Taking the evidence in the light most favorable to the Government, the Court concludes that the evidence against Petit was not so meager that no reasonable jury could find guilt beyond a reasonable doubt. On the contrary, the evidence provided ample support for conviction on several independently sufficient bases. Indeed, each of the evidentiary items described above were not only sufficient to convict but also added color to one another, reinforcing the conclusion that Petit had committed substantive securities fraud. Accordingly, Petit's motion for a judgment of acquittal is denied.

### B. Taylor's Conspiracy Conviction

Taylor was convicted on one count of conspiracy to commit securities fraud, make false filings with the SEC, and improperly influence the conduct of audits, in violation of 18 U.S.C. § 371. To prevail on his Rule 29 motion, Taylor must establish that no reasonable jury could have found that the charged conspiracy existed, that Taylor knowingly and willfully joined and

participated in this conspiracy during the applicable time period, and that at least one of the co-conspirators committed an overt fact in furtherance of the conspiracy. See The Court's Instructions of Law to the Jury, Dkt. No. 127, at 22. Taylor argues that no reasonable jury could have convicted him of the charged conspiracy as to any of four challenged distributers.

The Court, however, finds ample support for the jury verdict against Taylor. For starters, the jury could have convicted Taylor on the basis of the CPM transaction. The above-referenced email from Brent Miller indicated that Taylor, in league with others, wanted to manage the timing of the CPM product swap to avoid a "revenue recognition issue," noting that the auditors would be "here in the end of July looking at the books." GX 1033. Taylor insists that the Government's reading of this email -- that Taylor wanted to wait until August to ship the replacement product to conceal the right of return from the auditors -- is not only acontextual but also contrary to the testimony of Urbizo, who testified that the auditors received data relating to returns and exchanges regardless of whether or when they were physically onsite at MiMedx. Taylor Reply at 8 (citing Tr. at 1911). That Urbizo's testimony might be in tension with such a verdict, however, is not enough to set it aside. Taking the evidence in the light most favorable to the Government, a reasonable jury could have concluded

that Taylor conspired to mislead auditors regarding key features of the CPM transaction.

A reasonable jury could have independently convicted Taylor on the basis of the First Medical transaction. Central to the Government's First Medical case was that Taylor, in league with others, made an undisclosed promise to First Medical that it could return any product that it could not sell and that MiMedx would not leave First Medical with any losses. The Government's evidence showed that Taylor sent two emails to First Medical regarding the terms of the transaction: a "cover" email, on which MiMedx's accountants were copied, and then, just four seconds later, a "clarification" email, sent only to First Medical, that contained the true terms of the deal. See Gov. Mem. at 14-16.

The Government also sought to show that Taylor, and one or more co-conspirators, arranged for First Medical to provide to the auditors a false audit "confirmation" that omitted the true terms of the deal. To make this showing, the Government introduced a text message exchange between Taylor and Mike Carlton, and Carlton's testimony about those messages. In particular, the Government introduced GX 1509, which contained text messages that Taylor and Carlton exchanged on February 12, 2016 regarding the audit confirmation letter. GX 1509 appears below.

### GX 1509

| Date | Time (Eastern) | From | To | Text Message |
|---|---|---|---|---|
| 2/12/2016 | 11:28:51 AM | Bill Taylor | Mike Carlton | Were you able to send the email to Bassam? |

| Date | Time (Eastern) | From | To | Text Message |
|---|---|---|---|---|
| 2/12/2016 | 11:39:46 AM | Bill Taylor | Mike Carlton | See if Bassam can send a draft of the signed letter to me prior to him sending to the auditors to review. |
| 2/12/2016 | 11:47:39 AM | Mike Carlton | Bill Taylor | Ok |

| Date | Time (Eastern) | From | To | Text Message |
|---|---|---|---|---|
| 2/12/2016 | 12:27:24 PM | Bill Taylor | Mike Carlton | This is separate. Just the confirm for the auditors. |
| 2/12/2016 | 12:27:40 PM | Bill Taylor | Mike Carlton | No extra commentary. Just sign and send. |
| 2/12/2016 | 12:27:48 PM | Mike Carlton | Bill Taylor | Ok |

| Date | Time (Eastern) | From | To | Text Message |
|---|---|---|---|---|
| 2/12/2016 | 1:43:41 PM | Mike Carlton | Bill Taylor | Good. I'll hunt Bassam on Sunday when he's back to work |

On direct examination, Carlton testified that Taylor's messages, "This is separate. Just the confirm for the auditors." and "No extra commentary. Just sign and send." referred to Taylor's desire that MiMedx's auditors not learn of the supposed right of return that MiMedx had granted to First Medical in the "clarification" email. Tr. 594-95.

On cross-examination, Taylor's counsel presented DX 411, which contained text messages that the Government had excluded from GX 1509. DX 411 appears below.

16

**DX 411**

| Date | Time (Eastern) | From | To | Text Message |
|------|---------------|------|-----|-------------|
| 2/12/2016 | 11:28:51 AM | Bill Taylor | Mike Carlton | Were you able to send the email to Bassam? |
| 2/12/2016 | 11:28:58 AM | Bill Taylor | Mike Carlton | What about Charlie? |
| 2/12/2016 | 11:29:30 AM | Mike Carlton | Bill Taylor | Yes. No reply |
| 2/12/2016 | 11:39:46 AM | Bill Taylor | Mike Carlton | See if Bassam can send a draft of the signed letter to me prior to him sending to the auditors to review. |
| 2/12/2016 | 11:47:39 AM | Mike Carlton | Bill Taylor | Ok |
| 2/12/2016 | 12:23:03 PM | Mike Carlton | Bill Taylor | Charlie didn't pick up. |
| 2/12/2016 | 12:23:22 PM | Mike Carlton | Bill Taylor | Can we coordinate both calls for Monday? |
| 2/12/2016 | 12:23:49 PM | Bill Taylor | Mike Carlton | Need Charlie today if possible. |
| 2/12/2016 | 12:24:21 PM | Mike Carlton | Bill Taylor | I'll try again. Should I loop in BC? Schultz? |
| 2/12/2016 | 12:24:49 PM | Bill Taylor | Mike Carlton | No way. |
| 2/12/2016 | 12:24:59 PM | Mike Carlton | Bill Taylor | Ok. |
| 2/12/2016 | 12:26:57 PM | Mike Carlton | Bill Taylor | We discussed the payment plan option with Longo and Schultz. They will see him next week. I'll keep trying but it's a fall back |
| 2/12/2016 | 12:27:24 PM | Bill Taylor | Mike Carlton | This is separate. Just the confirm for the auditors. |
| 2/12/2016 | 12:27:40 PM | Bill Taylor | Mike Carlton | No extra commentary. Just sign and send. |
| 2/12/2016 | 12:27:48 PM | Mike Carlton | Bill Taylor | Ok |
| 2/12/2016 | 12:59:57 PM | Mike Carlton | Bill Taylor | Charlie can't talk but he said he thought Glenn Eddleman his CFO already sent it back to the auditor |
| 2/12/2016 | 01:00:31 PM | Bill Taylor | Mike Carlton | Would he be ok if I call Glenn? |
| 2/12/2016 | 01:11:29 PM | Mike Carlton | Bill Taylor | Glen just called me and said he sent it on the 10th |
| 2/12/2016 | 01:11:36 PM | Mike Carlton | Bill Taylor | I'll send you his number |
| 2/12/2016 | 01:11:43 PM | Mike Carlton | Bill Taylor | It will be a share contact |
| 2/12/2016 | 01:12:10 PM | Bill Taylor | Mike Carlton | Ok |
| 2/12/2016 | 01:13:10 PM | Mike Carlton | Bill Taylor | Attachments:<br>Size: 187<br>File name: Glenn Eddleman.vcf<br>Glenn Eddleman.vcf |
| 2/12/2016 | 01:41:56 PM | Bill Taylor | Mike Carlton | Thanks. I think we are all set here now. |
| 2/12/2016 | 01:43:41 PM | Mike Carlton | Bill Taylor | Good. I'll hunt Bassam on Sunday when he's back to work |

Taylor argues, as he did before the jury, that DX 411 illustrates that his comments at 12:27 p.m. had nothing to do with First Medical. Taylor points out that the messages for the 40 minutes preceding those comments and the 75 minutes following those comments referred to a different distributor: Athletic Surgical. Memorandum of Law in Support of William Taylor's Motion for a Judgment of Acquittal or a New Trial ("Taylor Mem.", Dkt. No. 126, at 5. Although Carlton testified that Taylor's 12:27 p.m. text message referred to First Medical, not Athletic Surgical, Taylor maintains that Carlton's testimony is incredible on its face and therefore cannot sustain his conviction. Taylor also points to

17

other portions of Carlton's testimony, where Carlton concedes that Taylor never told him to hide the right of return from anyone. See Tr. 755-56 (Q: "Now did Mr. Taylor ever tell you: Don't tell anybody about this deal we have with First Medical." A: "He did not." Q: "Did he ever tell you: Don't send this email to anybody." A: "He did not." Q: "Did he ever ask you to conceal information from anybody at MiMedx? A: "He did not.").

Taylor's evidence and arguments, most of which were presented to the jury, do not entitle him to a judgment of acquittal. For one thing, a reasonable jury could have believed Carlton's testimony regarding what Taylor intended with his 12:27 p.m. text message. In other words, Carlton's testimony was not "incredible on its face." In any event, as the Government argues, the 11:39 a.m. message -- where Taylor asks to review First Medical's audit confirmation prior to its being transmitted to the auditors -- could also support an inference that Taylor conspired to mislead the auditors. Thus, taking the evidence in the light most favorable to the Government, a reasonable jury could have concluded that Taylor conspired to mislead auditors regarding key features of the First Medical transaction.[4]

---

[4]    Taylor seeks to narrow the range of conduct that the Court can consider in assessing his motion by insisting that the jury's verdict "can only be understood as a rejection of the allegation in the Indictment that Mr. Petit and Mr. Taylor conspired together to commit securities fraud." Taylor Mem. at 9. Because the just-reviewed evidence, taken in the light most favorable to the

Taking the evidence in the light most favorable to the Government, the Court concludes that the evidence against Taylor was not so meager that no reasonable jury could find guilt beyond a reasonable doubt. Indeed, when his various actions, taken in concert with others, are added together, the evidence of his participation in an unlawful conspiracy is very substantial. Accordingly, Taylor's motion for a judgment of acquittal is denied.

## **Rule 33 Motions**

### I.  **Legal Standard**

Federal Rule of Criminal Procedure 33 allows a district court to vacate a judgment and grant a new trial where the evidence "preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." United

---

Government, would have enabled the jury to find Taylor guilty of conspiring with persons other than Petit and/or towards objects other than securities fraud, this issue is ultimately irrelevant to the resolution of Taylor's motion. Nevertheless, the Court agrees with the Government that the Second Circuit forbids this sort of inference, restraining a court to consider "only what the jury's verdicts were, not what the jury found" because "it is not within the province of the court to attempt to determine the reason or reasons for verdicts that are inconsistent." United States v. Acosta, 17 F.3d 538, 546 (2d Cir. 1994). Taylor seeks to narrow Acosta's holding as simply an "admonishment against trying to harmonize inconsistent verdicts." Reply Memorandum of Law in Support of William Taylor's Motion for Judgment of Acquittal or a New Trial ("Taylor Reply"), Dkt. No. 140, at 6. But Taylor's argument is that it would be inconsistent of the jury to find Taylor guilty of conspiring with Petit while also finding Petit not guilty of conspiracy. Acosta precludes this Court from pursuing just this line of reasoning. And, in any event, as shown above, Taylor's partners in crime were often people other than Petit.

<u>States v. Archer</u>, 977 F.3d 181, 188 (2d Cir. 2020). A district court must "defer to the jury's resolution of conflicting evidence," unless the evidence was "patently incredible or defied physical realities," or an "evidentiary or instructional error compromised the reliability of the verdict." <u>Id.</u> Before the granting the motion, a district court must have a "real concern that an innocent person may have been convicted." <u>Aguiar</u>, 737 F.3d at 264. Here, the Court does not harbor any such concern, even remotely.

## II.  Discussion

### A. Whether the Government's Comments Regarding Materiality Require a New Trial

Petit and Taylor argue that the Court must grant a new trial because the Government urged the jury to convict based on an erroneous standard of materiality. During trial, the defense elicited testimony on cross-examination from Jeff Russell, an asset manager at one of the institutional investors that held MiMedx shares in 2015 and 2016, that "any overstatement" of a company's revenue "by any amount for whatever reason," "even one dollar," would be "important for [Russell] to understand" because "it speaks to the integrity of the management." Tr. 1988-1989. Then, during summation, the Government made the following argument:

> It's not seriously in dispute the investors cared that
> MiMedx met their revenue guidance, and they were very

sensitive to issues like whether the company met its predictions about its quarterly revenue and whether it performed in line with the analyst expectations. You heard this from Joe Docter, that investor from Minnesota. He told you whether MiMedx reported revenue in line with what Wall Street expected in its own guidance was a crucial fact that he considered in determining whether to buy, sell or hold stock on behalf of his clients. Jeff Russell, who testified just yesterday, told you a misstatement of revenue by even a dollar would be of significance to him because it would raise concerns about integrity.

Tr. 2251-2252 (emphasis added). Petit and Taylor contend that the Government's argument "misled the jury about its evidentiary burden with respect to materiality." Petit Mem. at 23.

"In evaluating whether allegedly improper comments by the prosecutor are grounds for reversal, the fundamental question is whether, if there was misconduct, it caused substantial prejudice to the defendant, thereby depriving him of his right to a fair trial." United States v. LaMorte, 950 F.2d 80, 83 (2d Cir. 1991). Ordinarily, while "[t]his determination depends heavily on the context of the case . . .[,] it is largely controlled by three factors: (1) the severity of the misconduct; (2) curative measures taken by the district court; and (3) the certainty of conviction absent the misconduct." Id. However, when, as here, the defense totally fails to object at trial to the prosecutor's allegedly improper comments, a district court may not grant a new trial "absent flagrant abuse." United States v. Zichettello, 208 F.3d 72, 103 (2d Cir. 2000).

For several independent reasons, the Government's reference to Russell's testimony does not provide a basis for a new trial. First, the defense never objected at trial to the Government's reference to Russell's testimony. Second, even if the reference were improper, it did not amount to "flagrant abuse." Indeed, the main thrust of the point the Government was making -- that knowledge of a purposeful misstatement, even if itself financially minor, would cast doubt on the integrity of the company -- was clearly relevant. Third, turning to the third LaMorte factor, the Court finds that the comment, even if arguably improper, had virtually no effect on the likelihood of conviction, given that the evidence showed that MiMedx's revenue misstatements were in the millions of dollars. That is, the Government's passing reference to Russell's testimony is unlikely to have led the jury to mistakenly adopt and apply an erroneous materiality standard in this case. Finally, the Government's summation was followed by the Court's instructions of law, which correctly defined materiality (and is not challenged here).

**B. Whether the Government's Argument Regarding Athletic
   Surgical Requires a New Trial[5]**

During rebuttal summation, the Government addressed Taylor's

argument that his text message exchange with Mike Carlton referred

to Athletic Surgical, rather than First Medical:

> So then they make this desperate claim, well, it was all
> actually about Athletic Surgical. Athletic Surgical,
> some other distributor. What a bizarre argument. If Bill
> Taylor is directing Athletic Surgical to give an audit
> confirm that omits the terms of the deal, well then
> obviously he is guilty of the crimes charged in the
> indictment. He's still lying to the auditors. So even on
> the defense theory, he's guilty.
>
> But you also know from the messages that Bill Taylor was
> obviously talking about First Medical, right? He's
> freaked out about the right of return. These are the
> messages that come a week before the discussion of
> Athletic Surgical. These are messages sent by Mike
> Carlton with Bill Taylor standing right there next to
> him directing him what to put in the text messages. You
> can just see that from the face of the messages.

Tr. 2459. Taylor now contends that this argument presented a new

theory of liability -- one based on Athletic Surgical, which does

not appear in the Indictment -- that amounted to either a

constructive amendment of, or a prejudicial variance from, the

Indictment. Taylor Mem. at 15.

Once again, this argument fails for several independent

reasons. First and foremost, it is clear that the main thrust of

---

[5]   Taylor also asks for a new trial on the ground that the
evidence preponderated heavily against the verdict. Taylor Mem. at
19. For all the reasons discussed above, however, the Court finds
this argument entirely without merit.

the prosecutor's remarks was that Taylor was talking about First Medical. Indeed, this was so obvious that no objection was raised at trial to the prosecutor's immediately preceding remarks.

But even if this were not so, it would not amount to a constructive amendment or prejudicial variance. A constructive amendment occurs where "either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." United States v. Dove, 884 F.3d 138, 146 (2d Cir. 2018). "A variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." Id. at 149. "Although the distinction between constructive amendment and variance may appear merely one of degree, there is an important difference in outcome: a constructive amendment of the indictment is considered to be a per se violation of the grand jury clause, while a defendant must show prejudice in order to prevail on a variance claim." United States v. Salmonese, 352 F.3d 608, 621 (2d Cir. 2003).

Taylor not only failed to object at trial to the above-quoted remarks, he also failed to raise these claims of constructive amendment or prejudicial variance during trial. Indeed, when the text messages themselves were introduced earlier in the trial, he

did not object on these grounds, even though, on his theory, these text messages concerned Athletic Surgical, not First Medical. Nor, as noted, did he object to the Government's remarks on summation, even though the Court had made clear that objections during closing arguments should be made, either during the summation itself or at least immediately thereafter. See Tr. 2093. And he did not object on these grounds to any element of the jury instructions, even though Taylor could have, just by way of example, sought a limiting instruction to clarify for the jury that it should not find Taylor guilty on the basis of the unalleged Athletic Surgical transaction.[6]

Because Taylor therefore failed to raise this argument during trial, the Court now reviews the claim under the plain error standard. See United States v. Bastian, 770 F.3d 212, 219 n.3 (2d Cir. 2014) ("Where a defendant raises a constructive amendment claim for the first time on appeal, we . . . subject the challenge to plain error review."); United States v. Awad, 518 F. Supp. 2d 577, 582 (S.D.N.Y. 2007), aff'd, 369 F. App'x 242 (2d Cir. 2010) ("The plain error standard used in appellate review applies in the trial court to post-trial claims that could have been but were not raised during trial."); see also United States v. Fusco, No. 09-cr-1239 (PKC), 2012 WL 4320456, at *4 (S.D.N.Y. Sept. 17, 2012)

---

[6]    Of course, whether or not the Court would have given such an instruction is a separate question.

(applying plain error review to an unpreserved constructive amendment claim presented for the first time during post-trial proceedings). Under the plain error standard, Taylor "must demonstrate that: (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the defendant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Degroate, 940 F.3d 167, 174 (2d Cir. 2019). Because constructive amendments are "per se prejudicial," the third prong of the plain error standard is "automatically satisf[ied]." Bastian, 770 F.3d at 219 n.4.

Taylor's argument assumes that the Indictment charges misconduct only with respect to four specific MiMedx customers -- CPM, SLR, Stability, and First Medical -- and only a handful of transactions with respect to those distributors. Taylor Mem. at 16. Because the "grand jury did not indict [him] based on conduct relating to Athletic Surgical," id. Taylor concludes that the Government's argument at summation allowed the jury to convict him for "behavior entirely separate from that identified in the indictment." Bastian, 770 F.3d at 223.

The Court disagrees with Taylor's argument and holds that there has been no constructive amendment, let alone a plain error.

26

It is true that the Indictment focuses on four specific MiMedx customers. For example, the Indictment, in a section entitled "Overview of the Accounting Fraud Scheme," states that "from at least in or about 2015 through at least in or about 2016, [the defendants] engaged in a scheme to falsely recognize revenue from four distributers," and goes on to refer to CPM, SLR, Stability, and First Medical. Indictment ¶ 19. The Indictment then proceeds to outline MiMedx's fraudulent recognition of revenue from each of these four distributers. See id. ¶¶ 20-30 (CPM); id. ¶¶ 31-42 (SLR); id. ¶¶ 43-52 (Stability); id. ¶¶ 53-59 (First Medical). But such "general factual allegations leading into the statutory allegations 'add nothing but gloss,' and thus 'need not be proved.'" United States v. Gross, No. 15-cr-769 (AJN), 2017 WL 4685111, at *20 (S.D.N.Y. Oct. 18, 2017) (quoting United States v. Attanasio, 870 F.2d 809, 816-17 (2d Cir. 1989)). Moreover, it is important to remember that Taylor was convicted only on the conspiracy count. While "the object of a conspiracy constitutes an essential element of the conspiracy offense," United States v. Roshko, 969 F.2d 1, 5 (2d Cir. 1992), "the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy," Salmonese, 352 F.3d at 619; see also United States v. LaSpina, 299 F.3d 165, 182 (2d Cir. 2002) ("[T]he Government need not set out with precision each and every act committed in furtherance of the conspiracy, particularly

where the acts proven at trial were part of the core of the overall scheme and in furtherance of that scheme.").

Here, the core criminality pleaded in the Indictment was an accounting fraud scheme, operating between 2015 and 2016, whose ultimate purposes was to cause MiMedx to report to the investing public fraudulent inflated revenue figures to ensure that the reported figures fell within MiMedx's publicly accounted revenue guidance, "and to fraudulent convey to the investing public that MiMedx was accomplishing consistent growth quarter after quarter." See Indictment ¶ 19. Unlike the factual gloss, the statutory allegations themselves hardly make mention of the four distributers. The statutory allegations begin with an overview of the conspiracy charge:

> From at least in or about 2015 through at least in or about 2016, in the Southern District of New York and elsewhere, Parker H. Petit and William Taylor, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to commit offenses against the United States, to wit, securities fraud . . .; making false and misleading statements of material fact in applications, reports and documents required to be filed with the SEC . . .; and improperly influence the conduct of audits. . . .

Indictment ¶ 62. The next three paragraphs flesh out the three alleged objects of the conspiracy: committing securities fraud, making false filings with the SEC, and improperly influencing the conduct of audits -- and none mentions any particular distributer or transaction. See id. ¶¶ 63-65. The following paragraph lists

eight overt acts, but only some of which relate to the four distributers featured in the factual allegations. See id. ¶ 66.

Thus, in order for Taylor to prevail on his constructive amendment claim, he must show that the Athletic Surgical transaction "f[a]lls entirely outside th[is] criminal scheme." United States v. Zingaro, 858 F.2d 94, 103 (2d Cir. 1988). That is, that the Government's argument during rebuttal summation "shifted the core of criminality -- i.e. proved 'behavior entirely separate from that identified in the indictment.'" Gross, 2017 WL 4685111, at *23 (quoting Bastion, 770 F.3d at 223).

Under these circumstances, the Government's argument during rebuttal summation regarding Athletic Surgical "hardly constitutes a constructive amendment of the pleadings." Salmonese, 352 F.3d at 621 (permitting the Government to prove "other unalleged overt acts falling squarely within the charged scheme"). Although the Athletic Surgical transaction was "not specifically pleaded in the indictment, [it is] plainly within the charged core of criminality and constitute[s] a permissible alternative basis for proving the general allegation" that Taylor conspired to, among other things, mislead MiMedx's auditors. Id.

A comparison to a case where the Second Circuit has found a constructive amendment is instructive. In United States v. Zingaro, the indictment described a "series of unlawful gambling debt collections at various Yonkers social clubs." United States

v. Rosenthal, 9 F.3d 1016, 1022 (2d Cir. 1993) (describing Zingaro, 858 F.2d at 94). At trial, however, the Government "introduced proof of the unlawful collection of a debt that was not mentioned in the indictment and that was unrelated to the activities of the identified [Yonkers] social clubs." Id. The Zingaro Court concluded that there had been a constructive amendment because the evidence of an uncharged debt "fell entirely outside the criminal scheme" alleged in the indictment, and the defendant had no "inkling" that he was charged with criminal activity with respect to the unalleged debt collection. Id. Also relevant to the Zingaro court's holding was the fact that the district court twice refused the defense's request for a limiting instruction that would have clarified that evidence of the unalleged debt collection, even if relevant for some other purpose, "was not admissible as an independent basis for the jury to find loansharking or the collection of unlawful debt." Zingaro, 858 F.2d at 97.

What happened in this case is light years from what happened in Zingaro. There, the Government introduced evidence that enabled the jury to find the defendant guilty for conduct utterly unrelated to the charged conspiracy; here, the Government briefly adverted to the defense's theory of some evidence that, at the most, perhaps allowed the jury to find Taylor guilty for unalleged conduct squarely within the core criminality of the Indictment. There, the district court twice refused the defense's request to provide the

30

jury a limiting instruction; here, the defense never raised the issue, let alone sought a limiting instruction from the Court.

Even assuming arguendo that the Athletic Surgical transaction fell entirely outside the alleged conspiracy (which it does not), the jury instructions in this case nevertheless prevented against a constructive amendment. "[A] district court's jury instructions are of primary importance in a constructive amendment analysis." Gross, 2017 WL 4685111, at *23. Indeed, although the Second Circuit has not squarely addressed the issue, other circuits have held that a constructive amendment "cannot happen solely because of the evidence presented at trial, but that both the evidence and the jury instructions must amend the indictment." Id. at *23 n.29 (citing United States v. Mize, 814 F.3d 401, 409 (6th Cir. 2016)).[7] Regardless whether the Government's evidence on its own could in theory give rise to a constructive amendment, it remains the case that constructive amendments are less likely to occur where the jury instructions do not "clearly allow[] the jur[y] to convict on offenses other than those charged. See United States v. Clemente, 22 F.3d 477, 483 (2d Cir. 1994). Here, "[r]eviewing the charge in its entirety and not on the basis of excerpts taken out of

---

[7]    While the Second Circuit recently considered as two independent issues whether the district court's jury instructions or the Government's evidence amounted to a constructive amendment, the panel did not conclude that the Government's evidence by itself gave rise to a constructive amendment. See Dove, 884 F.3d at 147.

context," id., the jury instructions state that "the indictment alleges that, in 2015, Mr. Petit and Mr. Taylor entered into agreements with four distributors -- CPM, SLR, First Medical, and Stability -- to hide the fact that, as to certain sales to those distributors, the criteria for revenue recognition were not met and therefore the revenue from those sales was not properly recorded under Generally Accepted Accounting Principles ('GAAP')." Dkt. No. 17. Because the jury instructions clearly identify the four distributers at issue in this case and do not mention Athletic Surgical, the Court finds that there is no "substantial likelihood" that Taylor may have been convicted on the basis of the Athletic Surgical evidence.

In sum, because the Government's argument during rebuttal summation "concerned the same elaborate scheme . . . as was described in the indictment," United States v. Dupree, 462 F.3d 131, 140-41 (2d Cir. 2006), and because the jury instructions did not in any event clearly allow the jury to convict on the basis of the Athletic Surgical transaction, Clemente, 22 F.3d at 483, the Court holds that the Government's argument during rebuttal summation did not constructively amend the Indictment -- much less constitute the requisite plain error that Taylor would need to warrant a new trial.

At most, then, the Government's argument during summation amounted to a variance from the charges in the Indictment. "A

defendant cannot demonstrate that he has been prejudiced by a variance where the pleading and the proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." Salmonese, 352 F.3d at 621-22.

Taylor contends that he was prejudiced by the Athletic Surgical argument because "did not know his trial would have anything to do with Athletic Surgical until the government disclosed its exhibits on the eve of trial." Taylor Mem. at 16. Taylor also points to Jury Note 7, where the jury asked: "If we find that a defendant (1) had intent to mislead the auditors, and (2) knew that misleading the auditors would operate as a deceit upon purchasers or sellers of MiMedx stock, does that imply that he had intent to deceive purchases or sellers of MiMedx stock?" Tr. 2525. Given the jury's verdict convicting Taylor of conspiracy and acquitting him of securities fraud, Taylor speculates that Jury Note 7 "may well have referred to Mr. Taylor, which suggests that the basis for its verdict was a finding that Mr. Taylor was part of a conspiracy to mislead auditors but not to commit securities fraud . . . [and] that the government's change in theory related to the precise issue on which the jury reached its guilty verdict as to Mr. Taylor." Id.

The Court concludes, however, that, even assuming arguendo that there was a variance, Taylor has not established that he was prejudiced. For one thing, the Government consistently argued throughout the trial, including during rebuttal summation, that the text messages concerned First Medical, not Athletic Surgical. Indeed, immediately after making the comments at issue in this motion, the Government pivoted back to its primary theory: that, notwithstanding the defense's theory of the case, "Bill Taylor was obviously talking about First Medical." See Tr. 2459. Accordingly, the Court finds that the pleading and the proof substantially corresponded. Moreover, there is no "indication in the record that the evidence adduced at trial unfairly surprised [Taylor]." United States v. Kaplan, 490 F.3d 110, 130 (2d Cir. 2007); see also United States v. Ng Lap Seng, No. 15-cr-706 (VSB), 2018 WL 2287101, at *15 (S.D.N.Y. May 9, 2018) (observing that the defendant's "claims of surprise are further undermined by the fact that he never raised the issue of the Government's purportedly new theory at trial . . ."). In addition, aside from citing to the relevant standard, Taylor has not made any argument that the Government's rebuttal summation would somehow deprive him of his right against double jeopardy. And, as already mentioned, the jury instructions further reduce any potential prejudice against Taylor. Therefore, the Court holds that Taylor has not established substantial prejudice caused by any supposed variance in the proof at trial

and the Indictment -- and certainly no prejudice so obvious as to amount to plain error.

Accordingly, the Court denies Taylor's motion for a new trial based on a constructive amendment or prejudicial variance.

## Conclusion

For the foregoing reasons, the defendants' respective motions for a judgment of acquittal and, in the alternative, for a new trial, are denied. The Clerk of the Court is directed to close the entries at docket numbers 123 and 125.

SO ORDERED

Dated:    New York, NY
          February 21, 2021

United States District Judge